# In the United States Court of Appeals for the Sixth Circuit

———————————

CATHOLIC CHARITIES OF JACKSON, LENAWEE AND HILLSDALE COUNTIES;
EMILY MCJONES,

*Plaintiffs-Appellants,*

*v.*

GRETCHEN WHITMER, ET AL.,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court for the
Western District of Michigan Southern Division, No. 1:24-cv-718

---

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

---

LUKE W. GOODRICH
ADÈLE A. KEIM
DANIEL L. CHEN
BENJAMIN A. FLESHMAN
THE BECKET FUND
  FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketfund.org*

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: __25-1105__      Case Name: Catholic Charities of Jackson, Lenawee and Hillsdale Counties, et al vs. Gretchen Whitmer, et al

Name of counsel: __Luke W. Goodrich__

Pursuant to 6th Cir. R. 26.1, __Catholic Charities of Jackson, Lenawee, and Hillsdale Counties, et al__
*Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____February 5, 2025_____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/__Luke W. Goodrich__

_____

_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

    (a) **Parties Required to Make Disclosure**. With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement. A negative report is required except in the case of individual criminal defendants.

    (b) **Financial Interest to Be Disclosed**.

        (1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal. A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

        (2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

    (c) **Form and Time of Disclosure**. The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ..............................................................................i

TABLE OF AUTHORITIES.......................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF ISSUES.......................................................................3

INTRODUCTION....................................................................................4

STATEMENT OF THE CASE ................................................................7

I. Plaintiffs.............................................................................................7

II. Plaintiffs' Counseling.......................................................................8

III. Differing Approaches to Counseling...............................................13

    A. The Cautious or "Watchful Waiting" Approach ............................13

    B. The "Gender-Affirming" Approach ...............................................14

    C. Current Medical Evidence .............................................................15

IV. HB 4616...........................................................................................19

V. The Effect of HB 4616 on Plaintiffs.................................................20

VI. Proceedings Below ..........................................................................22

SUMMARY OF ARGUMENT ...............................................................24

STANDARD OF REVIEW......................................................................26

ARGUMENT ....................................................................... 26

I.  HB 4616 violates Plaintiffs' freedom of speech. ................................. 26

   A. HB 4616 restricts speech directly, not incidentally. .................... 27

      1. Supreme Court .......................................................... 27

      2. Circuit Courts ......................................................... 31

      3. The District Court ..................................................... 34

   B. HB 4616 restricts speech based on its content. ........................... 38

   C. HB 4616 restricts speech based on its viewpoint. ........................ 39

   D. HB 4616 cannot survive strict scrutiny. ................................... 40

      1. HB 4616 does not further a compelling state interest. ............. 41

      2. HB 4616 is not the least-restrictive alternative. ..................... 45

   E. HB 4616 cannot satisfy even intermediate scrutiny. .................... 49

   F. HB 4616 independently violates *Mansky*. ............................... 51

II. HB 4616 violates the Due Process Clause. ........................................ 52

   A. Fair Notice ................................................................. 53

   B. Arbitrary Enforcement ..................................................... 55

III. HB 4616 violates Plaintiffs' free exercise of religion. ...................... 56

IV. The remaining injunction factors favor relief. ................................. 58

CONCLUSION ..................................................................... 60

CERTIFICATE OF COMPLIANCE ..................................................... 61

CERTIFICATE OF SERVICE ......................................................... 62

DESIGNATION OF RELEVANT DISTRICT
COURT DOCUMENTS ............................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ackerman v. Washington,*
  16 F.4th 170 (6th Cir. 2021) ............................................. 48

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.*
  *for Reg'l Transp.,*
  978 F.3d 481 (6th Cir. 2020) ................................. 39, 40, 52

*Ass'n of Cleveland Fire Fighters v. City of Cleveland,*
  502 F.3d 545 (6th Cir. 2007) ............................................. 53

*Billups v. City of Charleston,*
  961 F.3d 673 (4th Cir. 2020) ............................................. 33

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ............................................. 41, 42, 44

*Cap. Associated Indus., Inc. v. Stein,*
  922 F.3d 198 (4th Cir. 2019) ............................................. 49

*Chiles v. Salazar,*
  116 F.4th 1178 (10th Cir. 2024) ................................. *passim*

*Chiles v. Salazar,*
  No. 24-539, 2025 WL 746313 (U.S. Mar. 10, 2025) ...................... 7, 34

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
  751 F.3d 427 (6th Cir. 2014) (en banc) ........................... 26, 58

*Cohen v. California,*
  403 U.S. 15 (1971) ............................................. 27, 28, 30, 35

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville &*
  *Davidson Cnty.,*
  274 F.3d 377 (6th Cir. 2001) ........................................ 59-60

*Disc. Tobacco City & Lottery, Inc. v. United States,*
674 F.3d 509 (6th Cir. 2012) ............................................................ 45

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
920 F.3d 421 (6th Cir. 2019) ..................................................... 30, 35

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander,*
978 F.3d 418 (6th Cir. 2020) ............................................................ 49

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020) .......................................................................... 58

*Expressions Hair Design v. Schneiderman,*
581 U.S. 37 (2017) ............................................................................ 54

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) .......................................................................... 53

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) .......................................................................... 57

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ..................................................................... 52-53

*Hines v. Pardue,*
117 F.4th 769 (5th Cir. 2024) ........................................................... 33

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ...................................................................... *passim*

*Holt v. Hobbs,*
574 U.S. 352 (2015) ..................................................................... 45, 48

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ..................................................................... 39, 40

*Int'l Outdoor, Inc. v. City of Troy,*
974 F.3d 690 (6th Cir. 2020) ............................................................ 38

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
3 F.4th 887 (6th Cir. 2021) .............................................................. 40

*Johnson v. City of Cincinnati,*
   310 F.3d 484 (6th Cir. 2002)......................................46, 48

*King v. Governor of the State of N.J.,*
   767 F.3d 216 (3d Cir. 2014) ..................................... *passim*

*Kolender v. Lawson,*
   461 U.S. 352 (1983)..................................................55, 56

*L.D. Mgmt. Co. v. Gray,*
   988 F.3d 836 (6th Cir. 2021) ...........................................39

*McCullen v. Coakley,*
   573 U.S. 464 (2014)...................................... 48, 49, 50, 51

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021)......................................56, 57

*Miller v. City of Cincinnati,*
   622 F.3d 524 (6th Cir. 2010)...........................................59

*Minn. Voters All. v. Mansky,*
   585 U.S. 1 (2018).............................................................51

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
   585 U.S. 755 (2018)................................................ *passim*

*NIFLA v. Harris,*
   839 F.3d 823 (9th Cir. 2016)...........................................29

*Nken v. Holder,*
   556 U.S. 418 (2009).........................................................59

*Norton Outdoor Advert., Inc. v. Village of St. Bernard,*
   99 F.4th 840 (6th Cir. 2024) ...........................................38

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012)...........................................59

*Otto v. City of Boca Raton,*
   981 F.3d 854 (11th Cir. 2020)................................... *passim*

*People v. DeJonge,*
   501 N.W. 2d 127 (Mich. 1993) ..........................................58

*Pickup v. Brown,*
   740 F.3d 1208 (9th Cir. 2014) ................................. 7, 29, 33

*Pierce v. Soc'y of Sisters,*
   268 U.S. 510 (1925) ..........................................................58

*Planned Parenthood v. Casey,*
   505 U.S. 833 (1992) ..........................................................29

*Platt v. Bd. of Comm'rs on Grievances & Discipline
of Ohio Sup. Ct.,*
   894 F.3d 235 (6th Cir. 2018) ............................................55

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) ..........................................................41

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ............................................. 26, 38, 45

*Richland Bookmart, Inc. v. Knox County,*
   555 F.3d 512 (6th Cir. 2009) ............................................49

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ..........................................................39

*Russell v. Lundergan-Grimes,*
   784 F.3d 1037 (6th Cir. 2015) .................................... 40, 41

*Sable Comms. of Cal., Inc. v. FCC,*
   492 U.S. 115 (1989) ................................................... 41, 45

*Simon & Schuster, Inc. v. Members of N.Y. State Crime
Victims Bd.,*
   502 U.S. 105 (1991) ..........................................................45

*Sisters for Life, Inc. v. Louisville-Jefferson County,*
   56 F.4th 400 (6th Cir. 2022) ...................................... 26, 51

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................... 27

*Stevens v. City of Columbus*,
    No. 21-3755, 2022 WL 2966396 (6th Cir. July 27, 2022) ................. 53

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ............................................................ 57

*Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*,
    696 S.W.3d 646 (Tex. 2024) ............................................. 37

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................... 37

*Tingley v. Ferguson*,
    144 S. Ct. 33 (2023) .......................................................... 34

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ....................................... 33, 47

*Tingley v. Ferguson*,
    57 F.4th 1072 (9th Cir. 2023) ........................................... 34

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ..................................................... 45-46

*L. W. by & through Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ..................................... *passim*

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ...................................................... 56, 58

*Women's Med. Pro. Corp. v. Taft*,
    353 F.3d 436 (6th Cir. 2003) ............................................ 26

## Statutes and Constitutional Provisions

Kan. Stat. ch. 1 ...................................................................... 19

MCL 37.2103 .......................................................................... 52

MCL 330.1100a ................................................................. *passim*

MCL 330.1100b ..................................................................... 20

MCL 330.1901a ................................................................. 19, 20

MCL 333.16226 ..................................................................... 20

U.S. Const., amend. I ........................................................... 26

Wash. Rev. Code § 18.225.030 ......................................... 47-48

## Other Authorities

Department of Health & Social Care (U.K.), *Ban on puberty blockers to be made indefinite on experts' advice*, Gov.UK (Dec. 11, 2024) .................................................................... 18

*File a Complaint with BPL*, Licensing and Regulatory Affairs .................................................................................. 20

Charlie McCann, *When girls won't be girls*, The Economist (Sept. 28, 2017) ................................................................... 17

Gabe Murchison et al., Supporting & Caring for Transgender Children, Human Rights Campaign Foundation & American Academy of Pediatrics (Sept. 2016) ............................ 13-15

Pamela Paul, Opinion, *As Kids, They Thought They Were Trans. They No Longer Do.,* N.Y. Times (Feb. 2, 2024) ......... 17, 21, 55

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics (Oct. 2018) ...................................... 14

Jesse Singal, *When Children Say They're Trans*, The Atlantic (July/August 2018) .............................................................. 17

*The Cass Review*, Independent Review of Gender Identity Services for Children and Young People (Apr. 2024).. 16, 18-19, 42, 54

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents important questions about the government's power to restrict speech under the Constitution's Free Speech, Due Process, and Free Exercise Clauses. To aid the Court in resolving these questions, Appellants respectfully request oral argument.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arose under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from an order denying an injunction. That order was issued on January 28, 2025. Opinion, R.39, PageID#1292-1327 ("Op."). Appellants timely filed their notice of appeal on January 30, 2025. Notice, R.40, PageID#1328.

