# In The United States Court of Appeals
## For the Sixth Circuit

Catholic Charities of Jackson, Lenawee and Hillsdale Counties;

Emily McJones,

Plaintiffs-Appellants,

v.

Gretchen Whitmer, et.al.,

Defendants-Appellees.

On Appeal from the United States District Court for the
Western District of Michigan, Southern Division, No: 1:24-cv-718

## BRIEF OF THE COUNCIL ON AMERICAN-ISLAMIC RELATIONS–MICHIGAN AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT

Amy V. Doukoure (P80461)
**CAIR-MI LEGAL FUND**
Counsel for CAIR-MI as Amicus Curiae
1905 S. Haggerty Road, Suite 5
Canton, MI  48188
(248) 559-2247
adoukoure@cair.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

CORPORATE DISCLOSURE STATEMENT………………………………………..v

STATEMENT OF INTEREST ............................................................. 1

AMICUS CONSENT FILING STATEMENT………………………………...2

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ............................................................................... 4

    1. Proper Standard for Likelihood of Success ................................... 4

    2. The District Court Misapplied the Balance of Equities
and Public Interest Factors ................................................................... 5

    3. Constitutional Rights Take Precedence Over Government Interests ……... 5

    4. The Government Has No Legitimate Interest in Enforcing an
      Unconstitutional Law ................................................................8

    5. The District Court Improperly Heightened the Standard for Irreparable
      Harm......................................................................................9

    6. The District Court Erred in Requiring an Extreme or Certain Degree of
      Harm, Contrary to Controlling Precedent................................. 11

        a. A Constitutional Violation Automatically Establishes Irreparable
          Harm ....................................................................... 12

        b. The District Court's Requirement of Additional Proof Defies the
          Very Purpose of Injunctive Relief.....................................13

        c. The District Court's Misapplication of the Standard Warrants
          Reversal…………………………………………………14

CONCLUSION ............................................................................... 15

CERTIFICATE OF COMPLIANCE ....................................................17

CERTIFICATE OF SERVICE .............................................................18

# TABLE OF AUTHORITIES

*303 Creative LLC v. Elenis*,
      600 U.S. 570 (2023)...........................................................................7

*ACLU of Ky. v. McCreary County*,
      354 F.3d 438 (6th Cir. 2003).........................................................7, 12

*Ashcroft v. Free Speech Coalition*,
      535 U.S. 234 (2002)...........................................................................8

*Connection Distributing Co. v. Reno*,
      154 F.3d 281 (6th Cir. 1998).........................................................9, 11

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
      70 F.3d 1474 (6th Cir. 1995)……………………….……………….... 11

*Doe v. Harris*,
      772 F.3d 563 (9th Cir. 2014)....................................................................3

*Elrod v. Burns*,
      427 U.S. 347 (1976)........................................................................3,12

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
      23 F.3d 1071 (6th Cir. 1994)………………………………………….11

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
      546 U.S. 418 (2006)……………………..…………………………….3

*Joelner v. Vill. of Washington Park*,
      378 F.3d 613 (7th Cir. 2004)................................................................8

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*,
      945 F.2d 150 (6th Cir. 1991)………………………………..……4

*Mitchell v. Cuomo*,
      748 F.2d 804 (2d Cir. 1984)...............................................................13

*N.Y. Progress & Protection PAC v. Walsh*,
      733 F.3d 483 (2d Cir. 2013)....................................................................9

*Opulent Life Church v. City of Holly Springs*,
      697 F.3d 279 (5th Cir. 2012)..................................................................12

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
      141 S. Ct. 63 (2020)..................................................................................3

*Winter v. NRDC*,
      555 U.S. 7 (2008)......................................................................................2

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-1105          Case Name: Catholic Charities of Jackson, Lenawee and Hillsdale Counties;
Emily McJones-vs- Gretchen Whitmer, et.al.,

Name of counsel: Amy V. Doukoure (P80461)

Pursuant to 6th Cir. R. 26.1, CAIR-MI as Amicus Curiae
                              *Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

## CERTIFICATE OF SERVICE

I certify that on April 4, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Amy V. Doukoure

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# STATEMENT OF INTEREST

The Council on American-Islamic Relations–Michigan (CAIR-MI) is a nonprofit civil rights organization that defends the constitutional rights of Muslims across Michigan through legal advocacy and public policy engagement. Its work regularly involves cases at the intersection of religious liberty, free speech, and professional practice.

