No. 25-1105

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

CATHOLIC CHARITIES OF JACKSON, LENAWEE AND HILLSDALE COUNTIES, *et al.*,

*Plaintiffs-Appellants*,

v.

GRETCHEN WHITMER, in her official capacity as Governor of Michigan, *et al.*,

*Defendants-Appellees.*

———————————

*On appeal from the United States District Court
for the Western District of Michigan – Case No. 1:24-cv-718*

———————————

BRIEF FOR THE STATES OF IOWA, SOUTH CAROLINA, AND 9 OTHER STATES
AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS

———————————

BRENNA BIRD
 *Attorney General of Iowa*
ERIC WESSAN
 *Solicitor General*
1305 E Walnut Street
Des Moines, IA 50319
(515) 823- 9117
eric.wessan@ag.iowa.gov

*Counsel for* Amici Curiae

ALAN WILSON
 *Attorney General of South Carolina*
JOSEPH D. SPATE
 *Asst. Dep. Solicitor General*
 *Counsel of Record*
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF *AMICI CURIAE* ......................................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT ......................................................................................................3

I. The Freedoms Recognized by the First Amendment Protect Licensed
Professionals from State-Imposed Orthodoxy. .............................................3

II. The Line Between Speech and Conduct Must be Vigilantly Guarded to
Preserve the Freedom of Speech. ..................................................................7

CONCLUSION .................................................................................................10

ADDITIONAL COUNSEL ..............................................................................12

CERTIFICATE OF COMPLIANCE ................................................................13

CERTIFICATE OF SERVICE .........................................................................14

## TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984)........................................................................4
*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ................................................ passim
*King v. Governor of N.J.*,
  767 F.3d 216 (3d Cir. 2014) ....................................................2, 9
*Leathers v. Medlock*,
  499 U.S. 439 (1991)........................................................................4
*NIFLA v. Becerra*,
  138 S.Ct. 2361 (2018)................................................................ passim
*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ..................................................2, 9
*Pickup v. Brown*,
  740 F.3d 1208 (9th Cir. 2014) ...........................................................7
*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992).....................................................................10
*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).................................................................. 4, 6, 10
*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995).....................................................................10
*Russell v. Lundergan-Grimes*,
  784 F.3d 1037 (6th Cir. 2015) ....................................................10
*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011).........................................................................6
*Tingley v. Ferguson*,
  144 S.Ct. 33 (2023)........................................................................1
*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ..........................................................2
*Tingley v. Ferguson*,
  57 F.4th 1072 (9th Cir. 2022) ..........................................................4
*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)........................................................................4

**Statutes**

Mich. Comp. Laws § 330.1100a(20)........................................................3
Mich. Comp. Laws § 333.16226(1)(3)......................................................3

**Other Authorities**

*A Remonstrance for Conscience*,
   106 U. PA. L. REV. 806 (1958)...................................................................................5

## INTEREST OF *AMICI CURIAE*

*Amici curiae* States of Iowa, South Carolina, Arkansas, Florida, Georgia, Idaho, Kansas, Louisiana, Missouri, Montana, and North Dakota ("*Amici* States") submit this brief in support of Appellants, urging this Court to reverse the District Court's decision. That decision allowed Michigan to regulate counselors' speech on a topic of "fierce public debate." *Tingley v. Ferguson*, 144 S.Ct. 33, 33 (2023) (Thomas, J., dissenting from denial of certiorari). That debate concerns how to best "help minors with gender dysphoria." *Id.*

*Amici* States have a strong interest in protecting their licensed professionals—and the children whom they treat—from State-imposed orthodoxy. The District Court's decision risks unduly restricting counselors' ability to advise and help children. *Amici* States are home to many Americans who are, or will soon be, affected by such censorship laws. Their citizens border States like Michigan and cannot speak or receive certain messages in those States. And this type of ban on counseling will create problems for children that split time between these States.

*Amici* States regulate professionals. Guidance as to the propriety of those regulations is important and will benefit *Amici* States as they consider the regulations they intend to enact regarding counseling.

