# In the United States Court of Appeals for the Sixth Circuit

CATHOLIC CHARITIES OF JACKSON, LENAWEE, AND HILLSDALE COUNTIES, ET AL.,

*Plaintiffs–Appellants,*

v.

GRETCHEN WHITMER, ET AL.,
*Defendants–Appellees.*

*On Appeal from the United States District Court
for the Western District of Michigan*

**BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Paul Sherman
Benjamin Field
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
psherman@ij.org
bfield@ij.org

*Counsel for Amicus Curiae
Institute for Justice*

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-1105

Case Name: Catholic Charities of Jackson, Lenawee, and Hillsdale Counties, et al., v. Gretchen Witmer, et al.

Name of counsel: Paul Sherman

Pursuant to 6th Cir. R. 26.1, Institute for Justice

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    No

## CERTIFICATE OF SERVICE

I certify that on _____ April 4, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Paul Sherman

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**PAGE**

DISCLOSURE OF CORPORATE AFFLIATIONS AND
FINANCIAL INTEREST ....................................................................i

TABLE OF AUTHORITIES .................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE .............................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT .........................................................................................5

   I.  Basic First Amendment principles and common objections. .........6

      A.  Speech vs. Professional Conduct...................................8

      B.  Content-based vs. Content-neutral....................................12

      C.  Public Speech vs. Private Speech ........................................15

      D.  Commercial Speech vs. Non-commercial Speech .................17

      E.  Paid vs. Unpaid Speech.........................................................18

      F.  Burdens vs. Bans .................................................................20

   II.  But what about lawyers? .........................................................21

   III.  If affirmed, the ruling below threatens all Americans who advise
others for a living. .........................................................................27

CONCLUSION .....................................................................................32

CERTIFICATE OF SERVICE...............................................................33

CERTIFICATE OF COMPLIANCE......................................................34

# TABLE OF AUTHORITIES

P<small>AGE</small>(S)

C<small>ASES</small>

*360 Virtual Drone Servs., LLC v. Ritter,*
 102 F.4th 263 (4th Cir. 2024)......................................... 15, 16

*Argello v. City of Lincoln,*
 143 F.3d 1152 (8th Cir. 1998) ............................................. 16

*Ark. Educ. Television Comm'n v. Forbes,*
 523 U.S. 666 (1998) ............................................................. 16

*Berner v. Delahanty,*
 129 F.3d 20 (1st Cir. 1997).................................................. 24

*Billups v. City of Charleston,*
 961 F.3d 673 (4th Cir. 2020) ............................................... 19

*Bolger v. Youngs Drug Prods. Corp.,*
 463 U.S. 60 (1983) ............................................................... 16

*Brandt v. Rutledge,*
 551 F.Supp.3d 882 (E.D. Ark. 2021)..................................... 5

*Brokamp v. District of Columbia,*
 No. 20-cv-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) ..................... 23

*Brokamp v. James,*
 66 F.4th 374 (2d Cir. 2023) ................................................. 12

*Cath. Charities v. Whitmer,*
 No. 1:24-cv-718, 2025 WL 369743 (W.D. Mich. Jan. 28, 2025)............ 15

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
 596 U.S. 61 (2022) ............................................................... 13

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1985) ............................................... 19

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) ...............................23

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir. 2022)..............................9

*Edwards v. District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014) ............................24

*Hines v. Pardue*,
117 F.4th 769 (5th Cir. 2024)........................9, 30

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010).................................... *passim*

*In re Primus*,
436 U.S. 412 (1978) ..............................................22

*King v. Governor of New Jersey*,
767 F.3d 216 (3d Cir. 2014)................................18

*Lawline v. Am. Bar Ass'n*,
956 F.2d 1378 (7th Cir. 1992) .............................24

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ..............................................22

*NAACP v. Button*,
371 U.S. 415 (1963) ..............................................22

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ................................. *passim*

*Nutt v. Ritter*,
707 F. Supp. 3d 517 (E.D.N.C. 2023)..............9, 29

*Otto v. City of Boca Raton,*
   981 F.3d 854 (11th Cir. 2020) ...................................... 2, 9, 22

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer,*
   961 F.3d 1062 (9th Cir. 2020) .......................................... 9, 12

*Planned Parenthood of Se. Pa. v. Casey,*
   505 U.S. 833 (1992) .............................................................. 11

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ............................................ 6, 13, 14, 15

*Richwine v. Matuszak,*
   707 F. Supp. 3d 782 (N.D. Ind. 2023) .............................. 9, 28

