No. 25-1105

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CATHOLIC CHARITIES OF JACKSON, LENAWEE & HILLSDALE, ET AL.,
PLAINTIFF-APPELLANTS,

V.

GRETCHEN WHITMER, in her official capacity, ET AL.,
DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:24-cv-718

## BRIEF OF *AMICUS CURIAE*
## ETHICS AND PUBLIC POLICY CENTER
## IN SUPPORT OF PLAINTIFF-APPELLANTS AND REVERSAL

CHRISTOPHER MILLS
SPERO LAW LLC
557 East Bay St.
 #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

ERIC N. KNIFFIN
MARY F. HASSON
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

B. TYLER BROOKS
THOMAS MORE SOCIETY
309 W. Washington Street
 Suite 1250
Chicago, IL 60606
(312) 637-8097
tbrooks@thomasmoresociety.org

April 4, 2025

*Counsel for* Amicus Curiae

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-1105        Case Name: Catholic Charities of Jackson v Whitmer

Name of counsel: Eric Kniffin

Pursuant to 6th Cir. R. 26.1, Ethics & Public Policy Center
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   No

---

### CERTIFICATE OF SERVICE

I certify that on _____ April 4, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Eric N. Kniffin

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................. 2

ARGUMENT ......................................................................................... 7

   I.  HB 4616 erroneously presumes gender affirmation is the only ethical response to gender dysphoria............................................. 7

   II. HB 4616 reflects a faulty anthropology that claims gender identity is immutable, but sex is not. ............................................ 9

   III. HB 4616 forecloses therapeutic exploration and healing. .......... 15

   IV. HB 4616 ignores the weak evidence for gender affirmation and the overwhelming evidence of irreversible harm. ........................ 19

   V. HB 4616 forces vulnerable adolescents towards gender affirmation and irreversible harm. ............................................... 26

CONCLUSION ..................................................................................... 29

# TABLE OF AUTHORITIES

**Statutes**

MCL § 330.1100a ..................................................................... 17

MCL § 37.2103 ......................................................................... 12

**Other Authorities**

Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy'
Care*, Free Press (Oct. 4, 2021) ............................................ 29

Alec Schemmel, *HHS slashes over $350M in grant funding for
gender ideology, DEI research projects*, Fox News (Mar. 21, 2025) .... 27

Andre Gonzales Real, et al., *Trajectories of Gender Identity and
Depressive Symptoms in Youths*, 7 JAMA Open Network
e2411322 (2024) ............................................................... 6, 15

Anna Miroshnychenko, et al., *Gender affirming hormone therapy
for individuals with gender dysphoria aged < 26 years: a
systematic review and meta-analysis*, Archiv. Diseases Child.
(OnlineFirst issue) (2025) ................................................. 5, 24

Anna Miroshnychenko, et al., *Puberty blockers for gender dysphoria
in youth: A systematic review and meta-analysis*, Archiv. Diseases
Child. (OnlineFirst issue) (2025) ...................................... 5, 24

C. Ronny Cheung, et al., *Gender medicine and the Cass Review:
why medicine and the law make poor bedfellows*, 110 Archiv.
Diseases Child. 251, 254 (2025) ............................................ 25

Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual Persons
Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*,
6 PLOS ONE e16885 (2011) ................................................ 28

Chantal M. Wiepjes, et al., *Trends in suicide death risk in transgender people: results from the Amsterdam Cohort of Gender Dysphoria study (1972-2017)*, 141 Acta Psychiat. Scandinavica 486 (2020)..........................................................28

Christina Buttons, *U.K.'s Largest Pediatric Gender Clinic Ignored Autism Connection In Teens Seeking Sex Changes, New Book Claims*, Daily Wire (Feb. 15, 2023) ....................................20

David Schwartz, *Clinical and Ethical Considerations in the Treatment of Gender Dysphoric Children and Adolescents: When Doing Less Is Helping More*, 20 J. Infant, Child, & Adolesc. Psychotherapy 439 (2021) ................................ 17, 19, 20, 30

David Schwartz, *Listening to children imagining gender: observing the inflation of an idea.* 59 J. Homosex. 460 (2012)...........................18

Devita Singh, et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, Frontiers Psychiat., Mar. 2021.............................10

Dr. Hilary Cass, OBE, Independent review of gender identity services for children and young people: Final Report (2024) ... 3, 21, 29

Elie Vandenbussche, *De-transition-Related Needs and Support: A Cross-Sectional Online Survey,* 69 J. Homosex. 1602 (2022) ..............7

Elizabeth R. Boskey, et al., *A Retrospective Cohort Study of Transgender Adolescents' Gender-Affirming Hormone Discontinuation,* 76 J. Adolesc. Health. 584 (2025).........................26

Ezra D. Oosthoek, et al., *Gender-affirming medical treatment for adolescents: a critical reflection on "effective" treatment outcomes*, BMC Med. Ethics, Dec. 2024.............................................25

George Halasz & Andrew Amos, *Gender Dysphoria: Reconsidering ethical and iatrogenic factors in clinical practice*, 32 Australasian Psychiat. 26 (2023)...............................................................17

Inst. of Med., Exploring the Biological Contributions to Human Health: Does Sex Matter? (2001) ........................................11

Jason Rafferty, et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018).............................................8

Jenifer K. McGuire, et al., *The Genderqueer Identity (GQI) Scale: Measurement and validation of four distinct subscales with trans and LGBQ clinical and community samples in two countries*, 20 Int'l J. Transgenderism 289 (2018) ....................................14

Jennifer Block, *Youth gender medicine has become a hall of mirrors,* Boston Globe (Nov. 7, 2023) ....................................9

Jesse Singal, *Yale's "Integrity Project" Is Spreading Misinformation About the Cass Review and Youth Gender Medicine, Part 1,* Singal-Minded Substack (Aug. 19, 2024)...........................24

