No. 25-1105

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CATHOLIC CHARITIES OF JACKSON, LENAWEE, AND
HILLSDALE COUNTIES, *et al.*,

Plaintiffs-Appellants,

v.

GRETCHEN WHITMER, Governor of
Michigan, in her official capacity, *et al.*,

Defendants-Appellees.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Jane M. Beckering

**BRIEF FOR DEFENDANTS-APPELLEES**

Christopher W. Braverman (P70025)

Daniel J. Ping (P81482)
Gallant Fish (P82196)
Assistant Attorneys General

Christopher M. Allen (P75439)
Assistant Solicitor General

Counsel of Record
Attorneys for Defendants-Appellees
G. Mennen Williams Building
525 W. Ottawa St., 5th Fl.
P.O. Box 30736
Lansing, MI 48909
(517) 335-7569

Dated: May 27, 2025

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................ iv

Statement in Support of Oral Argument ................................... xi

Jurisdictional Statement ................................................................ 1

Statement of Issues Presented ...................................................... 2

Introduction ...................................................................................... 3

Statement of the Case .................................................................... 5

    A.    Conversion therapy is widely recognized as both
          ineffective and harmful. ............................................ 5

    B.    The Legislature enacts HB 4616 to protect Michigan
          minors. ........................................................................ 8

    C.    LARA has taken no enforcement action under HB
          4616. .......................................................................... 11

    D.    The district court denies Plaintiffs' motion for
          preliminary injunction. ............................................ 12

    E.    The Supreme Court grants certiorari in a case
          presenting an all-but-identical issue. ..................... 15

Standard of Review ........................................................................ 17

Summary of Argument .................................................................. 18

Argument .......................................................................................... 21

I.    Plaintiffs have not established standing. ....................... 21

    A.    Plaintiffs fail to demonstrate that they will violate HB
          4616. .......................................................................... 23

    B.    There is no credible threat of prosecution. ............. 28

C.    Plaintiffs do not have standing to invoke their patients' parents' First Amendment rights............................................33

II.   HB 4616 regulates the professional conduct of medical providers and does not implicate the Plaintiffs' freedom of speech.................................................................................35

A.    Plaintiffs bear a heavy burden to establish entitlement to a preliminary injunction....................................36

B.    The Supreme Court has long affirmed States' authority to impose reasonable regulations on healthcare professionals.............................................................37

C.    HB 4616 regulates the provision of health care, and therefore, conduct....................................................39

    1.   State regulation of health care is subject to reduced scrutiny............................................39

    2.   HB 4616 regulates the provision of medical care, not of constitutionally protected speech. ....................43

D.    Plaintiffs have failed to demonstrate that conversion therapy is expressive speech. .................................45

    1.   *Otto* is an outlier that has not been followed by any other federal circuit. ...............................45

    2.   *Holder* does not govern this case.................................50

E.    HB 4616 survives rational-basis review, intermediate scrutiny, and strict scrutiny. .................................52

III.  HB 4616 is not unconstitutionally vague......................................58

IV.  Michigan's ban on conversion therapy is a neutral law of general applicability and does not burden Plaintiffs' exercise of religion. ........................................................................63

A.    Plaintiffs fail to allege a sufficient burden on their right to freely exercise their religious beliefs. .......................64

B.      Michigan's ban is neutral with respect to religion. ..............65

C.      The ban is generally applicable and does not burden
        religious conduct as compared to secular conduct................66

V.   The remaining injunction factors also weigh against the
     issuance of a preliminary injunction. ............................................69

Conclusion and Relief Requested.............................................................72

Certificate of Compliance .......................................................................73

Certificate of Service ...............................................................................74

Designation of Relevant District Court Documents ..............................75

# TABLE OF AUTHORITIES

Page

**Cases**

*Ammex, Inc. v. Cox,*
351 F.3d 697 (6th Cir. 2003) ................................................ 33

*Barnes v. Glen Theatre, Inc.,*
501 U.S. 560, 572 (1991) ...................................................... 45

*Bays v. City of Fairborn,*
668 F.3d 814 (6th Cir. 2012) .......................................... 37, 70

*Boos v. Barry,*
485 U.S. 312 (1988) ............................................................... 61

*Brown v. Entertainment Merchants Association,*
564 U.S. 786 (2011) ................................................... 54, 55, 56

*Chambers v. Stengel,*
256 F.3d 397 (6th Cir. 2001) ................................................ 59

*Chiles v. Salazar,*
116 F.4th 1178 (10th Cir. 2024) ..................................... 46, 50

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) ....................................................... 66, 67

*Collins v. State of Tex.,*
223 U.S. 288 (1912) ............................................................... 39

*Crane v. Johnson,*
242 U.S. 339 (1917) ............................................................... 39

*Dahl v. Bd. of Trustees of W. Mich. Univ.,*
15 F.4th 728 (6th Cir. 2021) ................................................ 65

*Dent v. State of W.Va.,*
129 U.S. 114 (1889) ....................................................... 38, 48

*Dobbs v. Jackson Women's Health Org.*,
 597 U.S. 215 (2022) ....................................................... 42, 43

*Emp't Div. v. Smith*,
 494 U.S. 872 (1990) ............................................................. 64

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
 920 F.3d 421 (6th Cir. 2019) ................................... 14, 42, 44

*Expressions Hair Design v. Schneiderman*,
 581 U.S. 37 (2017) ............................................................... 41

*Fair Housing Center of Metro. Detroit v. Singh Senior Living Center, LLC*,
 12 F.4th 990 (6th Cir. 2025) .............................................. 21

*Flast v. Cohen*,
 392 U.S. 83 (1968) .............................................................. 27

*Fulton v. City of Philadelphia*,
 593 U.S. 522 (2021) ............................................................ 68

*Giboney v. Empire Storage & Ice Co.*,
 336 U.S. 490 (1949) ...................................................... 41, 44

*Glenn v. Holder*,
 690 F.3d 417 (6th Cir. 2012) .............................................. 22

*Goldfarb v. Virginia State Bar*,
 421 U.S. 773 (1975) ............................................................ 53

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ............................................................ 60

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010) ................................................... 51, 52, 53

*Jaffee v. Redmond*,
 518 U.S. 1 (1996) ............................................................... 48

*James B. Oswald Co. v. Neate*,
 98 F.4th 666 (6th Cir. 2024) ............................................. 17

*Jenkins v. Rock Hill Local Sch. Dist.*,
    513 F.3d 580 (6th Cir. 2008) .............................................. 61

*Johnson v. Recca*,
    821 N.W.2d 520 (Mich. 2012) ...................................... 24, 63

*Johnson v. United States*,
    576 U.S. 591 (2015) ........................................................ 59

*Kareem v. Cuyahoga Cty. Bd. of Elections*,
    95 F.4th 1019 (6th Cir. 2024) ........................................ 23

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ......................................... 27

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................... 22

*Lambert v. Yellowley*,
    272 U.S. 581 (1926) ...................................................... 39

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................... 21, 31, 35

*Malam v. Adducci*,
    452 F. Supp. 3d 643 (E.D. Mich. 2020) ....................... 37

*Maryland v. King*,
    567 U.S. 1301 (2012) .................................................... 71

*McKay v. Federspiel*,
    823 F.3d 862 (6th Cir. 2016) .............................. 22, 23, 29

*McNeilly v. Land*,
    684 F.3d 611 (6th Cir. 2012) ........................................ 17

*Milne v. Robinson*,
    6 N.W.3d 40 (Mich. 2024) .......................................... 24, 63

*Morrison v. Bd. of Educ. of Boyd Cty.*,
    521 F.3d 602 (6th Cir 2008) ......................................... 71

*Mosley v. Kohl's Dep't Stores, Inc.*,
942 F.3d 752 (6th Cir. 2019) ............................................... 21

*Murray v. U.S. Dep't of Treasury*,
681 F.3d 744 (6th Cir. 2012) ............................................... 21

*Nat'l Rifle Ass'n of Am. v. Magaw*,
132 F.3d 272 (6th Cir. 1997) ............................................... 33

*New York v. Ferber*,
458 U.S. 747 (1982) .................................................... 41, 54

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ................................................. passim

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ........................................................ 5

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) .................................................... 42, 47

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ...................................... 46, 47, 55

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ............................................... 71

*People v. Burkman*,
15 N.W.3d 216 (Mich. 2024) ............................................... 62

*People v. Phippin*,
37 N.W. 888 (Mich. 1888) ................................................ 38

*Pickup v. Brown*,
740 F.3d 1208 (9th Cir. 2014) ...................................... 46, 47, 49

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) ...................................................... 31

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992) ...................................................... 42

*Powell v. State of Texas*,
   392 U.S. 514 (1968) ....................................................38, 48

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ............................................................64

*Reno v. ACLU*,
   521 U.S. 844 (1997) ............................................................57

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ............................................68

*Rumsfeld v. FAIR, Inc.*,
   547 U.S. 47 (2006) ........................................................41, 53

*Russell v. Lundergan-Grimes*,
   784 F.3d 1037 (6th Cir. 2015) ........................................29, 30

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ............................................................17

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ............................................................29

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ........................................................22, 29

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ..............................................................68

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022)........................................50, 67

*United States v. Krumrei*,
   258 F.3d 535 (6th Cir. 2001) ............................................60

*United States v. Lee*,
   455 U.S. 252 (1982) ........................................................65, 66

*United States v. O'Brien*,
   391 U.S. 367 (1968) ............................................................53

*United States v. Rowlee,*
  899 F.2d 1275 (2d Cir. 1990) ............................................. 41

*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) ............................................. 64

*Watson v. Maryland,*
  218 U.S. 173 (1910) ......................................................... 38

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................... 17, 37

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) ......................................................... 35

## Statutes

Mich. Comp. Laws § 330.1100a(20) ............................... passim

Mich. Comp. Laws § 330.1100b(19) ..................................... 10

Mich. Comp. Laws § 330.1901a .............................................. 9

Mich. Comp. Laws § 333.1111(2) ......................................... 64

Mich. Comp. Laws § 333.18101 ............................................ 58

Mich. Comp. Laws § 333.18501(1)(g) .................................. 58

Mich. Comp. Laws § 37.2103(f) ........................................... 10

Mich. Comp. Laws §§ 333.18201(b) ..................................... 58

## Other Authorities

Amy E. Green *et al.*, *Self-Reported Conversion Efforts and
  Suicidality Among US LGBTQ Youths and Young Adults, 2018,*
  110 Am. J. Pub. Health 1221, 1222–24 (2020) ..................... 8

APA, *Resolution on Gender Identity Change Efforts* 2 (2021) ......... 6

*Committee Meeting Minutes*, Mich. H. Comm. on Health Policy Subcomm. on Behavioral Health (June 7, 2023)................................. 11

*Gov. Whitmer Signs Legislation to Protect LGBTQ+ Youth, Ban Conversion Therapy*, Press Release (July 26, 2023) ........................... 12

HB 4617, § 100a(20) ................................................................. 53

## Constitutional Provisions

U.S. Const. amend. I................................................................. 64

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents important questions about whether the Constitution bars Michigan from regulating health professions in certain respects.