# STATEMENT OF ISSUES

A new Michigan law, HB 4616, prohibits licensed counselors from engaging in "any practice," including pure speech, that seeks to help a minor "change" her "gender expression" or "behavior" to align with her biological sex. But HB 4616 expressly permits counseling that "provides assistance" for a "gender transition." Plaintiffs are counselors who provide pure talk therapy, consisting solely of speech, to minor clients who desire to embrace their biological sex.

The issues are:

**I.** Whether HB 4616 violates the Free Speech Clause by regulating Plaintiffs' speech based on its content and viewpoint and by failing strict and intermediate scrutiny.

**II.** Whether HB 4616 violates the Due Process Clause by failing to provide objective guidelines for distinguishing between counseling that "facilitates" gender "identity exploration and development" (which is permitted), and counseling that "seeks to change" "gender identity," "behavior," or "gender expression" (which is forbidden).

**III.** Whether HB 4616 violates the Free Exercise Clause by burdening religious exercise in a way that is not generally applicable or that interferes with parents' right to direct the religious upbringing of their children.

# INTRODUCTION

The nation is engaged in a vigorous debate over how best to help children who experience gender dysphoria—*i.e.*, distress over their biological sex.

On one side are mental health professionals like Plaintiffs—professional counselors in Michigan—who follow a cautious approach. These professionals recognize that a child's experience of gender dysphoria is complex and individualized, can be influenced by a variety of factors, and can change over time. Instead of immediately affirming a child's desire to "transition" to the other sex, they offer "talk therapy"—counseling consisting entirely of speech—to help the child explore the underlying causes of distress and, if possible, alleviate that distress without resorting to irreversible medical interventions. This cautious approach has long been standard practice among counselors and is supported by the best available scientific evidence. It is also supported by recently enacted laws in twenty-six states, including every state in this Circuit except Michigan.

On the other side of the debate are mental health professionals who advocate for a "gender-affirming" approach. This approach assumes that children who assert a transgender identity "know their gender as clearly and consistently as their developmentally equivalent peers." Accordingly, the role of a counselor is not to explore potential underlying causes of distress, but to "follow the child's lead" and "affirm" the child's desire to

alter her body to resemble the opposite sex—including via puberty-blocking drugs, cross-sex hormones, and surgeries.

This case arises because Michigan is suppressing counselors' speech on one side of this debate. A new Michigan law, HB 4616, prohibits counselors from offering minors what the state (inaccurately) labels "conversion therapy"—broadly defined to include "any practice," including pure speech, that seeks to "change" an individual's "gender expression," "behavior," or "gender identity." However, the law excludes from the definition of conversion therapy any "counseling that provides assistance to an individual undergoing a gender transition." In other words, counseling that helps a child undergo a gender transition is permitted; counseling that helps a child accept her biological sex is prohibited. If Plaintiffs persist in prohibited speech, they are subject to "disciplinary action," "licensing sanctions," and fines up to $250,000.

This attempt to control what counselors say violates several constitutional protections. First, it violates the Free Speech Clause because it restricts speech based on its content and viewpoint. Second, it is void for vagueness under the Due Process Clause because it relies on vague, undefined terms that invite arbitrary enforcement. Third, it violates the Free Exercise Clause by selectively burdening religious speech and by undermining the right of parents to direct the religious upbringing of their children. And HB 4616 cannot survive strict or even intermediate scrutiny. Indeed, it affirmatively harms children by depriving them of

compassionate counseling supported by the best available evidence, and instead pushes them toward drugs, hormones, and surgeries that are "in truth still experimental" and impose irreversible harms. *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024).

The Eleventh Circuit enjoined nearly identical counseling bans, recognizing that they are "plainly" "content-based restrictions on speech" that fail strict scrutiny. *Otto v. City of Boca Raton*, 981 F.3d 854, 863 (11th Cir. 2020). But the district court disagreed. It held that HB 4616 "is not subject to heightened First Amendment scrutiny" because the law "on its face" regulates "professional conduct," not speech—even though Plaintiffs' "conduct" consists entirely of "speaking." Op., R.39, PageID#1319-20.

That was error. To determine whether a law regulates "conduct" or "speech," the Supreme Court has held that the key question is what "trigger[s] coverage under the statute" "as applied to plaintiffs." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). If the statute is triggered by "what [plaintiffs] say," it regulates "speech"—even if the law on its face "may be described as directed at conduct." *Id.* Here, what triggers coverage under HB 4616 is the words Plaintiffs speak. Thus, HB 4616 regulates speech.

The Third and Eleventh Circuits have reached the same conclusion, reasoning that "[i]f speaking to clients is not speech, the world is truly

upside down." *Otto*, 981 F.3d at 866. And while the Ninth and Tenth Circuits have disagreed, the Supreme Court has not let those contrary decisions persist. It has abrogated the Ninth Circuit's leading decision, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) ("*NIFLA*") (abrogating *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)), and granted certiorari to review the Tenth Circuit's, *Chiles v. Salazar*, No. 24-539, 2025 WL 746313 (U.S. Mar. 10, 2025).

Applying ordinary First Amendment principles to enjoin HB 4616 does not mean Michigan's hands are tied. Consistent with the First Amendment, Michigan can still express its own view on how best to help children with gender dysphoria. It can still impose content-neutral licensing requirements on counselors, require informed consent for counseling, and punish malpractice that causes harm. It can even regulate the content of counselors' speech when doing so satisfies strict scrutiny. What it cannot do, consistent with the First Amendment, is impose broad, prophylactic rules punishing counselors' speech based on its content and viewpoint—particularly when that speech helps spare children a lifetime of experimental drugs, hormones, surgeries, and harm.

This Court should reverse.

## STATEMENT OF THE CASE

### I. Plaintiffs

Plaintiff Catholic Charities of Jackson, Lenawee, and Hillsdale Counties ("Catholic Charities") is a religious ministry of the Roman Catholic

Diocese of Lansing. Lewis Decl., R.15-1, PageID#163 ¶3 ("Lewis"). Its mission is to share the love of Christ by performing corporal and spiritual works of mercy. *Id.*, PageID#163 ¶4. As part of its religious mission, it employs sixteen licensed counselors to provide counseling and therapy to individuals and families in need. *Id.*, PageID#163 ¶6; Veenstra Decl., R.15-2, PageID#229 ¶15 ("Veenstra").

Emily McJones, MA, LLP, is a Catholic and licensed counselor in Lansing, Michigan. McJones Decl., R.15-3, PageID#236 ¶2 ("McJones"). After serving for years as a therapist for children and adolescents in crisis, McJones opened her own counseling practice, Little Flower Counseling. *Id.*, PageID#236-37 ¶¶4-6. McJones counsels both children and adults on a wide range of psychological, emotional, relational, and spiritual issues. *Id.*, PageID#236-37, 239, 242 ¶¶4, 22, 38.

## II. Plaintiffs' Counseling

Plaintiffs provide "talk therapy." In talk therapy, a counselor asks a client questions, listens, and discusses various aspects of the client's life, with the goal of helping the client address troubling emotions, thoughts, or behaviors. *Id.*, PageID#239-40 ¶¶21-24; Veenstra, R.15-2, PageID#230-31 ¶¶25-29. Plaintiffs do not administer drugs or employ coercive or aversive techniques; their counseling consists solely of spoken words. Complaint, R.1, PageID#10-11 ¶¶35, 47; Lewis, R.15-1, PageID#164 ¶9; McJones, R.15-3, PageID#238 ¶11.

At the outset of a counseling relationship, Plaintiffs meet with the prospective client to describe their approach to counseling, discuss the client's goals, and assess whether there is a good fit. McJones, R.15-3, PageID#239 ¶¶21-23; Veenstra, R.15-2, PageID#230 ¶25. They also obtain the client's informed consent. For minors, this includes meeting with both the minor and parents to describe the scope of services, confidentiality, and termination of services, including that the client can at any time choose another counselor or end the counseling relationship. McJones, R.15-3, PageID#241-42 ¶¶34-35; Veenstra, R.15-2, PageID#231 ¶28; Lewis, R.15-1, PageID#164 ¶10. If the client wishes to proceed, Plaintiffs typically meet with the client weekly for about an hour, discussing any issues the client wishes. McJones, R.15-3, PageID#240 ¶24; Veenstra, R.15-2, PageID#231 ¶29.

Plaintiffs' counseling is client-driven—meaning clients determine their goals for counseling. McJones, R.15-3, PadeID#244 ¶47; Veenstra, R.15-2, PageID#230 ¶¶24-25. Clients' goals vary widely and can be spiritual, emotional, relational, or psychological. McJones, R.15-3, PageID#239 ¶22; Veenstra, R.15-2, PageID#230 ¶26. A client who experiences depression might have the goal to feel better and stabilize his emotions. Veenstra, R.15-2, PageID#230 ¶26. A client who experiences anxiety around people might have the goal to feel comfortable entering a grocery store and shopping by herself. McJones, R.15-3, PageID#239 ¶22. If a client wants to pursue a goal that Plaintiffs are unable to assist with,

they refer the client to other counselors who can help. Lewis, R.15-1, PageID#166 ¶24. Overall, the purpose of Plaintiffs' counseling is to help clients achieve their goals and live the lives they want to live—in which their thoughts, feelings, actions, and beliefs are aligned. McJones, R.15-3, PageID#239 ¶20; Veenstra, R.15-2, PageID#230 ¶24.

Plaintiffs' counseling is an expression of their religious faith, which informs and guides their practices. McJones named her practice Little Flower Counseling after St. Thérèse of Lisieux, also known as The Little Flower. McJones, R.15-3, PageID#237 ¶8. St. Thérèse and her "little way" of trusting Jesus are an inspiration for McJones, who seeks "to integrate tried and true psychotherapy techniques with the life-giving truth that comes from Jesus Christ and His Church." *Id.*, PageID#237-38 ¶¶8-9. Catholic Charities provides counseling, sometimes at no cost, to further its religious mission to share the love of Christ with those in need. Lewis, R.15-1, PageID#163 ¶5. In Plaintiffs' experience, integrating spirituality and psychology enriches therapy, treats clients holistically, and contributes to better therapeutic outcomes. McJones, R.15-3, PageID#237-39 ¶¶9-10, 16-17; Veenstra, R.15-2, PageID#229 ¶15.

Many clients seek Plaintiffs' counseling precisely because they share Plaintiffs' Catholic faith and want counseling from a shared faith perspective. McJones, R.15-3, PageID#238 ¶16; Veenstra, R.15-2, PageID#230 ¶22. This includes the Catholic Church's beliefs that a per-

son's biological sex is ordained by God, that marriage is a lifelong commitment between one man and one woman, and that sexual activity is designed for marriage. Lewis, R.15-1, PageID#165 ¶14. In Plaintiffs' experience, clients who are able to align their lives with their own religious beliefs often experience greater healing and flourishing. Veenstra, R.15-2, PageID#229 ¶15; McJones, R.15-3, PageID#237-38 ¶¶9-10.