CAIR-MI is a trusted resource for Michigan's Muslim community, frequently fielding requests for referrals to faith-aligned mental health providers. Since the enactment of HB 4616 and HB 4617, CAIR-MI has also received inquiries from Muslim therapists alarmed that these laws threaten their ability to provide care consistent with Islamic beliefs. Some have reduced or discontinued services as a result.

Following the enactment of Michigan HB 4616 and HB 4617, CAIR-MI began receiving urgent inquiries from Muslim therapists and organizations alarmed by the laws' chilling effect. Licensed professionals expressed fear that offering therapy consistent with their religious beliefs—or those of their clients—could result in disciplinary action or legal sanction. Several practitioners have since curtailed or ended their services entirely.

The laws at issue prohibit licensed mental health providers from engaging in certain conversations with minors regarding gender identity and sexual orientation—even when the patient voluntarily seeks faith-informed therapy in alignment with their sincerely held beliefs. The effect has been to silence Muslim therapists, sever trust between religious patients and providers, and deprive Michigan's Muslim youth of access to therapeutic care grounded in their religious values.

CAIR-MI submits this brief to highlight how the enforcement of HB 4616 and HB 4617 has not only chilled constitutionally protected religious speech but has also compelled silence and conformity among faith-based professionals, forcing them to choose between their religious obligations and professional licensure.

Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus affirms that no party's counsel authored this brief in whole or in part and that no party or party's counsel contributed funds for its preparation or submission.

**Amicus Filing Consent Statement:**

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for amicus curiae certifies that counsel for all parties were notified of the intent to file this brief and have consented. No party has objected to the filing of this brief.

**SUMMARY OF ARGUMENT**

A preliminary injunction is an extraordinary remedy, but courts have consistently affirmed that it is warranted when an applicant satisfies four well-

established factors: (1) a likelihood of success on the merits, (2) irreparable harm absent relief, (3) that the balance of equities favors relief, and (4) that an injunction serves the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). These factors are not mere guidelines; they are binding legal standards that courts must properly apply.

The district court's ruling misapplied these factors by improperly elevating the burden for relief and disregarding key precedents that mandate injunctive relief in cases of clear and immediate constitutional violations. As the Supreme Court has stated, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The district court's failure to recognize the immediate and irreparable nature of the constitutional harm at issue is directly contrary to this long-standing principle.

Additionally, the Supreme Court has emphasized that the likelihood of success on the merits is a primary consideration in granting preliminary relief. See, e.g., *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006) (recognizing that courts must apply heightened scrutiny where constitutional rights are at stake). Here, the applicant demonstrated a strong likelihood of success on the merits, but the district court erred as a matter of law, contradicting Supreme Court precedent, contradicting Supreme Court precedent.

Further, when constitutional rights are at risk, courts have found that the balance of equities and public interest factors strongly favor injunctive relief. As the

Court held in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020), "there can be no question that the challenged restrictions, if enforced, will cause irreparable harm." The public interest is "always served when constitutional rights are vindicated." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). By failing to weigh these factors correctly, the district court departed from well-established precedent.

For these reasons, this Court should reverse the district court's ruling and grant the requested preliminary injunction The Supreme Court has made clear that where a party demonstrates a likelihood of success on the merits and irreparable harm, injunctive relief is not only appropriate but required to prevent ongoing constitutional violations.

## ARGUMENT

The district court's application of an overly stringent standard in evaluating the "likelihood of success on the merits" for a preliminary injunction is a clear departure from established legal precedent, particularly within the Sixth Circuit. This misapplication is especially egregious when constitutional rights are at stake, as courts have consistently held that a strong indication of a constitutional violation suffices to demonstrate a likelihood of success.