1

Ultimately, the District Court's interpretation imposes undue and illegal burdens on the First Amendment. State laws telling counselors how they must treat hotly contested issues go too far. This Court should reverse.

## SUMMARY OF ARGUMENT

Most states do not censor therapists from speaking disfavored messages to their patients. *Tingley v. Ferguson*, 47 F.4th 1055, 1063 (9th Cir. 2022). What's more, the Eleventh and Third Circuits have rejected efforts to censor therapists. The Eleventh Circuit set aside as unconstitutional speech restrictions because they "sanction speech directly, not incidentally—the only 'conduct' at issue is speech." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020). So too with the Third Circuit, which rejected "the argument that verbal communications become 'conduct' when they are used to deliver professional services." *King v. Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014), *abrogated in part by Nat'l Inst. Of Fam. & Life Advocs v. Becerra*, 585 U.S. 755, 767 (2018). While the Ninth and Tenth Circuits have taken a different approach, the Tenth Circuit's position is now on appeal at the Supreme Court. *See Tingley*, 47 F.4th at 1064; *see also Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024), *cert. granted*, No. 24-539, 2025 WL 746313 (U.S. Mar. 10, 2025).

The District Court found that Michigan's law banning "any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change

2

behavior or gender expression or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender" does not intrude on a therapist's First Amendment rights. Opinion, R.39, PageID#1295 (quoting MICH. COMP. LAWS § 330.1100a(20)). Violating that law has "massive" consequences for "state-licensed mental health practitioner[s]" in Michigan. *Id.* at PageID#1309. Indeed, those consequences include "fines up to $250,000 and the potential loss of their licenses and livelihoods." *Id.*; *see also* MICH. COMP. LAWS § 333.16226(1)(3).

The District Court's decision to uphold Michigan's censorship law is deeply troubling. Under the District Court's logic, "any restriction on professional speech is just incidental to the regulation of conduct." *Chiles*, 116 F.4th at 1226. But that cannot be. Indeed, "such wordplay poses a serious threat to free speech." *Id.*

This case presents two outstanding and important issues. *First*, free citizens need not choose between making a living in a licensed profession and retaining their right to speak freely. *Second*, a government cannot regulate speech by calling it conduct. This Court should restore balance to the First Amendment and prohibit States in the Sixth Circuit from regulating professional speech in this way.

## ARGUMENT

### I.    The Freedoms Recognized by the First Amendment Protect Licensed Professionals from State-Imposed Orthodoxy.

Licensed professionals do not lose their First Amendment rights by entering a regulated profession. That's why Michigan's law invading "the sphere of intellect

3

and spirit" in a professional's practice violates the First Amendment. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). A State government exercising police power, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (cleaned up). State governments cannot censor in that way. *Id.*

Limiting professionals' ability to speak in violation of the First Amendment fails to respect the "individual dignity and choice upon which our political system rests." *Leathers v. Medlock*, 499 U.S. 439, 448–49 (1991). The First Amendment guarantees to Americans their free speech rights as citizens. "[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503-04 (1984).

Unfortunately, the District Court's approach sets aside those core constitutional principles by carving out "a First-Amendment-free zone." *Tingley v. Ferguson*, 57 F.4th 1072, 1074 (9th Cir. 2023) (O'Scannlain, J., dissenting from denial of rehearing en banc). Indeed, the District Court "pa[id] lip service to the proposition that the Supreme Court has never recognized a lesser First Amendment protection for 'professional' speech." *Chiles*, 116 F.4th at 1227 (Hartz, J., dissenting). That approach "ignores" protections for professional speech that the Supreme Court has held "cannot be treated differently" from generally protected speech "just because it

4

is uttered by a professional." *Id.*

Michigan's licensing approach fails to work within any appropriate First Amendment framework. The First Amendment has roots that go across the pond to England, which can help inform this Court's analysis. A good example with which the Framers would have been familiar is Parliament's Licensing Order of 1643. John Milton famously opposed that order in *Areopagitica*: "if it come to prohibiting, there is not ought more likely to be prohibited then truth it self; whose first appearance to our eyes blear'd and dimm'd with prejudice and custom, is more unsightly and un-plausible than many errors." John Milton, *Areopagitica; A Speech of Mr. John Milton for the Liberty of Unlicen'd Printing, To the Parliament of England* (1644), Dartmouth College: The John Milton Reading Room (https://ti-nyurl.com/mwkw3wff) (last visited Mar. 24, 2025); *see* Harrop A. Freeman, *A Remonstrance for Conscience*, 106 U. Pa. L. Rev. 806, 815 (1958) (recognizing Milton's influence).