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988) .............................................................. 19

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
   502 U.S. 105 (1991) .......................................................... 7, 19

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ........................................ 11, 12, 20, 22

*Tingley v. Ferguson,*
   47 F.4th 1055 (9th Cir. 2022) ............................................... 9

*United States v. Hansen,*
   599 U.S. 762 (2023) .............................................................. 24

*United States v. Nat'l Treasury Emps. Union,*
   513 U.S. 454 (1995) .............................................................. 19

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ...................................................... 6, 7, 20

*United States v. Stevens,*
   559 U.S. 460 (2010) .............................................................. 25

*Upsolve, Inc. v. James,*
  604 F. Supp. 3d 97 (S.D.N.Y. 2022) ...................................................9, 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) ...............................................................................26

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ..................................................................... *passim*

**OTHER AUTHORITIES**

Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law:*
  *An Overview of the Legal and Ethical Parameters,*
  67 Fordham L. Rev. 2581 (1999).........................................................25

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Institute for Justice ("IJ") is a nonprofit legal center dedicated to defending the foundations of free society, including the right to free speech. IJ is also the nation's leading legal advocate defending occupational speech—that is, speech, typically in the form of expert advice or information, through which people earn a living. IJ has litigated cases across the country defending diverse speakers who advise others on topics including diet, end-of-life care, engineering, legal problems, parenting issues, and pet care. In that litigation, IJ has encountered a number of common objections to the straightforward application of First Amendment principles urged by Appellants, including those raised by the Appellee and adopted by the court below. IJ believes that all these common objections have definitive answers rooted in binding Supreme Court precedent and that IJ's perspective will assist the Court both in resolving those objections and in understanding the full implications of its ruling in this important case.

---

[1] No party's counsel authored any portion of this brief. No party or person—other than Amicus—contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

1

## SUMMARY OF ARGUMENT

"If speaking to clients is not speech, the world is truly upside down." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020). Thankfully, in our right-side up world, the First Amendment principles that govern this case are straightforward. Advice, no matter the subject it pertains to, is speech within the scope of the First Amendment's protection. When the government restricts the advice that one person may give to another, whether or not in a professional/client relationship, it has imposed a content-based restriction on speech. And, like all content-based restrictions on speech, those restrictions are subject to strict scrutiny, which requires the government to prove that the restriction is narrowly tailored to serve a compelling government interest.

Applying those well-established First Amendment principles here is just as straightforward. Michigan law forbids Appellants from giving advice to minors on how to "change behavior or gender expression or . . . reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender." Michigan law permits them to give advice to minors on how to change any other behavior or reduce any other feelings. That is a content-based restriction on speech, and at the

preliminary-injunction stage the government needed to show that it is likely to satisfy strict scrutiny. The district court failed to hold the government to that burden.

That was error. But the district court's error was not unique. Many courts resist the straightforward application of binding First Amendment precedent, raising a number of common objections. As explained below, these objections typically concern topics like the distinction between speech and conduct, the distinction between laws that are content-based and content-neutral, and the distinction between paid and unpaid speech. But Supreme Court precedent supplies answers to all these objections. And those answers all point in the same direction: Expert advice is fully protected speech. In some cases, it may be speech that the government has a particularly strong interest in regulating, but that fact goes to the strength of the government's interest under First Amendment scrutiny. It is not—and cannot be—a reason for courts not to apply that scrutiny.

Why, then, have some courts gotten these cases wrong? Amicus suspects that it is because they are concerned about the implications of applying full First Amendment protection to speech on topics like law and

medicine. Some may fear that doing so will make regulating these fields impossible, while others may fear that the government will be prevented from addressing real problems. But these concerns are unfounded. Applying the First Amendment to speech about these important topics will not affect the government's ability to regulate the wide array of non-speech conduct that makes up the vast bulk of these professions or prevent the government from enforcing common consumer-protection laws or disclaimer requirements about a speaker's credentials. Indeed, it will not even prevent the government from directly regulating expert advice when it can show that doing so is the most narrowly tailored means of addressing a compelling government interest.