Joanne Sinai & Peter Sim, *Psychodynamic psychotherapy for gender dysphoria is not conversion therapy.* 33 J. Can. Acad. Child Adolesc. Psychiat. 145 (2024) ...............................4, 17

Jon Brown, *Rachel Levine's claim all agree on 'gender-affirming care' is slammed by doctors 'in hiding,'* Fox News (May 11, 2022).....28

Julia K. Moore, et al., *The Perth Gender Picture (PGP): Young people's feedback about acceptability and usefulness of a new pictorial and narrative approach to gender identity assessment and exploration*, 22 Int'l J. Transgender Health 337 (2020) ..............14

Kasia Kozlowska, et al., *Attachment Patterns in Children and Adolescents With Gender Dysphoria*, 11 Frontiers Psych. 582688 (2021) ........................................................................18

Kasia Kozlowska, et al., *Evolving national guidelines for the treatment of children and adolescents with gender dysphoria: International perspectives*, Human Sys. (OnlineFirst issue) (2024) 4,22

Kathleen McDeavitt, *Critiques of the Cass Review: Fact-Checking the Peer-Reviewed and Grey Literature*, 51 J. Sex & Marital Therapy 175 (2025).............................................25

Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archiv. Sex. Behav. 1983 (2019) ...................................................... 10

Kristina R. Olson, et al, *Gender Identity 5 Years After Social Transition*, 150 Pediatrics e2021056082 (2022) ................................. 10

Kristine Parks, *Young mother facing permanent health problems after gender transition warns she was sold a 'lie,'* Fox News (Dec. 22, 2024) .................................................................................... 15

Laura Edwards-Leeper & Erica Anderson, *The mental health establishment is failing trans kids*, Wash. Post (Nov. 24, 2021) ........ 29

Laura Edwards-Leeper, et al., *Affirmative practice with transgender and gender nonconforming youth: Expanding the model*, 3 Psych. Sex. Orient. & Gender Diversity 165 (2016) .............. 9

Leor Sapir, *Gender Medicine on the Ropes*, Manhattan Instit. Mag. (Winter 2025) ........................................................................ 23

Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF, (last updated Mar. 19, 2025) ........................................................... 26

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archiv. Sex Behav. 3353 (2021) ................................................................ 18, 29

Lisa Nainggolan, *Hormonal Tx of Youth With Gender Dysphoria Stops in Sweden*, Medscape (May 12, 2021) ...................................... 22

Lucy Griffin, et al., *Sex, gender and gender identity: a re-evaluation of the evidence*, 45 B. J. Psych. Bull. 291 (2021) .................... 13, 18, 28

Meredithe McNamara, et al., An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria (2024) ................................................................... 24

Nastasja M. de Graaf, et al., *Psychological Functioning in Non-binary Identifying Adolescents and Adults*, 47 J. Sex Marital Therapy 773 (2021) ........................................................................ 7, 15

*One Year Since Finland Broke with WPATH "Standards of Care"*, Society for Evidence-based Gender Medicine (July 2, 2021) .............. 22

Penelope Strauss, et al., *A critical discussion of pediatric gender measures to clarify the utility and purpose of "measuring" gender*, Int'l J. Transgender Health (2024) ............................................ 6, 13, 14

Press Release, HHS, HHS Takes Action on President Trump's Executive Orders Defending Women and Children (Feb. 19, 2025) .. 27

*Puberty blockers ban is lawful, says High Court*, BBC (July 29. 2024) ................................................................................. 3, 22

Roberto D'Angelo, *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, 50 Archiv. Sex. Behav. 7 (2021) ........................................................................................ 28

Sarah C. J. Jorgensen, et al., *Puberty Suppression for Pediatric Gender Dysphoria and the Child's Right to an Open Future*, 53 Archiv. Sex. Behav. 1941 (2024) ................................................. 6, 7, 15

Sarah Joy Bowman, et al., *Assessing gender dysphoria: Development and validation of the gender preoccupation and stability questionnaire–2nd edition (GPSQ-2)*, 71 J. Homosexuality 666 (2022) .................................................................... 15

Society for Evidence-Based Medicine, *Denmark Joins the List of Countries That Have Sharply Restricted Youth Gender Transitions*, SEGM (Aug. 17, 2023) ............................................. 5, 22

Stella O'Malley, *Review of book by Hannah Barnes: Time to Think: The Inside Story of the Collapse of the Tavistock's Gender Service for Children*, Clinical Advisory Network on Sex and Gender (Mar. 8, 2023) ............................................................................ 19

Stephen B. Levine, *Informed Consent for Transgendered Patients*, 45 J. Sex & Marital Therapy 218 (2019) ............................................. 11

Theresa Farnan, et al., *Trump Ends Government Promotion of Gender Ideology and Child Mutilation*, First Things (Jan. 31, 2025) .................................................................................................... 27

Thomas D. Steensma, et al., *Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study*, 52 J. Am. Acad. Child & Adolesc. Psychiat. 582 (2013) ...... 10

Zhenya Abbruzzese, et al, *The Myth of Reliable Research in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies – and research that has followed*, 49 J. Sex & Marital Therapy 673 (2023) ........................................................................... 21

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

The Ethics and Public Policy Center ("EPPC") is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, and culture. EPPC's Programs cover a wide range of issues, including bioethics and human flourishing, governmental and judicial restraint, personhood and identity, and religious liberty. EPPC has a strong interest in promoting the Judeo-Christian vision of the human person, upholding rights of free speech and religious liberty, and responding to the challenges of gender ideology.[1]

In addition to the listed counsel, Ryan T. Anderson, Ph.D., the President of EPPC, also contributed to this brief.