But this Term, the U.S. Supreme Court will answer the same central question raised by Appellants: whether a state law barring health professionals from engaging in conversion therapy with minors violates the Free Speech Clause. The Court granted certiorari in *Chiles v. Salazar* (No. 24-539), 2025 WL 746313 (U.S. Mar. 10, 2025), which presents an identical claim to a nearly identical state statute. Because the parties agree that *Chiles* involves a challenge to a law similar to HB 4616, and because the Supreme Court's decision will likely control the outcome of this case, this Court should not hold oral argument until that decision is issued and the parties have had an opportunity for supplemental briefing on *Chiles*' impact on this case.

Whenever oral argument is held, however, the State Defendants respectfully request to participate.

## JURISDICTIONAL STATEMENT

Appellees agree that this Court has jurisdiction.

**STATEMENT OF ISSUES PRESENTED**

1.  Whether Plaintiffs have standing to challenge HB 4616, which bars licensed mental health professionals from practicing harmful conversion therapy on minors, where they fail to sufficiently allege their conduct falls within the ambit of the law?

2.  Whether the district court abused its discretion in denying Plaintiffs' motion to preliminarily enjoin HB 4616, where the law regulates professional conduct in a manner that is clear, neutral, and generally applicable?

## INTRODUCTION

"Conversion therapy" is a discredited and dangerous practice that seeks to change an individual's sexual orientation or gender identity. Study after study shows that it inflicts enduring and profound harms on those receiving it. For instance, children who were exposed to conversion therapy were *more than twice as likely* to later attempt suicide than those who did not experience conversion therapy. Presented with mounting evidence of these harms, Michigan's Legislature enacted HB 4616 to safeguard Michigan youth by prohibiting licensed mental health professionals—practitioners who hold a role of immense responsibility in our healthcare system—from subjecting minors to this practice.

Plaintiffs say HB 4616 infringes on their free-speech and free-exercise rights. But a therapy session is not the town square, and the therapist's chair is not a platform to communicate a particular message or viewpoint. Conversion therapy is neither speech nor religious exercise. It is professional conduct, and regulations of professional conduct like HB 4616 call for rational-basis review. But whatever scrutiny applies, HB 4616 meets it.

Plaintiffs also argue that HB 4616 is unconstitutionally vague and invites arbitrary enforcement. Both arguments were appropriately handled below. As to the first, the district court properly recognized that HB 4616 draws a clear line between the impermissible *predetermined outcome* of change, and the permissible facilitation of identity exploration and development. And as to Plaintiffs' second argument, Defendants explained below that only Michigan's licensing agency, not individuals, can enforce HB 4616.

Most fundamentally: Plaintiffs disavow performing "conversion therapy" under the law. Rather, they allege that they merely facilitate the development of their clients' sexual orientations or gender identities—which HB 4616 explicitly permits. By the same token, Plaintiffs cannot show a credible threat of enforcement. They lack pre-enforcement standing.

But even if Plaintiffs have standing, the district court properly held they are unlikely to succeed on the merits and, accordingly, have not satisfied the other preliminary-injunction factors. Accordingly, Defendants respectfully ask this Court to affirm.

# STATEMENT OF THE CASE

## A. Conversion therapy is widely recognized as both ineffective and harmful.

Conversion therapy is a discredited set of practices that attempts to change a person's sexual orientation or gender identity.[1] The practice is "premised on or motivated by the unscientific perspective that diversity in sexual orientation and/or gender identity and expression is a deficit, developmental defect, and/or a mental illness." (Glassgold Decl., R. 27-1, Page ID # 590, ¶ 34.)

But sexual orientation and gender identity are not afflictions in need of a cure. *See Obergefell v. Hodges*, 576 U.S. 644, 661 (2015) ("[P]sychiatrists and others [have] recognized that sexual orientation is both a normal expression of human sexuality and immutable."). As the American Psychological Association (APA) has recognized, "diversity in gender identity and expression is part of the human experience." APA, *Resolution on Gender Identity Change Efforts* 2 (2021),

---

[1] Conversion therapy has also been referred to as sexual orientation change efforts (SOCE) or sexual orientation and gender identity change efforts (SOGICE). (R. 27-1, Page ID ## 580–583, ¶¶ 11–12, 15.)

https://bit.ly/4382FP6.  Thus, conversion therapy is not just unnecessary, but ill-advised.

The leading associations that develop the standards of care for medical and mental health care for children have rejected the use of conversion therapy.  (R. 27-1, Page ID ## 586, 593–594, ¶¶ 24, 42.)  This is because research studies consistently find conversion therapy to be both ineffective and uniquely harmful to minors—in addition to serving no legitimate purpose.  (*Id.*, Page ID ## 595–598, ¶¶ 43–46.)

Two comprehensive reports examining over sixty years of scientific literature in this area demonstrate why conversion therapy has been so thoroughly rejected: (1) APA, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009) (R. 27-1, Page ID # 626) (APA Report); and (2) U.S. Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* (2023) (R. 27-1, Page ID # 845) (SAMHSA Report).

The APA Report concluded, based on the scientifically valid research conducted up to that point, that "it is unlikely that individuals

will be able to reduce same-sex sexual attractions or increase other-sex attractions through SOCE." (R. 27-1, Page ID # 717.) Further, the APA noted that the research found "unintended harmful side effects" resulting from conversion therapy, including "depression, suicidality, and anxiety." (*Id.*)

The SAMHSA Report, published in 2023, reviewed and summarized more recent research on conversion therapy efforts. SAMHSA found that "[t]here is now a significant body of research on SOGI change efforts" and that the research conducted since the APA Report has further corroborated conversion therapy's ineffectiveness and its harm. (*Id.*, Page ID ## 869–870.) "Recent large, methodologically rigorous studies consistently find that exposure to sexual orientation change efforts places individuals at increased risk of suicidality and suicide attempts," and "[i]t is now scientific consensus that sexual orientation change efforts are not effective and can cause significant harm." (*Id.*)[2]

_____

[2] The SAMHSA report cited numerous recent studies finding a link between attempted conversion therapy and suicide risk. (*See, e.g.*, SAMHSA Report at 8 (collecting studies), 27.) One such study, involving 34,808 respondents, found that 43.6% of those who experienced conversion therapy had attempted suicide, compared to

Twenty-two state legislatures and the District of Columbia have banned the practice of conversion therapy.[3] Several additional states have banned the practice by executive order or administrative action.[4]

## B. The Legislature enacts HB 4616 to protect Michigan minors.

The Michigan Legislature enacted HB 4616 and HB 4617 to protect minors from the harms caused by conversion therapy.[5] HB 4616 amended Michigan's Mental Health Code by adding § 901a, which provides that "[a] mental health professional shall not engage in conversion therapy with a minor" and that violations will subject those

---

[3] See S.B. 1172 (Cal. 2012); H.B. 19-1129 (Colo. 2019); H.B. 6695 (Conn. 2017); S.B. 65 (Del. 2018); B20-0501 (D.C. 2014); H.B. 664 (Haw. 2019); H.B. 0217 (Ill. 2015); L.D. 1025 (Me. 2019); S.B. 1028 (Md. 2018); H. 140 (Mass. 2019); HB 4616 (Mich. 2023); H.F. 16 (Minn. 2023); S.B. 201 (Nev. 2017); H.B. 587 (N.H. 2018); A.B. 3371 (N.J. 2013); S.B. 121 (N.M. 2017); S.B. 1046 (N.Y. 2019); H.B. 2307 (Or. 2015); H. 5277A (R.I. 2017); H.B. 228 (Utah 2023); S. 132 (Vt. 2016); H.B. 386 (Va. 2020); S.B. 5722 (Wash. 2018).

[4] Exec. Order No. 2023-13 (Ariz. 2023); Exec. Order No. 97 (N.C. 2019); N.D. Admin. Code § 75.5-02-06.1; Exec. Order No. 122 (Wis. 2021); and Wis. Admin. Code MPSW § 20.02(25).

[5] For ease of reference, this brief adopts Plaintiffs' convention of referring to HB 4616 and HB 4617 collectively as "HB 4616."

17.3% of those who did not. Amy E. Green *et al.*, *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults, 2018*, 110 Am. J. Pub. Health 1221, 1222–24 (2020).

professionals to potential licensing sanctions.  Mich. Comp. Laws

§ 330.1901a.  HB 4617, in turn, defines "conversion therapy" as "any

practice or treatment by a mental health professional that seeks to

change an individual's sexual orientation or gender identity, including,

but not limited to, efforts to change behavior or gender expression or to

reduce or eliminate sexual or romantic attractions or feelings toward an

individual of the same gender."  Mich. Comp. Laws § 330.1100a(20).

The bill further clarifies what does *not* constitute conversion

therapy:

> Conversion therapy does not include counseling that
> provides assistance to an individual undergoing a gender
> transition, counseling that provides acceptance, support, or
> understanding of an individual or facilitates an individual's
> coping, social support, or identity exploration and
> development, including sexual orientation-neutral
> intervention to prevent or address unlawful conduct or
> unsafe sexual practices, as long as the counseling does not
> seek to change an individual's sexual orientation or gender
> identity.[6]  [*Id.*]

---

[6] "Gender identity" is defined at Mich. Comp. Laws § 37.2103(f) as "having or being perceived as having a gender-related self-identity or expression whether or not associated with an individual's assigned sex at birth."  And "sexual orientation" is defined at subsection (*l*) as "having an orientation for heterosexuality, homosexuality, or bisexuality or having a history of such an orientation or being identified with such an orientation."

The Mental Health Code defines "mental health professional" to include psychologists, licensed master's social workers, licensed counselors, and several other professions. Mich. Comp. Laws § 330.1100b(19). Unlicensed counselors are not included within the definition. *See id.*

HB 4616 was first considered by the Committee on Health Policy's Subcommittee on Behavioral Health, which heard testimony from numerous individuals and organizations in support of the bill, including the Michigan Psychological Association, the National Center for Lesbian Rights (NCLR), and the Michigan Association of School Psychologists (MASP). *See Committee Meeting Minutes*, Mich. H. Comm. on Health Policy Subcomm. on Behavioral Health (June 7, 2023).[7]

The testimony presented to the Subcommittee discussed at length the scientific research on the ineffectiveness of conversion therapy and its documented harms, particularly its association with increased risk of

---

[7] Subcommittee materials, including meeting minutes and letters in support and opposition, are available at https://bit.ly/3ZnrCDB. The recording of the Subcommittee hearing is available at https://bit.ly/3SeXA16.

suicide.  *See, e.g.*, NCLR Letter (June 7, 2023); MASP Letter (June 5, 2023); The Trevor Project Letter (June 7, 2023) (R. 27-3, Page ID ## 964–968).