Some of Plaintiffs' clients, both minors and adults, seek counseling on matters related to gender identity and sexual orientation. When these issues arise, Plaintiffs follow the same client-driven approach as on any other issue.

For example, Lisa Veenstra, a counselor at Catholic Charities, has had clients as young as 10 to 12 years old who told her they were questioning their gender identity; some said they felt like they were someone of the opposite sex or were attracted to people of the same sex. Veenstra, R.15-2, PageID#232 ¶34. As with other life issues, Veenstra gently helps these clients explore why they feel this way. *Id.*, PageID#232 ¶35. She has found that children she has counseled have often expressed discomfort with their biological sex due to prior trauma or other life events. *Id.* In these situations, she has counseled clients to delay major life changes, like identifying as someone of the opposite sex or entering sexual relationships, because they were quite young and still figuring out who they were. *Id.* This approach has allowed her clients time and space to figure out who they are and explore other issues that might be contributing to

their distress. *Id.* By helping her clients address underlying trauma and heal from past experiences, she has often seen clients change their behavior in ways that better align with their religious beliefs and their own goals for their lives. *Id.*, PageID#232-33 ¶36.

Similarly, one of McJones's teenage clients had intrusive thoughts while attending Catholic Mass and felt as though she was in the wrong body (*i.e.*, that she should be a male, not female). McJones, R.15-3, PageID#242-43 ¶39. This client sought McJones's services specifically because McJones is a Catholic counselor, and the client did not want these intrusive thoughts to be affirmed. *Id.* McJones talked with her about the origins of those thoughts and helped her work toward accepting herself. Through counseling, this client was able to feel more comfortable in her body, reduce her cognitive dissonance around involvement in the Mass, and report feeling more fully herself. *Id.*

McJones has seen multiple clients make changes in their behavior and gender expression to conform with their own life goals. *Id.*, PageID#244 ¶49. Out of respect for her clients and their autonomy, McJones believes that when a client comes to her and seeks to change her gender identity or gender expression to match her biological sex, or seeks to change her behavior to refrain from acting on same-sex attraction, it is McJones's ethical and religious duty to help that client live the life she desires. *Id.*, PageID#244 ¶¶47-48.

## III.  Differing Approaches to Counseling

### A. The Cautious or "Watchful Waiting" Approach

Plaintiffs' counseling aligns with the mainstream, cautious approach that has long prevailed in counseling minors who experience gender dysphoria. It also aligns with the best and most current medical evidence. Dr. Clark Decl., R.15-4, PageID#254-60 ("Clark").

Under this approach, a counselor recognizes that a young person's experience of gender dysphoria can be the product of a lengthy and individualized process with layers of complexity that merit careful consideration. *Id.*, PageID#257 ¶43. In particular, past experiences and co-occurring mental health conditions can significantly impact a youth's perception, judgment, and self-regard. *Id.*, PageID#253, 256-58 ¶¶19-20, 37, 45, 49. Also, a young person's heartfelt expressions of identity may change over time through the dynamic process of development. *Id.*, PageID#258 ¶47. Thus, under the cautious approach, a careful therapist will seek to help a young person explore the underlying causes of her distress and will look for ways to alleviate that distress by helping the young person accept and embrace her body, if possible, without resorting to medical or surgical intervention. *Id.*, PageID#257-60 ¶¶42, 50, 52-53. This cautious approach is sometimes called the "watchful waiting" approach. *Id.*,

PageID#255 ¶31. It is also often pejoratively and inaccurately lumped together with "conversion therapy."[1] *Id.*, PageID#285-86 ¶148.

## B. The "Gender-Affirming" Approach

In contrast with the cautious approach, some medical and advocacy groups endorse what they call the "gender-affirming" approach. Under this approach, a counselor presumes that "children who are prepubertal and assert a [transgender] identity … know their gender as clearly and as consistently as their developmentally equivalent peers." *Id.*, PageID#260 ¶55 (quoting Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics, 4 (Oct. 2018), https://perma.cc/S7U2-Z8K4). Thus, "gender-affirmative approaches follow the child's lead." Gabe Murchison et al., *Supporting & Caring for Transgender Children* at 16, Human Rights Campaign Foundation & American Academy of Pediatrics

---

[1] In the latter half of the 20th century, some providers developed various forms of "conversion therapy"—also known as reparative therapy or "sexual orientation change efforts"—sometimes characterized by the use of coercion, shaming, or aversive conditioning in efforts to change an individual's sexual orientation. Clark, R.15-4, PageID#280, 287 ¶¶132, 153. Those practices have been broadly repudiated, even by former practitioners, and are rare to nonexistent today. *Id.*, PageID#280, 283-84 ¶¶133, 142-44. More recently, the term conversion therapy has been used to describe any practice that is not fully gender-affirming, including the mainstream, cautious use of pure talk therapy. *Id.*, PageID#285-87 ¶¶148-51, 153. This conflation of distinct practices "is highly questionable" and creates confusion. *Id.*, PageID#285-86 ¶¶148, 150. As noted above, Plaintiffs do not engage in any coercive or aversive practices; all their counseling is client-directed, pure talk therapy.

(Sept. 2016), https://perma.cc/N5HW-KYJ6 ("Murchison"); *see* Clark, R.15-4, PageID#260 ¶55.

The role of the therapist is not to explore potential underlying causes of distress, but to "reassure[] [the child] that there is nothing wrong with their gender identity or expression." Murchison at 16; *see* Clark, R.15-4, PageID#262-63 ¶62. When a child asserts a transgender identity, "[c]linicians help these children and their families socially affirm the child's gender identity." Murchison at 16; *see* Clark, R.15-4, PageID#262-63 ¶62. "If puberty is imminent, they may also recommend puberty-delaying medications," which may be followed later by other medical interventions, like cross-sex hormones and surgeries. Murchison at 16-17; *see* Clark, R.15-4, PageID#263 ¶64.

## C. Current Medical Evidence

The benefits and risks of these competing approaches are currently the subject of vigorous national and international debate. However, the most robust and current scientific evidence favors the cautious approach. Clark, R.15-4, PageID#268-78.

The gender-affirming approach is premised on the notion that gender identity is stable and that children know it from an early age. *Id.*, PageID#268. It also assumes that social and medical transition is an effective treatment to alleviate depression and suicidality. *Id.*, PageID#269. Neither assumption is supported by the data.

The most robust studies of gender dysphoria in children have found that up to 80-95% of prepubertal children who identify as transgender will naturally "desist"—or become comfortable in their biological sex—after passing through puberty. *Id.*, PageID#255 ¶32. In other words, in most cases, feelings of gender dysphoria in children will naturally resolve by adulthood without invasive medical interventions. Nor is there any reliable data indicating that doctors or counselors can "reliably predict which children/young people will transition successfully and which might regret or detransition at a later date." *The Cass Review* at 194, Independent Review of Gender Identity Services for Children and Young People (Apr. 2024), https://perma.cc/J5GN-ELUY ("Cass Review").

Moreover, there is no reliable evidence that social and medical transition helps improve long-term outcomes in children with gender dysphoria. Clark, R.15-4, PageID#273 ¶102. For example, a recent study published in the Journal of the Endocrine Society found that it "could not draw any conclusions" as to whether social or medical transition reduced risk of "death by suicide." *Id.*, PageID#269 ¶92. In other studies, neither hormones nor surgeries have been found to reduce suicidality long-term for children experiencing gender dysphoria. *Id.* Nor is there any reliable evidence showing psychological benefits for transitioning children with gender dysphoria. Expert Report of James Cantor, Ph.D. ¶¶178-201, *Boe v. Marshall*, No. 2:22-cv-184 (M.D. Ala. June 24, 2024), ECF No. 591-1, https://perma.cc/M8DK-63LS.

By contrast, the harms from medical transitions are well documented. Administering puberty blockers to interrupt pubertal development can cause diminished bone density, infertility, and sexual dysfunction. Clark, R.15-4, PageID#265-66, 273-74 ¶¶74-78, 103. Cross-sex hormones for girls increase the risk of erythrocytosis, myocardial infarction, liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast and uterine cancer. *Id.*, PageID#273-74 ¶103. And cross-sex hormones for boys can cause sexual dysfunction and increase the risk of macroprolactinoma, coronary artery disease, cerebrovascular disease, cholelithiasis, and hypertriglyceridemia. *Id.* For either sex, a full medical transition renders an individual permanently sterile. These adverse health effects are undisputed—and confirmed by the experiences of numerous individuals who have suffered from their medical transitions and later sought to reverse them. *See Skrmetti*, 83 F.4th at 487 (citing Detransitioners' Amicus Br. 19-25).[2]

In short, a child who undergoes a medical transition is virtually certain to experience significant, long-term, adverse health effects. Meanwhile, there is no reliable evidence that such a transition offers any long-term health benefits. And the best available evidence indicates that a

---

[2] *See also* Pamela Paul, Opinion, *As Kids, They Thought They Were Trans. They No Longer Do.,* N.Y. Times (Feb. 2, 2024), https://perma.cc/9FDV-2J45; Jesse Singal, *When Children Say They're Trans*, The Atlantic (July/August 2018), https://perma.cc/YMR4-ZRGE; Charlie McCann, *When girls won't be girls*, The Economist (Sept. 28, 2017), https://perma.cc/AD63-TKBW.

significant number of children diagnosed with gender dysphoria would, if permitted to pass through puberty without medical intervention, naturally desist—meaning the medical interventions and attendant harms were unnecessary to begin with.

For this reason, several European countries have recently restricted medical interventions for children. Clark, R.15-4, PageID#274-77 ¶¶107-120. Sweden, for example, published national guidelines finding that for most children experiencing gender dysphoria, the risks of puberty blockers and gender-affirming care likely outweighed any benefits. *Id.*, PageID#276-77 ¶117. Finland conducted a systematic evidence review and found that the evidence supporting pediatric gender transition was weak and inconclusive. It recommended that "[t]he first-line intervention for gender variance during childhood and adolescent years is psychosocial support and, as necessary, gender-explorative therapy and treatment for comorbid psychiatric disorders." *Id.*, PageID#276 ¶116. And the United Kingdom closed its only dedicated gender-identity clinic for children and issued an emergency order banning the private use of puberty blockers and cross-sex hormones for new minor patients. *Id.*, PageID#275-76 ¶¶108-14. That emergency ban has now been extended indefinitely.[3] And a comprehensive, U.K.-government-initiated review found there is "no

---

[3]    Department of Health & Social Care (U.K.), *Ban on puberty blockers to be made indefinite on experts' advice*, Gov.UK (Dec. 11, 2024), https://perma.cc/G4EX-2B6T.

good evidence on the long-term outcomes of interventions to manage gender-related distress." Cass Review at 13.

Similarly, at least twenty-six states have recently banned or severely restricted medical transitions for minors. Motion, R.15, PageID#135 (collecting citations); *see also* Kan. Stat. ch. 1, §§ 1-6. Given the absence of data on long-term effects, and the "unsettled, developing, in truth still experimental, nature of treatments in this area," these states have chosen "fair-minded caution" as the best path for protecting children. *Skrmetti*, 83 F.4th at 488.