### 1. <u>Proper Standard for Likelihood of Success</u>

The Sixth Circuit has articulated that to satisfy the "likelihood of success" criterion, a movant need not prove their case in full but must present at least "serious questions going to the merits." In *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, the court stated:" To justify the granting of a preliminary injunction, the plaintiffs must establish that they are likely to succeed on the merits, suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

This standard underscores that a preliminary injunction is warranted when there is a substantial question as to the merits of the case, without necessitating a full trial on the issues

## 2. <u>The District Court Misapplied the Balance of Equities and Public Interest Factors</u>

The district court committed clear legal error by improperly weighing the balance of equities and public interest. The Supreme Court and the Sixth Circuit have consistently held that where Plaintiffs have met the first injunctive-relief factor, these factors necessarily favor the moving party. Instead of applying this well-settled principle, the district court elevated speculative government interests over actual constitutional harm, a fundamentally flawed approach that warrants reversal.

**3. Courts Consistently Hold That Constitutional Rights Take Precedence Over Government Interests**

The Supreme Court has long held that government interests—even when substantial—cannot override fundamental constitutional rights. In *Roman Catholic Diocese of Brooklyn* the Court rejected the proposition that administrative burden could excuse infringement on First Amendment freedoms, holding: "Even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn* 141 S. Ct. 63, 67 (2020).

If emergency public health measures during a once-in-a-century pandemic were insufficient to justify curtailing religious exercise and expressive freedom, then routine regulatory interests—like administrative ease or policy conformity—cannot justify compelled speech and viewpoint discrimination under Michigan's HB 4616 and HB 4617.

Yet the district court accepted vague and unsubstantiated claims that enforcing constitutional protections for religious speech would be burdensome. *Catholic Charities of Jackson v. Whitmer*, No. 1:24-cv-718, ECF No. 39, PageID.1326 (W.D. Mich. Jan. 28, 2025)(finding that restraining the government from executing its laws—based on constitutional claims—comes at a significant cost to state sovereignty and democratic governance.).That logic is not only unsupported by the record—it is irreconcilable with binding Supreme Court precedent. The Court has

made clear that governmental efficiency cannot serve as a trump card over core First Amendment rights.

This is not a hypothetical concern. CAIR-MI has documented numerous real-world consequences stemming directly from the enactment of HB 4616 and HB 4617. Muslim therapists, social workers, and faith-based counseling organizations across Michigan have curtailed, suspended, or altogether abandoned their practices due to fears of legal and professional sanctions for offering treatment aligned with their clients' religious convictions. These are not fringe concerns—they represent a chilling effect on religious speech with real and ongoing harm.

One experienced social worker—a respected professor and longtime provider in the Muslim community—stopped treating patients entirely out of fear that faith-consistent therapy would be deemed illegal under the new laws. Another, a school counselor, resigned from her position after realizing that she could not safely assist Muslim students wrestling with gender identity issues without potentially violating HB 4616. Even entire nonprofit counseling centers now fear state enforcement actions simply for practicing therapeutic methods grounded in Islamic teachings.

This compelled speech regime is precisely what the First Amendment prohibits. As the Supreme Court reaffirmed in *303 Creative LLC v. Elenis*, 600 U.S. 570, 143 S. Ct. 2298 (2023), the state may not compel private citizens to adopt or promote its preferred messages. Yet Michigan's laws impose severe penalties—including fines

and loss of licensure—on professionals who decline to affirm state-sanctioned views on gender and sexuality, regardless of religious objection or therapeutic judgment.

The Sixth Circuit has likewise recognized that where constitutional violations are at issue, equitable considerations favor the plaintiff. In *ACLU of Ky. v. McCreary County*, 354 F.3d 438, 461 (6th Cir. 2003), the court held: "No substantial harm can befall the government from an injunction that prevents it from enforcing unconstitutional restrictions."

The district court's contrary reasoning—that the state would suffer harm from having to accommodate constitutionally protected religious counseling—flatly contradicts this precedent. As the Supreme Court made clear in Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244 (2002), statutes that chill protected expression—particularly on matters of moral or religious belief—are presumptively invalid.

In short, Michigan's statutory scheme does not merely regulate conduct; it compels ideological conformity, punishes dissent, and eliminates safe space for faith-based therapeutic practices. The Constitution does not permit the state to coerce religious counselors into silence or surrender under threat of professional ruin.

If the Constitution is to mean anything, it must protect the right of individuals and institutions to speak, believe, and care for others in ways that reflect their most

deeply held convictions. This Court should reverse and restore the primacy of First Amendment protections over government-imposed orthodoxy.