While there can be extremely limited instances when it is proper for the State to intercede and protect its citizens by restricting speech, this is not one of those instances. And its efforts mirror what this Court in *NIFLA* described as occasions when totalitarian governments "manipulat[ed] the content of doctor-patient discourse." *NIFLA v. Becerra*, 138 S.Ct. 2361, 2374 (2018) (cleaned up). The Soviet Union ordered doctors to withhold information from patients to fast-track

construction projects; the Third Reich commanded physician fealty to state ideology above patient wellbeing; and Romanian Communists prohibited doctors from providing their patients with information about birth control to increase the country's birth rate. *Id.* The goal in each of these instances ultimately was "to increase state power and suppress minorities." *Id. NIFLA*'s examples and warnings could apply with equal vigor to Michigan's anti-speech law here.

That the Supreme Court has long recognized the ability of medical professionals to speak freely is especially important. In the "fields of medicine and public health," "information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). So the Supreme Court has been quick to reject content-based regulations like Michigan's that do not "advance a legitimate regulatory goal, but [instead] suppress unpopular ideas or information." *NIFLA*, 138 S.Ct. at 2374 (cleaned up). That type of law—this type of law—is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (cleaned up).

That warning rings especially true when laws like Michigan's risk tainting medicine with politics. Free speech should protect the medical field from political pressure seeking to stifle scientific advancements. And it is far from clear that the ideological partisan bent embodied in Michigan's law is "settled" in any meaningful sense. *Chiles*, 116 F.4th at 1241 (Hartz, J., dissenting). Indeed, not that long ago, the

"shoe" was "on the other foot." *Id.* at 1227. In recent memory, "the mental-health establishment declared homosexuality to be a mental disorder." *Id.* Under the District Court's position, "a state law *prohibiting* therapy that affirmed a youth's homosexual orientation would have faced only rational-basis review and very likely would have been upheld as constitutional." *Id.* The Michigan Legislature likely would blanche if the valence were reversed.

And perhaps most importantly here, the District Court erred in avoiding the Supreme Court's binding precedent. The Supreme Court rejected treating "professional speech" as a separate category; and rejected regulating professional speech categorically as conduct that incidentally touches on speech. *NIFLA*, 138 S.Ct. at 2371-72. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Id*. But that is the fiction that Michigan has peddled here. Michigan "cannot nullify the First Amendment's protections for speech by playing this labeling game." *Pickup v. Brown*, 740 F.3d 1208, 1218 (9th Cir. 2014) (O'Scannlain, J., dissenting from denial of rehearing en banc), *abrogated by NIFLA*, 138 S.Ct. 2361. Michigan's censorship regime flouts the First Amendment and vital protections guaranteed by our Constitution.

## II.    The Line Between Speech and Conduct Must be Vigilantly Guarded to Preserve the Freedom of Speech.

The District Court mistakenly found that Michigan's law "concerns treatment and does not target speech." Op., R.39, PageID#1319. Indeed, it found that the law

7

"prohibits the administration of conversion treatment" but "does not prohibit licensed mental health professionals from speaking with clients about gender identity or sexual orientation, generally, or even conversion therapy, specifically." *Id.* at PageID#1320. On that basis, the court explained that affirming the Michigan law that prohibited therapists from disfavored speaking did not restrict "a special constitutional category of professional speech." *Id.*

*NIFLA* held that "States may regulate professional conduct, even though that conduct incidentally involves speech." 138 S.Ct. at 2372. But that incidental exception risks swallowing the generally protective rule. Indeed, *NIFLA* explained that States may not regulate speech "under the guise of prohibiting professional misconduct." *Id.* (cleaned up). The District Court, recognizing that flaw, offered a fig leaf rejecting that it was doing just that. Op., R.39, PageID#1320. But Michigan's law is an example of speech regulation disguised as conduct regulation.