That is not to say that this Court's ruling will be unimportant. Indeed, faithfully applying these established First Amendment principles here is essential precisely because this Court's ruling will be important for countless speakers throughout the Sixth Circuit. Most crucially, this includes the LGBTQ minors that Michigan seeks to protect. For if talk therapy is mere medical conduct, entitled to no First Amendment protection, then there is nothing to prevent a state from doing the opposite of what Michigan has done. Any state could enact a law providing that

conversion therapy is the *only* permissible type of talk therapy for minors struggling with their gender identity or sexuality, and that law would be subject to only rational-basis review.[2]

## ARGUMENT

Appellants' opening brief does an excellent job of explaining why the Free Speech Clause of the First Amendment, as interpreted in controlling decisions of the U.S. Supreme Court, requires strict scrutiny for the content-based speech regulations at issue. Amicus will not recapitulate those arguments at length here. But in Amicus's experience litigating occupational-speech cases across the country, some courts resist this straightforward interpretation of Supreme Court precedent, raising a number of common objections.

Thus, to assist the Court, Amicus will first explain why each of these common objections is foreclosed by binding Supreme Court precedent. Amicus will then explain why this interpretation of Supreme Court precedent is no cause for alarm. Applying the robust protection for speech

---

[2] *Cf. Brandt v. Rutledge*, 551 F.Supp.3d 882, 893–94 (E.D. Ark. 2021) (holding that Arkansas law that prohibited healthcare professionals from making referrals for "gender transition procedures" in states where those procedures were legal likely violated the First Amendment).

required under Supreme Court precedent will not deprive the government of tools for addressing genuine problems. Finally, Amicus will explain the implications this Court's ruling will have for other speakers throughout this Circuit, including the LGBTQ minors Michigan wishes to protect.

## I. Basic First Amendment principles and common objections.

The short version of Appellants' free speech argument can be summed up in three points:

- Expert advice is fully protected speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767–68 (2018) (*NIFLA*) (rejecting the professional speech doctrine and holding that speech based on "expert knowledge and judgment" or that is "within the confines of [a] professional relationship" is fully protected); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (holding that a law prohibiting the provision of "advice derived from 'specialized knowledge'" burdened fully protected speech).

- Laws that regulate speech on specific subjects are content-based, even if those laws are not motivated by hostility to the viewpoint being expressed. *See Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

- Content-based burdens on speech—including restrictions on being paid for speech—are subject to strict scrutiny, even if they do not ban the speech entirely. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous

scrutiny as its content-based bans."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (holding New York's "Son of Sam law" was subject to strict scrutiny because "[i]t singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content").

Despite the clarity with which the Supreme Court has expressed these principles, some lower courts have continued to struggle with them when the First Amendment right to provide expert advice intersects with government power to regulate occupations. In Amicus's experience, this struggle revolves around six topics:

- The distinction between regulations of speech and regulations of professional conduct that incidentally involves speech;

- The distinction between laws that are content-based and laws that are content-neutral;

- The distinction between speech in public settings and speech in private settings;

- The distinction between so-called "commercial speech" and speech that occurs in a commercial context;

- The distinction between the First Amendment protection for speech that is paid or unpaid; and

- The distinction between laws that ban speech and those that merely burden it.

Below, Amicus will show that, for each of these topics, binding Supreme Court precedent provides courts with clear guidance.

## A.    Speech vs. Professional Conduct

The Supreme Court's ruling in *NIFLA* confirmed that there is no general exception to the First Amendment for so-called "professional speech." In doing so, that ruling stressed that there are only two circumstances in which the Court has afforded speech uttered by "professionals" reduced First Amendment protection. One is where a law "require[s] professionals to disclose factual, noncontroversial information in their 'commercial speech,'" such as required disclosures in attorney advertisements. 585 U.S. at 768. The other is where the government has regulated "professional conduct, even though that conduct incidentally involves speech." *Id.* In all other circumstances, laws that burden "professional" speech on particular subjects are to be reviewed with the same strict scrutiny that applies to content-based restrictions on any other variety of fully protected speech. *Id.* at 773.

Following *NIFLA*, many lower courts have faithfully extended full protection to what would once have been considered unprotected or

lesser-protected "professional" speech.[3] But some lower courts—including the court below—have seized on the special rules that apply to regulation of speech incidental to professional conduct in ways that essentially recreate the now-discredited professional speech doctrine. To do this, they relabel the provision of expert advice—along with associated First Amendment activities like gathering information and forming opinions—as "professional conduct."[4] But this interpretation of speech incidental to conduct conflicts with the Supreme Court's established test for

---

[3] *See, e.g.*, *Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024) (holding that prohibition on providing veterinary advice regarding animals one has not first physically examined is a regulation of fully protected speech); *Otto*, 981 F.3d at 861–62 (holding that prohibition on talk therapy regulated fully protected speech); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) (same; vocational training); *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97 (S.D.N.Y. 2022), *appeal docketed* No. 22-1345 (same; legal advice); *Nutt v. Ritter*, 707 F. Supp. 3d 517 (E.D.N.C. 2023) (same; engineering opinions); *Richwine v. Matuszak*, 707 F. Supp. 3d 782 (N.D. Ind. 2023), *appeal docketed* No. 24-1081 (same; end-of-life advice).