---

[1] All parties received timely notice and consented to the filing of this brief. No party's counsel authored any part of this brief, and no person other than *amicus* made a monetary contribution to fund its preparation or submission.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

Michigan's "Conversion Law" ("HB 4616") cannot be considered apart from the gender-affirming approach underlying it. Gender affirmation provides the basis for HB 4616 and similar laws that 1) treat a minor's assertion of a transgender identity as presumptively correct (and unlikely to change), and 2) require clinicians to affirm the minor's asserted identity and his or her desire to transition.

Gender affirmation theory, and its prescriptive response to pediatric identity distress, raises serious ethical concerns. HB 4616—which enshrines gender affirmation theory into Michigan law—raises similar ethical concerns by prohibiting effective psychotherapy for minors open to the possibility of "change" or desisting from transgender identification.

Across the globe, gender specialists, clinicians, and whistleblowers have sounded the alarm over the scant evidence supporting gender-affirming protocols, amid mounting evidence that gender affirmation seriously harms vulnerable children. In April 2024, a four-year substantive evidence review (the "Cass Review"), commissioned by the UK National Health Service, delivered a definitive analysis of pediatric

gender-affirming interventions. The Cass Review concluded that the evidence supporting pediatric gender-affirming interventions, including social transition, is "remarkably weak," with "no good evidence on the long-term outcomes of interventions."[2] The UK government imposed an emergency ban on puberty suppression for identity-distressed minors, a ban upheld by the High Court and extended indefinitely.[3]

Similarly, Scandinavian countries that were quick to embrace pediatric gender-affirming protocols conducted their own substantive evidence reviews and reversed course, curtailing medical interventions. They cited the lack of quality evidence, uncertain long-term outcomes including "future fertility," "future sexual function," psychiatric issues, and increasing "detransition and regret."[4] ("Detransition is the process where people with [gender dysphoria] who have undergone medical or

---

[2] Dr. Hilary Cass, OBE, Independent review of gender identity services for children and young people: Final Report 13 (2024) (hereinafter "Cass Review"), https://cass.independent-review.uk/home/publications/final-report/.

[3] *Puberty blockers ban is lawful, says High Court*, BBC (July 29, 2024), https://www.bbc.com/news/articles/c4ng3gz99nwo.

[4] Kasia Kozlowska, et al., *Evolving national guidelines for the treatment of children and adolescents with gender dysphoria: International perspectives*, Human Sys. (OnlineFirst issue) 25 (2024), https://doi.org/10.1177/26344041241269298.

surgical transition choose to revert back to identifying as their natal sex."[5]) Other European countries expressed similar cautions.[6]

Remarkably, *no* systematic review—the gold standard of evidence-based medicine—has found high-quality (or even moderate-quality) evidence supporting pediatric medical gender interventions. Following the Cass Review, Gordon Guyatt, a founder of evidence-based medicine principles, conducted two systematic reviews and meta-analyses and concluded the "overarching theme" of these and other substantive evidence reviews is "the lack of high quality evidence" supporting gender affirmation.[7] Behind the puffery of activist clinicians, the affirmation model is propped up by flawed, cherry-picked studies.

---

[5] Joanne Sinai & Peter Sim, *Psychodynamic psychotherapy for gender dysphoria is not conversion therapy*. 33 J. Can. Acad. Child Adolesc. Psychiat. 145, 149 (2024), https://pubmed.ncbi.nlm.nih.gov/38952790/.

[6] Kozlowska, et al., *supra* note 4.

[7] Anna Miroshnychenko, et al., *Gender affirming hormone therapy for individuals with gender dysphoria aged < 26 years: a systematic review and meta-analysis*, Archiv. Diseases Child. (OnlineFirst issue) 7 (2025),https://adc.bmj.com/content/early/2025/02/11/archdischild-2024-327921.long.  Anna Miroshnychenko, et al., *Puberty blockers for gender dysphoria in youth: A systematic review and meta-analysis*, Archiv. Diseases Child. (OnlineFirst issue) (2025), https://adc.bmj.com/content/early/2025/01/29/archdischild-2024-327909.long.

Further, the premise of gender affirming care (and HB 4616), i.e., the claim that transgender self-identification in adolescents is "permanent, or 'stable,'" is contradicted by mounting evidence.[8] Even "proponents of gender affirmation recognize that gender identity development is dynamic and can undergo multiple shifts throughout childhood and into adulthood."[9]

For example, psychological assessments that measure gender identity incorporate the concept of "change."[10] 18.2% of sexual and gender minority youth report a "different gender identity over time."[11] "Non-binary" and "gender-fluid" self-identifications provide clear examples of

---

[8] Society for Evidence-Based Gender Medicine, *Denmark Joins the List of Countries That Have Sharply Restricted Youth Gender Transitions,* SEGM (Aug. 17, 2023), https://segm.org/Denmark-sharply-restricts-youth-gender-transitions.

[9] Sarah C. J. Jorgensen, et al., *Puberty Suppression for Pediatric Gender Dysphoria and the Child's Right to an Open Future,* 53 Archiv. Sex. Behav. 1941, 1943 (2024), https://pubmed.ncbi.nlm.nih.gov/38565790/.

[10] Penelope Strauss, et al., *A critical discussion of pediatric gender measures to clarify the utility and purpose of "measuring" gender,* Int'l J. Transgender Health (2024), https://www.tandfonline.com/doi/full/10.1080/26895269.2024.2375409.

[11] Andre Gonzales Real, et al., *Trajectories of Gender Identity and Depressive Symptoms in Youths,* 7 JAMA Open Network e2411322 (2024), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC11112442/.

"a dynamic gender identity."[12] Finally, the testimonies of detransitioners offer compelling evidence that individuals do pursue gender identity change.[13] Gender-affirmation—reinforced by laws like HB 4616—functions as a devastating barrier to authentic self-acceptance, with serious consequences.[14]

In short, despite Michigan's effort to prevent gender identity "change," self-perceived identities and related personal goals *can and do* change. Ethical counselors must consider and respond to changes in a client's self-knowledge and goals, not impose state-mandated narratives or prescriptive responses on the client.