When signing HB 4616, Governor Gretchen Whitmer celebrated the law's passage, noting that "[n]ot only is conversion therapy ineffectual, it can lead to significant long-term harm, including anxiety, depression, internalized homophobia, self-blame, and higher risk of suicide." *See Gov. Whitmer Signs Legislation to Protect LGBTQ+ Youth, Ban Conversion Therapy*, Press Release (July 26, 2023), https://bit.ly/45lQsro [https://perma.cc/V35M-NVN6].

## C. LARA has taken no enforcement action under HB 4616.

HB 4616 became effective on February 13, 2024.  Since taking effect, the Michigan Department of Licensing and Regulatory Affairs (LARA) has taken no disciplinary action enforcing HB 4616. (Gumbrecht Decl., R. 27-2, Page ID # 962, ¶¶ 24–25.)  LARA has made no public statements regarding HB 4616, nor has it issued any warnings to Plaintiffs or other licensed mental health professionals (LMHPs) relating to HB 4616.  (*Id.*, ¶¶ 21–22.)

### D. The district court denies Plaintiffs' motion for preliminary injunction.

Plaintiffs filed their complaint against thirty-four State Defendants, including the Governor, the Attorney General, the Directors of the Department of Licensing and Regulatory Affairs (LARA) and of Health and Human Services (MDHHS), and the Board members of the Michigan Board of Counseling, the Michigan Board of Social Workers, and the Michigan Board of Psychology. They raised several constitutional claims against HB 4616, claiming that it violates the Free Speech Clause, the Free Exercise Clause, and the Due Process Clause of the Fourteenth Amendment. (Compl., R. 1, Page ID ## 32–33.)

Plaintiffs moved to preliminarily enjoin the State Defendants from enforcing HB 4616. (Mot. for Prelim. Injunc., R. 14, Page ID ## 115–116.) After the parties submitted briefing, the district court denied the motion against all defendants and dismissed MDHHS Director Hertel. (Op. & Order, R. 39, Page ID ## 1292–1327.)[8]

_____

[8] Director Hertel was dismissed because Plaintiffs' complaint alleged that Director Hertel administered a statute that was, in fact, housed in an unrelated chapter of the Michigan Compiled Laws related to substance abuse. (R. 39, Page ID # 1305.) Plaintiffs forfeited any claim

First, disagreeing with the State Defendants, the district court determined that, "at this pleading stage," Plaintiffs had standing to lodge their claims in federal court.  (*Id.*, Page ID # 1311.)  The court rested its standing ruling on its conclusions that "Plaintiffs' intended conduct is at least arguably prohibited by a plausible interpretation of the statute" (*Id.*, Page ID # 1308), and that there is a "credible threat of enforcement" by the State Defendants, even though the State Defendants have not taken any steps to enforce the statute against *anyone*, including the Plaintiffs (*Id.*, Page ID ## 1308–1311).

But turning to the merits, the district court properly rejected each of Plaintiffs' claims supporting their argument for a preliminary injunction.  (*Id.*, Page ID ## 1311–1327.)  First, the district court relied on the "broad power of States to regulate the practice of licensed professionals," and "specifically," under a long line of Supreme Court precedent, "the power of States to regulate health care professionals." (*Id.*, Page ID # 1313.)  This power has been affirmed even in cases

---

to the contrary, (see *id.*), and they do not appeal Director Hertel's dismissal at this juncture.

where there is an ongoing difference of opinion and where the regulation encompassed speech. (*Id.*, Page ID ## 1314–1319.)

Surveying Supreme Court precedent, this Court's holdings, and sister circuit case law, the district court concluded that HB 4616 falls within *NIFLA*'s exception for professional regulations that only incidentally burden speech. (*Id.*, Page ID # 1320.) The district court rejected the idea that HB 4616 falls within some "special constitutional category of professional speech; rather, the new addition to Michigan's Mental Health Code is a general law regulating professional conduct, a category of speech belonging to a long tradition of restriction." (*Id.*, Page ID # 1320 (cleaned up).) Thus, "[u]nder Supreme Court and Sixth Circuit precedent, the law is not subject to heightened First Amendment scrutiny but 'traditional rational basis review.'" (*Id.*, Page ID # 1320 (quoting *EMW*, 978 F.3d at 439–40).)

The district court held that rational basis was met because Michigan has a legitimate interest in "safeguarding the psychological wellbeing of minors," and that the Michigan Legislature and Governor acted to do so. (*Id.*, Page ID ## 1321–1322.) Thus, the district court

concluded Plaintiffs had not established a likelihood of success on the merits of their Free Speech claims.  (*Id.*, Page ID # 1322.)

The district court also rejected any likelihood of success on Plaintiffs' Free Exercise claims, finding HB 4616 to be both neutral and generally applicable, (*Id.*, Page ID ## 1324–1325), and rejecting their due process claim, finding that HB 4616 is not unconstitutionally vague (*Id.*, Page ID # 1326.)

Consistent with the absence of any constitutional violation, the district court found that the Plaintiffs failed to state any "viable predicate for irreparable harm."  (*Id.*)  And since the State has an interest in enforcing its duly enacted laws, and the public has an interest "in regulating the practice of state-licensed professionals and protecting the psychological wellbeing of minors," the court concluded that the equities weighed against Plaintiffs.  (*Id.*)

### E.    The Supreme Court grants certiorari in a case presenting an all-but-identical issue.

Plaintiffs timely filed their notice of appeal on January 30, 2025. (Notice, R. 40, Page ID # 1328.)  On March 10, 2025, the U.S. Supreme Court granted certiorari in *Chiles v. Salazar* (No. 24-539).

As the parties agreed in a joint motion in this Court, "The question presented [in *Chiles*] addresses whether Colorado's law barring covered professionals from engaging in conversion therapy with minors (a law substantially similar to Michigan's) violates the Free Speech Clause, which is the same as Plaintiffs-Appellants' lead claim." (Joint Mot. re: Briefing Sch., R. 35, p. 2.)  The parties also agreed that "*Chiles* is 'a case involving a challenge to a law similar to HB 4616.' [R.20.]" and concurred that, "[t]he Court's opinion in *Chiles* will likely impact the resolution of this case."  (*Id.*, p. 4.)

In addition to their joint request to adjust briefing deadlines, the State Defendants asked this Court to "defer from scheduling further proceedings until the Supreme Court issues its decision in *Chiles v. Salazar*."  (*Id.*, p. 6.)  This Court granted the scheduling adjustments, but it did not rule on the State Defendants' request to defer further proceedings.  (Ruling Letter, R. 36, pp. 1–6.)

## STANDARD OF REVIEW

This Court reviews decisions regarding a preliminary injunction for an abuse of discretion, though embedded legal analysis is reviewed de novo and factual findings are reviewed for clear error. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024). "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.' " *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Thus, the burden is on the plaintiffs, who are required to make a "clear showing" that the four factors favor them. *Id.* Plaintiffs face a "much more stringent [standard] than the proof required to survive a summary judgment motion" because a preliminary injunction is "an extraordinary remedy." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

## SUMMARY OF ARGUMENT

*Standing*

To establish pre-enforcement standing, Plaintiffs bear the burden of alleging an intent to engage in proscribed conduct and a credible threat of enforcement. Plaintiffs have not sufficiently alleged either. Their conduct, as alleged, falls outside the bounds of "conversion therapy" as defined by HB 4616. And given that LARA has taken no enforcement action under HB 4616 since its enactment, Plaintiffs have not shown a credible threat of enforcement action against them.

*Free Speech*

Plaintiffs, at bottom, argue that HB 4616 violates their free speech rights because it prevents them from communicating a particular message. But state-licensed mental health professionals, even those who provide "talk therapy," are not communicating a particular viewpoint when they are treating a patient; rather, they are providing medical care. HB 4616 treads well-worn territory by regulating professional conduct, not expressive speech.

HB 4616 is therefore subject to rational-basis review. But HB 4616 can survive any level of review. The statute furthers the long-

recognized compelling state interests in regulating the provision of medical care and in safeguarding the wellbeing of minors. And it does so by the only means that will effectively guard against the harms at issue.

### Due Process

HB 4616 is not unconstitutionally vague. The statute draws a clear distinction between permissible open-ended therapy that facilitates a client's self-exploration and impermissible therapy that has a predetermined outcome of changing a client's sexual orientation or gender identity. The statute neither fails to provide fair notice nor invites arbitrary enforcement.

### Free Exercise

Plaintiffs have not demonstrated a free-exercise violation. At the outset, Plaintiffs have failed to adequately establish a burden on the exercise of their religious beliefs. Moreover, to the extent HB 4616 does impose a burden, the statute is both neutral and generally applicable, as it neither targets religion nor places greater burdens on religious practice when compared with comparable secular activities.

Ultimately, the district court properly concluded that Plaintiffs failed to show a likelihood of success on the merits for any of their constitutional claims, and that the remaining factors also weigh against granting a preliminary injunction.  That decision should be affirmed.

# ARGUMENT

## I. Plaintiffs have not established standing.

In evaluating standing, this Court "must accept the allegations set forth in the complaint as true, drawing all inferences in favor of the plaintiff." *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quotation omitted). This Court reviews a district court's decision regarding a plaintiff's Article III standing *de novo*. *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012) (citation omitted).[9]

Article III standing requires a plaintiff to establish three elements: (1) the plaintiff suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly traceable to the challenged action of the defendant"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

---

[9] "Because Article III standing is a jurisdictional requirement that cannot be waived, it may be brought up at any time in the proceeding." *Fair Housing Center of Metro. Detroit v. Singh Senior Living Center, LLC*, 12 F.4th 990, 992 (6th Cir. 2025) (internal quotations omitted).