In short, both the best and most current evidence, and the most recent policy developments domestically and internationally, favor Plaintiffs' cautious counseling, which helps alleviate a child's distress without resorting to irreversible medical or surgical interventions. Clark, R.15-4, PageID#254-61 ¶¶27-53.

## IV.   HB 4616

Unfortunately, Michigan recently amended its Mental Health Code to prohibit Plaintiffs' counseling. Two bills—HB 4616 and 4617 (collectively, "HB 4616")—define "conversion therapy" to encompass Plaintiffs' speech and prohibit Plaintiffs from offering cautious counseling to minors.

HB 4616 provides that "[a] mental health professional shall not engage in conversion therapy with a minor." MCL 330.1901a. HB 4617 then defines "conversion therapy" as follows:

"Conversion therapy" means any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, *including, but not limited to, efforts to change behavior or gender expression* or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender.

MCL 330.1100a(20) (emphasis added). HB 4617 also excludes certain gender-affirming practices from the definition of conversion therapy:

Conversion therapy does not include counseling that provides assistance to an individual undergoing a gender transition, counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development, including sexual orientation-neutral intervention to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change an individual's sexual orientation or gender identity.

*Id.*

Any individual or organization who believes a counselor has violated HB 4616 can file a complaint with the state. *See File a Complaint with BPL*, Licensing and Regulatory Affairs, https://perma.cc/7LHH-NKT5. Any counselor found in violation of HB 4616 is "subject to disciplinary action and licensing sanctions," MCL 330.1901a, including denial, suspension, or revocation of her license, restitution, and fines up to $250,000, MCL 333.16226(1)-(3).

## V. The Effect of HB 4616 on Plaintiffs

Plaintiffs are "mental health professional[s]" subject to HB 4616. MCL 330.1100b(19). Plaintiffs face sanctions under HB 4616, as they admit-

tedly provide talk therapy that seeks to help clients "change [their] behavior or gender expression" to align with the clients' goals and religious beliefs on matters of gender identity and same-sex sexual relationships. MCL 330.1100a(20); McJones, R.15-3, PageID#242-44 ¶¶37-45, 48-49; Veenstra, R.15-2, PageID#231-33 ¶¶31-36.

The threat of sanctions has already chilled Plaintiffs' speech. Because anyone can file a complaint under HB 4616, Plaintiffs are just one dissatisfied teenager or parent away from a complaint, investigation, and enforcement action. McJones, R.15-3, PageID#245 ¶¶51-52; Veenstra, R.15-2, PageID#233 ¶¶37-39. In Plaintiffs' experience, it is not uncommon for minor clients to misunderstand or significantly mischaracterize what Plaintiffs say during counseling conversations. Veenstra, R.15-2, PageID#233 ¶38. Thus, one misreported or misunderstood conversation can trigger an enforcement action. Worse, enforcement can be triggered by entirely unrelated activist organizations. This has already occurred in Oregon and Arizona, where counselors advocating a cautious counseling approach have been investigated by the state licensing board—and in some cases have stopped counseling minors altogether—in response to complaints lodged by activists and other adults who were not their clients. Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, https://perma.cc/9FDV-2J45.

Due to this risk, McJones has become more guarded in her counseling conversations with gender nonconforming youth. McJones, R.15-3,

PageID#245 ¶¶51-52. This has severely undermined her ability to establish the relationship of openness and trust that is essential for effective counseling. *Id.*, PageID#245 ¶52. Veenstra was unable to have a candid conversation with one of her minor clients who wanted to discuss same-sex relationships. Veenstra, R.15-2, PageID#233-34 ¶40. Unable to address important topics, the client became disengaged and eventually stopped coming for counseling. *Id.*

## VI. Proceedings Below

Plaintiffs filed this lawsuit on July 12, 2024, challenging enforcement of HB 4616 under the Free Speech, Free Exercise, and Due Process Clauses of the Constitution, Complaint, R.1, PageID#1, and requesting a preliminary injunction. Motion, R.15, PageID#117. Plaintiffs argued that HB 4616 violated the Free Speech Clause by regulating their speech based on its content and viewpoint. *Id.*, PageID#138-153. They also argued that HB 4616 violated the Due Process Clause as unconstitutionally vague because it provides no objective basis for distinguishing between counseling that "facilitates" an individual's "identity exploration and development," which is permitted, and counseling that "seeks to change" an individual's "gender expression," which is forbidden. *Id.*, PageID#153-155. And they argued that HB 4616 violated the Free Exercise Clause because it was not neutral or generally applicable and interfered with parents' rights to direct the religious upbringing of their children. *Id.*, PageID#155-59.

Defendants opposed the motion on the merits and additionally asserted that Plaintiffs lacked standing to bring a pre-enforcement challenge. Opposition to Preliminary Injunction, R.27, PageID#521 ("Opp.").

The district court held that Plaintiffs have standing because they demonstrated (1) an intent to engage in expression arguably protected by the Constitution, (2) their expression is arguably proscribed by HB 4616, and (3) they face a credible threat of enforcement. Op., R.39, PageID#1303-1311. But the court denied a preliminary injunction on the merits.

On the free speech claim, the court held that HB 4616 "is not subject to any form of heightened scrutiny under the First Amendment" because it regulates "treatment and does not target speech," even if "all of [Plaintiffs'] treatment is provided via speaking." *Id.*, PageID#1319-20. On the due process claim, the court held that HB 4616 is "not vague" because it adequately draws a "dividing line" between "exploring issues of sexuality or gender with a minor client," which is permissible, and counseling with "'change' as [a] predetermined treatment goal," which is not. *Id.*, PageID#1325-26. And on the free exercise claims, the court held that HB 4616 was neutral and generally applicable toward religion and did not burden Plaintiffs' religious practices. *Id.*, PageID#1323-25.

After denial of the preliminary injunction, Plaintiffs filed this appeal.

## SUMMARY OF ARGUMENT

**I.** HB 4616 violates Plaintiffs' freedom of speech. It restricts speech based on content by prohibiting counselors from speaking words with particular content—*i.e.*, words that help clients accept their biological sex. HB 4616 also restricts speech based on viewpoint—permitting speech that encourages gender transitions, but prohibiting speech that encourages minors to accept their biological sex.

HB 4616 also fails strict scrutiny. Far from advancing a compelling interest, HB 4616 harms children by depriving them of counseling that is supported by the best available evidence and the policies of every other state in this Circuit. Nor is HB 4616 the least restrictive means of advancing Michigan's asserted interest. Instead of preemptively banning speech, Michigan could ban aversive or coercive practices that go beyond mere words; ban therapy that contradicts a client's self-determined goals; impose malpractice liability for bad acts that cause actual harm; require counselors to obtain informed consent; or enact a religious exemption. Other states have successfully employed these methods, and Michigan hasn't explained why it is different. That means HB 4616 cannot survive even intermediate scrutiny, much less strict scrutiny.

The district court's contrary ruling—that HB 4616 escapes First Amendment scrutiny because it regulates "conduct," not "speech"—contradicts Supreme Court precedent. The Court has repeatedly held that

even if a law "may be described as directed at conduct," when "the conduct triggering coverage under the statute consists of communicating a message"—as here—the law regulates speech.

**II.**  HB 4616 is also impermissibly vague under the Due Process Clause. It purports to draw a line between counseling that facilitates gender-identity "exploration," "development," or "transition" (which is permitted), and gender-identity "change" (which is forbidden). But the terms "exploration," "development," and "transition" themselves connote "change"—and HB 4616 neither defines them nor offers any objective guidance for distinguishing between them. Thus, HB 4616 invites arbitrary enforcement in violation of due process.

**III.**  HB 4616 also violates the Free Exercise Clause. It burdens Plaintiffs' (and their clients') religious exercise by prohibiting them from having conversations that are an exercise of their religious faith. And it is subject to strict scrutiny both because it is not "generally applicable" toward religion, and because it interferes with parents' right to direct the religious upbringing of their children.

**IV.**  The remaining preliminary injunction factors favor relief. Plaintiffs are suffering an ongoing violation of their constitutional rights, which constitutes irreparable harm. And the balance of equities and public interest strongly favor protection of constitutional rights.

## STANDARD OF REVIEW

A preliminary injunction is warranted when a plaintiff shows (1) likelihood of success on the merits, (2) irreparable harm absent an injunction, (3) the balance of equities favors relief, and (4) relief is in the public interest. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

"[T]he likelihood of success on the merits often will be the determinative factor," and it is "a question of law" reviewed "de novo." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). The district court's weighing of the remaining factors is reviewed for "abuse of discretion." *Id.*

Although courts "normally review questions of fact for clear error," in cases involving "constitutional facts," like this one, the Court must "conduct an independent review of the record." *Women's Med. Pro. Corp. v. Taft*, 353 F.3d 436, 442 (6th Cir. 2003).

## ARGUMENT

### I. HB 4616 violates Plaintiffs' freedom of speech.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const., amend. I. Among other things, this means a law is "presumptively unconstitutional" and subject to strict scrutiny if it restricts expression "because of its message … its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). HB 4616 violates this

prohibition by restricting counselors' expression based on its content and viewpoint.

## A. HB 4616 restricts speech directly, not incidentally.

The district court did not dispute that HB 4616 regulates the words counselors may speak based on their content and viewpoint. Instead, it held that that HB 4616 "is not subject to any form of heightened scrutiny under the First Amendment" because it regulates "professional conduct," not speech. Op., R.39, PageID#1320. But this conclusion conflicts with controlling Supreme Court precedent on the speech/conduct distinction. It also picks the wrong side of a circuit split, which the Supreme Court recently granted certiorari to correct.

### 1. Supreme Court

The Supreme Court has long distinguished between laws that regulate "speech" and laws that regulate "nonexpressive conduct" while only "incidental[ly]" burdening speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Consider three examples relevant here.

In *Cohen v. California*, 403 U.S. 15, 16 (1971), a state law prohibited "disturb[ing] the peace … by … offensive conduct," and the state enforced the law against a defendant who wore a jacket bearing the words "Fuck the Draft." The defendant argued that his conviction violated the First Amendment by suppressing his expression about the draft; the state, however, argued that the law was aimed at his "offensive conduct," not speech. *Id.* The Supreme Court sided with the defendant, reasoning that

"[t]he only 'conduct' which the State sought to punish is the fact of communication." *Id.* at 18. Absent some "*separately identifiable conduct*" that "*does not necessarily convey any message*," the law regulated "speech." *Id.* (emphasis added).

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), elaborated on *Cohen*. There, a federal statute prohibited providing "material support" to terrorist organizations. *Id.* at 8. The plaintiffs were attorneys and non-profits that wished to provide legal training and advice that qualified as "material support" under the statute, and they challenged the statute under the First Amendment. *Id.* at 25-27. The government argued that "the only thing truly at issue in this litigation is conduct, not speech," because the statute was "directed at the fact of plaintiffs' interaction with [terrorist organizations]." *Id.* at 26.