4. **The Government Has No Legitimate Interest in Enforcing an Unconstitutional Law**

Even if Appellees could articulate some burden, it is black-letter law that the government has no legitimate interest in enforcing unconstitutional statutes or policies. As the Seventh Circuit unequivocally held in *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004): "The government does not have an interest in enforcing an unconstitutional law."

The Second Circuit has reinforced this principle, explicitly stating in *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013): "The government does not have an interest in enforcing a law that is likely unconstitutional."

The Sixth Circuit has embraced this doctrine as well, holding that even temporary enforcement of an unconstitutional law is unjustifiable. In *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), the court made clear: "When a constitutional violation is likely, the harm to the government is outweighed by the continuing harm to the plaintiff."

The district court completely ignored this binding precedent. Rather than acknowledging that the government suffers no harm from being required to comply

with constitutional mandates, the court instead afforded weight to a government interest that, by law, does not exist. That misapplication of the law is reversible error.

5. **The Balance of Equities and Public Interest Overwhelmingly Favor Appellants**

The district court fundamentally misunderstood the equities at stake. While Appellants and their supporting communities face ongoing, demonstrable constitutional violations, Appellees' only asserted harm is the administrative inconvenience of complying with constitutional mandates. This is not a legally cognizable harm—and the Sixth Circuit has expressly rejected it.

In *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 733 (M.D. Tenn. 2019), the court held: "Protecting fundamental constitutional rights outweighs administrative burdens on the government."

The district court's failure to apply this standard is a manifest legal error. The balancing of equities is not a theoretical exercise—it requires courts to weigh the actual harm suffered by the plaintiff against real burdens on the government. And here, that balance overwhelmingly favors Appellants.

Muslim mental health professionals have already been forced to curtail or abandon their practices out of fear that religiously grounded therapy—consistent with their own and their patients' beliefs—will trigger professional sanctions under HB 4616 and HB 4617. One therapist with over a decade of experience ceased treating patients entirely. A school counselor resigned from her position, unwilling

to risk liability for offering students guidance aligned with Islamic teachings. A respected nonprofit counseling organization fears closure due to its inability to lawfully serve its faith community without violating state law.

These are not speculative harms—they are present, specific, and irreparable constitutional injuries. The government, by contrast, suffers no lawful harm from being enjoined from enforcing an unconstitutional regime. The Sixth Circuit made this point unmistakably clear in *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), holding: "When a constitutional violation is likely, the harm to the government is outweighed by the continuing harm to the plaintiff."

That principle is dispositive here. The balance of harms decisively favors Appellants and their supporters, including Michigan's Muslim therapists, families, and religious organizations.

The public interest analysis is equally one-sided. Courts have long held that it is always in the public interest to prevent the violation of constitutional rights. In *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994), the Sixth Circuit emphasized: "It is always in the public interest to prevent the violation of a party's constitutional rights." And in *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir. 1995), the court reaffirmed: "Public interest is never served by upholding unconstitutional statutes."

These statements are not discretionary—they are binding precedent. Yet the district court treated the public interest as a neutral factor, failing to give appropriate weight to the urgent and ongoing suppression of religious speech and professional autonomy. That alone warrants reversal.

## 6. **The District Court Erred in Requiring an Extreme or Certain Degree of Harm, Contrary to Controlling Precedent**

The district court improperly heightened Appellants' burden by requiring them to demonstrate an extreme or certain degree of harm, despite clear Supreme Court and Circuit precedent establishing that a constitutional violation itself constitutes irreparable harm as a matter of law. This misapplication of the standard directly contradicts binding precedent and constitutes reversible error.

### a. *A Constitutional Violation Automatically Establishes Irreparable Harm*

The Supreme Court has long held that the loss of constitutional rights—even briefly—constitutes irreparable harm per se. In *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the Court held: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

That principle applies broadly. The Fifth Circuit stated in *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012): "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." And the Sixth Circuit, applying this

standard in *ACLU of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003), squarely held: "[W]hen reviewing a motion for preliminary injunction, a plaintiff who has shown a likelihood of success on the merits of a constitutional violation has also shown irreparable harm."

Here, the constitutional violations are not hypothetical. As CAIR-MI's amicus brief documents in detail, Muslim therapists and counselors across Michigan have stopped treating patients, closed practices, and withdrawn from the profession altogether—not because of patient need, but because of the chilling effect of HB 4616 and HB 4617. These laws penalize the provision of therapeutic care grounded in Islamic religious teachings on gender and sexuality, silencing practitioners and denying patients access to faith-aligned mental health services.