The District Court thus failed to draw a distinction "between speech and conduct." *Cf. NIFLA*, 138 S.Ct. at 2373. Drawing such a distinction may be difficult, but the District Court's decision shows it is necessary. *Id.* Therapists' therapeutic communications fall on the speech side of the line.

The District Court committed "remarkable" error by "treat[ing] speech as conduct." *Chiles*, 116 F.4th at 1228 (Hartz, J., dissenting). That is because "a restriction on speech is not *incidental* to regulation of conduct when the restriction is imposed

8

because of the expressive conduct of what is said." *Id.* And "the 'conduct' being regulated here is speech itself"—even worse, that speech "is being regulated because of disapproval of its expressive content." *Id.* That leads to the absurd result that to avoid the First Amendment, all a State must do "is put it within a category ('a therapeutic modality') that includes conduct and declare that any regulation of speech within the category is merely incidental to regulating the conduct." *Id.* at 1231. But that "labeling game" fails. *Id.* (quoting *King*, 767 F.3d at 228–29).

And the absurd results do not stop there. Counseling "consists—entirely—of words." *Otto*, 981 F.3d at 865. So if counseling is conduct rather than speech, "the same could be said of teaching or protesting—both are activities, after all. Debating? Also an activity. Book clubs? Same answer." *Id.* The logic of treating speech as conduct quickly collapses. Simply put, "[s]peech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 866 (cleaned up).

Michigan's ban impermissibly burdens speech because conduct is not its object. Contrast Michigan's law with laws requiring doctors to provide informed consent. Those laws reach speech—but only in service of regulating a given procedure. *NIFLA*, 138 S.Ct. at 2373 ("[T]he requirement that a doctor obtain informed consent to perform an operation is 'firmly entrenched in American tort law.'") (cleaned up). To be like informed consent laws, a law that burdens speech must be a necessary means of regulating conduct subject to State regulation. Pure speech itself falls

9

outside of those bounds. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). But regulating speech—the therapy at issue here—is the object and subject of Michigan's ban.

Michigan's law bans speech based on a viewpoint unpopular in the regulated profession. As a result, it is "per se invalid," so strict scrutiny does not even need to be applied to invalidate the law. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 n.1 (6th Cir. 2015) (cleaned up). Michigan's ban also "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. So even if the law did not discriminate based on viewpoint, this "content-based" law is still "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). It may be justified only if the State proves it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. This Court should correct the District Court's error here and find Michigan's law fails strict scrutiny by impermissibly censoring professional speech.

## CONCLUSION

This Court should reverse the District Court's judgment.


[Signature on following page]

10

Respectfully submitted,

BRENNA BIRD
  *Attorney General of Iowa*
ERIC WESSAN
  *Solicitor General*
  1305 E Walnut Street
Des Moines, IA 50319
(515) 823- 9117
eric.wessan@ag.iowa.gov

s/Joseph D. Spate
ALAN WILSON
  *Attorney General of South Carolina*
JOSEPH D. SPATE
  *Asst. Dep. Solicitor General*
  *Counsel of Record*
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for* Amici Curiae

April 4, 2025　　*Additional Counsel for* Amici Curiae *Listed on Next Page*

## ADDITIONAL COUNSEL

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

DREW H. WRIGLEY
Attorney General
State of North Dakota

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), contains 2,301 words. *See* Fed. R. App. P. 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted, this 4th day of April, 2025.

<u>s/ Joseph D. Spate</u>
Joseph D. Spate

## CERTIFICATE OF SERVICE

On April 4, 2025, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under Sixth Circuit Rule 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

<u>s/ Joseph D. Spate</u>
Joseph D. Spate

14