[4] *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225–26 (11th Cir. 2022) (holding that "[a]ssessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system [*i.e.*, proposed dietary recommendations], and integrating information from a nutrition assessment are not speech. They are 'occupational conduct[.]'"); *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (holding that talk therapy is "professional conduct").

distinguishing speech from conduct and with *NIFLA*'s explanation of that doctrine.

Start with the Supreme Court's test for distinguishing speech from conduct. As explained in Appellants' brief, that test is set forth most clearly in the Supreme Court's ruling in *Humanitarian Law Project*, a case that involved the provision of expert legal advice that federal law characterized as "material support" to terrorist groups. The government contended that "the only thing truly at issue" in that case was "conduct, not speech," and that the law "only incidentally burden[ed] [plaintiffs'] expression." *Humanitarian Law Project*, 561 U.S. at 26. But the Supreme Court emphatically and *unanimously* rejected that argument.[5] As the Court explained, when determining whether a generally applicable law regulates speech or conduct, courts look to the activity "triggering coverage under the statute." *Id.* at 28. When that "conduct" consists of "communicating a message"—including specifically "advice derived from

---

[5] Although three justices dissented from the Court's ultimate ruling on the merits, *Humanitarian Law Project*, 561 U.S. at 40 (Breyer, J., dissenting), all members of the Court agreed that, as applied to the plaintiffs, the federal material support prohibition operated as a direct restriction on speech.

'specialized knowledge'"—that application of the law must be analyzed as a direct restriction on speech. *Id.* at 27–28.

The Supreme Court's ruling in *NIFLA* reinforces this understanding of *Humanitarian Law Project* in two ways. First, *NIFLA* makes clear that regulations of "professional" speech are to be reviewed with "ordinary First Amendment principles," 585 U.S. at 773, and the test set forth in *Humanitarian Law Project* for distinguishing speech from conduct is one of those principles. Second, *NIFLA*'s explanation of the special rules applicable to the regulation of speech incidental to conduct makes clear that those rules apply only when the conduct triggering application of the law is *not* communicative. Thus, the classic example of laws that regulate speech incidental to conduct are laws that require informed consent for abortion. *Id.* at 769–70 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)). Those laws require physicians to speak, but—unlike the law in *Humanitarian Law Project*—that requirement is triggered by non-communicative conduct: performing a surgical procedure. And this is no different from the way the Supreme Court has long applied this rule for speech incidental to regulable non-communicative conduct in other contexts. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("That

is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs; why an ordinance against outdoor fires might forbid burning a flag; and why antitrust laws can prohibit agreements in restraint of trade." (cleaned up)).

This Court should reaffirm those principles here. If expert advice to terrorist groups is fully protected by the First Amendment, it cannot be the case that expert advice to minors on how to cope with unwanted feelings or urges regarding their sexual orientation or gender expression are fully outside it. Under *Humanitarian Law Project*, Michigan's law imposes a direct—not incidental—burden on speech.

## B. Content-based vs. Content-neutral

Another source of potential confusion in cases like this one is the distinction between laws that are content-based and those that are content-neutral.[6] Here, for example, the government may argue that

---

[6] *Compare, e.g.*, *Kirchmeyer*, 961 F.3d at 1071 (holding that a law that regulated postsecondary educational programs only if they were vocational in nature was content based because it distinguishes between programs based on the subject matter of the lessons, "even if [the court] assume[s] that the state has no particular interest in encouraging . . . or suppressing" the type of lesson itself), *with Brokamp v. James*, 66 F.4th 374, 393, 401 (2d Cir. 2023) (holding that a law that regulated only speech "pertaining to a mental disorder or problem" was content neutral because

Michigan's law is content-neutral because the state does not care what specific advice Appellants give their clients on how to reduce or eliminate unwanted feelings or urges. But as the Supreme Court has explained, "[t]his analysis conflates two distinct but related limitations that the First Amendment places on government regulation of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015). Specifically, it conflates *content*-neutrality and *viewpoint*-neutrality.