Given the lack of evidence for gender affirmation, Europe's pivot to psychotherapy (i.e., talk therapy) as the first line treatment for identity-distressed minors is unsurprising. Michigan's contrary action, foreclosing sound therapeutic options for identity-distressed minors while

---

[12] Nastasja M. de Graaf, et al., *Psychological Functioning in Non-binary Identifying Adolescents and Adults*, 47 J. Sex Marital Therapy 773, 780 (2021), https://pubmed.ncbi.nlm.nih.gov/34344272/.

[13] Elie Vandenbussche, *De-transition-Related Needs and Support: A Cross-Sectional Online Survey,* 69 J. Homosex. 1602 (2022), https://pubmed.ncbi.nlm.nih.gov/33929297/.

[14] Jorgensen, *supra* note 9, at 1945-46.

mandating compliance with gender affirmation theory, is deeply troubling.

*Amicus* urges the Court to consider the serious ethical concerns raised by HB 4616 and grant Plaintiff-Appellants' requested relief.

## ARGUMENT

### I. HB 4616 erroneously presumes gender affirmation is the only ethical response to gender dysphoria.

Gender affirmation—which presumes that a minor's experience of gender dysphoria (disharmony between self-perceived identity and the body) is immutable and the minor's judgments concerning identity and distress are always correct—provides the rationale for HB 4616. The ethics of HB 4616 cannot be considered apart from its gender-affirmative premise.

Dr. Jason Rafferty, author of the American Academy of Pediatrics policy supporting gender affirmation,[15] describes gender affirmation as "fundamentally about 'affirming and validating the child's sense of

---

[15] Jason Rafferty, et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018) (reaffirmed 2023), https://pubmed.ncbi.nlm.nih.gov/30224363/.

identity from day one through to the end.'"[16] Pioneering gender clinician Laura Edwards-Leeper similarly explains that gender affirmation presumes "that the gender identity and related experiences asserted by a child, an adolescent, and/or family members are true, and that the clinician's role in providing affirming care to that family is to empathetically support such assertions."[17] A child's identity claims dictate the therapeutic response. According to Rafferty, "the child's sense of reality and feeling of who they are is the navigational beacon" around which treatment is oriented.[18]

Fifteen years ago, gender dysphoria diagnoses were rare; typical patients were adult males or young boys, and most (up to 88%) children resolved their distress by puberty, through "watchful waiting" or

---

[16] Jennifer Block, *Youth gender medicine has become a hall of mirrors*, Boston Globe (Nov. 7, 2023), https://www.bostonglobe.com/2023/11/07/opinion/gender-affirming-care-trans-kids/?p1=Article_Inline_Related_Box.

[17] Laura Edwards-Leeper, et al., *Affirmative practice with transgender and gender nonconforming youth: Expanding the model*, 3 Psych. Sex. Orient. & Gender Diversity 165 (2016), https://dx.doi.org/10.1037/sgd0000167.

[18] Block, *supra* note 16.

psychotherapy.[19] Over the past decade, however, transgender identification has skyrocketed and patient demographics have changed to predominately adolescent females with psychological co-morbidities.[20] The dominant clinical approach also shifted radically, from "watchful waiting" or psychotherapy to gender affirmation, despite little evidence justifying the change. Today *nearly all* gender dysphoric children who receive gender affirmation *persist* in transgender identification.[21]

## II. HB 4616 reflects a faulty anthropology that claims gender identity is immutable, but sex is not.

HB 4616 and gender affirmation deny the immutable reality of sex while insisting that gender identity is innate and unchanging. These

---

[19] Devita Singh, et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, Frontiers Psychiat., Mar. 2021, https://doi.org/10.3389/fpsyt.2021.632784; Thomas D. Steensma, et al., *Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study*, 52 J. Am. Acad. Child & Adolesc. Psychiat. 582 (2013), https://pubmed.ncbi.nlm.nih.gov/23702447/.

[20] Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archiv. Sex. Behav. 1983 (2019), https://pubmed.ncbi.nlm.nih.gov/31321594/.

[21] *See*, *e.g.*, Kristina R. Olson, et al, *Gender Identity 5 Years After Social Transition*, 150 Pediatrics e2021056082 (2022), https://pubmed.ncbi.nlm.nih.gov/35505568/. (after five years, 97.5% of children who received gender affirmation and were socially transitioned persisted in transgender identification).

false beliefs contradict sound medical ethics, which requires clinicians to treat patients with "honesty, beneficence [doing good], nonmaleficience [sic] [doing no harm], justice, and respect for patient autonomy."[22] Good medicine facilitates human flourishing, where mind and body function well and achieve their ends. A person's thoughts and feelings achieve their ends by being in contact with reality—here, the reality that sex is binary and immutable.

According to the National Academy of Science's Committee on Understanding the Biology of Sex and Gender Differences, sex is "the classification of living things … as male or female according to their reproductive organs and functions assigned by the chromosomal complement."[23] A person's sex (male or female) is imprinted in every cell of the body and cannot change.[24]

---

[22] Stephen B. Levine, *Informed Consent for Transgendered Patients*, 45 J. Sex & Marital & Therapy 218 (2019), https://doi.org/10.1080/0092623X.2018.1518885.

[23] Inst. of Med., Exploring the Biological Contributions to Human Health: Does Sex Matter? 1 n.1 (2001), https://www.ncbi.nlm.nih.gov/books/NBK222288/.

[24] *Id*. at 28-44 (Chapter 2: "Every Cell has a Sex").