Although a plaintiff seeking declaratory relief may pursue "a pre-enforcement challenge . . . before the actual completion of an injury-in-fact," *Glenn v. Holder*, 690 F.3d 417, 421 (6th Cir. 2012) (quotation omitted), no relief may be obtained unless the plaintiff demonstrates "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and [2] there exists a credible threat of prosecution thereunder." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

The same framework applies regardless of whether a plaintiff violates the statute or wishes to violate the statute but abstains from doing so (*i.e.*, a "chilling" theory).[10]  In either situation, a plaintiff still must establish both that the conduct in question violates the statute *and* a credible threat of enforcement.  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *Kareem v. Cuyahoga Cty. Bd. of Elections*, 95 F.4th 1019,

---

[10] On this point, Plaintiffs' claim is not altogether clear.  They suggest—somewhat inconsistently—that their reading of the law has caused them to act cautiously in how they speak to their clients.  (*Compare, e.g.*, Compl., R. 1, ¶ 122–125 (alleging chilled speech), Page ID ## 23–24, *with id.* ¶ 71 (disavowing intent to change therapeutic model), and McJones Decl. ¶¶ 44, 48, Page ID # 244 (same)).

1023 (6th Cir. 2024) (holding "subjective apprehension and a personal (self-imposed) unwillingness to communicate . . . lack the sufficiently adverse interests necessary to establish standing" (cleaned up)).

Plaintiffs fail to meet their burden. Their perceived need to tread cautiously—or their modalities prior to HB 4616's effectiveness—are insufficient to allege either an objective chill or a violation of the law they challenge. As explained in Part I.A, *infra*, Plaintiffs have not established that they are engaged, or wish to engage, in conduct HB 4616 prohibits. And there is no constitutionally cognizable threat of specific future or present harm, *i.e.*, enforcement. (*See* Part I.B, *infra*.)

## A. Plaintiffs fail to demonstrate that they will violate HB 4616.

Plaintiffs have failed to demonstrate that either their past conduct or their intended future conduct constitutes conversion therapy as defined by HB 4616. As a result, they have failed to establish standing. *Cf. McKay*, 823 F.3d at 868 (finding standing when "a plain reading of the order suggests that it would apply to [the plaintiff]'s proposed [conduct]").

HB 4616 defines "conversion therapy" as "any practice or treatment by a mental health professional that *seeks to change* an individual's sexual orientation or gender identity." Mich. Comp. Laws § 330.1100a(20) (emphasis added.) It exempts mere facilitation of the client's exploration or development of their own orientation or identity. *See id.* Under this framework, the counselor and client are free to work through all manner of issues related to a client's sexual orientation or gender identity, so long as the treatment remains open-ended as to its ultimate result, and does not *seek to change* the client's orientation or identity.

Plaintiffs have not sufficiently alleged, in either their Complaint or the materials supporting their motion below, that their intended conduct is impermissible under HB 4616. Michigan law requires construing its statutes to "avoid an interpretation that would render any part of the statute surplusage or nugatory." *Johnson v. Recca*, 821 N.W.2d 520, 525 (Mich. 2012) (citation omitted). And "when statutes conflict, the more specific provision governs over the more general one." *Milne v. Robinson*, 6 N.W.3d 40, 47 n. 8 (Mich. 2024) (quotation omitted). Applying these principles here, HB 4616 draws a clear line

between what it prohibits—*i.e.*, a fixed therapeutic goal of "conversion" or "change"—and what it specifically permits—*i.e.*, therapy that "*facilitates . . . an individual's . . .* identity exploration and development." (Emphasis added.)

Plaintiffs have consistently disavowed attempting to change their clients' sexual orientation or gender identity:

> "Plaintiffs' approach to counseling is client driven," in which "clients, not Plaintiffs, determine the goals for counseling." (Compl., R. 1, Page ID # 12, ¶ 55.)

> "I do not set goals for my clients; goal setting is done by the clients themselves." (Veenstra Decl., R. 15-2, Page ID # 230, ¶ 25.)

> "[M]y practice has been to *gently explore* those issues and ask my clients why they felt that way." (*Id.*, Page ID # 232, ¶ 35 (emphasis added).)

> "I allowed clients to guide any conversations around sexuality or gender." (McJones Decl., R. 15-3, Page ID # 241, ¶ 32.)

> "Some youth . . . made changes in their behavior or gender expression, *but this was never my direct aim.*" (*Id.* (emphasis added).)

"Often," say Plaintiffs, clients "shift their goals" away from those which Plaintiffs are willing to entertain. (R. 1, Page ID # 13, ¶ 57.) When such a shift occurs, and the client wishes to "pursue a gender identity that is not aligned with a client's biological sex or to act on

same-sex romantic attractions," Plaintiffs "refer them to other counselors in the community who are able to do so." (Lewis Decl., R. 15-1, Page ID # 166, ¶ 24.) Consistent with these statements, Plaintiff Catholic Charities' "Outpatient Counseling Program Policies and Procedures" provides:

> Clinicians and staff refrain from professing or projecting their own culture upon their clients. Treatment goals are created in collaboration with clients to promote client empowerment and transparency. This collaboration ensures that clinicians attend to cultural, historical, and gender issues essential to the client. [*Id.*, Page ID # 169.]

Catholic Charities' "Clients' Rights Policy" likewise guarantees clients the right to "receive services in a manner that is free from harassment or coercion and that protects the client right [to] self-determination." (*Id.*, Page ID # 174.)

On appeal, Plaintiffs further emphasize that they "uniformly testified that they *don't* have 'change' as their predetermined treatment goal." (Appellant Br., R. 23, p. 54 (cleaned up).)

Based on their descriptions of their conduct, Plaintiffs lack standing to bring this action. If, as they suggest, Plaintiffs intend only to facilitate identity development by "gently exploring" issues of sexuality or gender, while honoring the client's right of "self-

determination," they will not run afoul of HB 4616.  Because Plaintiffs'
briefing does not suggest that their therapy seeks to alter patients'
sexual orientation or gender identity, they have failed to establish that
they are the proper parties to bring these claims.  Standing to confer
jurisdiction over this "difficult constitutional question" requires a party
whose conduct is concretely adverse to what the statutes permit and
proscribe—it requires a personal stake in the outcome sufficient to
"assure" a sharpening of the issues raised.  *Flast v. Cohen*, 392 U.S. 83,
99 (1968) (quotation omitted).  Plaintiffs' motion does not satisfy that
requirement.

The district court disagreed with the foregoing, noting that
"Plaintiffs need not prove their speech is actually prohibited; rather, it
is enough if their speech is 'arguably proscribed' by 'at least a plausible
interpretation of the statute.' "  (R. 39, Page ID # 1306 (quoting
*Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022)).)  The court
concluded that the conduct described by Plaintiffs meets this threshold.
(*Id.*, Page ID # 1308.)

This Court should revisit that holding.  Later in its opinion, the
district court correctly recognized that "Michigan's law is not vague,"

and that "the dividing line between exploring issues of sexuality or gender with a minor client and running afoul of Michigan's new law" is when "change" is the "predetermined treatment goal[.]" (*Id.*, Page ID ## 1325–1326.) As explained above, Plaintiffs have not sufficiently alleged that they will cross this line.

To be sure, Plaintiffs might—in contrast to their pleadings— intend to engage in therapy that *seeks to change* their clients' gender identity or sexual orientation. If that is the case, Plaintiffs will violate HB 4616. But taking Plaintiffs at their word, and accounting for their burden to "make a clear showing" that they are "likely" to establish standing, *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (cleaned up), they have failed to demonstrate that their intended conduct falls outside the "counseling that provides . . . understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development" that HB 4616 permits. As a result, this Court lacks jurisdiction to provide relief.

### B. There is no credible threat of prosecution.

Plaintiffs also fail to plead or support a credible threat of enforcement, another necessary component of pre-enforcement

standing.  An allegation of future injury clears this hurdle only if the "alleged 'threat of injury is certainly impending, or there is a substantial risk that the harm will occur.' "  *McKay*, 823 F.3d at 867 (quoting *Susan B. Anthony List*, 573 U.S. at 158).  Even when a law's text "suggests it would apply" to the plaintiff, the plaintiff still must allege facts that support "a credible threat of prosecution."  *Id.* at 868 (quoting *Susan B. Anthony List*, 573 U.S. at 159).

This hurdle might be cleared by proof of a warning directed to the plaintiff.  *E.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  Or it might be satisfied by a history of past enforcement of the same law. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015).

Plaintiffs make no allegation or showing of any actions directed against them.  Nor do Plaintiffs establish a history of past enforcement "against the *same conduct.*"  *Id.* (emphasis added); *see also Susan B. Anthony List*, 573 U.S. at 164–65 (cataloguing complaints "alleging violations of the [challenged] statute").  At best, Plaintiffs allege that "Michigan actively enforces its licensing regulations," to which Plaintiffs are subject.  (R. 1, Page ID # 21, ¶ 110.)  In support, however, Plaintiffs make only general overtures to Defendants' regulatory duties.

(*Id.*, Page ID ## 21–22.)  Plaintiffs invoke the issuance of "hundreds or thousands of disciplinary orders each year." (*Id.*, Page ID # 23, ¶ 119.) But this is akin to alleging that a criminal statute carries a credible threat of prosecution by citing the number of convictions, of any stripe, obtained in a given year.  Plaintiffs thus fail to establish a history of enforcement "against the same conduct." *Russell*, 784 F.3d at 1049.

Related, it is unlikely that anyone else—patients or third-party activists—meaningfully contributes to a credible threat of enforcement via Defendants' complaint process.  Plaintiffs' offerings in this regard (R. 1, Page ID # 23, ¶ 121; R. 15-2, Page ID # 233, ¶ 38) are irrelevant, shedding no light on HB 4616's possible future enforcement in Michigan, and each comprises speculation unmoored from any concrete threat, which untenably depends on third parties' decision-making. *Lujan*, 504 U.S. at 560.

Despite the foregoing problem with causality, Plaintiffs assert they have standing because the statute "'threaten[s] with destruction' Plaintiffs' 'business.'"  (R. 1, Page ID # 31, ¶ 179 (quoting *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 535 (1925)); *see also id.*, Page ID # 20.)  But Plaintiffs have not alleged or supported this injury.  *Pierce* is

distinguishable, in part, based on the scope of the harm alleged. Those plaintiffs (two private schools) alleged a definite and complete loss of their business. *Pierce*, 268 U.S. at 535–36.

Here, neither the Complaint nor any of Plaintiffs' declarations alleges a financial threat beyond a conclusory claim that such a threat exists. They do not articulate the proportion of clients who are minors seeking treatment implicating HB 4616. Nor do they articulate the proportion of those clients who pay for services.