But the Supreme Court said "[t]hat argument runs headlong into" *Cohen*. *Id.* at 27-28. In both cases, the Court explained, the law "may be described as directed at conduct"—breach of the peace in *Cohen*, or material support for terrorists in *Holder*. *Id.* at 28. But in both cases, "*the conduct triggering coverage under the statute*," "as applied to plaintiffs," "*consists of communicating a message*." *Id.* (emphasis added). Thus, because application of the statute "depends on what [plaintiffs] say," it regulates "speech," not conduct. *Id.* at 27.

Finally, *NIFLA* involved a First Amendment challenge to a California law that regulated licensed health clinics focused on pregnancy-related

care, requiring them to notify patients about state programs offering family planning, prenatal care, and abortion. 585 U.S. at 762-63. The Ninth Circuit upheld the law as a permissible regulation of "professional speech"—part of the clinics' "professional practice" of offering "medical treatment." *NIFLA v. Harris*, 839 F.3d 823, 840 (9th Cir. 2016). But the Supreme Court reversed, concluding that "[s]peech is not unprotected merely because it is uttered by 'professionals'" or in the context of practicing "medicine." *NIFLA*, 585 U.S. at 767. In so doing, the Court went out of its way to criticize and abrogate two circuit-court decisions that upheld conversion-therapy bans like the law at issue here instead of treating them as "content-based regulations of speech [that] are subject to strict scrutiny." *Id.* (abrogating *Pickup*, 740 F.3d 1208, and *King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014)).

The Court also rejected the argument that the law was a "regulation of professional conduct" that only "incidentally burden[ed] speech"—contrasting the law at issue with laws requiring "informed consent" before performing an abortion. *Id.* at 769-70 (distinguishing *Planned Parenthood v. Casey*, 505 U.S. 833, 884 (1992)). Informed-consent laws, the Court explained, regulate the performance of a non-expressive "medical procedure" (like an abortion) by requiring physicians to provide patients with "information" relevant to their decision to undertake the procedure. *Id.* at 770. The notice requirement in *NIFLA*, by contrast, "was not tied to a procedure" and provided "no information about the risks or

benefits" of such a procedure. *Id.* It thus "regulates speech as speech." *Id.*; *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 426 (6th Cir. 2019) (upholding an informed-consent-to-abortion statute because it "regulates doctors' conduct: performing abortions").

Under *Cohen*, *Holder*, and *NIFLA*, HB 4616 likewise regulates speech. Plaintiffs do not administer drugs, use aversive techniques, or perform any other medical procedure separately identifiable from their speech; their counseling consists exclusively of words—talking with clients, asking questions, and discussing their clients' lives. McJones, R.15-3, PageID#238-40 ¶¶11, 21-24; Veenstra, R.15-2, PageID#230-31 ¶¶25-29; Lewis, R.15-1, PageID#164 ¶9. As in *Cohen*, then, Plaintiffs engage in no "separately identifiable conduct" that HB 4616 regulates; "[t]he only 'conduct' which the State s[eeks] to punish is the fact of communication." 403 U.S. at 18.

Likewise, it does not matter that HB 4616, like the laws in *Cohen* and *Holder*, "may be described as directed at conduct," *Holder*, 561 U.S. at 28—*i.e.*, as directed at the "practice or treatment" of conversion therapy, Op., R.39, PageID#1319. What matters is that "*as applied to plaintiffs* the conduct triggering coverage under the statute consists of *communicating a message.*" *Holder*, 561 U.S. at 28 (emphasis added).

Nor does it matter that HB 4616 is part of a "system of regulation" for "mental health care professionals." Op., R.39, PageID#1312. *NIFLA* expressly rejected the notion that speech becomes "conduct" simply because

"it is uttered by 'professionals'" or in the context of "medicine and public health." 585 U.S. at 767, 771. Nor is HB 4616 an informed-consent statute. It doesn't require counselors to inform clients of the "risks or benefits" of a non-expressive medical procedure before engaging in it, *id.* at 770; it regulates the content of counseling conversations themselves. It thus "regulates speech as speech." *Id.*

## 2. Circuit Courts

The Third and Eleventh Circuits have reached the same conclusion, applying the same Supreme Court precedent to materially identical counseling laws. In *King*, the Third Circuit addressed a New Jersey law prohibiting licensed counselors from "seeking to change a person's sexual orientation … gender identity, or gender expressions." 767 F.3d at 221 (abrogated on other grounds in *NIFLA*, 585 U.S. at 766-67). As here, the district court held that "talk therapy," administered "wholly through verbal communication," was a form of "conduct" for purposes of the First Amendment, because it was a "'tool' employed by therapists to administer treatment." *Id.* at 224.

But the Third Circuit reversed, concluding that "the Supreme Court rejected this very proposition in *Holder*." *Id.* at 225. *Holder*'s reasoning, the court said, is "simple and intuitive." *Id.* While the statute in *Holder* "ordinarily banned conduct, the activity it prohibited in the particular case before it—the provision of legal training and advice—was speech." *Id.* Thus, that law regulated speech—as did New Jersey's counseling law.

*Id.* The court rejected as "unprincipled and susceptible to manipulation" the "enterprise of labeling certain verbal or written communications" as "conduct" based on their "function." *Id.* at 225, 228. "Simply put, speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 228-29.[4]

The Eleventh Circuit reached the same conclusion in *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020). There, counselors who engaged in "talk therapy" challenged ordinances prohibiting "any counseling" of a minor "performed with the goal of changing an individual's sexual orientation or gender identity." *Id.* at 859-60. As in this case, the government claimed that the ordinances regulated a "medical procedure" and were therefore directed at "conduct," not speech. *Id.* at 865.

But the Eleventh Circuit disagreed, relying on *Cohen* and *NIFLA*. "What the governments call a 'medical procedure,'" the court explained, "consists—entirely—of words." *Id.* at 865. Plaintiffs' "treatment" is "not just carried out *in part* through speech: the treatment ... *is entirely* speech." *Id.* And "[i]f speaking to clients is not speech, the world is truly

---

[4]     The court went on to hold that counseling conversations receive "lesser protection" as "professional speech." *Id.* at 232. That is the portion of *King* that the Supreme Court abrogated in *NIFLA*, 585 U.S. at 766-67.

upside down." *Id.* at 866. Accordingly, under *Cohen* and *NIFLA*, "these ordinances sanction speech directly, not incidentally." *Id.*[5]

The Ninth and Tenth Circuits have split from these circuits, declining to apply *Cohen*, *Holder*, and *NIFLA* and concluding instead that so-called conversion-therapy bans regulate conduct. In *Tingley v. Ferguson*, 47 F.4th 1055, 1073-74 (9th Cir. 2022), the Ninth Circuit held that it was "bound" to conclude that Washington's ban was "a regulation of conduct" under its prior decision in *Pickup*, 740 F.3d 1208—even though *Pickup* was criticized and abrogated by the Supreme Court in *NIFLA*. *Tingley*, 47 F.4th at 1071, 1073. Similarly, in *Chiles v. Salazar*, the Tenth Circuit upheld Colorado's ban, concluding that it regulated only a "therapeutic modality … carried out through use of verbal language"—not "speech." 116 F.4th 1178, 1208 (10th Cir. 2024).

Both decisions were heavily criticized within their circuits and by several Supreme Court Justices. *See id.* at 1231-32 (Hartz, J., dissenting) ("the Supreme Court has long rejected" the "maneuver" of redefining

---

[5]     Other circuits have applied the same understanding of *Cohen*, *Holder*, and *NIFLA* outside the conversion-therapy context. *See, e.g.*, *Hines v. Pardue*, 117 F.4th 769, 778 & n.50 (5th Cir. 2024) (disagreeing with *Chiles'* speech/conduct analysis and holding that a law prohibiting telehealth veterinarian visits prohibited speech "[b]ecause the act in which [Plaintiff] engaged that 'trigger[ed] coverage' … was the communication of a message"); *Billups v. City of Charleston*, 961 F.3d 673, 682-84 (4th Cir. 2020) (discussing *Holder* and concluding that a city ordinance requiring tour guides to obtain a license before giving paid tours "undoubtedly burdens protected speech").

"verbal language" as "conduct") (citing *Cohen* and *Holder*); *Tingley v. Ferguson*, 57 F.4th 1072, 1076, 1083 (9th Cir. 2023) (O'Scannlain, J., dissenting from denial of rehearing en banc, joined by Ikuta, R. Nelson, and VanDyke, JJ.) (criticizing the court for "fail[ing] to apply binding Supreme Court precedent" in *Cohen*, *Holder*, and *NIFLA*); *id.* at 1084 & n.3 (Bumatay, J., dissenting from denial of rehearing en banc) (counseling "would clearly be classified as … speech"); *Tingley v. Ferguson*, 144 S. Ct. 33, 34-35 (2023) (Thomas, J., dissenting from denial of certiorari) ("There is little question that [this law] regulates speech."); *id.* at 35 (Alito, J., dissenting from denial of certiorari) ("It is beyond dispute that these laws restrict speech."); *id.* at 33 (noting that Kavanaugh, J., "would grant the petition"). The Supreme Court has now granted certiorari in *Chiles. See* 116 F.4th 1178, *cert. granted*, No. 24-539, 2025 WL 746313 (U.S. Mar. 10, 2025).

### 3. The District Court

Instead of following Supreme Court precedent, the district court adopted the mistaken position of the Ninth and Tenth Circuits. It held that HB 4616 "is a general law regulating professional conduct," because HB 4616 "on its face" is directed at "the administration of [a medical] procedure or treatment." Op., R.39, PageID#1319-20. Thus, "the law is not subject to heightened First Amendment scrutiny," even if "all of [plaintiffs'] treatment is provided via speaking." *Id.*

This flies in the face of *Cohen* and *Holder*, neither of which—remarkably—the district court addressed. Under those cases, it doesn't matter whether a law, on its face, is "directed at conduct." *Holder*, 561 U.S. at 28. What matters is whether what "trigger[s] coverage under the statute," "as applied to plaintiffs," is "what [plaintiffs] say." *Id.* at 27-28. And that is undisputed here. Plaintiffs are not engaged in any "separately identifiable," non-expressive "conduct"—such as performing an abortion. *Cohen*, 403 U.S. at 18; *see also EMW*, 920 F.3d at 426 ("conduct: performing abortions"). What triggers HB 4616, as applied to Plaintiffs, is that they are "communicat[ing] advice derived from 'specialized knowledge,'" *Holder*, 561 U.S. at 27-28—*i.e.*, talking with clients about embracing their biological sex. Under *Cohen* and *Holder*, then, HB 4616 clearly regulates Plaintiffs' speech.

The district court's decision also contradicts *NIFLA* by resurrecting the "professional speech" doctrine by another name. In rejecting the professional speech doctrine, *NIFLA* made clear that the speech/conduct distinction does not "turn[] on the fact that professionals [a]re speaking." 585 U.S. at 768. Yet the district court here said just the opposite. The "key," it said, is that HB 4616 "regulate[s] the practice of licensed professionals." Op., R.39, PageID#1312-13. And because HB 4616 regulates conversations by "licensed mental health professionals," it is actually regulating "professional conduct"—even if the "conduct" consists entirely of "speaking." *Id.*, PageID#1319.