One licensed social worker with over a decade of experience left her practice entirely for fear of professional sanction. A school counselor resigned, unable to support religious students grappling with identity conflicts. A nonprofit organization providing Islamic counseling now faces potential closure, knowing that its mission-driven services could trigger penalties. These are not speculative injuries—they are ongoing First Amendment harms suffered by real people in the real world.

By demanding additional proof of harm beyond these constitutional injuries, the district court disregarded controlling precedent and improperly imposed a heightened standard that the law does not require.

## b. *The District Court's Requirement of Additional Proof Defies the Very Purpose of Injunctive Relief*

The entire purpose of injunctive relief is to prevent irreparable harm before it occurs. The Supreme Court and lower courts have consistently rejected the idea that a plaintiff must wait for tangible or escalating harm to seek protection of constitutional rights. In *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984), the Second Circuit explained: "When an alleged deprivation of a constitutional right is involved, no further showing of irreparable harm is necessary because such harm is, by its nature, irreparable."

This is especially true in cases involving the First Amendment. Even temporary violations of religious expression and speech can produce permanent, structural injuries, such as the disintegration of trusted faith-based therapeutic networks and the silencing of religious counselors who feel forced to choose between licensure and belief.

The district court's demand for "more" than a constitutional injury not only imposes a legally erroneous burden, it undermines the core function of injunctive relief by requiring violations to escalate before relief is granted. In doing so, the court rewrote the established standard and ignored the lived consequences of HB 4616 and HB 4617 on protected religious expression.

## c. *The District Court's Misapplication of the Standard Warrants Reversal*

The correct legal rule is settled and straightforward: A constitutional violation itself satisfies the irreparable harm requirement (Elrod, McCreary County, Opulent Life Church). No further proof is required (Mitchell, ACLU of Ky.). Requiring more contradicts the very function of emergency relief (Mitchell, Elrod).

The district court failed on all three counts. Its decision fundamentally misapplied governing precedent, ignored direct Supreme Court and Sixth Circuit authority, and wrongly heightened Appellants' burden in a way that deprived them—and those they represent—of immediate protection for core constitutional freedoms.

The Supreme Court and multiple Circuit Courts—including the Sixth Circuit—have been unequivocal: a constitutional violation itself constitutes irreparable harm as a matter of law. The district court's refusal to apply that standard—especially in light of the concrete harms documented by CAIR-MI—was legally indefensible and factually unjustifiable. The decision should be reversed, and injunctive relief granted to prevent further erosion of First Amendment rights.

## CONCLUSION

The Constitution does not permit the government to compel ideological conformity, punish religious speech, or drive faith-based professionals out of practice under threat of penalty. Yet that is precisely what HB 4616 and HB 4617 have done—and what the district court failed to prevent. The Supreme Court and Sixth Circuit have been unequivocal: a constitutional violation, particularly one

involving First Amendment freedoms, constitutes irreparable harm and mandates prompt judicial intervention.

The ongoing suppression of protected religious expression—experienced acutely by Muslim therapists and organizations across Michigan—cannot be dismissed as speculative or outweighed by administrative convenience. The government has no legitimate interest in enforcing an unconstitutional regime, and the public interest is always served by the protection of constitutional rights.

This Court should reverse the district court's decision and grant immediate injunctive relief to prevent further irreparable harm to the individuals, communities, and freedoms the First Amendment was designed to protect.

DATED: April 4, 2025                     Respectfully Submitted,

/s/ Amy V. Doukoure
Amy V. Doukoure (P80461)
**CAIR-MI LEGAL FUND**
Counsel for CAIR-MI as Amicus Curiae
1905 S. Haggerty Road, Suite 5
Canton, MI  48188
(248) 559-2247
adoukoure@cair.com

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit in Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,262 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) be- cause this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Times New Roman.

DATED: April 4, 2025

/s/ Amy V. Doukoure
Amy V. Doukoure (P80461)

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court or the United States Court of Appeals for the Sixth Circuit by using the appellate CIECF system on April 4, 2025.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CMIECF system or by other electronic means.

DATED: April 4, 2025

/s/ Amy V. Doukoure
Amy V. Doukoure (P80461