As the Supreme Court clarified in *Reed*, viewpoint discrimination is merely a particularly disfavored subset of content discrimination. But "a speech regulation targeted at specific *subject matter* is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169 (emphasis added); *accord City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022) (holding that a location-based on-/off-premises sign restriction was not content-based under *Reed* because it "[did] not single out *any topic or subject matter* for differential treatment" (emphasis added)). Thus, "a law banning the use of sound trucks for political speech—and only political speech—would be a

---

the government "does not license 'views it finds acceptable,' while refusing to license 'less favored or more controversial views'").

content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Reed*, 576 U.S. at 169.

Applying that principle here, Michigan's law is plainly content-based as applied to Appellants. Under the law, Appellants may give advice on dealing with any challenging feelings or urges, except if they concern sexual orientation and gender expression and the advice is intended to help reduce or eliminate them. In other words, Michigan has singled out the subject matter of sexual orientation and gender expression for burdens that do not apply to talk therapy on other subjects. Under *Reed*, that is a content-based regulation of speech.

The Supreme Court's ruling in *Humanitarian Law Project* reinforces this conclusion. There, the Court held that a prohibition on expert advice to terrorist groups that extended to advice *on any topic* was content based merely because it distinguished between "advice derived from 'specialized knowledge'" and advice that "imparts only general or unspecialized knowledge." 561 U.S. at 27. Here, by contrast, the government has singled out advice regarding a single subject for disfavored treatment. Under both *Reed* and *Humanitarian Law Project*, that is a content-based regulation of speech. And like all such regulations, it "is subject to

strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165.[7]

## C.   Public Speech vs. Private Speech

More recently, some courts—including the court below—have been led astray by a supposed distinction in the First Amendment status of speech in public settings versus private settings. As the district court put it, "a therapy session is not the town square." *Cath. Charities v. Whitmer*, No. 1:24-cv-718, 2025 WL 369743, at *11 (W.D. Mich. Jan. 28, 2025); *see also 360 Virtual Drone Servs., LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024) (identifying whether "the regulation is aimed at speech taking place in a traditionally public sphere" as a relevant factor in determining

---

[7] Michigan's law may also be characterized as viewpoint-based, because it allows speech on the same topics as conversion therapy but that seeks to affirm, rather than change a minor's sexual orientation. But as the Supreme Court has explained, viewpoint discrimination is not distinct from content discrimination but is, rather, a "more blatant" and "egregious form of content discrimination." *Reed*, 576 U.S. at 168. Viewpoint discriminatory laws are treated with particular disfavor not because they are treated differently from content-discriminatory laws, but because—within the framework of strict scrutiny that applies to both—the government virtually never has a compelling interest in limiting viewpoints on one side of an issue. *See id.* at 169 ("Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

whether a law "is aimed at speech *as speech*—not conduct"), *petition for cert. filed*, No. 24-279.

This argument is completely unmoored from First Amendment law. There is no principle of First Amendment law recognized in any other context that suggests that speech contained entirely within private spaces is entitled to less protection than speech in traditional public forums. Indeed, the opposite must be true. It is unimaginable that the government could, for example, impose content-neutral time/manner/place regulations on conversations in homes, churches, or—yes—private offices.

This error stems from a fundamental misconception about the role of the public square in forum analysis. The public square is the most protected of *government-owned* places where speech can occur. And the role of forum analysis is to ensure that its use is fairly available to all, because it is a scarce, government-controlled resource. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998) (discussing the role of forum analysis in the regulation of "government properties").

But a *private* office (or church, or home) is different. It is not a resource that the government must fairly parcel out. It is a resource

controlled by the private property owner who, along with their guests, gets to decide what speech occurs there. And if the government wants to reach in and control speech in that most private of settings, where it has even less legitimate reason to be, it must satisfy full First Amendment scrutiny.

### D.     Commercial Speech vs. Non-commercial Speech

Another potential source of confusion is the distinction between "commercial speech," which the Supreme Court has held is entitled to reduced First Amendment protection, and speech with a commercial *motive*, which the Supreme Court has held is fully protected.

Supreme Court precedent makes clear that the "core notion of commercial speech" is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up). This is distinct from speech that is the subject of that transaction. After all, one can sell a copy of Plato's *Republic*, but that does not convert the book into lesser-protected commercial speech. And those same principles apply when speech is delivered one-on-one and tailored to the needs of the listener. Thus, as the Eighth Circuit explained in a case involving fortune tellers: "There is a distinct difference between the

offer to tell a fortune ('I'll tell your fortune for twenty dollars.'), which is commercial speech, and the actual telling of the fortune ('I see in your future . . . .'), which is not." *Argello v. City of Lincoln*, 143 F.3d 1152, 1153 (8th Cir. 1998).