HB 4616 disregards the permanence of sex while treating "gender identity" as self-determined and unchanging, regardless of the person's sex.[25] As such, HB 4616 makes an erroneous metaphysical claim about the nature of the human person and then requires therapists to align their words and behaviors with the state's viewpoint—against reality.

Medical ethics demands better. When an adolescent seeks validation for an asserted identity at odds with reality, a therapist is ethically bound to speak the truth, not validate the adolescent's false self-perception. It is profoundly unethical, for example, to reinforce a male child's belief that he is *not* a boy or that he "*is*" a female. It is similarly unethical for a therapist to tell a female patient that her self-perception that she "*is*" a boy overrides the reality of her female-sexed body.

HB 4616 treats a minor's transgender identification or expressed "gender identity" as "a fixed or stable entity, rather than a state of mind with multiple causative factors," and thus "closes down opportunities for

---

[25] "Gender identity" means "having or being perceived as having a gender-related self-identity or expression whether or not associated with an individual's assigned sex at birth." MCL § 37.2103, https://www.legislature.mi.gov/Laws/MCL?objectName=mcl-37-2103.

doctors and patients to explore the meaning of any discomfort."[26] Under HB 4616, a therapist seeking to help a client align his or her feelings with the immutable reality of the sexed body will run afoul of the law. Although HB4616 purports to treat gender identity feelings as innate, it permits therapists to facilitate "change" that moves *towards* transgender identification, but not *away* from it.

Despite "affirmative" rhetoric opposing "change" efforts, the claim that "transgender" self-identification is "permanent, or 'stable'"[27] is contradicted by mounting evidence. Psychological assessments that measure gender identity already incorporate the concept of "change," regardless of direction.[28] A narrative review of "pediatric gender measures" reveals that "change," including change over time and the client's prediction of and desire for change, is a common aspect of clinical assessment.[29]

---

[26] Lucy Griffin, et al., *Sex, gender and gender identity: a re-evaluation of the evidence*, 45 B. J. Psych. Bull. 291 (2021), https://pubmed.ncbi.nlm.nih.gov/32690121/.

[27] Society for Evidence-Based Gender Medicine, *supra* note 8.

[28] Strauss, *supra* note 10.

[29] *Id.*

For example, the Perth Gender Picture, a "pictorial and narrative tool used … with young people aged 11–18 to reflect on and communicate gender identity," asks the child to "use colored markers to show … their current gender identity, how it was in the past, and how they hope or wish it will be in five or ten years in the future."[30] The Genderqueer Identity Scale, "a tool to measure non-binary and genderqueer identities and expression across time, including before, during and after medical transition," asks whether "[i]n the future, I think my gender will be fluid or change over time."[31] The Gender Preoccupation and Stability Questionnaire probes the client's experience of gender dysphoria, asking: "Over the past two weeks how often has your sense of what gender you identify with changed at all?"[32]

---

[30] *Id.* (citing Julia K. Moore, et al., *The Perth Gender Picture (PGP): Young people's feedback about acceptability and usefulness of a new pictorial and narrative approach to gender identity assessment and exploration*, 22 Int'l J. Transgender Health 337 (2020), https://pubmed.ncbi.nlm.nih.gov/34240076/).

[31] *Id.* (citing Jenifer K. McGuire, et al., *The Genderqueer Identity (GQI) Scale: Measurement and validation of four distinct subscales with trans and LGBQ clinical and community samples in two countries*, 20 Int'l J. Transgenderism 289 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6830987/).

[32] *Id.* (citing Sarah Joy Bowman, et al., *Assessing gender dysphoria: Development and validation of the gender preoccupation and stability*

A 2024 study of sexual and gender minority youth found that "18.2% reported a different gender identity over time," proof that "gender identity can evolve."[33] "Non-binary" and "gender-fluid" identity labels defy narratives of immutable gender identity, demonstrating instead that an individual's "relationship to the body can vary at different time points," signaling "a dynamic gender identity."[34]

Finally, detransitioners' compelling testimonies cannot be ignored: their experiences reflect change over time—in opposing directions. Gender-affirming change resulted in amputated body parts, mental illness, and lifelong disability,[35] foreshadowing the tragic consequences of mandated gender affirmation.[36]

These examples illustrate the reality of clinical practice, where "change," including gender identity change, happens regularly. Ethical

*questionnaire–2nd edition (GPSQ-2)*, 71 J. Homosexuality 666 (2022), https://pubmed.ncbi.nlm.nih.gov/36286814/).

[33] Gonzales Real, et al., *supra* note 11.

[34] de Graaf, et al., *supra* note 12, at 780.

[35] Kristine Parks, *Young mother facing permanent health problems after gender transition warns she was sold a 'lie,'* Fox News (Dec. 22, 2024), https://www.foxnews.com/media/young-mother-facing-permanent-health-problems-after-gender-transition-warns-she-sold-lie

[36] Jorgensen, *supra* note 9, at 1945-46.

counseling seeks to respond to changes in a client's self-knowledge and individual goals, not impose an inflexible narrative or channel the client towards a state-favored goal. HB 4616 renders it quite risky and near impossible to navigate the arbitrary and vague distinctions between *prohibited* versus *permissible* "change" discussions.