At best, Plaintiffs allege that they or their employees could face licensure consequences if they do not hew to the law. (R.1, Page ID # 117, ¶ 117.) But Catholic Charities does not allege that it holds a license, and none of its LMHPs are named parties. Nor does it support whether, or to what extent, suspension of pertinent employees' licenses would affect its business. (*See* R. 15-1, Page ID # 164, ¶ 7 ("Catholic Charities employs 16 counselors, nine who see adults[.]").) And Plaintiff McJones apparently sees no minor clients seeking treatment implicating HB 4616 whatsoever.[11] Thus, Plaintiffs have not offered

---

[11] The Complaint does not allege that McJones, in particular, counsels any minors on the relevant issues, or that she will do so in the future. (*See* R. 1, Page ID ## 10–11, ¶¶ 38–48.) In her declaration, McJones

evidence suggesting that any improper licensure suspensions would affect their revenues to the dramatic extent necessary to confer standing.

At bottom, nothing in the record sufficiently alleges or supports that any defendant means to enforce HB 4616 against anyone engaged in the conduct Plaintiffs describe.

Although the district court agreed with the foregoing generally, it found a credible threat of enforcement based only on the allegation that "any person . . . may initiate enforcement," Defendants' refusal to disavow enforcement altogether, and the law's relative newness. (R. 39, Page ID ## 1310–1311.)

As a matter of law, it is inaccurate that any person may "initiate enforcement." Defendants explained below that a private complaint does not result in "enforcement" unless the agency, upon reviewing a complaint, finds a reasonable basis for concluding that a violation has occurred. (R. 27, Page ID # 544.) The thrust of Plaintiffs' claim was

---

merely claims to have seen some gender-nonconforming minor clients and states that she "expects that" existing or future clients "may make changes in their sexual behavior or gender expression." (R. 15-3, Page ID # 242, ¶¶ 36–37.)

that activists could weaponize the complaint process against them, but demonstrable procedural safeguards rebut this allegation.

Moreover, although Defendants cannot disavow enforcement of the law under any and all circumstances, Plaintiffs' complaint is too vague as to permit Defendants to disavow enforcement *as against Plaintiffs' alleged conduct* for the reasons described in Part I.A. Defendants must understand Plaintiffs' intended conduct before they can weigh in on enforcement. As it stands, Defendants have opined that the conduct described in the Complaint does not implicate the statute. (*See, e.g.*, R. 27, Page ID ## 542–543.) This consideration therefore has little to no relevance here.

Finally, as to the law's newness, it is relevant that the *status quo* of non-enforcement remains true even now, more than half a year after Defendants' brief in the district court and fifteen months after HB 4616 became effective.

## C.    Plaintiffs do not have standing to invoke their patients' parents' First Amendment rights.

Plaintiffs also invoke their clients' parents' First Amendment right to direct the religious upbringing of their children. (R. 1, Page ID

## 30–31, 158, ¶¶ 174–80.)  But Plaintiffs have not established standing to invoke the First Amendment rights of third-party parents, and they fail to state a claim regarding the same.

First, this claim is incompatible with Plaintiffs' description of their client-led therapeutic model.  Under this model, the parent's only roles comprise, *at most*, (1) providing informed consent and (2) receiving notice of any "concerns about abuse or dangerous situations." (*Id.*, Page ID # 12, ¶ 54.)  When the existence of an injury depends on the intervening decisions of a third party, the plaintiff bears a heavy burden "to adduce facts showing that those [third parties'] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  Here, Plaintiffs' own policies break the causal chain between Defendants and the third-party parents.

Plaintiffs' invocation of *Wisconsin v. Yoder*, 406 U.S. 205 (1972), is unavailing.  That case protected the rights of Amish parents to insulate their children from an external affront to their religious beliefs, *i.e.*, compelled attendance at public or private schools.  *Id.* at 209.  *Yoder* is applicable only if this Court accepts Plaintiffs' faulty premise that HB

4616 requires them to provide gender-affirming care.  But as explained more fully below, HB 4616's proscription on conversion therapy means only "no conversion therapy."  It does not *require* Plaintiffs to engage in treatment with which they—or their clients' parents—disagree.  For this reason, too, Plaintiffs' third-party standing claim fails.

## II.   HB 4616 regulates the professional conduct of medical providers and does not implicate the Plaintiffs' freedom of speech.

The district court properly found that Plaintiffs have not proven entitlement to the extraordinary relief of a preliminary injunction against a duly enacted state law.  States have long exercised their broad latitude to regulate professional conduct, particularly the conduct of health professionals.  Since HB 4616 regulates the conduct of health professionals and only incidentally burdens speech, it is subject to only rational basis review.  And Michigan has an overwhelming interest in protecting the psychological wellbeing of children through HB 4616's prohibition on the harmful practice of conversion therapy.  Because the district court did not abuse its discretion, this Court should affirm.

### A. Plaintiffs bear a heavy burden to establish entitlement to a preliminary injunction.

Plaintiffs bear the burden of establishing entitlement to a preliminary injunction, which requires a court to balance the following considerations: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012).

When the government opposes the issuance of an injunction, however, "the final two factors—the balance of equities and the public interest—merge, because the government's interest is the public interest." *Malam v. Adducci*, 452 F. Supp. 3d 643, 661–62 (E.D. Mich. 2020) (cleaned up). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (cleaned up).

**B.    The Supreme Court has long affirmed States' authority to impose reasonable regulations on healthcare professionals.**

Standards of professional conduct are well within States' legitimate exercise of police power.  More specifically, State regulation of the medical profession has a long pedigree.  *See Watson v. Maryland*, 218 U.S. 173, 176 (1910).  "There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Id.* at 176.  The States reserve the power, and the duty, to "require[e] for [medicine's] successful practice general education and technical skill." *Id.; see also Dent v. State of W.Va.*, 129 U.S. 114, 122 (1889) ("Few professions require more careful preparation by one who seeks to enter it than that of medicine."); *People v. Phippin*, 37 N.W. 888, 897 (Mich. 1888) (acknowledging the State "has power to define the qualifications of those who shall be licensed to practice those callings or professions the exercise of which may affect the public health or safety").

And the power to regulate the healthcare profession extends to mental healthcare.  *See, e.g., Powell v. State of Texas*, 392 U.S. 514, 528 (1968) (counting "psychotherapy" as part of "the medical profession").

Over a century ago, the Supreme Court noted States' strong purpose in regulating the "drugless practitioner," which the plaintiff had defined as one who "employ[s] faith, hope, and the processes of mental suggestion and mental adaptation." *Crane v. Johnson*, 242 U.S. 339, 343 (1917). Specific training and credentialling requirements for such regulated professionals were appropriate: "To treat a disease there must be an appreciation of it, a distinction between it and other diseases, and special knowledge is therefore required." *Id.* at 343–44.

Beyond endorsing credential requirements and standards, the Court has consistently respected States' authority to regulate "medical matters concerning which there is difference of opinion and dispute." *Collins v. State of Tex.*, 223 U.S. 288, 297–98 (1912). In *Lambert v. Yellowley*, 272 U.S. 581, 587–89 (1926), for example, a physician sued to enjoin a law barring him from prescribing liquor for medicinal purposes, contending that this restriction violated his "fundamental rights." The Court disagreed—Dr. Lambert's "belie[f] that the use of spirituous liquor as a medicinal agent is at times both advisable and necessary" did not override the ability of the government to outlaw it. *Id.* at 596. Accordingly, Plaintiffs' insistence that their intended counseling

"furthers Michigan's interest in children's wellbeing by helping children alleviate their distress without resorting to harmful, irreversible medical procedures" is not just unpersuasive—it is belied by the People of the State of Michigan's policy as effectuated by its Legislature. (Appellant Br., R. 23, p. 68.)

## C. HB 4616 regulates the provision of health care, and therefore, conduct.

Consistent with States' power and special responsibility to regulate the medical profession, HB 4616 regulates the conduct of health care professionals by barring the provision of a discredited and harmful course of treatment.

### 1. State regulation of health care is subject to reduced scrutiny.

Where a law regulates the conduct of medical professionals, those laws are subject to reduced scrutiny. Contrary to Plaintiffs' suggestion, the mere fact that conversion therapy involves speaking does not render HB 4616 a speech-based regulation. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or

carried out by means of language, either spoken, written, or printed."
*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)*; see also*
*New York v. Ferber*, 458 U.S. 747, 761–62 (1982); *United States v.*
*Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) ("Put another way, speech is
not protected by the First Amendment when it is the very vehicle of the
crime itself."). In other words, where a "law's effect on speech would be
only incidental to its primary effect on conduct," even where the conduct
is effectuated through language, strict scrutiny is not appropriate.
*Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017); *see*
*also Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) ("[W]e have
extended First Amendment protection *only* to conduct that is *inherently*
*expressive*." (cleaned up) (emphases added)).

In *NIFLA v. Becerra*, 585 U.S. 755 (2018), the Supreme Court
fielded a free-speech challenge to a California law requiring licensed
clinics serving pregnant women to "notify women that California
provides free or low-cost services, including abortions, and give them a
phone number to call." *Id.* at 761. Certain "crisis pregnancy centers"
challenged the law on First Amendment free-speech grounds. *Id.*

Although "[n]umerous examples could be cited of communications that are regulated without offending the First Amendment," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978), the Court disavowed a blanket, independent category of "professional speech" entitled to lesser scrutiny. *NIFLA*, 585 U.S. at 767. But as this Court has since explained, *NIFLA* described two categories of professional speech for which there *is* "less protection": (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" like advertisements, and (2) the regulation of "professional conduct, even though that conduct incidentally involves speech." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 426 (6th Cir. 2019) (quoting *NIFLA*, 585 U.S. at 768).

That second category governs this case. Applied to the regulation of medical care, both the Supreme Court and this Court have defined the contours of what constitutes "conduct" in the context of State regulation of medical care. *See Planned Parenthood v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In addressing a physician's First Amendment challenge to a state law mandating the oral provision

of "information about the risks of abortion, and childbirth," *Casey* made clear that where a law regulates "the practice of medicine" the State has latitude to impose "reasonable regulation." *Id.* at 885.

*NIFLA* firmly suggested that laws like HB 4616 implicate conduct for which reduced scrutiny is warranted. The Court noted that "drawing the line between speech and conduct can be difficult," but it confidently asserted that it is a line that is "long familiar to the bar." *NIFLA*, 585 U.S. at 769. It explained that mandated informed-consent requirements fell on the "conduct" side of the line, consistent with *Casey*. *Id.* at 770. But requiring licensed clinics that serve pregnant women to "notify women that California provides free or low-cost services, including abortions, and give them a phone number to call" constituted speech. *Id.* at 761. The Court explained this line-drawing by stating that "regulation of professional conduct" that is "tied" to a "medical procedure" constitutes "conduct" which the State may regulate subject to reduced scrutiny. *Id.* at 770.