Under that reasoning, whether a conversation is speech or conduct depends entirely on whether the speaker is a licensed professional. A pastor or psychology student who talks with a minor about accepting her biological sex is engaged in protected speech; but a licensed counselor who speaks "the same words" would be engaged in unprotected "conduct." *King*, 767 F.3d at 228.

This is just what *NIFLA* told courts *not* to do. Indeed, *NIFLA* specifically warned against "the danger of content-based regulations 'in the fields of medicine and public health.'" 585 U.S. at 771. And it went out of its way to abrogate two appellate decisions upholding conversion-therapy bans like HB 4616—so "the Justices undoubtedly had regulation of conversion therapy at the forefront of their minds." *Chiles*, 116 F.4th at 1236 (Hartz, J., dissenting). "It would be passing strange for the Court to cite critically those particular cases if it thought the decisions were ultimately correct." *Id.*

Nor does it salvage HB 4616 to say, as the district court did, that HB 4616 "does not prohibit [counselors] from speaking with clients *about* … conversion therapy," but merely prohibits conversations that *constitute* conversion therapy. Op., R.39, PageID#1320 (emphasis added). "The First Amendment does not protect the right to speak *about* banned speech; it protects speech itself, no matter how disagreeable that speech might be to the government." *Otto*, 981 F.3d at 863-64 (emphasis added).

All that matters is that "some words about sexuality and gender are allowed, and others are not." *Id.*

Finally, allowing the state to redefine words as "conduct" makes it easy to circumvent the First Amendment. "What [Michigan] call[s] a 'medical procedure' consists—entirely—of words." *Id.* at 865. If those words can be redefined as "conduct," almost any words can be redefined as conduct. "[A]ll the government needs to do" is define a broad new category of "conduct" and "declare that any regulation of speech within the category is merely incidental to regulating the conduct." *Chiles*, 116 F.4th at 1231 (Hartz, J., dissenting). "[J]ournalism" can be redefined as "the 'act' of taking money from employers to produce news articles." *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*, 696 S.W.3d 646, 667 (Tex. 2024) (Young, J., concurring). Likewise, "teaching," "protesting," or "[d]ebating" can be redefined as "activities" and regulated as "conduct." *Otto*, 981 F.3d at 865. Yet each of these "activities" receives First Amendment protection. Even conduct that contains *no words at all* is protected as speech when it is designed to express a particular idea. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 415-16 (1989) (flag burning). The words of a counseling conversation are an *a fortiori* case.

The district court's approach, in short, turns the First Amendment into a "labeling game," *King*, 767 F.3d at 228-29, that is "unprincipled and susceptible to manipulation." *Otto*, 981 F.3d at 865. It is also contrary

to controlling Supreme Court precedent. Because HB 4616 is triggered by Plaintiffs' words alone, it regulates their speech.

**B. HB 4616 restricts speech based on its content.**

Because HB 4616 regulates Plaintiffs' speech, it must comply with the Free Speech Clause. It does not.

Under the Free Speech Clause, a law is "presumptively unconstitutional" if it is "content-based"—that is, if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163-64. Examples of "obvious" content-based restrictions include (1) laws that "defin[e] regulated speech by particular subject matter," *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020); (2) laws that define regulated speech "by its function or purpose," *id.*; or (3) laws that "prohibit discussion of a topic altogether," *Norton Outdoor Advert., Inc. v. Village of St. Bernard*, 99 F.4th 840, 847 (6th Cir. 2024).

HB 4616 does all three. First, HB 4616 defines prohibited speech by the "particular subject matter" of a client's sexual orientation or gender identity. *Int'l Outdoor*, 974 F.3d at 703. HB 4616 doesn't regulate conversations on any other subject. Second, HB 4616 prohibits speech based on "its function or purpose." *Id.* Speech intended "to change behavior or gender expression" is prohibited, while speech that "provides assistance to an individual undergoing a gender transition" is permitted. MCL 330.1100a(20). Third, HB 4616 prohibits certain topics "altogether," *Norton*, 99 F.4th at 847—such as the topic of how a minor client can "change

behavior or gender expression" to align with her biological sex. MCL 330.1100a(20). This is quintessential content regulation.

The Third and Eleventh Circuits held that materially identical counseling laws are "plainly 'speaker-focused and content-based restrictions on speech'" because they limit "a category of people—therapists—from communicating a particular message." *Otto*, 981 F.3d at 863; *King*, 767 F.3d at 236 & n.20 (law "discriminates on the basis of content" because it "prohibits licensed counselors from speaking words with a particular content"). Neither Michigan nor the district court disputed this point below. "Because the message" conveyed "makes all the difference," HB 4616 is "a content-based regulation of speech." *L.D. Mgmt. Co. v. Gray*, 988 F.3d 836, 839 (6th Cir. 2021).

### C. HB 4616 restricts speech based on its viewpoint.

HB 4616 also regulates counselors' speech based on viewpoint—a particularly "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). A law is viewpoint-based when it "distinguishes between two opposed sets of ideas," *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019), or "permits some private speech on the subject and only disfavors certain points of view." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 498 (6th Cir. 2020) ("*AFDI*").

That is what HB 4616 does. HB 4616 allows counseling conversations on the *subject* of a minor client's gender identity or sexual orientation;

but it forbids a certain point of view. Conversations that "provide[] assistance to an individual undergoing a gender transition" are permitted, but conversations that seek "to change behavior or gender expression" to help an individual accept her biological sex are forbidden. MCL 330.1100a(20). Likewise, counselors can "provide[] acceptance, support, or understanding of an individual" who wants to act on "sexual or romantic attractions or feelings toward an individual of the same gender," but they cannot counsel in a way that tries "to reduce or eliminate" those same feelings or "to change behavior" to refrain from acting on such feelings. *Id.*

As the Eleventh Circuit explained in *Otto*, such laws "codify a particular viewpoint … and prohibit the therapists from advancing any other perspective when counseling clients." 981 F.3d at 864. This "necessarily discriminates between viewpoints," *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021) (quoting *AFDI*, 978 at 500)—which, again, neither Michigan nor the district court disputed below.

### D. HB 4616 cannot survive strict scrutiny.

Because HB 4616 is "[v]iewpoint-based," it is "per se invalid"—without the need to apply strict scrutiny. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 n.1 (6th Cir. 2015). Under Supreme Court precedent, a "finding of viewpoint bias end[s] the matter"—the law "violates the First Amendment." *Iancu*, 588 U.S. at 399; *AFDI*, 978 F.3d at 501 (invalidating viewpoint-discriminatory law without applying strict scrutiny).

Even assuming HB 4616 is only content-based, it is still "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). It can survive only if it "promote[s] a compelling interest" and uses "the least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). This is "the most demanding test known to constitutional law," and the burden of satisfying it "falls entirely upon the government." *Russell*, 784 F.3d at 1050. It is "rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). HB 4616 does not satisfy this test.

### 1. HB 4616 does not further a compelling state interest.

To prove that HB 4616 furthers a compelling state interest, it is not enough for the legislature to "make a predictive judgment" based on "competing psychological studies." *Id.* Nor is it enough to show a "correlation" between the regulated speech and "harmful effects on children." *Id.* at 800. Instead, Michigan must demonstrate "a direct causal link between [Plaintiffs' speech]"—non-aversive talk therapy—"and harm to minors." *Id.* at 799. Michigan hasn't made that showing.

Below, Michigan claimed that "[e]xtensive empirical evidence" documents "the harms of conversion therapy," citing the supposed "consensus of all major medical and mental health organizations." Opp., R.27, PageID#558-59. But the Eleventh Circuit thoroughly reviewed the same evidence and held that it fell short. *Otto*, 981 F.3d at 868-70. As the court

explained, the "reports and studies" purporting to show harms address "aversive" techniques, rather than "purely speech-based" talk therapy. *Id.* In fact, the American Psychological Association "concedes that 'nonaversive and recent approaches to [conversion therapy] have not been rigorously evaluated.'" *Id.* at 868. Rather, there is a "complete lack" of "rigorous recent prospective research," with some "recent research indicat[ing]" that some individuals "perceive they have benefited from nonaversive" approaches. *Id.* at 868-69; *see also Chiles*, 116 F.4th at 1243 (Hartz, J., dissenting) (noting the admitted "absence of any study (good or bad) that focuses on the type of therapy at issue in this case: talk therapy for a minor provided by a licensed mental-health professional").

At minimum, there is significant uncertainty about how best to help minors experiencing gender dysphoria—and Michigan "bears the risk of uncertainty" on strict scrutiny. *Brown*, 564 U.S. at 799-800. As this Court has explained, gender dysphoria "is a relatively new diagnosis with ever-shifting approaches to care over the last decade or two." *Skrmetti*, 83 F.4th at 491. The "nature of treatments" is "unsettled, developing, [and] in truth still experimental." *Id.* at 488. "The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." Cass Review at 13.

If anything, mounting evidence indicates that HB 4616 *undermines* Michigan's interest in protecting minors. By prohibiting Plaintiffs' talk therapy, HB 4616 leaves children with no alternative but the so-called

42

"gender-affirming approach"—which affirms children in their chosen gender identity, helps them socially transition, and routinely leads to medical interventions like puberty blockers, cross-sex hormones, and surgeries. *Supra*, pp.14-19; Clark, R.15-4, PageID#260-68.

But as this Court explained in *Skrmetti*, "no one disputes" that gender transitions carry serious "risks." 83 F.4th at 489. Puberty blockers "can cause diminished bone density, infertility, and sexual dysfunction." *Id.* Cross-sex testosterone "increases the risk of erythrocytosis, myocardial infarction, liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast and uterine cancer." *Id.* And cross-sex estrogen "can cause sexual dysfunction and increases the risk of macroprolactinoma, coronary artery disease, cerebrovascular disease, cholelithiasis, and hypertriglyceridemia." *Id.*; *see also* Clark, R.15-4, PageID#265-66, 273-74 ¶¶74-78, 103. HB 4616 pushes youth toward these harmful, irreversible medical interventions, even though up to 80-95% of youth experiencing gender dysphoria naturally desist without medical intervention—meaning such interventions are ultimately unnecessary. Clark, R.15-4, PageID#255 ¶32; *see also Skrmetti*, 83 F.4th at 487 (citing Detransitioners' Amicus Br. at 19-25).