The Third Circuit implicitly recognized this same distinction in *King v. Governor of New Jersey*—a pre-*NIFLA* case about conversion therapy—where it distinguished "professional speech" from the separate category of "commercial speech." 767 F.3d 216, 233 (3d Cir. 2014). Although *NIFLA* has since abrogated *King*'s holding that professional speech is entitled to the reduced protection afforded to commercial speech, that decision reinforces that the two categories of speech are distinct.

Applying those same principles here, Michigan's law regulates more than speech that proposes a commercial transaction. It regulates the fully protected advice that forms the substance of that transaction.

### E.    Paid vs. Unpaid Speech

Although less common than the previous objections, some courts are similarly confounded by the distinction between paid and unpaid speech. This objection can be quickly disposed of because it, too, is

squarely foreclosed by Supreme Court precedent. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). Thus, the Court has repeatedly held that speech is entitled to the same level of protection whether it is sold or given away, and that prohibitions on receiving payment for speech receive the same scrutiny as any other burden on speech.[8] And in the wake of *NIFLA*, other federal appellate courts have applied this reasoning directly to occupational regulations. *See Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) (rejecting the argument that a licensing scheme for tour guides "[could not] constitute a burden on protected speech because tour guides who do not charge

---

[8] *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1985) (explaining that First Amendment protection is the same whether speech is sold or given away); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (striking down statute that prohibited speakers from receiving payment); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (striking down New York's "Son of Sam law" as a "content-based statute" because "[i]t singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content").

for their services [could] give tours without a license" as being "quite beside the point" under Supreme Court precedent).

**F.     Burdens vs. Bans**

Related to the previous objection, another is that Michigan's law does not completely prohibit speech about sexual orientation and gender expression. To the extent that this is not simply an admission that the law discriminates based on viewpoint, the argument would fail for the same basic reason as the previous argument about paid and unpaid speech. That is because the Supreme Court's multiple decisions striking down prohibitions on receiving payment for speech reflect the more general principles "that the 'distinction between laws burdening and laws banning speech is but a matter of degree' and that the '[g]overnment's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Sorrell*, 564 U.S. at 565–66 (quoting *Playboy Ent. Grp., Inc.*, 529 U.S. at 812).

And of course this must be the rule. Were it otherwise, the government could require newspaper publishers to get a license before publishing without triggering First Amendment scrutiny, simply because the licensure requirement does not ban speech outright. That, in turn, would

"give[] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 585 U.S. at 773.

## II. But what about lawyers?

The preceding section addressed all the common legal arguments that are raised in defense of regulations of occupational speech. To the extent the government comes forward with cases applying less than strict scrutiny to such regulations, those cases will invariably conflict with one or more of the binding precedents discussed above.

That raises the question of why some courts are getting these decisions wrong, notwithstanding those clear precedents. In Amicus's experience arguing these cases in front of both more and less receptive judicial panels, the overwhelming sense we have gathered is that some courts are concerned that applying Supreme Court precedent to mean what it says will have dire consequences for other types of expert advice, especially advice concerning law and medicine. These courts seem concerned that applying the First Amendment to all expert advice will mean that the government is powerless to regulate these professions at all. But, as explained below, these concerns are unwarranted. Applying strict scrutiny

to regulations that burden what was formerly characterized as "professional speech" will leave most applications of occupational licensing laws unaffected. And even where those laws are affected, holding that strict scrutiny applies does not prevent the government from addressing demonstrable harms in a narrowly tailored fashion.

To begin, it's worth emphasizing that the "Court *has* applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers." *NIFLA*, 585 U.S. at 771 (emphasis added) (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963); *In re Primus*, 436 U.S. 412, 432 (1978); and *Humanitarian Law Project*, 561 U.S. at 27–28); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001). It has also stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives." *NIFLA*, 585 U.S. at 771 (citing *Sorrell*, 564 U.S. at 566). Following *NIFLA*'s abrogation of the professional speech doctrine, the lower courts have applied strict scrutiny not just to laws that burden legal or medical speech by those who hold occupational licenses, but also to laws that burden speech by those who are unlicensed or who wish to speak in jurisdictions where they are not licensed. *Compare Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020)

(applying strict scrutiny to regulation of talk therapy by licensed talk therapists), *with Brokamp v. District of Columbia*, No. 20-cv-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) (applying strict scrutiny to regulation of talk therapy by an out-of-jurisdiction therapist), *and Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 102–03 (S.D.N.Y. 2022) (applying strict scrutiny to prohibition on non-lawyers providing legal advice about debt collection).