## III. HB 4616 forecloses therapeutic exploration and healing.

HB 4616 and its gender-affirming approach have significant clinical consequences.[37] Therapists are prohibited from helping a minor explore dynamic feelings and bodily experiences or discuss alternative ways to address dysphoria, without gender transition. But ethical,

---

[37] HB 4616 provides that "[a] mental health professional shall not engage in conversion therapy with a minor." "Conversion therapy," in turn, is defined by HB 4617: "Conversion therapy" means any practice or treatment by a mental health professional that seeks to **change** an individual's sexual orientation or gender identity, *including, but not limited to, efforts to **change** behavior or gender expression* or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender." MCL § 330.1100a(20) (emphasis added). HB 4617 specifically excludes gender-affirmation from HB 4616's definition of conversion therapy: "Conversion therapy does not include counseling that provides assistance to an individual undergoing a gender transition, counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development, including sexual orientation-neutral intervention to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change an individual's sexual orientation or gender identity." *Id.*

"[c]omprehensive treatment of gender dysphoria," writes psychiatrist Andrew Amos, *requires* "exploration of childhood adversity and trauma and comprehensive formulation with differential diagnosis and treatment options."[38] Because psychotherapy recognizes that "gender identity is often fluid and may change during therapy,"[39] it "treats gender related distress, like any other form of distress, as something which emerges in a context which must be explored and understood."[40]

Adolescent gender dysphoria is complex. "There is no common underlying meaning to gender dysphoria," writes psychologist David Schwartz.[41] The causes of gender dysphoria are unclear, but dysphoric minors typically suffer multiple comorbidities, including depression, anxiety, and histories of trauma and adverse childhood experiences.[42]

---

[38] George Halasz & Andrew Amos, *Gender Dysphoria: Reconsidering ethical and iatrogenic factors in clinical practice*, 32 Australasian Psychiat. 26 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10809775/.

[39] Sinai & Sim, *supra* note 5, at 147.

[40] *Id.* at 146.

[41] David Schwartz, *Clinical and Ethical Considerations in the Treatment of Gender Dysphoric Children and Adolescents: When Doing Less Is Helping More*, 20 J. Infant, Child & Adolesc. Psychotherapy 439, 446 (2021), https://doi.org/10.1080/15289168.2021.1997344.

[42] A recent study found 87.7% of gender-dysphoric children and

These complicated histories necessitate exploratory psychotherapy to address "factors that could be misinterpreted as non-temporary gender dysphoria as well as factors that could be underlying causes for gender dysphoria."[43]

The gender-affirming protocol, however, sidelines this evidence. It never questions "why" an adolescent feels such distress, but theorizes an "essentialist" view of gender, a supposed true gender self, awaiting discovery.[44] Gender affirmation erroneously equates "questioning the … existence of gender identity" or a particular gender identity with "questioning that person's entire sense of being."[45]

---

adolescents had co-occurring psychiatric diagnoses, and many had a "history of self-harm, suicidal ideation, or symptoms of distress." Kasia Kozlowska, et al., *Attachment Patterns in Children and Adolescents With Gender Dysphoria*, 11 Frontiers Psych. 582688 (2021), https://www.frontiersin.org/journals/psychology/articles/10.3389/fpsyg.2020.582688/full.

[43] Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archiv. Sex Behav. 3353 (2021), https://pubmed.ncbi.nlm.nih.gov/34665380/.

[44] David Schwartz, *Listening to children imagining gender: observing the inflation of an idea.* 59 J. Homosex. 460, 465 (2012), https://pubmed.ncbi.nlm.nih.gov/22455331/.

[45] Griffin, *supra* note 26, at 293.

The complexity of these situations underscores the need for therapeutic goals that meet the client's (not others') needs and desires. The therapeutic goal of "desisting," or re-integrating one's sense of identity with the reality of the sexed body, should never be precluded. "Remember what desisting is," writes Dr. Schwartz, "the child becomes *comfortable* in his or her skin. The child stops insisting that he or she *is* really another gender … The child is at relative peace with the body he or she has. By what logic could the child's acquisition of peace and comfort not be a desirable outcome?"[46]

HB 4616 treats a therapist's support for a client's desistance as unethical, but encourages therapists to facilitate a client's move *towards* transgender identification. When clinicians presume that a minor's present feelings signal an emergent, fixed "transgender" identity, they risk overlooking other issues such as autism, mental illness, trauma, or same-sex attraction.[47] These clinicians are likely "getting it wrong …

---

[46] Schwartz, *supra* note 41, at 444.

[47] Stella O'Malley, *Review of book by Hannah Barnes: Time to Think: The Inside Story of the Collapse of the Tavistock's Gender Service for Children*, Clinical Advisory Network on Sex and Gender (Mar. 8, 2023), https://can-sg.org/2023/03/08/review-of-book-by-hannah-barnes-time-to-

with some of the most vulnerable children and young people," observes a former Tavistock (UK) gender clinician.[48]

An ethical approach recognizes that "desistance, when it happens, is desirable," writes Dr. Schwartz. "[W]e should think of every trans aspiring child as a potential desister."[49]

## IV. HB 4616 ignores the weak evidence for gender affirmation and the overwhelming evidence of irreversible harm.

Gender affirmation and its package of "affirming" bodily modifications is an ethically indefensible response to identity distress. Gender specialists, clinicians, and whistleblowers worldwide have raised alarm over the scant evidence supporting gender-affirming protocols, amid growing evidence that gender affirmation seriously harms vulnerable children.

---

think-the-inside-story-of-the-collapse-of-the-tavistocks-gender-service-for-children/.

[48] Christina Buttons, *U.K.'s Largest Pediatric Gender Clinic Ignored Autism Connection In Teens Seeking Sex Changes, New Book Claims*, Daily Wire (Feb. 15, 2023), https://www.dailywire.com/news/u-k-s-largest-pediatric-gender-clinic-ignored-autism-connection-in-teens-seeking-sex-changes-new-book-claims.

[49] Schwartz, *supra* note 41, at 444.