This Court echoed and relied on *NIFLA* and *Casey* in explaining that, although "[h]eightened scrutiny *generally* applies to content-based regulation of any speaker," regulation of "professional conduct" is

subject to less protection. *EMW Women's Surgical Ctr.*, 920 F.3d at 426 (emphasis added). In *EMW Women's Surgical Center*, the Court applied this rubric to a physician's free-speech challenge to a state law requiring physicians, under threat of licensure sanctions, to "explain, in the doctor's own words, what is being depicted by the images—for example, pointing out organs." *Id.* at 424. In other words, the law *forced* a physician to speak. And yet, the Court found it regulated conduct, burdening speech only incidentally. *Id.* at 446.

In a nutshell, "*Casey* and *NIFLA* recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the practice of medicine." *Id.* at 429.

> **2.  HB 4616 regulates the provision of medical care, not of constitutionally protected speech.**

HB 4616 proscribes the harmful act of a mental health professional "seek[ing] to change" a minor's sexual orientation or gender identity. It bars "conduct [that is] in part initiated, evidenced, or carried out by means of language," *Giboney*, 336 U.S. at 502, and is therefore subject to reduced scrutiny.

To start, the language of the statute does not target speech. HB 4616, § 901a, provides that "[a] mental health professional *shall not engage* in conversion therapy with a minor." (Emphasis added.) And "conversion therapy" is defined as a "*practice* or *treatment*," which encompasses "*efforts* to change." HB 4617, § 100a(20) (emphases added). Barring one from "engag[ing]" in a "practice or treatment" designates the prohibition of a course of conduct. *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (Scalia, J., concurring) (finding that, "[o]n its face," a law barring a person from "engag[ing], appear[ing], or fondl[ing]" was "not directed at expression in particular"). The challenged statute does not facially target protected speech.

Importantly, HB 4616 does not bar LMHPs from speaking on the topics of gender identity or sexual orientation generally, or conversion therapy specifically. A therapist is not barred from *discussing* or even *endorsing* conversion therapy. Rather, the law prohibits only an LMHP's administration of the treatment. Speech about conversion therapy is not foreclosed—it is the administration of this form of so-called treatment that is barred. *See Pickup v. Brown*, 740 F.3d 1208,

1229 (9th Cir. 2014) (citation omitted), *abrogated in part NIFLA*, 585

U.S. 755 (2018) (holding that the law only "bans *a form of treatment* for

minors; it does nothing to prevent licensed therapists from discussing

the pros and cons of SOCE with their patients" (emphasis added));

*Chiles*, 116 F.4th at 1214 ("The MCTL prohibits licensed professionals

from engaging in a certain therapeutic treatment with their minor

clients.  The MCTL does not prohibit a mental health professional from

discussing what conversion therapy is, what her views on conversion

therapy are, or who can legally provide this treatment to her minor

clients.").  What is proscribed is a specific course of treatment that has

been demonstrated to be harmful to children.

> **D.  Plaintiffs have failed to demonstrate that conversion therapy is expressive speech.**

>> **1.  *Otto* is an outlier that has not been followed by any other federal circuit.**

Despite the fact that HB 4616 follows a long tradition of State

authority to regulate the conduct of health professionals, Plaintiffs

contend that talk therapy is protected "speech" in the constitutional

sense.  They rely heavily on *Otto v. City of Boca Raton*, 981 F.3d 854,

863 (11th Cir. 2020), which considered a similar ban on conversion

therapy for minors.  The Eleventh Circuit asserted, "The government cannot regulate speech by relabeling it as conduct."  *Otto*, 981 F.3d at 865.  True enough.  But simply declaring talk therapy to be First-Amendment-protected speech fails to grapple with the central issue of this case.

It is a half-measure to pithily announce, as the Eleventh Circuit did, that "[s]peech is speech."  *Id.* at 866 (citation omitted).  Examples abound where government regulation regarding the use of words or communication is *not* subject to strict scrutiny.  *See, e.g.*, *Ohralik*, 436 U.S. at 456 (collecting cases).  And holding that talk therapy is automatically speech, for which the government must satisfy strict scrutiny, would severely compromise the State's ability to ensure the health and safety of its citizens, including minors, rendering psychotherapy "virtually immune from regulation."  *Pickup*, 740 F.3d at 1231 (cleaned up); *id.* at 1229 ("[A]ny prohibition of a particular medical treatment would raise First Amendment concerns because of its incidental effect on speech.").  The delivery of any form of health care relies, in some measure, on speech.  A contrary understanding would undermine the Supreme Court's long endorsement of State regulation of

the medical profession, *Dent*, 129 U.S. at 122, including *NIFLA*'s recognition of the propriety of "[l]ongstanding torts for professional malpractice." 585 U.S. at 769.

The *Otto* majority hinged its analysis on another faulty premise: that conversion therapy "*is not medical at all*—it is a client-directed conversation consisting entirely of speech." *Id.* at 866 n.3 (emphasis added). That is simply wrong. *E.g.*, *Powell*, 392 U.S. at 528 (including psychotherapists within the scope of "the medical profession"); *accord Jaffee v. Redmond*, 518 U.S. 1, 16 (1996) (rejecting distinction between licensed social workers, psychiatrists, and psychologists in application of privilege).

"[P]sychotherapy delivered by words is part of a tool kit of interventions for the LMHP." (Glassgold Decl., R. 27-1, Page ID ## 600–601, ¶ 52.) "Psychotherapy treatments for minors can be delivered through structured activities such as play, art, and dance, as well as with words." (*Id.*, Page ID # 600, ¶ 52.) And "[p]sychotherapy treatments" are not just "conversations"; they "are elements of an individualized treatment plan with specific mental health goals such as alleviating distress and improving function." (*Id.*, Page ID # 601, ¶ 54.)

Moreover, even when psychotherapy relies on words, such words are not expressive on the part of the therapist: "The role of the LMHP is not to express or impose their own personal viewpoints, but rather to allow the client to lead their own discovery process." (*Id.*, Page ID # 608, ¶ 68.)

This aligns with other aspects of health care. "Most, if not all, medical and mental health treatments require speech, but that fact does not give rise to a First Amendment claim when the state bans a particular treatment." *Pickup*, 740 F.3d at 1229. And in Michigan, Plaintiffs' conduct as licensed health professionals explicitly involves rendering treatment, even if virtually all of that treatment is provided via speaking. *See* Mich. Comp. Laws §§ 333.18201(b) ("practice of psychology" includes "treatment of mental or emotional disorders"); 333.18101 ("practice of counseling" includes "treating mental and emotional disorders"); 333.18501(1)(g) ("practice of social work at the master's level" includes "treatment of mental, emotional, and behavioral disorders").

Of note, federal circuits considering conversion therapy bans since the Eleventh Circuit have rejected *Otto*'s conclusion that these laws

regulate expressive speech.  *See Tingley v. Ferguson*, 47 F.4th 1055, 1077 (9th Cir. 2022) (recognizing a split with *Otto*), *cert. denied*, 144 S. Ct. 33 (2023); *Chiles v. Salazar*, 116 F.4th 1178, 1208 (10th Cir. 2024), *cert. granted*, 2025 WL 746313 (U.S. Mar. 10, 2025).  Those courts applied rational-basis review.  *Tingley*, 47 F.4th at 1077–78; *Chiles*, 116 F.4th at 1215.

Plaintiffs, citing *Otto*, warn that recognizing conversion therapy as conduct will open the door for the state to define all manner of speech as conduct.  (Appellant Br., R. 23, pp. 37–48.)  But, again, talk therapy is not a medium for a mental health professional to express personal viewpoints.  (R. 27-1, Page ID # 608, ¶ 68.)  This makes talk therapy unlike journalism, teaching, protesting, debating, and flag burning (*see* Appellant Br., R. 23, p. 37), each of which can be a medium for communicating a particular message.  Thus, contrary to Plaintiffs' assertions, the professional conduct being proscribed in this case is different in kind from various forms of expressive speech.

What is more, holding that *all* speech is expressive for purposes of the First Amendment carries its own host of problems.  The consequences of holding that HB 4616 regulates expressive speech

would call into question innumerable regulations of conduct that could be recast as speech, and in a variety of professions. *See generally NIFLA*, 585 U.S. at 782 (Breyer, J., dissenting) (recognizing that almost all government regulation impacts some form of speech). Non-expressive speech, delivered as part of medical treatment, falls on the conduct side of the "long familiar" "line between speech and conduct." *NIFLA*, 585 U.S. at 769.

## 2. *Holder* does not govern this case.

Finally, Plaintiffs rely heavily on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), seeking to categorize HB 4616 as targeting expressive speech. (Appellant Br., R. 23, pp. 39–42.) But *Holder* cannot support the burden Plaintiffs place upon it. In *Holder*, the plaintiffs sought to provide legal training and advice on dispute resolution to two entities that the United States had designated as foreign terrorist organizations. 561 U.S. at 7–8. They were prohibited from doing so by federal law, which made it a crime to "knowingly provide material support or resources to a foreign terrorist organization." *Id.* at 8 (cleaned up). The Supreme Court sustained the law, but only after subjecting the law (as applied) to heightened scrutiny because "*the*

*conduct* triggering coverage under the statute consists of communicating a message." *Id.* at 28 (emphasis added).

The Supreme Court has already distinguished *Holder* from the professional-regulation category. *NIFLA* declared the federal law in *Holder* to be categorically distinct from regulations of professional conduct. 585 U.S. at 771 (holding that, "[o]*utside of the two contexts discussed above*—disclosures under *Zauderer* and *professional conduct*—this Court's precedents have long protected the First Amendment rights of professionals," including "organizations that provided specialized advice about international law" under *Holder* (emphases added)).

Moreover, *Holder* cannot be folded into the clean "speech is speech" rule adopted by the Fourth and Eleventh Circuits and pressed by Plaintiffs. *Holder* does not stand for the proposition that speaking always comprises protected speech; in fact, it stated that the challenged law "may be described as *directed at conduct*," but that "*the conduct triggering coverage* under the statute *consists of communicating a message*." *Id.* at 28 (emphasis added). That differentiates HB 4616— which regulates the provision of a specific harmful course of medical

care—and does not regulate the communication of "a message." *Id.* Again, a therapist's office is not a platform for communicating a particular viewpoint or message. (*See* R. 27-1, Page ID # 608, ¶ 68.)