Because of the harms of medical interventions, at least twenty-six states have restricted gender-transitions for minors—including every state in this Circuit besides Michigan. *See supra*, p.19. Likewise, many of "the same European countries that pioneered these treatments" have

"now express[ed] caution about them" and "pulled back on their use." *Skrmetti*, 83 F.4th at 477. Sweden has found that for most children, the risks of gender-transition treatments likely outweigh any benefits. Clark, R.15-4, PageID#276 ¶¶115, 117. Finland recommends robust and comprehensive counseling as the first-line intervention for asserted pediatric gender dysphoria. *Id.*, PageID#276 ¶¶115-16. And the United Kingdom, which previously ran one of the world's largest pediatric gender clinics, shuttered that clinic following a government investigation that found it had failed children by providing invasive interventions without any evidence of their efficacy. *Id.*, PageID#274-76 ¶¶107-14. The United Kingdom has now banned even the private use of puberty blockers and cross-sex hormones for new minor patients. *Id.*, PageID#276 ¶114.

The district court dismissed all this evidence as "not helpful to the Court's analysis," reasoning that HB 4616 regulates talk therapy, not "medical interventions." Op., R.39, PageID#1322 n.7. But the point is that by banning cautious talk therapy, HB 4616 leaves children with no alternative but the "gender-affirming" approach—making harmful, irreversible, and unnecessary medical interventions more likely. Thus, far from being "necessary" to solve an "actual problem," *Brown*, 564 U.S. at 799, HB 4616 increases the harm—and fails strict scrutiny.

## 2. HB 4616 is not the least-restrictive alternative.

Even assuming HB 4616 advanced a compelling interest, it would still fail strict scrutiny because it is not the least restrictive means of furthering that interest. "The least-restrictive-means standard is exceptionally demanding." *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015). If the government's prohibition is either "underinclusive" of activity that undermines the state's interests, *Reed*, 576 U.S. at 171, or "overinclusive" of speech that does not implicate the state's interests, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991), then it is not the least restrictive means. Additionally, the government must show that it has *no other means* of achieving its desired goal without restricting speech. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

Under this standard, it is not enough for the government to show that a narrower regulation of speech is "more arduous" or less effective than the broad one the State has chosen. *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 548 (6th Cir. 2012). Nor can the government dismiss proposed alternatives because they are novel or untested. *See, e.g.*, *Sable Commc'ns*, 492 U.S. at 130-31 (restriction failed strict scrutiny because FCC failed to show new, untested technology couldn't have prevented youth from accessing dial-a-porn phone messages). Rather, "[w]hen a plausible, less restrictive alternative is offered to a content-

based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816; *accord Johnson v. City of Cincinnati*, 310 F.3d 484, 504 (6th Cir. 2002) (strict scrutiny requires "evidence demonstrating the ineffectiveness of proposed alternatives").

Here, several less-restrictive alternatives could serve Michigan's asserted interest in protecting the health of minors.

*First*, Michigan could ban aversive or coercive methods, rather than pure talk therapy. Below, Michigan said this would undermine "the statute's goal of protecting minors" from a "harmful form of therapy." Opp., R.27, PageID#562. But Michigan presented no evidence that pure talk therapy is harmful; its only evidence was based on studies addressing aversive or coercive methods. *Cf. Chiles*, 116 F.4th at 1243 (Hartz, J., dissenting) (noting the admitted "absence of any study" focusing on "talk therapy for a minor"). Thus, banning those methods would protect minors from the only evidence-backed harms, while still protecting Plaintiffs' speech.

*Second*, Michigan could ban efforts to "change" gender identity, expression, or behavior solely when doing so is contrary to the client's self-determined goals. In an effort to evade standing, Michigan suggested this *is* how HB 4616 should be construed—confirming that it is an acceptable less-restrictive alternative. *See* Opp., R.27, PageID#540-42. But the dis-

trict court correctly concluded that HB 4616's *text* sweeps further, creating "no carve-out ... for a client's 'self-chosen goals.'" Op., R.39, PageID#1307.

*Third*, Michigan could rely on "'[l]ongstanding torts for professional malpractice' or other state-law penalties for bad acts that produce actual harm." *Otto*, 981 F.3d at 870 (quoting *NIFLA*, 585 U.S. at 769). If a client is ever harmed, Michigan could pursue license revocations, monetary penalties, and even criminal charges. *Id.*

*Fourth*, Michigan could enact an informed consent requirement for the talk therapy practices at issue here. This would ensure that minors and their families are fully informed of any alleged risks without muzzling licensed therapists. Michigan objected to this alternative below only by saying "minors cannot meaningfully consent" to Plaintiffs' counseling. Opp., R.27, PageID#562. But Michigan offered no reason why minors and their parents have "capacity to consent" to "irreversible" puberty blockers, cross-sex hormones, and surgeries, *Skrmetti*, 83 F.4th at 488—all of which Michigan law permits—but not mere conversations with a licensed counselor.

*Fifth*, Michigan could adopt a religious exemption to allow counselors to offer this form of counseling as part of their sincerely held religious beliefs. This is the approach taken by Washington in the law upheld in *Tingley*, 47 F.4th at 1065; *see* Wash. Rev. Code § 18.225.030 ("Nothing in this chapter shall be construed to prohibit or restrict: ... mental health

counseling … under the auspices of a … religious organization.”). Yet Michigan has not explained why it wouldn't suffice.

*Sixth*, Michigan could simply follow the lead of the many states that have not adopted this type of ban at all. As the Supreme Court has explained, the policies adopted by other jurisdictions are "relevant to a determination of the need for a particular type of restriction." *Holt*, 574 U.S. at 368. And when many other jurisdictions continue to protect their interests without adopting a particular policy, the government "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Ackerman v. Washington*, 16 F.4th 170, 191 (6th Cir. 2021) (quoting *Holt*, 574 U.S. at 369). Other states have the same interest in protecting youth, but Michigan has never explained why it must take a different course.

In fact, Michigan failed to explain why *any* of these methods would be ineffective. Nor did it demonstrate "that it seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494-95 (2014). It simply speculated that these proposed alternatives wouldn't be "as effective" at protecting its interests. Opp., R.27, PageID#562. That falls far short of the State's "burden of identifying potential alternatives," "evaluat[ing]" those alternatives, and providing "evidence demonstrating the[ir] ineffectiveness." *Johnson*, 310 F.3d at 504-05. Thus, HB 4616 fails strict scrutiny.

### E. HB 4616 cannot satisfy even intermediate scrutiny.

Even assuming HB 4616 regulated conduct and only incidentally burdened speech, it would still be subject to intermediate scrutiny. The district court never addressed intermediate scrutiny. It simply assumed HB 4616 was subject to "traditional rational-basis review," citing the standard for laws governing abortion. Op., R.39, PageID#1320 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 439-40 (6th Cir. 2020), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). But this Court has held that "a regulation of general conduct" that only "incidentally burden[s]" expression is still subject to "intermediate scrutiny." *Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512, 521, 523 (6th Cir. 2009); *see also Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019) ("intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech").

Under intermediate scrutiny, a law must "be 'narrowly tailored to serve a significant governmental interest.'" *McCullen*, 573 U.S. at 486. That means a law "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id*. HB 4616 fails this standard.

First, HB 4616 fails narrow tailoring because it burdens Plaintiffs' speech even when doing so *undermines* Michigan's stated interest in protecting children. That's because most children with gender dysphoria

grow out of it naturally—and Plaintiffs' cautious counseling helps those children become comfortable with their biological sex without hormonal and surgical interventions that cause long-term harms. Clark, R.15-4, PageID#255, 273-74 ¶¶32, 103-05. Thus, allowing Plaintiffs to engage in this type of counseling *furthers* the state's interest in protecting children; prohibiting their counseling does not.

Second, Michigan's ban fails narrow tailoring because the state "has available to it a variety of approaches that appear capable of serving its interests" without silencing Plaintiffs' speech. *McCullen*, 573 U.S. at 493-94. In *McCullen*, the Supreme Court invalidated a Massachusetts statute that prohibited standing within 35 feet of the entrance of abortion clinics. *Id.* at 471. The Court stated that the statute advanced legitimate interests in maintaining public safety, preventing harassment of clinic visitors, and securing unobstructed use of public sidewalks. *Id.* at 490-91. But the law still failed intermediate scrutiny because Massachusetts "has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* at 494. Specifically, the Court noted that local and state ordinances already made it a crime to knowingly obstruct entry and exit from an abortion clinic, that Massachusetts could pass an ordinance to prevent harassment, and that generic criminal statutes forbade assault, breach of the peace, trespass, vandalism, and the like. *Id.* at 490-92.

Similar alternatives are available here. Michigan could ban aversive treatments, ban treatments that contradict a client's goals, enact a narrow religious exemption, require informed consent, or enforce existing malpractice laws to address any harms. As in *McCullen*, Michigan has failed to "demonstrate" that these "alternative measures" would "fail to achieve the government's interests." *Id.* at 495; *see also Sisters for Life*, 56 F.4th at 405 ("[T]he County has not shown that it 'seriously undertook to address' its concerns 'with less intrusive tools.'"). Of course, broadly banning an entire category of speech is easier to enforce, just as "[a] painted line on the sidewalk is easy to enforce[.] [B]ut the prime objective of the First Amendment is not efficiency." *McCullen*, 573 U.S. at 495. HB 4616 fails intermediate scrutiny.

### F. HB 4616 independently violates *Mansky*.

Finally, even assuming Michigan can regulate speech based on its content, it still "must draw a reasonable line." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). HB 4616 does not.

The Supreme Court explained this reasonableness requirement in *Mansky*. There, Minnesota banned "political" apparel in polling places on Election Day. While the sensitive nature of the government forum permitted content-based restrictions, the Court still struck down the restriction as not "capable of reasoned application" because interpretation of the term "political" would spawn "unfair or inconsistent enforcement." *Id.* at 22-23. The lack of "objective, workable standards," *id.* at 21, meant

enforcement was left to the "unbridled discretion" of government officials, which left the law susceptible to viewpoint discrimination. *AFDI*, 978 F.3d at 497-98 (public transit authority's ban on "political" ads not reasonable).

So too here. HB 4616 prohibits speech that seeks to "change" an individual's "gender identity," but permits speech that seeks to "facilitate[]" "gender identity" "development." MCL 330.1100a(20). It offers no objective, workable standards for distinguishing between forbidden gender-identity "change" and permissible gender-identity "development." It doesn't even provide a workable definition of "gender identity"—defining it subjectively (and circularly) as "having a gender-related self-identity." MCL 37.2103(f). Thus, Plaintiffs have no way of knowing when their counseling crosses the line from permissibly "facilitat[ing] … development" to illegally seeking "change." MCL 330.1100a(20). Like the term "political" in *Mansky* and *AFDI*, this creates an "amorphous ban" that lends itself to inconsistent enforcement. *AFDI*, 978 F.3d at 498. In fact, this case is even easier than *Mansky* or *AFDI* because HB 4616 regulates private speech in a private setting—not speech in a government forum where content-based restrictions are presumptively permissible. Yet the district court never addressed *Mansky*.

## II. HB 4616 violates the Due Process Clause.

For similar reasons, HB 4616 is void for vagueness under the Due Process Clause. "It is a basic principle of due process that an enactment is

void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Where an ordinance "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Holder*, 561 U.S. at 19; *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (same). To satisfy the Constitution, a law must (1) ensure "fair notice" of what is prohibited, and (2) provide objective "standards for enforcement." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007). HB 4616 does neither.