These rulings do not imply that all occupational-licensing laws are unconstitutional under the First Amendment. For example, they do not apply to laws that require a license to engage in non-expressive conduct like surgery or the handling of client funds. They are also inapplicable to speech that has independent legal significance when laws aim to regulate the legal effect of that speech rather than the speech itself. Thus, although the First Amendment protects *advising* a patient to take a controlled substance, it does not protect a doctor's prescription that—although communicated in writing—creates a legal entitlement to access that controlled substance. *See Conant v. Walters*, 309 F.3d 629, 635 (9th Cir. 2002). Finally, these cases are largely inapplicable to speech in special government-created forums, such as a lawyer's oral argument before

a court. *See, e.g.*, *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a courtroom—is a nonpublic forum.").

Nor does applying the First Amendment to pure advice about law and medicine require the wholesale invalidation of any occupational-licensing scheme simply because some of its applications may violate the First Amendment. *See, e.g., Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (rejecting facial challenge to UPL law while expressly reserving future as-applied challenges). Under the Supreme Court's overbreadth doctrine, that severe remedy is necessary only when "the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023). Facial invalidation may sometimes be appropriate—such as when the government licenses the speech of tour guides, *see Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)—but most licensing laws will have enough applications not triggered solely by speech that facial invalidation would be inappropriate.

Laws punishing malpractice would likewise be unaffected. For one thing, the Supreme Court in *NIFLA* specifically recognized malpractice

laws as constitutionally permissible. 585 U.S. at 769. For another, there are strong arguments that laws imposing liability for actually harmful legal or medical advice, like laws imposing liability for defamation, satisfy the historical test set forth in *United States v. Stevens* for identifying exceptions to the First Amendment. 559 U.S. 460, 468 (2010). Medical malpractice (or its substantial equivalent) existed as a private cause of action for centuries before the enactment of the First Amendment, and legal malpractice dates back at least to the Founding Era. By contrast, the licensing of professional advice did not become widespread until the twentieth century. *See* Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581, 2583–85 (1999) (tracing origination of unauthorized-practice-of-law statutes to the early twentieth century).

Applying full First Amendment protection for advice about topics like law and medicine would also leave standard consumer protection laws largely unaffected. For example, those who misrepresent their credentials or what they may be able to accomplish for clients have engaged in either false commercial speech or fraud, both of which are unprotected

by the First Amendment. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).

Finally, even for the speech that will be affected—such as expert advice—the government will not be left powerless to address real problems. Holding that burdens on expert advice are content-based restrictions on speech means only that those laws must satisfy strict scrutiny, not that they are per se unconstitutional. And although strict scrutiny is a high bar, it is not insurmountable—indeed, the Supreme Court ultimately upheld the prohibition on expert advice under review in *Humanitarian Law Project* because it concluded the law was a narrowly tailored means of advancing the government's compelling interest in combatting terrorism. 561 U.S. at 39.

In short, nothing that this Court decides here will deprive the government of its general power to regulate non-speech conduct, including non-speech conduct by "professionals." Nor will it deprive the government of the power to regulate even pure speech, where the government can meet the First Amendment's requirements. And perhaps the government can meet that burden here if it brings forward strong evidence that conversion therapy is harmful and that there is no more narrow

restriction available that would serve the government's interest in protecting minors from that harm. But as in all cases about content-based laws, the strength of the government's interest must be treated as a factor in the strict scrutiny analysis—not a substitute for it.

## III. If affirmed, the ruling below threatens all Americans who advise others for a living.

By contrast, the consequences of affirming the decision below are grave indeed. In today's information-based economy, ever-greater numbers of people earn their living purely by speaking. Under the ruling below, all these speakers can be silenced if the government is sufficiently creative in recharacterizing their speech as professional conduct.

Those speakers include people like Lauren Richwine of Fort Wayne, Indiana. Lauren is the founder of Death Done Differently, a business through which she helps those with terminal illnesses and their families plan for the final days of life and what will happen after someone dies. She does not embalm or bury remains or do any of the conduct of funeral directors. Instead, she facilitates conversations and provides useful guidance that helps her clients cope with the reality of death, promotes healthy grieving, and ensures that her clients and their families are prepared when the time comes. Even so, the Indiana State Board of Funeral

and Cemetery Service informed her that these conversations constituted the illegal, unlicensed "practice of funeral services."