Decades after the Dutch initiated puberty suppression and hormonal interventions for gender dysphoric adolescents (the "Dutch Protocol"), the promised success—happy, healthy futures for transgender-identified young people—is unrealized.[50] Instead, clinicians are confronting a stunning lack of evidence of medical benefit and an epidemic of trans-identified youth with significant psychological illness,, suicidality, and demonstrable medical harm.[51]

In April 2024, the Cass Review, a four-year substantive evidence review commissioned by the UK National Health Service, delivered a definitive analysis of youth gender-affirming interventions. It concluded that the evidence supporting pediatric gender-affirming interventions, including social transition, is "remarkably weak," with "no good evidence on the long-term outcomes of interventions."[52] The UK government imposed an emergency ban on puberty suppression for identity-

---

[50] Zhenya Abbruzzese, et al., *The Myth of Reliable Research in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies – and research that has followed*, 49 J. Sex & Marital Therapy 673 (2023), https://pubmed.ncbi.nlm.nih.gov/36593754/.

[51] Cass Review, *supra* note 2.

[52] *Id.* at 13.

distressed minors, a ban upheld by the High Court and extended indefinitely.[53]

Scandinavian countries, early adopters of gender-affirming protocols, eventually conducted their own substantive evidence reviews, reversed course, and curtailed medical transitions for minors. The leading gender clinic in Sweden has stopped using puberty blockers for minors.[54] Finland has issued new guidelines that prioritize psychotherapy as the first-line treatment for gender dysphoric minors.[55] Denmark recently followed Sweden and Finland, drastically limiting its use of puberty blockers and hormones in minors, citing the lack of evidence.[56] Other European countries are increasingly cautious,[57] as disturbing aspects of gender affirmation continue to emerge: insufficient

---

[53] *Puberty blockers ban is lawful,* BBC, *supra* note 3.

[54] Lisa Nainggolan, *Hormonal Tx of Youth With Gender Dysphoria Stops in Sweden*, Medscape (May 12, 2021), https://www.medscape.com/viewarticle/950964.

[55] *One Year Since Finland Broke with WPATH "Standards of Care",* Society for Evidence-based Gender Medicine (July 2, 2021), https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors.

[56] Society for Evidence-Based Gender Medicine, *supra* note 8.

[57] Kozlowska, et al., *supra* note 4.

evidence, uncertainty about long-term harms and benefits, harmful outcomes (including reduced bone density, sterility, and serious complications), unexplained changes in patient demographics (predominately female with significant psychiatric comorbidities), persistently elevated suicide rates (post-transition), activist-suppressed research, political manipulation of supposedly evidence-based standards, and rising numbers of detransitioners.[58]

Remarkably, *no* systematic review—the gold standard of evidence-based medicine—has found high-quality (or even moderate-quality) evidence supporting medical gender transition for children. Gordon Guyatt, a founder of evidence-based medicine principles, conducted two systematic reviews and meta-analyses after the Cass Review and concluded the "overarching theme" of these and other substantive evidence reviews is "the lack of high-quality evidence" to support gender

---

[58] Leor Sapir, *Gender Medicine on the Ropes*, Manhattan Instit. Mag. (Winter 2025), https://www.city-journal.org/article/gender-medicine-trans-movement-donald-trump-election.

affirmation.[59] Behind the puffery of activist clinicians, the affirmation model is propped up by flawed, cherry-picked studies.

The Cass Review's devastatingly thorough evidence review prompted baseless critiques from proponents of gender affirmation, especially Yale Law School's so-called Integrity Project ("the Project").[60] The Project's response was described by one commentator as "an exceptionally misleading, confused, and fundamentally unprofessional document."[61] It glossed over the many systematic reviews critical of gender affirmation, while drawing erroneous comparisons between medical gender transition and other areas of pediatrics characterized by low-quality evidence. The low-quality evidence supporting medical gender transition, however, "stems not from a lack of randomised controlled trials, but from poor study design, inappropriate comparison

---

[59] Miroshnychenko, et al., *Gender affirming hormone therapy*, *supra* note 7; Miroshnychenko, et al., *Puberty blockers for gender dysphoria in youth*, *supra* note 7.

[60] Meredithe McNamara, et al., An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria (2024), https://tinyurl.com/mppm5cjz.

[61] Jesse Singal, *Yale's "Integrity Project" Is Spreading Misinformation About the Cass Review and Youth Gender Medicine*, *Part 1*, Singal-Minded Substack (Aug. 19, 2024), https://perma.cc/FQQ4-434M.

groups, high attrition and inadequate follow-up."[62] Further, unlike typical pediatric interventions, gender medical transitions notoriously result in sterility and sexual dysfunction.

Gender medicine's failure to produce quality evidence showing children benefit from gender-affirming medical transition is driving a new rationale to justify gender affirmation for minors. Recent articles by gender clinicians challenge "the normative assumption" that hormonal and surgical medical interventions are justified only if they "inevitably lead to 'positive' outcomes."[63] Analogizing to abortion, these clinicians propose a new standard that justifies gender interventions "on the basis of personal desire and autonomy."[64] Objective evidence of medical benefit

---

[62] C. Ronny Cheung, et al., *Gender medicine and the Cass Review: why medicine and the law make poor bedfellows*, 110 Archiv. Diseases Child. 251, 254 (2025), https://pubmed.ncbi.nlm.nih.gov/39401844/. *See also* Kathleen McDeavitt, *Critiques of the Cass Review: Fact-Checking the Peer-Reviewed and Grey Literature*, 51 J. Sex & Marital Therapy 175 (2025), https://www.tandfonline.com/doi/full/10.1080/0092623X.2025.2455133.

[63] Ezra D. Oosthoek, et al., *Gender-affirming medical treatment for adolescents: a critical reflection on "effective" treatment outcomes*, BMC Med. Ethics, Dec. 2024 https://pmc.ncbi.nlm.nih.gov/articles/PMC11667851/.

[64] *Id.*

becomes irrelevant if "affirming" interventions fulfill an adolescent's "embodiment goals"[65] or produce "experiential" benefits (e.g., being recognized as one's asserted identity).[66] Gender clinicians seem eager to displace evidence-based medicine with consumer satisfaction metrics.