### E. HB 4616 survives rational-basis review, intermediate scrutiny, and strict scrutiny.

Rational-basis review properly applies to HB 4616 because it does not regulate protected speech. Even if HB 4616 incidentally affected protected speech, it would be subject only to intermediate scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968). Under intermediate scrutiny, an incidental burden on speech is permissible "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld*, 547 U.S. at 67 (cleaned up). But whatever level of scrutiny applies, HB 4616 would survive because it is the least restrictive means of achieving a compelling state interest.

HB 4616 implicates a compelling state interest. States have a compelling interest in regulating professional conduct to protect public health and safety. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975); Mich. Comp. Laws § 333.1111(2). Indeed, "States have

broad power to establish standards for licensing practitioners and regulating the practice of professions." *Id.* Additionally, and equally as important, "it is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *New York v. Ferber*, 458 U.S. 747, 756 (1982). Thus, HB 4616 furthers at least two compelling state interests.

Extensive empirical evidence confirms that HB 4616 promotes these compelling state interests. To appreciate the weight of the evidence, it helps to compare the evidence in this case to the evidence found insufficient to satisfy strict scrutiny in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), on which Plaintiffs rely. (Appellant Br., R. 23, pp. 41–42, 44.) In *Brown*, the government relied primarily on studies conducted by a single researcher who claimed to find a connection between violent video games and harm to minors, which reliance the Court deemed inadequate. *Brown*, 564 U.S. at 800. Here, the State does not rely on the view of an individual outlier but on the uniform consensus of all major medical and mental health organizations. (*See* R. 27-1, Page ID ## 593–595, ¶ 42.) And in *Brown*, the Supreme Court criticized the methodology of the research on which

the government relied, finding that it showed "at best some correlation" between violent video games and the purported harm. *Brown*, 564 U.S. at 800–01. Here, the harms of conversion therapy have been documented across numerous studies using a variety of methodologies, including contemporaneous and retrospective studies and studies of both minors and adults. (*See* R. 27-1, Page ID ## 593–595, 596–597, ¶¶ 42, 44.)

Plaintiffs challenge the weight of this evidence, arguing that the Eleventh Circuit in *Otto* "reviewed the same evidence and held that it fell short." (Appellant Br., R. 23, p. 41.) This is not accurate. *Otto,* decided in 2020, noted that the APA's 2009 report called attention to a lack of rigorous research around conversion therapy, particularly in its nonaversive forms. *Otto*, 981 F.3d at 868–69; (R. 27-1, Page ID ## 676–677). The SAMHSA Report, however, written in 2023, noted that "[t]here is now a significant body of research on SOGI change efforts." (R. 27-1, Page ID # 869.) The report specifically noted that, since the publication of the 2009 APA Report, numerous additional studies have documented the harms of conversion therapy. (*Id.*) The *Otto* court did not have the benefit of this additional research, which

studied both aversive and nonaversive forms of conversion therapy.

(*Id.*, Page ID # 585.)

In addition to being well-documented, the harm to be avoided could not be weightier. Among the studies examining the effects of conversion therapy, the link between conversion therapy and attempted suicide is particularly well-documented. *See* SAMHSA Report at 8, 27. Looking again to *Brown*, the Supreme Court concluded that the government's objective ultimately was to protect minors from particular "*ideas* expressed by speech," rather than "its objective effects." *Brown*, 564 U.S. at 799. Here, the opposite is true. The State's objective underlying HB 4616 is to protect minors from the devastating and documented effects caused by an ineffective and harmful form of therapy.

Again, assuming HB 4616 does affect speech, it is also narrowly tailored. The statute does not mandate any particular form of therapy or treatment at all; it imposes a *negative restriction* on conduct, *i.e.*, it bans performing conversion therapy. Rather than casting a wide net to catch all potentially harmful speech, HB 4616 is narrowly drawn in terms of what it limits, whom it limits, and whom it protects:

- *Content*:  HB 4616 does not impose a general prohibition on speech challenging the scientific consensus that sexual orientation and gender diversity are a normal and healthy part of the human experience.  Nor does the statute prevent LMHPs from exploring questions of sexual orientation and gender identity with clients.  Instead, the statute prohibits a specific form of therapy that has repeatedly been found to cause severe harm: therapy that seeks to change an individual's sexual orientation or gender identity.

- *Speakers*:  HB 4616 imposes no restrictions on family members, religious leaders, community members, or even unlicensed counselors.  Instead, the statute applies only to licensed (*i.e.*, regulated) mental health professionals in a treatment setting, who hold unique positions of trust and authority with their clients.

- *Audience*:  HB 4616 prohibits conversion therapy only for minors, those most vulnerable to the harms of conversion therapy.  (Glassgold Decl., R. 27-1, Page ID ## 597–598, ¶ 46.)  The statute does not prohibit conversion therapy for adults.

In each of these ways, HB 4616 is narrowly tailored to impact only the speech that causes the most serious harm.

Plaintiffs list a series of proposed alternatives to HB 4616 (*see* Appellant Br., R. 23, pp. 46–48), but none "would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve," *Reno v. ACLU*, 521 U.S. 844, 874 (1997).

Relying on existing remedies, such as malpractice, that apply *after* a client is harmed is not an acceptable alternative when suicide is

among the harms to be avoided.  Nor is informed consent an option because minors cannot meaningfully consent to a harmful and ineffective treatment.  (*See* R. 27-1, Page ID ## 608–609, ¶¶ 69–70.)

Allowing non-aversive methods of conversion therapy or permitting an exception for religiously affiliated LMHPs would give Plaintiffs their desired outcome but would run directly contrary to the statute's goal of protecting minors from a demonstrably harmful form of therapy.

"[F]ollow[ing] the lead" of other states in not banning conversion therapy, (Appellant Br., R. 23, p. 48), is also not a viable alternative for multiple reasons.  As an initial matter, by banning conversion therapy, Michigan joined the *majority* of states that *have* banned the practice. Moreover, despite Plaintiffs' blanket assertion that states without bans "continue to protect their interests," (*id.*), the studies on the effects of conversion therapy demonstrate that allowing this practice *is* harming minors.

Finally, Plaintiffs suggest an alternative ban that would permit a therapist to provide therapy consistent with "the client's self-determined goals."  (Appellant Br., R. 23, p. 46.)  As set forth above, HB

4616 does expressly allow therapy that "facilitates" the client's "identity exploration and development." But the line between permitted "exploration" and prohibited conversion therapy is crossed when the therapy "seeks to change" the client's sexual orientation or gender identity. The focus of the statutory definition is on the *treatment* itself, not on *who* (the counselor or client) may be seeking it, or with whose goals it aligns.

Thus, Plaintiffs' proposed alternatives may be more desirable to them, but they are not effective alternatives for achieving the State's compelling interest. In sum, Plaintiffs have not established a likelihood of success on their Free Speech claim in support of their request for the "extraordinary" relief of a preliminary injunction.

## III. HB 4616 is not unconstitutionally vague.

A statute is void for vagueness "only if it is so vague that no standard of conduct is specified at all," *Chambers v. Stengel*, 256 F.3d 397, 400 (6th Cir. 2001), or if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," *Johnson v. United States*, 576 U.S. 591, 595 (2015).

Plaintiffs "bear[] the burden of establishing that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation." *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (citation omitted). To survive a vagueness challenge, the contested law need only: (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"; (2) "provide explicit standards for those who enforce them" to prevent "arbitrary and discriminatory enforcement"; and (3) "not impinge upon first amendment rights." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

Even without its express clarification as to forms of therapy that do not constitute conversion therapy, the statute would not be vague: LMHPs are prohibited from employing a "practice or treatment" that seeks to "change" an individual's gender identity or sexual orientation. But by also defining with particularity what conversion therapy *is not*, both LMHPs and licensing authorities are well-informed as to what conduct is permitted or proscribed by the statute. The district court agreed below. (R. 39, Page ID ## 1325–1326.)

Plaintiffs point to the ability of any person, highlighting "minor clients" and "any ideological opponent or activist," in particular, to file a complaint regarding a LMHP, thereby somehow creating a rubric for "harsh and discriminatory treatment." (Appellant Br., R. 23, p. 55.) But, as mentioned, a complaint does not mean enforcement, let alone *arbitrary* enforcement. (*See* R. 27, Page ID # 544 (explaining that enforcement on a complaint is subject to agency confirmation that a violation occurred, along with several other procedural safeguards prior to initiating formal licensing action).) *Cf. Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 591 (6th Cir. 2008) ("There is no constitutional violation in merely being subjected to a false report.").

Nor is there any merit to Plaintiffs' contention that HB 4616 fails to provide fair notice of what it prohibits. On this point, the district court sensibly concluded that "the dividing line" between permitted and prohibited speech is whether "change" is the "predetermined treatment goal." (R. 39, Page ID ## 1325–1326.) And although this Court may not narrow a state law to save it from vagueness, *see Boos v. Barry*, 485 U.S. 312, 330 (1988), it is proper to undertake a vagueness inquiry by reference to how the state supreme court would interpret the law,

*Grayned*, 408 U.S. at 111–12.  Recently, the Michigan Supreme Court reaffirmed that the "fair notice" facet of a vagueness challenge dictates that an ordinary person's knowledge "may be acquired by referring to judicial interpretations, common law, dictionaries, treatises, or the common meaning of words."  *People v. Burkman*, 15 N.W.3d 216, 237 (Mich. 2024) (citation omitted).

On appeal, Plaintiffs essentially argue that the proscription on "conversion therapy" overlaps—and therefore conflicts—with the carve-out for therapy that "facilitates . . .  exploration and development," arguing that these terms "themselves connote 'change.' "  (Appellant Br., R. 23, p. 53.)  But, again, there is a dividing line between facilitating a client's self-exploration without a predetermined outcome and actively seeking to change the client's orientation and identity.  There is no conflict, insofar as HB 4616 plainly permits the former and prohibits the latter.

Thus, a person of ordinary intelligence—particularly an LMHP of ordinary intelligence who practices in these fields—understands that the statute's express approval of a practice that "*facilitates . . . an individual's . . . identity exploration and development*" exempts any

such cooperative and supportive practice from the general prohibition on conversion therapy. (Glassgold Decl., R. 27-1, Page ID # 24, ¶ 24 (referencing existing professional standards of care).) The terms used are not difficult to understand or apply: An LMHP may openly work through the ongoing "exploration" and "development" of a client's sexual orientation and gender identity, without a predetermined outcome, but may not "seek to change" a client's recognized gender identity or sexual orientation. Any other reading of the statute would untenably collapse its carve-out into its general rule, rendering the carve-out nugatory.

Even assuming a conflict, the Michigan Supreme Court would not find vagueness, instead concluding that the general provision yields to the specific, avoiding rendering any portions nugatory. *Milne*, 6 N.W.3d at 47 n. 8; *Johnson*, 821 N.W.2d at 525. Here, that would mean the specificity of the permitted activities controls over the more general definition of "conversion therapy," which avoids rendering nugatory the various permitted activities. HB 4616 is not vague.