## A. Fair Notice

The fair-notice inquiry looks at "the words of the ordinance itself," *Grayned*, 408 U.S. at 110, and considers how they are used in "common parlance." *Stevens v. City of Columbus*, No. 21-3755, 2022 WL 2966396, at *7 (6th Cir. July 27, 2022). Terms that require "untethered, subjective judgments" are impermissibly vague. *Holder*, 561 U.S. at 21.

HB 4616's definition of "conversion therapy" cannot be applied without untethered, subjective judgments. HB 4616 permits counseling that "facilitates" an individual's "identity exploration and development" or "assist[s]" a "gender transition"; but it forbids counseling that "seeks to change" an individual's "gender identity," "behavior," or "gender expression." MCL 330.1100a(20). The terms "transition," "exploration" and "development" themselves connote "change"—and HB 4616 neither defines them nor offers any objective basis for distinguishing among them. If a

counselor helps a boy who identifies as transgender become more comfortable wearing feminine clothes, presumably that is permissible "support" for a "gender transition." But if McJones helps a girl who identifies as Catholic become more comfortable wearing feminine clothes, McJones, R.15-3, PageID#242-43, is that permissible gender-identity "development" or prohibited gender-identity "change"? HB 4616 offers no objective way to tell. And what if a client identifies as gender fluid, with a gender identity that often changes? *See* Clark, R.15-4, PageID#252 ¶16. This sort of "ambiguity" in the "interpretation of potential legislation on conversion practices" is precisely what the Cass Review cautioned against—warning that it would expose counselors to "legal challenge" and make them "fearful of accepting referrals of these children and young people." Cass Review at 202; *see also* Clark, R.15-4, PageID#290 ¶166.

The district court tried to sidestep this by asserting that "the dividing line" between permitted and prohibited speech is whether "change" is the "predetermined treatment goal"—and that under this interpretation, HB 4616 isn't vague because Plaintiffs' speech "is clearly proscribed." Op., R.39, PageID#1325-26 (quoting *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017)). But Plaintiffs uniformly testified that they *don't* have "'change' as [their] predetermined treatment goal," *id.*; rather, all treatment goals are determined by their clients. McJones, R.15-3, PageID#244 ¶47; Veenstra, R.15-2, PageID#230 ¶25. And to the extent the district court is saying the dividing line is whether *the client* has

"change" as a "predetermined treatment goal," that simply restates the vagueness problem: Clients' goals often evolve, and HB 4616 provides no objective basis for determining when a client's goal has evolved from permissible "exploration" and "development" to forbidden "change."

## B. Arbitrary Enforcement

The same vagueness inherent in the terms "gender identity," "exploration," "development," and "change" likewise invites arbitrary enforcement. The "key question" is whether HB 4616 "provide[s] explicit standards guiding [its] enforcement." *Platt v. Bd. of Comm'rs*, 894 F.3d 235, 252 (6th Cir. 2018) (alterations in original). But HB 4616 provides none. Under HB 4616, any number of discussions on matters of gender identity, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions can trigger significant penalties. Further, it is not uncommon for minor clients to misunderstand or even misrepresent discussions in counseling. Veenstra, R.15-2, PageID#233 ¶¶38-39. Thus, Plaintiffs face potential enforcement based on mere misunderstanding. Worse, HB 4616 allows any person or organization to file a complaint. Thus, complaints may be filed by any ideological opponent or activist who wants to turn HB 4616 into "a convenient tool for 'harsh and discriminatory enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 360 (1983). This has already happened to counselors in Oregon and Arizona. Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, https://perma.cc/9FDV-

2J45. And it is just what the "constitutional standards for definiteness and clarity" are designed to prevent. *Kolender*, 461 U.S. at 361.

## III. HB 4616 violates Plaintiffs' free exercise of religion.

HB 4616 also violates the Free Exercise Clause—both because it is not religiously "neutral and generally applicable," *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021), and because it interferes with parents' right to direct the religious upbringing of their children, *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972). The district court's contrary ruling was mistaken.

*Burden*. The district court first asserted that "Plaintiffs have not identified any particular religious practice that [HB 4616] burdens." Op., R.39, PageID#1323. But Plaintiffs' declarations clearly allege that their counseling is an expression of their Catholic faith, which teaches that "the biological sex of the human person is given by God," and that when a client "seeks to change her gender identity or gender expression to match her biological sex," Plaintiffs have a "religious duty to help that client live the life she desires to live." Lewis, R.15-1, PageID#165-66 ¶¶13-15, 23; McJones, R.15-3, PageID#239, 244 ¶¶17-18, 47-48; Veenstra, R.15-2, PageID#230-33 ¶¶18, 31-36. HB 4616 thus subjects Plaintiffs to ruinous penalties for carrying out a religious duty. That is an obvious burden on religious exercise. *Cf. Yoder*, 406 U.S. at 208-09 ($5 fine on religious duty burdened religious exercise).

*Neutrality and general applicability.* Because HB 4616 burdens Plaintiffs' religious exercise, it must survive strict scrutiny unless it is both neutral toward religion and generally applicable. *Meriwether*, 992 F.3d at 512. HB 4616 fails that standard. Laws are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

Here, Michigan's asserted interest is in protecting children's well-being. As explained above, Plaintiffs' counseling, which is an expression of their religious faith, *furthers* Michigan's interest in children's wellbeing by helping children alleviate their distress without resorting to harmful, irreversible medical procedures. Yet HB 4616 bans that counseling. Meanwhile, HB 4616 permits counseling that "provides assistance to an individual undergoing a gender transition"—even when that gender transition leads to devastating, irreversible harms. Thus, Michigan "permit[s] secular conduct that undermines [its] asserted interests" even more than Plaintiffs' religiously motivated counseling would. *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). That means HB 4616 is not generally applicable and is subject to strict scrutiny—which, as explained above, it fails. *Supra*, pp.40-48.

*Parental rights.* The district court did not assess Plaintiffs' parental rights claims. But Plaintiffs are entitled to relief on these grounds too. The Free Exercise Clause independently protects parents' right to direct "the religious upbringing and education of their children." *Yoder*, 406 U.S. at 213-14; *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020); *People v. DeJonge*, 501 N.W. 2d 127, 134-35 (Mich. 1993). Plaintiffs can assert that right on behalf of the parents of their clients. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925). And if the government interferes with that right, it must survive strict scrutiny—even if HB 4616 is religiously neutral and generally applicable.

Here, HB 4616 interferes with parental rights by forcing parents to either send their children to gender-affirming therapists who will counsel their children in ways "undeniably at odds with fundamental tenets of their religious beliefs," *Yoder*, 406 U.S. at 218, or forgo professional therapy altogether. As in *Yoder*, this "substantially interfer[es] with the religious development of … child[ren] and [their] integration" into a religious "way of life" and "faith community." *Id.*

## IV. The remaining injunction factors favor relief.

Because "the likelihood of success on the merits often will be the determinative factor," *Schimmel*, 751 F.3d at 430, an injunction is warranted here. In any event, all the remaining factors also favor injunctive relief.

For irreparable injury, "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010). Here, HB 4616 infringes both free speech and free exercise rights. And it is unconstitutionally vague under the Due Process Clause. Because Plaintiffs' constitutional rights are "impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Even absent this presumption, Plaintiffs' testimony reveals actual and ongoing harm. Plaintiffs are already self-censoring conversations with minor clients to avoid penalties under HB 4616. McJones, R.15-3, PageID#245 ¶52; Veenstra, R.15-2, PageID#233-34 ¶40. This means that, right now, counselors are either unable to have open, candid talk therapy sessions, or foregoing those sessions altogether. These are conversations that Plaintiffs and their clients can never regain, so the harm is irreparable.

The final two factors—whether the balance of equities favors relief and whether relief is in the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both favor injunctive relief. When the "plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). Further, "it is always in the public interest to prevent violation of

a party's constitutional rights." *Id.* Thus, the balance of equities and the public interest strongly favor Plaintiffs.

## CONCLUSION

This Court should reverse and remand with instructions to enter a preliminary injunction.

Respectfully submitted,

Dated: March 28, 2025

/s/ *Luke W. Goodrich*
Luke W. Goodrich
Adèle A. Keim
Daniel L. Chen
Benjamin A. Fleshman
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketfund.org*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limit in Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: March 28, 2025

/s/ *Luke W. Goodrich*
Luke W. Goodrich

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on March 28, 2025.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CM/ECF system or by other electronic means.

Dated: March 28, 2025                                    /s/ *Luke W. Goodrich*
                                                        Luke W. Goodrich

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

## W.D. Mich. Case No. 1:24-cv-718

| Record | Description | Page ID Range |
|--------|-------------|---------------|
| 1 | Complaint | 1–33 |
| 14 | Plaintiffs' Motion for Preliminary Injunction | 115–116 |
| 15 | Plaintiffs' Brief in Support of Motion for Preliminary Injunction | 117–161 |
| 15-1 | Exhibit A to Motion for Preliminary Injunction: *Declaration of Sue Lewis* | 162–226 |
| 15-2 | Exhibit B to Motion for Preliminary Injunction: *Declaration of Lisa Veenstra* | 227–234 |
| 15-3 | Exhibit C to Motion for Preliminary Injunction: *Declaration of Emily McJones* | 235–246 |
| 15-4 | Exhibit D to Motion for Preliminary Injunction: *Declaration of Dr. Andrew Clark* | 247–304 |
| 27 | Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction | 521–575 |
| 27-1 | Exhibit 1 to Defendants' Opposition to Preliminary Injunction: *Declaration of Dr. Judith Glassgold* | 576–956 |

| 27-2 | Exhibit 2 to Defendants' Opposition to Preliminary Injunction: *Declaration of Amy Gumbrecht* | 957–962 |
|---|---|---|
| 27-3 | Exhibit 3 to Defendants' Opposition to Preliminary Injunction: *NCLR Letter, MASP Letter, and The Trevor Project Letter* | 963–968 |
| 31 | Plaintiffs' Reply In Support of Their Motion for Preliminary Injunction | 1042–1062 |
| 31-1 | Exhibit E to Motion for Preliminary Injunction: *Declaration of Kelly Oeltjenbruns* | 1063–1071 |
| 36 | Plaintiffs' Notice of Supplemental Authority regarding *Chiles v. Salazar* | 1113–1114 |
| 36-1 | Exhibit A to Plaintiffs' Notice of Supplemental Authority: *Tenth Circuit's Opinion regarding* Chiles v. Salazar | 1115–1161 |
| 37 | Defendants' Notice of Supplemental Authority regarding *Chiles v. Salazar* | 1162–1164 |
| 37-1 | Exhibit 1 to Defendants' Notice of Supplemental Authority: *Tenth Circuit's Opinion regarding* Chiles v. Salazar | 1165–1289 |
| 39 | Opinion and Order Denying Motion for Preliminary Injunction | 1292–1327 |
| 40 | Notice of Appeal | 1328 |