Lauren sought a preliminary injunction under the First Amendment, and the Northern District of Indiana granted her motion. *Richwine v. Matuszak*, 707 F. Supp. 3d 782, 808 (N.D. Ind. 2023). The court rejected the government's argument that the funeral-licensing laws escape First Amendment scrutiny if they largely restrict conduct "in the abstract." *Id.* at 799. Whatever the government's power to regulate those who embalm or bury human remains, as applied to Lauren, the laws restricted her pure advice. Thus, the court correctly held they were subject to "ordinary First Amendment principles." *Id.* at 804. And which ordinary principles did the court apply? Precisely the same ones that Appellants and Amicus have pressed here: That under precedents like *Humanitarian Law Project*, *NIFLA*, and *Reed*, Indiana's law operated as a content-based regulation of speech subject to strict scrutiny, which it could not survive. *Id.* at 799–807.

Retired engineer Wayne Nutt of North Carolina faced a similar experience at the hands of that state's Board of Examiners for Engineers and Surveyors after he shared his expertise on municipal water systems

through spoken testimony and written reports. Once again, the state's licensing board characterized Wayne's speech as the unlicensed "practice" of engineering.

Like Lauren, Wayne went to court to vindicate his First Amendment rights, and he won. *Nutt v. Ritter*, 707 F. Supp. 3d 517, 545 (E.D.N.C. 2023). In ruling for Wayne, the court acknowledged that although there are cases where the line between speech and conduct can be fuzzy, Wayne's case did not come close to this line because all his actions involved speaking and writing. *Id.* at 537. These actions are "plainly protected activity." *Id.* And just like in Indiana, it did not matter that the law "generally regulates" professional conduct or targeted an occupation "in the abstract." *Id.* at 539. What mattered was that "the Act *as applied to expert reports* target[ed] 'speech as speech.'" *Id.* at 540. And so, here again, the court looked to the ordinary First Amendment principles set forth in *Humanitarian Law Project*, *NIFLA*, and *Reed*. *Id.* at 539–40.

Finally, consider the case of Ronald Hines, a retired Texas veterinarian who answered questions sent in to him from animal owners all around the globe. Texas prohibited his advice because he had not first physically examined the animals to which it pertained. When Dr. Hines

challenged that requirement as applied to his emails, the state responded that any impact on Dr. Hines's speech was merely incidental to the law's "general regulation of conduct." *Hines v. Pardue*, 117 F.4th 769, 775 (5th Cir. 2024). But the Fifth Circuit rejected that argument, holding that it "must determine from the evidence, rather than the parties' labels, whether Dr. Hines's course of action involved speech." *Id*. at 777. And "[b]ecause the act in which Dr. Hines engaged that 'trigger[ed] coverage' under the physical-examination requirement was the communication of a message," the court easily concluded that "the State primarily regulated Dr. Hines's speech." *Id.* at 778.

In short, these speakers prevailed because the courts hearing their cases faithfully applied binding Supreme Court precedent in the manner discussed above. That result is a boon not just to them as speakers, but to those who rely on their advice. For a family facing difficult end-of-life decisions, or an unsophisticated litigant facing a predatory debt-collection lawsuit, this advice may be invaluable.

The same is true for minors facing difficult feelings and urges about their sexual orientation or gender identity. And although no one can seriously dispute that Michigan has acted from a desire to protect these

listeners from harm, that is a factor to be considered *within* the First Amendment analysis. It is not a substitute for that analysis.

And that must be the case because the alternative, if talk therapy is merely professional conduct, is that states can regulate it almost without limit. That would include allowing states to prohibit the very speech that Michigan has exempted: "counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development." In our current political climate, it is easy to imagine that some states *would* prohibit such counseling, just as some have prohibited medical interventions like hormone replacement therapy for minors.

That is why it is vital that this Court faithfully apply the First Amendment and hold the government to its burden—if not for Appellants' sake, then for the sake of every other speaker and listener whose rights hang in the balance.

# CONCLUSION

This Court should reverse the ruling below regarding the appropriate standard of scrutiny and either apply that standard or remand for the district court to do so in the first instance.

Dated: April 4, 2025.                    Respectfully submitted,

<div style="margin-left: 50%;">

/s/ Paul Sherman
Paul Sherman
Benjamin Field
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9329
psherman@ij.org
bfield@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and that upon filing, a notice of electronic filing will be sent to all registered parties in this case.

/s/ Paul Sherman
*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(g), I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,367 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

/s/ Paul Sherman
*Counsel for Amicus Curiae*
*Institute for Justice*