Lawmakers in 27 U.S. states have responded to the scant evidence for pediatric gender affirmation, and resulting international shift, by banning or restricting gender-affirming interventions for minors.[67] (Legal challenges to state restrictions on gender affirmation continue to play out in the courts.[68]) At the federal level, the Trump administration has recognized—through Executive Orders, agency action, and litigation—the binary, immutable nature of sex, and seeks to cut off federal funding for gender affirmative initiatives in education, federal

---

[65] Elizabeth R. Boskey, et al., *A Retrospective Cohort Study of Transgender Adolescents' Gender-Affirming Hormone Discontinuation,* 76 J. Adolesc. Health. 584 (2025), https://pubmed.ncbi.nlm.nih.gov/39818655/.

[66] *Id.*

[67] Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (last updated Mar. 19, 2025), https://www.kff.org/other/dashboard/gender-affirming-care-policy-tracker/.

[68] *Id.*

research, and medicine.[69] Despite ongoing litigation, these government actions reflect the growing global consensus that pediatric gender affirmation is unethical.

## V. HB 4616 forces vulnerable adolescents towards gender affirmation and irreversible harm.

By prohibiting open-ended psychotherapy and alternative approaches, HB 4616 forces gender-dysphoric adolescents down the gender-affirming path towards inevitable harm. Adults who receive gender affirmative medical interventions suffer persistent mental illness, numerous health problems, and elevated suicide risks. For example, post-transition adults are *nineteen times* more likely than the general population to commit suicide. Another study found that suicides among

---

[69] Theresa Farnan, et al., *Trump Ends Government Promotion of Gender Ideology and Child Mutilation*, First Things (Jan. 31, 2025), https://firstthings.com/trump-ends-government-promotion-of-gender-ideology-and-child-mutilation/; Press Release, HHS, HHS Takes Action on President Trump's Executive Orders Defending Women and Children (Feb. 19, 2025), https://www.hhs.gov/about/news/2025/02/19/hhs-takes-action-president-trumps-executive-orders-defending-women-children.html; Alec Schemmel, *HHS slashes over $350M in grant funding for gender ideology, DEI research projects*, Fox News (Mar. 21, 2025), https://www.foxnews.com/politics/hhs-slashes-over-350-million-grant-funding-gender-ideology-dei-research-projects.

persons receiving medical gender affirmation occurred on average six years *after* beginning gender affirmation.[70]

Laws like HB 4616 create a fearful climate that puts clinicians "in hiding, so to speak, because speaking out can get us into trouble."[71] Therapists are "unsure whether addressing psychological and social antecedents will lead to accusations of conversion therapy," even though "attempts to reconcile a sufferer's discomfort with their actual body would be good practice" for similar conditions "such as anorexia nervosa."[72] Two prominent U.S. gender clinicians warn that clinicians will avoid doing psychological assessments for fear of "being cast as

---

[70] Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLOS ONE e16885 (2011), https://doi.org/10.1371/journal.pone.0016885; Roberto D'Angelo, *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, 50 Archiv. Sex. Behav. 7 (2021), https://doi.org/10.1007/s10508-020-01844-2; Chantal M. Wiepjes, et al., *Trends in suicide death risk in transgender people: results from the Amsterdam Cohort of Gender Dysphoria study (1972-2017)*, 141 Acta Psychiat. Scandinavica 486 (2020), https://pubmed.ncbi.nlm.nih.gov/32072611/.

[71] Jon Brown, *Rachel Levine's claim all agree on 'gender-affirming care' is slammed by doctors 'in hiding,'* Fox News (May 11, 2022), https://www.foxnews.com/us/doctors-slam-levines-claim-gender-affirming-care-fear-speaking-in-hiding.

[72] Griffin, *supra* note 26.

transphobic bigots by their local colleagues" who equate "gender exploring therapy" with "conversion therapy."[73] A recent study of 100 detransitioners bears this out, as "fifty-five percent said they 'did not receive an adequate evaluation from a doctor or mental health professional before starting transition.'"[74]

Ethical counselors must consider and respond to changes in a client's self-knowledge and goals, never imposing on the client a uniform narrative or prescriptive goals. Respect for the "child's right to an open future" means recognizing that "[g]ender identity and the importance of gender to an individual's sense of self can change over time."[75] Given the "remarkably weak" evidence[76] for gender affirmation, the European pivot to prioritize psychotherapy (talk therapy) for identity-distressed minors is hardly surprising.

---

[73] Laura Edwards-Leeper & Erica Anderson, *The mental health establishment is failing trans kids*, Wash. Post (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/; Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, Free Press (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle

[74] Littman, *supra* note 43.

[75] Jorgensen, *supra* note 9, at 1947.

[76] Cass Review, *supra* note 2, at 13.

Michigan's choice to ignore the evidence and foreclose sound therapeutic options for identity-distressed minors is a medical scandal— and a human tragedy. Clinicians know the "bedrock principle of all clinical practice: First, do no harm."[77] HB 4616 effectively mandates pediatric gender affirmation, putting vulnerable children on a one-way path towards irreversible harm. This is ethically indefensible.

## CONCLUSION

*Amicus* urges the Court to consider the serious ethical concerns raised by HB 4616 and grant Plaintiff-Appellants' requested relief.

---

[77] Schwartz, *supra* at note 41, at 441.

Respectfully submitted,

s/ Eric N. Kniffin

ERIC N. KNIFFIN
MARY F. HASSON
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
  Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

CHRISTOPHER MILLS
SPERO LAW LLC
557 East Bay St.
  #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

B. TYLER BROOKS
THOMAS MORE SOCIETY
309 W. Washington Street
  Suite 1250
Chicago, IL 60606
(312) 637-8097
tbrooks@thomasmoresociety.org

April 4, 2025          *Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 6,489 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2309 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: April 4, 2025

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.