**IV. Michigan's ban on conversion therapy is a neutral law of general applicability and does not burden Plaintiffs' exercise of religion.**

Plaintiffs also claim that, by banning the practice of conversion therapy on children, Michigan has violated their First Amendment rights by "prohibiting the free exercise" of their religion. U.S. Const. amend. I. (Appellant Br., R. 23, pp. 67–69.) But "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up). "[P]ublic authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012).

In the free-exercise context, the Supreme Court has recognized that the government has "a wide range of power" and inherent authority to "protect the welfare of children[.]" *Prince v. Massachusetts*, 321 U.S. 158, 165–68 (1944). And "[w]hen followers of a particular sect *enter into commercial activity as a matter of choice*, the limits they accept on their own conduct as a matter of conscience and faith are not

to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982) (emphasis added).

Plaintiffs' free-exercise claim fails because (1) they have not sufficiently alleged how HB 4616 burdens or interferes with their free exercise of religion, (2) HB 4616 is neutral with respect to religion, and (3) HB 4616 is generally applicable.

### A.    Plaintiffs fail to allege a sufficient burden on their right to freely exercise their religious beliefs.

Plaintiffs' free-exercise claim fails at the initial, threshold inquiry because they did not allege or show *how* Michigan's ban on conversion therapy burdens their right to exercise their religion.  "To prevail, plaintiffs must show that defendants burdened their religious exercise[.]" *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021).

An actual burden was shown, for example, where adherents of Santeria expressly wished to "bring the practice of the Santeria faith, including its ritual of animal sacrifice, into the open" before their city banned the practice.  *Church of the Lukumi Babalu Aye v. City of*

*Hialeah*, 508 U.S. 520, 526 (1993).  And it was shown where an Amish employer plainly stated that "both payment and receipt of social security benefits is forbidden by the Amish faith," and that participation in such a system violates Amish beliefs.  *United States v. Lee*, 455 U.S. 252, 257 (1982).

Although they failed to do so in the district court (*see* R. 39, Page ID # 1323), on appeal Plaintiffs now assert that "their counseling is an expression of their Catholic faith" and that they have a "religious duty to help that client live the life *she desires to live*."  (Appellant Br., R. 23, p. 67 (emphasis added).)  But, as described above, HB 4616 does not prohibit an LMHP from facilitating a client's exploration or development of their own orientation or identity.  Mich. Comp. Laws § 330.1100a(20).

## B.    Michigan's ban is neutral with respect to religion.

Even if Plaintiffs had shown a burden on their free-exercise rights, HB 4616 still passes muster because it is neutral and generally applicable.  The neutrality inquiry asks "if the object of a law is to infringe upon or restrict practices *because of their religious motivation*."  *Lukumi*, 508 U.S. at 533 (emphasis added).  "[T]he minimum

requirement of neutrality is that a law not discriminate on its face." *Id*.

HB 4616 easily passes this step, as it makes no reference to religion.

Rather, it prohibits "any practice or treatment by a mental health

professional that seeks to change an individual's sexual orientation or

gender identity[.]" Mich. Comp. Laws § 330.1100a(20); *see also Tingley*,

47 F.4th at 1085 (finding that Washington's similar statute "makes no

reference to religion").[12]  HB 4616 is neutral because it prohibits all

conversion therapy on minors regardless of whether the motivation is

religious or secular.

### C.  The ban is generally applicable and does not burden religious conduct as compared to secular conduct.

The final component of the free exercise analysis is determining

whether HB 4616's proscriptions are generally applicable with regard to

both religious and secular conduct.  *Lukumi*, 508 U.S. at 542.  A law is

not generally applicable if it either (1) "invites the government to

consider the particular reasons for a person's conduct by providing a

mechanism for individualized exemptions" or (2) "prohibits religious

---

[12] On appeal, Plaintiffs no longer press a claim that the law was borne of religious animus.  *See Lukumi*, 508 U.S. at 533–34.

conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) (cleaned up). Michigan's law does neither.

Plaintiffs do not argue that HB 4616 contains a mechanism for seeking individual exemptions (it does not), so this issue is not in dispute.

Neither does HB 4616 "treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Conversion therapy is not by its nature a "religious exercise" akin to the religious ritual in *Lukumi* or the gathering for religious services at issue in numerous pandemic-order cases. *See, e.g.*, *Tandon*, 593 U.S. at 64 (noting that California allowed larger secular gatherings than those allowed for at-home religious exercise); *Roberts v. Neace*, 958 F.3d 409, 413–14 (6th Cir. 2020) (finding similarly regarding Kentucky's prohibitions on in-person gatherings). HB 4616 does not lend itself to the sort of tidy, apples-to-apples comparison that a ban on in-person religious gatherings does. Conversion therapy, as defined, is a specific type of mental health treatment that can be pursued for both

secular *and* religious reasons.  Plaintiffs admit as much.  (*E.g.*, R. 1,

Page ID # 14, ¶ 70 (alleging that a client may seek treatment to

vindicate their "religious beliefs *and* the client's own goals for their

lives" (emphasis added)); *id.*, Page ID # 24, ¶ 125 (alleging obstacles to

living "consistently with [clients'] own personal, religious, and life

goals").)  Accordingly, there is not a "comparable" secular activity that

is treated more favorably than any religious exercise implicated by HB

4616.[13]

Finally, Plaintiffs argue in passing that HB 4616 interferes with

parental rights.  (Appellant Br., R. 23, p. 58.)  But as discussed in Part

---

[13] Below, Plaintiffs went to great lengths to draw a false comparison between banning conversion therapy, on the one hand, and, on the other, the alleged harms of undergoing surgical or medical gender transitions "via puberty blocking drugs, cross-sex hormones, and surgeries."  (Mot. for Prelim. Injunc., R. 15, Page ID ## 126, 157.)  Plaintiffs' fixation on the harms from "medical transitions" (*see, e.g.*, *id.*, Page ID ## 134–135, 144–146) is a red herring and not a proper comparison.  (R. 27-1, Page ID # 602, ¶ 56; *see also* R. 39, Page ID # 560.)

In HB 4616, Michigan targeted specific harms to children that result from conversion therapy, including dramatically increased risks of suicide and depression.  (*See, e.g.*, R. 27-3, Page ID ## 964–968.)  During the Michigan Senate deliberations, Senator McMorrow specifically commented that "nothing in this legislation is about sterilization or physically changing one's body[.]"  (2023 Sen. J. 1182 (No. 62, June 27, 2023).)

I.C, *supra*, HB 4616 does not implicate parental rights. Moreover, Plaintiffs' argument as to parental rights rests on a false dichotomy— asserting that parents will be forced to choose between gender-affirming care or forgoing professional counseling. In fact, HB 4616 does not preclude Plaintiffs from facilitating the exploration of orientation or identity, including from a religious perspective. HB 4616 instead aligns with what the overwhelming consensus of medical authorities has already determined—seeking to *change* a minor client's sexual orientation or gender identity is acutely harmful and should not be practiced by licensed professionals.

Ultimately, Michigan's law is generally applicable, and Plaintiffs' free exercise claim fails.

## V.     The remaining injunction factors also weigh against the issuance of a preliminary injunction.

Plaintiffs have failed to demonstrate that they will suffer irreparable injury without a preliminary injunction. *See Bays*, 668 F.3d at 818–19. In support of irreparable harm, Plaintiffs rely primarily on their arguments regarding the purported violations of their constitutional rights. (Appellant Br., R. 23, p. 70.) But there is no

constitutional violation from which to presume irreparable harm. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Plaintiffs also allege they are experiencing ongoing harm due to "self-censoring" and their inability "to have open, candid" sessions with clients. (Appellant Br., p. 70.) But the statute *does not prohibit* open conversations around sexual orientation and gender identity. Instead, it expressly *permits* therapy that "facilitates . . . identity exploration and gender development." Mich. Comp. Laws § 330.1100a(20). Indeed, as set forth above, Plaintiffs have not adequately shown that their conduct violates the statute. If Plaintiffs are experiencing a self-imposed chilling of speech, that chill is insufficient to demonstrate harm. *See Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 608 (6th Cir 2008).

Conversely, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (cleaned up). Similarly, the third and fourth factors—the balancing of equities and the public interest—weigh against an injunction. The

reinstatement of an ineffective and harmful form of purported therapy would only hurt the public.  And the harms to children that HB 4616 seeks to prevent, which are well-documented and weighty, are clearly contrary to the public's interest.

## CONCLUSION AND RELIEF REQUESTED

The State Defendants respectfully request this Court affirm the district court decision denying a preliminary injunction.

Respectfully submitted,

*/s/ Christopher W. Braverman*
Christopher W. Braverman (P70025)

Daniel J. Ping (P81482)
Gallant Fish (P82196)
Assistant Attorneys General

Christopher M. Allen (P75439)
Assistant Solicitor General

Counsel of Record
Attorneys for Defendants-Appellees
G. Mennen Williams Building
525 W. Ottawa St., 5th Fl.
P.O. Box 30736
Lansing, MI 48909

Dated: May 27, 2025

(517) 335-7569

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words.  This document contains 12,975 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

*/s/ Christopher W. Braverman*
Christopher W. Braverman (P70025)

Counsel of Record
Attorney for Defendants-Appellees
G. Mennen Williams Building
525 W. Ottawa St., 5th Fl.
P.O. Box 30736
Lansing, MI  48909
(517) 335-7569

Dated: May 27, 2025

## CERTIFICATE OF SERVICE

I certify that on May 27, 2025, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system if

they are registered users or, if they are not, by placing a true and

correct copy in the United States mail, postage prepaid, to their address

of record.

*/s/ Christopher W. Braverman*
Christopher W. Braverman (P70025)
Assistant Attorney General

G. Mennen Williams Building

525 W. Ottawa St., 5th Fl.
P.O. Box 30736
Lansing, MI 48909
Dated: May 27, 2025        (517) 335-7569

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 07/12/2024 | R. 1 | 1-33 |
| Motion for Preliminary Injunction | 07/19/2024 | R. 14 | 115-116 |
| Brief in Support of Motion for Preliminary Injunction | 07/19/2024 | R. 15 | 117-304 |
| Response in Opposition to Motion for Preliminary Injunction | 08/16/2024 | R. 27 | 521-968 |
| Opinion and Order | 01/28/2025 | R. 39 | 1292-1327 |
| Notice of Appeal | 01/30/2025 | R. 40 | 1328 |