No. 25-1105

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

CATHOLIC CHARITIES OF JACKSON, LENAWEE, AND HILLSDALE COUNTIES;
EMILY MCJONES,

*Plaintiffs-Appellants*,

v.

GRETCHEN WHITMER, GOVERNOR OF MICHIGAN; IN HER OFFICIAL CAPACITY; DANA
NESSEL, ATTORNEY GENERAL OF MICHIGAN; IN HER OFFICIAL CAPACITY; MARLON
BROWN, DIRECTOR OF THE MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY
AFFAIRS; IN HIS OFFICIAL CAPACITY; AMY GUMBRECHT, DIRECTOR OF THE BUREAU
OF LICENSING IN THE MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY
AFFAIRS; IN HER OFFICIAL CAPACITY; ELIZABETH HERTEL, DIRECTOR OF THE
MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; IN HER OFFICIAL
CAPACITY; NAPOLEON HARRINGTON, MEMBER OF THE MICHIGAN BOARD OF
COUNSELING; OFFICIAL CAPACITY; SHERI PICKOVER, MEMBER OF THE MICHIGAN
BOARD OF COUNSELING; OFFICIAL CAPACITY; LESLEY ADDISON, MEMBER OF THE
MICHIGAN BOARD OF COUNSELING; OFFICIAL CAPACITY; LAURA MAMMEN, MEMBER
OF THE MICHIGAN BOARD OF COUNSELING; OFFICIAL CAPACITY; ROBIN CHOSA,
MEMBER OF THE MICHIGAN BOARD OF COUNSELING; OFFICIAL CAPACITY; MARY
BILLMAN, MEMBER OF THE MICHIGAN BOARD OF COUNSELING; OFFICIAL CAPACITY;
WALTER HARPER, MEMBER OF THE MICHIGAN BOARD OF COUNSELING; OFFICIAL
CAPACITY; CHARLES HUGHES, MEMBER OF THE MICHIGAN BOARD OF COUNSELING;
OFFICIAL CAPACITY; JANET GLAES, MEMBER OF THE MICHIGAN BOARD OF
COUNSELING; OFFICIAL CAPACITY; ROTESA BAKER, MEMBER OF THE MICHIGAN
BOARD OF COUNSELING; OFFICIAL CAPACITY; ROBERTO OVERTON, MEMBER OF THE
MICHIGAN BOARD OF COUNSELING; OFFICIAL CAPACITY; COURTENAY MORSI,
MEMBER OF THE MICHIGAN BOARD OF COUNSELING AND MICHIGAN BOARD OF
PSYCHOLOGY; OFFICIAL CAPACITY; JULIAN DIAZ, MEMBER OF THE MICHIGAN BOARD
OF SOCIAL WORKERS; OFFICIAL CAPACITY; DANIELLE HOOVER, MEMBER OF THE
MICHIGAN BOARD OF SOCIAL WORKERS; OFFICIAL CAPACITY; JANET JOINER,
MEMBER OF THE MICHIGAN BOARD OF SOCIAL WORKERS; OFFICIAL CAPACITY;
MARIA PETRIDES, MEMBER OF THE MICHIGAN BOARD OF SOCIAL WORKERS;
OFFICIAL CAPACITY; PETRA ALSOOFY, MEMBER OF THE MICHIGAN BOARD OF SOCIAL
WORKERS; OFFICIAL CAPACITY; MAXINE THOME, MEMBER OF THE MICHIGAN BOARD

**[CASE CAPTION CONTINUED ON NEXT PAGE]**

OF SOCIAL WORKERS; OFFICIAL CAPACITY; VICTOR WEIPERT, MEMBER OF THE
MICHIGAN BOARD OF SOCIAL WORKERS; OFFICIAL CAPACITY; ROCHELLE VRSEK,
MEMBER OF THE MICHIGAN BOARD OF SOCIAL WORKERS; OFFICIAL CAPACITY;
CHINA SELLS, MEMBER OF THE MICHIGAN BOARD OF SOCIAL WORKERS; OFFICIAL
CAPACITY; LATRICIA POWELL, MEMBER OF THE MICHIGAN BOARD OF PSYCHOLOGY;
OFFICIAL CAPACITY; JOHN RANDLE, MEMBER OF THE MICHIGAN BOARD OF
PSYCHOLOGY; OFFICIAL CAPACITY; GARY HARPER, MEMBER OF THE MICHIGAN
BOARD OF PSYCHOLOGY; OFFICIAL CAPACITY; FRANCES BROWN, MEMBER OF THE
MICHIGAN BOARD OF PSYCHOLOGY; OFFICIAL CAPACITY; CHARMEKA NEWTON,
MEMBER OF THE MICHIGAN BOARD OF PSYCHOLOGY; OFFICIAL CAPACITY; HARPER
WEST, MEMBER OF THE MICHIGAN BOARD OF PSYCHOLOGY; OFFICIAL CAPACITY;
MELISSA GREY, MEMBER OF THE MICHIGAN BOARD OF PSYCHOLOGY; OFFICIAL
CAPACITY; BRANDELL ADAMS, MEMBER OF THE MICHIGAN BOARD OF PSYCHOLOGY;
OFFICIAL CAPACITY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
Case No. 1:24-cv-00718, Jane M. Beckering, U.S. District Judge

**BRIEF OF AMERICAN PSYCHOLOGICAL ASSOCIATION, MICHIGAN
PSYCHOLOGICAL ASSOCIATION, NATIONAL ASSOCIATION OF
SOCIAL WORKERS, AND AMERICAN ASSOCIATION FOR MARRIAGE
AND FAMILY THERAPY AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

Deanne M. Ottaviano
AMERICAN PSYCHOLOGICAL
    ASSOCIATION
705 First Street NE
Washington, DC 20002
(202) 336-6100

*Counsel for American
Psychological Association*

Jessica Ring Amunson
    *Counsel of Record*
Illyana A. Green
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* the American Psychological Association hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*Amicus curiae* the Michigan Psychological Association hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*Amicus curiae* the National Association of Social Workers hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*Amicus curiae* the American Association for Marriage and Family Therapy hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF INTEREST .....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT .........................................................................................6

I.  Background on SOGICE. ...................................................................8

    A. History of SOCE and GICE.............................................................8

    B. The APA's Position on SOGICE. ..................................................10

II. SOGICE Are Not Legitimate Therapeutic Practices and Can Cause Harm,
    Especially to Minors. ....................................................................13

    A. Individuals Report Harm from SOGICE. .......................................14

    B. Minors Are Particularly Vulnerable to Harm from SOGICE.......................18

    C. Licensed Mental Health Providers Have a Duty to Avoid Harm to
       Members of the Public Whom They Are Licensed to Serve.........................20

III. There Is No Evidence to Support Exposing Individuals to SOGICE.................21

IV.   Plaintiffs Misstate and Misrepresent the Science on SOGICE. ....................23

CONCLUSION .....................................................................................28

# TABLE OF AUTHORITIES

**CASES**

*Doyle v. Hogan*, No. 19-cv-0190, 2019 WL 3500924 (D. Md. Aug. 1, 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021)..........................11

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated on other grounds by National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018)...........................................................................................10

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ................................................11

**OTHER AUTHORITIES**

AAMFT, *Position Statement on Nonpathologizing Sexual Orientation* (2004)...............................................................................................................10

American Academy of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx ......................................................10

American Medical Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited June 3, 2025) ........................................................10

American Psychological Ass'n, *Criteria for Practice Guideline Development and Evaluation* 1048 (Dec. 2002), https://www.apa.org/practice/guidelines/criteria.pdf .........................................................24

American Psychological Ass'n, *Ethical Principles of Psychologists and Code of Conduct* (Jan. 1, 2017), https://www.apa.org/ethics/code ....................20

American Psychological Ass'n, *Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf .......................................................*passim*

*APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014) ......................................................................13

APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf.................................................................9

APA Resolution on Gender Identity Change Efforts (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf................................................... 2, 5, 8-9, 11-12, 19-20, 23

APA Resolution on Sexual Orientation Change Efforts (Feb. 2021), https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf ...........................................................2, 5, 11, 18, 19, 21

Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1 (2021), https://perma.cc/YHU2-GW72................................................25

A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psych. 651 (2004)..............................................................15

John R. Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults, United States, 2016-2018*, 110 Am. J. Pub. Health 1024 (2020)............................................................16

Travis Campbell & Yana van der Meulen Rodgers, *Conversion Therapy, Suicidality, and Running Away: An Analysis of Transgender Youth in the U.S.*, 89 J. Health Econ. 102750 (2022)......................................19

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022)............................................................12

Jonathan S. Comer et al., *Reckoning With Our Past and Righting Our Future: Report From the Behavior Therapy Task Force on Sexual Orientation and Gender Identity/Expression Change Efforts (SOGIECEs)*, 55 Behav. Therapy 649 (2024)......................................10

iv

Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018* (Nov. 1, 2018), https://lims.dccouncil.gov/downloads/LIMS/40980/Committee_Report/B22-0972-CommitteeReport1.pdf?Id=62615 ................................. 10-11

Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976)............................................................23

Dep't Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*: *Review of Evidence and Best Practices* (May 1, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf.........................................................................................................27

Alex R. Dopp et al., *Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research*, RAND (2024), https://www.rand.org/pubs/research_reports/RRA3223-1.html.........................................................................................27

Anna Forsythe et al., *Humanistic and Economic Burden of Conversion Therapy Among LGBTQ Youths in the United States*, 176 JAMA Pediatrics 493 (2022) ............................................................................17

Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2022)..................................................................................................25

Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among U.S. LGBTQ Youths and Young Adults, 2018*, 110 Am. J. Pub. Health 1221 (2020) ..................................................................16, 19

Melissa Grey et al., *Review of U.S. Public Policy, Legislative, and Judicial Work on Conversion Efforts*, in *The Case Against Conversion "Therapy": Evidence, Ethics, and Alternatives* 195 (Douglas C. Haldeman ed., 2022)...........................................................................13

D.M. Grijseels, *Biological and Psychosocial Evidence in the Cass Review: A Critical Commentary*, 25 Int'l J. Transgender Health 1 (2024).....................26

Claire Heathcote et al., *Psychosocial Support Interventions for Children and Adolescents Experiencing Gender Dysphoria or Incongruence: A Systematic Review*, 109 Archive Disease in Childhood S19 (2024) .................27

Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Consideration*s, 32 Archives Sexual Behav. 438 (2003)..........................................................................................................23

Tracy N. Hipp et al., *From Conversion Toward Affirmation: Psychology, Civil Rights, and Experiences of Gender-Diverse Communities in Memphis*, 74 Am. Psych. 882 (2019) ...................................................................6

Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews* (Jill Eden et al. eds., 2011) .....................................................6

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality (Dec. 2016), https://trans equality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf............17

Stanton L. Jones & Mark A. Yarhouse, *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011) ...........................................................................................22

*Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth*, SAMHSA (2023).........................................................13

NASW, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.utah.gov/pmn/files/517781.pdf............................. 9-10

NHS England, *Implementing Advice from the Cass Review*, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/implementing-advice-from-the-cass-review/ (last visited June 3, 2025)................................................... 26-27

Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000) ...................................................................15

Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82 (2018) .................................12

Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) ........................................................22

Maggi Price et al., *A Developmental Perspective on Victimization Faced by Gender Nonconforming Youth*, in Handbook of Children and Prejudice: Integrating Research, Practice, and Policy 447 (H.E. Fitzgerald et al. eds., 2019)........................................................................17

Amy Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81 (2020)........................................16

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018) ............................................................12

*Retraction Notice*, 87 Linacre Q. 108(2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7016425/pdf/10.1177_0024 363919854842.pdf ........................................................22

Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. on Homosexuality 159 (2018)................................19

Travis Salway et al., *A Systematic Review of the Nature of Contemporary Sexual Orientation and Gender Identity or Expression Change Efforts, 2000–2024*, 17 Current Sexual Health Reps. 5 (2025)....................................6, 7

Travis Salway et al., *Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes Among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502 (2020)........................................................16

Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018 ....................................22

Kim W. Schaeffer et al., *Religiously-Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000)................................................15

Michael Schroeder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 5 J. Gay & Lesbian Psychotherapy 131 (2001) ...................................................................15

Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, *in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy* 291 (Kurt A. DeBord et al. eds., 2017) ..................................................................20

Ariel Shidlo & Michael Schroeder, *Changing Sexual Orientation: A Consumer's Report*, 33 Pro. Psych.: Rsch. & Prac. 249 (2002).........................15

Glenn Smith et al., *Treatments of Homosexuality in Britain Since the 1950s—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004)............................................................................................15

Tara E. Smith & Campbell Leaper, *Self-Perceived Gender Typicality and the Peer Context During Adolescence*, 16 J. Rsch. Adolescence 91 (2006)................................................................................................17

Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open e220978 (2022) .........................................................................25

Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68 (2020)...7, 16, 19

Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics e20191725 (2020) .....................................25

# STATEMENT OF INTEREST[1]

*Amici curiae* the American Psychological Association ("APA"), Michigan Psychological Association ("MPA"), National Association of Social Workers ("NASW"), and American Association for Marriage and Family Therapy ("AAMFT") submit this brief to inform the Court of existing scientific knowledge about the safety and effects of gender identity change efforts ("GICE"), and the related research on sexual orientation change efforts ("SOCE"), together known as sexual orientation and gender identity change efforts ("SOGICE").

*Amicus*, the APA is a scientific and educational organization dedicated to increasing and disseminating psychological knowledge. Its over 174,000 members include researchers, educators, clinicians, consultants, and students. The APA's mission is to increase and disseminate knowledge regarding human behavior and foster the application of psychological learning to important human concerns.

The APA is deeply concerned about the effects of SOGICE, especially on minors. From 2007 to 2009, an APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation (the "2009 Task Force") conducted a systematic

---

[1] All parties consent to the filing of this *amicus* brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than *amici*, their members, and their counsel contributed money that was intended to fund preparing or submitting this brief.

review of the peer-reviewed studies on SOCE, which culminated in a comprehensive Report on the state of the scientific literature.[2] The 2009 Report concluded that SOCE are adverse childhood experiences that do not lead to change in sexual orientation, but do cause harm.[3] In 2021, the APA updated its findings to reflect the most recent research. This effort culminated in the APA Resolution on Sexual Orientation Change Efforts and the APA Resolution on Gender Identity Change Efforts.[4] The Resolutions state that SOGICE are ineffective practices associated with psychological and social harm. Given the attention the parties have devoted to the 2009 Report and Resolutions in this litigation,[5] and Plaintiffs' mischaracterizations of several of the APA's key findings, the APA has a distinct interest in this case.

---

[2] *See* Am. Psych. Ass'n, *Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf (the "2009 Report").

[3] *Id.* at 2-3.

[4] APA Resolution on Sexual Orientation Change Efforts (Feb. 2021) ("SOCE Resolution"), https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf; APA Resolution on Gender Identity Change Efforts (Feb. 2021) ("GICE Resolution"), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[5] *See* Mot. for Preliminary Injunction 19-20, R.15; Clark Decl. 32-33, R.15-4; Glassgold Decl. 14, 23, 32, R.27-1; Defendants' Br. 5-7, 54; Plaintiffs' Br. 42.

*Amicus*, the MPA's mission is to improve the health of Michigan residents by advancing the science, education, and practice of psychology. It is the Michigan affiliate of the APA. MPA represents roughly 670 psychologists working in the state to advance psychology as a science, and serves as the primary professional home for Michigan psychologists by providing legislative advocacy, continuing education, professional networking, and promotion of health service psychology.

*Amicus*, the NASW is the largest association of professional social workers in the United States with 110,000 members in 55 chapters. Its Michigan Chapter has over 5,040 members. NASW promulgates professional policies, conducts and publishes research, provides continuing education, and enforces the NASW Code of Ethics. NASW is committed to advancing policies and practices that improve the status and well-being of transgender, gender diverse, and nonbinary people. NASW strongly advocates for the availability of appropriate and effective mental health services and supports children's rights to be treated with respect as individuals and to have their opinions about their lives considered.

*Amicus*, the AAMFT is the national professional association representing the field of marriage and family therapy and the professional interests of over 81,000 marriage and family therapists in the United States. AAMFT stands as the organizational thought leader in and advocate of systemic and relational therapies. AAMFT joins this brief for the reasons expressed in its 2024 *Statement*

*on Gender-Affirming Care Position Statement, Transgender Resources for MFTs, Gender-Affirming Care: Guidelines for Working Systemically with Transgender, Nonbinary, and Gender Expansive Clients* and in its 2004 *Statement on Nonpathologizing Sexual Orientation* and related statements found on its website.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The state of the scientific evidence regarding the effects and safety of SOGICE more broadly is at the center of this case. *Amici* respectfully submit this brief to clarify and describe the scientific evidence on these conversion efforts.

To begin, the APA rejects the idea that SOGICE are legitimate therapeutic approaches. SOGICE are dangerous, discredited practices, and are not supported by credible evidence of effectiveness. SOGICE developed in the nineteenth century from the perspective of viewing same-sex attraction and gender-nonconforming behaviors as mental illnesses, which is a perspective that mainstream mental health professionals have decisively rejected for decades.

Before issuing its 2009 Report, the APA Task Force conducted a comprehensive multi-year survey of the scientific literature on SOCE. The 2009 Report reached two key conclusions. *First*, it found SOCE unlikely to change sexual orientation. *Second*, the 2009 Report raised significant concerns that SOCE can pose a risk of harm to individuals who undergo them. *See* 2009 Report at 3. Multiple scientific studies suggest that SOCE may lead to a range of psychological, relational,

4

and physical harms—including elevated risks for mental health issues (such as depression, anxiety, and suicidal ideation), relational difficulties (like social isolation and strained family relationships), and indirect harms (including wasted time and financial costs). *See id.* at 83.

After reviewing research since 2009 on the harms of SOCE, the 2021 SOCE Resolution reaffirmed that SOCE lack sufficient bases in scientific principles. The 2021 GICE Resolution similarly concluded that GICE pose a significant risk of harm and are not supported by empirical evidence as practices for changing gender identity. Indeed, the research supports the APA's conclusions that SOGICE are not psychotherapy interventions but are sources of anti-minority stress that reinforce stigma and discrimination against LGBTQ+ youth. *See* SOCE Resolution at 4-5; GICE Resolution at 2-4.

In their challenge to Michigan's H.B. 4616, which prohibits licensed counselors from engaging in conversion therapy with minors, Plaintiffs mischaracterize the 2021 Resolutions' key findings and ignore their updated evidence. For example, Plaintiffs attempt to discredit the APA's findings by: (1) noting the lack of published research on SOGICE; (2) suggesting that gender-affirming care does not actually produce any psychological benefits; and (3) refusing to engage with new research showing that SOGICE cause serious harm. Each of these claims is without merit.

5

*Amici* urge this Court to reject Plaintiffs' mischaracterizations of the scientific evidence and affirm the decision below.

## ARGUMENT

In this brief, *amici* report the conclusions of a systematic review[6] of peer-reviewed empirical research on the effects of SOCE completed and published by the APA in 2009, as well as more recent studies on the effects of SOGICE.

Plaintiffs challenge only the ban on GICE. While direct empirical evidence for GICE is more limited than for SOCE, available research and professional consensus indicate similar patterns of harm. Moreover, research focused solely on SOCE is still relevant as it is indicative of the effects and effectiveness of GICE. Although gender and sexual orientation are distinct characteristics, conversion efforts often regard them as similar or the same.[7] A 2025 systematic review reported that the most common SOGICE modality imposes "gender-normative and

---

[6] A systematic review is the use of "scientific methods to identify, select, assess, and summarize the findings of similar but separate studies." Inst. of Med., *Finding What Works in Health Care: Standards for Systematic Reviews* 1 (Jill Eden et al. eds., 2011).

[7] Tracy N. Hipp et al., *From Conversion Toward Affirmation: Psychology, Civil Rights, and Experiences of Gender-Diverse Communities in Memphis*, 74 Am. Psych. 882 (2019).

cisnormative behaviors" contrary to patients' identities.[8]  This suggests that "similar methods are being used across forms of [SOGICE] targeting gender identity, gender modality, gender expression, and sexual orientation" and that "[SOGICE] targeting characteristics related to gender and sexuality remain as intertwined as they have been historically."[9]

The APA's 2009 systematic review on SOCE considered only peer-reviewed empirical research on treatment outcomes published from 1960 to the time of the Report.  *See* 2009 Report at 2.  For this brief, the APA has made a good-faith effort to review and report the findings of all valid, empirical studies published on SOGICE since the 2009 Report.  Significant studies have corroborated the 2009 Report's findings with reliable data, such as one that examined 27,715 transgender adults exposed to GICE, finding that exposure was significantly associated with psychological distress and lifetime suicide attempts.[10]

The 2009 Report also conducted narrative reviews of the larger body of studies on SOCE.  These studies are useful in understanding the experiences of those

---

[8] Travis Salway et al., *A Systematic Review of the Nature of Contemporary Sexual Orientation and Gender Identity or Expression Change Efforts, 2000–2024*, 17 Current Sexual Health Reps. 5, 27 (2025).

[9] *Id.*

[10] Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68, 69 (2020).

who have experienced SOCE, but they are not valid bases for conclusions regarding whether SOCE can change sexual orientation. The results of such studies will be reported in this brief when they are pertinent to other important questions.

## I.     Background on SOGICE.

### A.     History of SOCE and GICE.

SOCE developed in the mid-nineteenth century to cure homosexual desires, which were then viewed as a mental illness. 2009 Report at 21 & n.18. This erroneous perspective on homosexuality persisted throughout much of the twentieth century. *Id.* at 21-22. Techniques to alter sexual orientation included inducing nausea and paralysis; electric shock therapy; shame-aversion therapy; and "systematic desensitization." *Id.* at 22. Some therapists also used "non[-]aversive" treatments like assertiveness and dating trainings, so-called "satiation therapy," or hypnosis. *Id.* Like SOCE, GICE arose from a belief that the lack of conformity of a person's gender identity or expression with that person's sex assigned at birth, or a person's nonbinary gender identity, is pathological. *See* GICE Resolution at 1-2.

Perspectives on same-sex attraction and gender nonconformity have shifted over the decades as overwhelming evidence has demonstrated that variance in human sexuality, gender identity, and gender expression is healthy and normal. By 1973, the American Psychiatric Association removed homosexuality from the *Diagnostic and Statistical Manual of Mental Disorders II* ("DSM-II"), and in 1975,

the APA adopted a policy reflecting the same conclusion.  2009 Report at 11.  Over the next several decades, professional health and mental health organizations increasingly adopted the view that homosexuality is "a normal variant of human sexuality."  *Id.*  Similarly, health organizations today recognize that an "incongruence between sex and gender in and of itself is not a mental disorder," GICE Resolution at 1, and that "gender diversity is present throughout the lifespan and has been present throughout history."[11]

After homosexuality was removed from the DSM-II, experiments and studies on SOGICE decreased dramatically.  *See* 2009 Report at 11; *see also id.* at 2 (most SOCE studies were conducted before 1981).  Behavioral therapists "became increasingly concerned that aversive therapies designed as SOCE for homosexuality were inappropriate, unethical, and inhumane."  *Id.* at 24.  By the 1980s, mainstream mental health professionals had rejected SOGICE because they saw same-sex sexual orientation and gender diversity as a normal part of the continuum of human experience.  In response to a 1990s pro-SOGICE countermovement, mental health organizations—including the American Counseling Association, the American Psychiatric Association, and the American Psychoanalytic Association—adopted resolutions opposed to SOGICE because "such efforts were ineffective and

---

[11] APA Policy Statement on Affirming Evidence-Based Inclusive Care (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf.

potentially harmful." *Id.* at 12.[12]  More recently, one publication has taken steps to identify historical studies requiring "prominent advisory information" that "the [SOGICE] practices tested or described in these papers are inconsistent with modern standards."[13]

## B.     The APA's Position on SOGICE.

To assess the safety and effects of SOGICE, the APA Task Force conducted an extensive review of the literature and published a 130-page Report.  The Report concluded SOCE were ineffective and associated with harm.  2009 Report at 2-3, 12.

Several states and localities have relied on the 2009 Report's findings when passing bans on SOGICE for minors.  *See, e.g.*, *Pickup v. Brown*, 740 F.3d 1208, 1224, 1231-32 (9th Cir. 2014) (California), *abrogated on other grounds by Nat'l*

---

[12] *Amici* NASW and AAMFT, as well as the American Medical Association and the American Academy of Child & Adolescent Psychiatry have all published statements opposing SOGICE.  *See* NASW, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.utah.gov/pmn/files/517781.pdf; Am. Medical Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited June 3, 2025); AAMFT, *Position Statement on Nonpathologizing Sexual Orientation* (2004); Am. Acad. of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx.

[13] Jonathan S. Comer et al., *Reckoning With Our Past and Righting Our Future: Report From the Behavior Therapy Task Force on Sexual Orientation and Gender Identity/Expression Change Efforts (SOGIECEs)*, 55 Behav. Therapy 649, 650 (2024).

*Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755 (2018); Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018*, at 1 (Nov. 1, 2018), https://lims.dccouncil.gov/downloads/LIMS/40980/Committee_Report/B22-0972-CommitteeReport1.pdf?Id=62615.  Numerous courts have also cited the Report in upholding such bans.  *See Doyle v. Hogan*, No. 19-cv-0190, 2019 WL 3500924, at *2-3 (D. Md. Aug. 1, 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021); *Tingley v. Ferguson*, 47 F.4th 1055, 1078 (9th Cir. 2022).

        In 2021, the APA reviewed the research on SOCE published since the 2009 Report and passed two new resolutions reaffirming and strengthening its opposition to SOGICE, *especially* when used on minors.  The GICE Resolution was based on findings that empirical evidence does not show that GICE change one's gender identity, but does show GICE are associated with psychological and social harm.  GICE Resolution at 1-2.  The SOCE Resolution, for its part, found that SOCE pose a significant risk of harm to minors and "may be understood as an adverse childhood experience."  SOCE Resolution at 1-2.  Accordingly, the APA "opposes" training psychologists in SOGICE or otherwise teaching SOGICE as part of an education in psychology.  *Id.* at 8; GICE Resolution at 1-4.

The APA and other health organizations have established practice guidelines, informed by empirical research and professional consensus, that encourage clinicians to use gender-affirming practices when addressing gender identity issues, rather than GICE. *See* GICE Resolution at 2. These guidelines reflect a view that gender-affirming care for youth is best understood as "developmentally appropriate care that is oriented toward understanding and appreciating [one's] gender experience."[14] Gender affirming care can include medical interventions, but "there is no 'one-size-fits-all' approach" and transgender and gender diverse people may need to "undergo all, some, or none of these interventions to support their gender affirmation."[15]

The same is true of SOCE: "mainstream mental health professional associations [currently] support affirmative approaches that focus on helping sexual minorities cope with the impact of minority stress and stigma," rather than SOCE. 2009 Report at 24. Affirmative therapy here refers to therapy that "addresses the influence of social inequities on the lives of LGBQ clients; fosters autonomy,

---

[14] Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018).

[15] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S57 (2022).

enhances resilience, coping, and community building, [and] advocates to reduce systemic barriers to mental, physical, relational, and sexual flourishing."[16]

## II. SOGICE Are Not Legitimate Therapeutic Practices and Can Cause Harm, Especially to Minors.

Plaintiffs emphasize that they do not seek to change their patients' gender identity as their predetermined treatment goal. Plaintiffs' Br. 54. However, "talk therapy" or "counseling" that actively seeks to change one's gender identity or sexual orientation is not clinically appropriate. Being a person of diverse sexual orientation and/or gender identity is not a mental disorder—though an individual's minority status may leave them more vulnerable to stigma and discrimination, *see generally APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014), and any attempts to "treat" normal variations in human sexuality and gender identity are flawed.[17] Moreover, as demonstrated below, these practices are dangerous, unethical, ineffective, and the overwhelming scientific consensus has rejected them.

---

[16] Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82, 83 (2018).

[17] *See Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth*, SAMHSA, 11 (2023); Melissa Grey et al., *Review of U.S. Public Policy, Legislative, and Judicial Work on Conversion Efforts*, in The Case Against Conversion "Therapy": Evidence, Ethics, and Alternatives 195 (Douglas C. Haldeman ed., 2022).

In addition, the suggestion that "talk-therapy" is akin to everyday speech—as opposed to a professional practice carried out by highly trained professionals according to rigorous standards of care—misapprehends the nature of therapeutic intervention. The APA takes positions on therapeutic practices like its position on SOGICE precisely because talk therapy is not just speech like any other; it is speech by professional health providers with the power to seriously harm patients, and it must be subject to professional standards.[18]

### A.    Individuals Report Harm from SOGICE.

As the 2009 Report explained, there is "evidence to indicate that individuals experienced harm from SOCE." 2009 Report at 3; *see id.* at 6 (SOCE "has the potential to be harmful"). With respect to aversive SOCE therapies, studies show "negative side effects include[] loss of sexual feeling, depression, suicidality, and anxiety." *Id.* at 83. Even for so-called "non[-]aversive" SOCE, research reports published at the time of the Report "indicate[d] that there are individuals who perceive that they have been harmed." *Id.* at 3.

Based on its exhaustive review of the SOCE literature, the 2009 Task Force ultimately concluded that the best available evidence suggested "attempts to change

---

[18] *Amici* acknowledge that some practitioners hold sincere religious beliefs about gender identity and sexual orientation. These standards do not regulate individuals' private religious beliefs, but establish professional obligations to provide evidence-based care and avoid practices known or believed to cause harm within the licensed practice of psychology.

sexual orientation may cause or exacerbate distress and poor mental health in some

individuals, including depression and suicidal thoughts." *Id.* at 42.  The 2009 Task

Force also described in detail "studies that report perceptions of harm," noting those

studies "represent[] a serious concern." *Id.*

The 2009 Report also noted that studies "document that there are people who

perceive that they have been harmed through SOCE." *Id.*  Among those studies,

"the reported negative social and emotional consequences include[d] self-reports of

anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated

relationships with family, loss of social support, loss of faith, poor self-image, social

isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and

sexual dysfunction."[19]  *Id.*  Participants in these studies also described "decreased

self-esteem and authenticity to others"; "increased self-hatred and negative

perceptions of homosexuality"; "an increase in substance abuse and high-risk sexual

---

[19] *See* A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psychologist 651 (2004); Glenn Smith et al., *Treatments of Homosexuality in Britain Since the 1950s—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004); Ariel Shidlo & Michael Schroeder, *Changing Sexual Orientation: A Consumer's Report*, 33 Pro. Psych.: Rsch. & Prac. 249 (2002); Michael Schroeder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 5 J. Gay & Lesbian Psychotherapy 131 (2001); Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000); Kim W. Schaeffer et al., *Religiously-Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000).

behaviors"; and a variety of harms to their relationships, including hostility towards their parents and the loss of lesbian, gay, and bisexual friends and potential romantic partners. *Id.* at 50-51. More recently, a 2020 study further documented the harms of SOCE: In a survey of over 8,000 sexual minority men in Canada, researchers found "[e]xposure to SOCE was positively associated with loneliness, regular illicit drug use, suicidal ideation, and suicide attempt."[20]

Research shows GICE in particular lead to adverse outcomes such as emotional distress, loss of relationships, and low self-worth. In a study of 27,715 transgender adults in America, the authors found GICE were "significantly associated with increased odds of severe psychological distress during the previous month and lifetime suicide attempts compared with transgender adults who had

---

[20] Travis Salway et al., *Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes Among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502, 502 (2020); *see also* John R. Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults, United States, 2016-2018*, 110 Am. J. Pub. Health 1024, 1027 (2020) (experiencing SOCE was "independently associated with suicidal ideation, suicide planning, and suicide attempts," even adjusting for adverse child experiences); *see also* Amy Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81, 95 (2020) (identifying similar harms associated with SOCE and noting that they "may compound" experiences of "stigma, heterosexism, violence, and discrimination").

discussed gender identity with a professional but who were not exposed to [GICE]."[21]

Another study from 2015 reported that individuals who had experienced GICE were "[f]ar more likely to currently be experiencing serious psychological distress" than those who did not, were "[m]ore likely to have attempted suicide," "[n]early three times as likely to have run away from home," "[m]ore likely to have ever experienced homelessness," and "[m]ore likely to have ever done sex work" than those who had not experienced GICE.[22]

---

[21] Turban, *supra* note 10, at 69; *see also* Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults, 2018*, 110 Am. J. Pub. Health 1221, 1224 (2020) (identification as transgender or nonbinary was one of the strongest predictors of increased suicidality associated with exposure to SOGICE).

[22] *See* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality at 110 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf. These results match findings on the harmful effects of coercion toward gender nonconformity from other sources, including peers and family. *See* Tara E. Smith & Campbell Leaper, *Self-Perceived Gender Typicality and the Peer Context During Adolescence*, 16 J. Rsch. Adolescence 91, 101 (2006); Maggi Price et al., *A Developmental Perspective on Victimization Faced by Gender Nonconforming Youth*, *in Handbook of Children and Prejudice: Integrating Research, Practice, and Policy* 447 (H.E. Fitzgerald et al. eds., 2019).

In addition to *direct* harms, SOGICE also have the potential to cause *indirect* harms like loss of time, energy, and money.  *See* 2009 Report at 68.[23]  Moreover, some SOGICE recipients may suffer an indirect harm in the form of disappointment or psychological damage from the ineffectiveness of a therapy they thought would be effective.  Indeed, the 2009 Report found "[i]ndividuals who failed to change sexual orientation, while believing they should have changed with such efforts, described their experiences as a significant cause of emotional and spiritual distress and negative self-image."  2009 Report at 3; *see id*. at 50 (some participants in SOCE studies reported "anger at and a sense of betrayal by SOCE providers" or "blamed themselves for the failure" of SOCE to work as expected).  Because SOGICE are unlikely to change gender identity or sexual orientation, SOGICE risk psychological harms by promising a result unlikely to occur, especially when that change might be a condition of family or community acceptance.

### B.    Minors Are Particularly Vulnerable to Harm from SOGICE.

Importantly, there are considerable ethical issues with providing SOGICE to minors.  *See* 2009 Report at 71-80.  In the absence of scientifically valid studies of

---

[23] *See also* Anna Forsythe et al., *Humanistic and Economic Burden of Conversion Therapy Among LGBTQ Youths in the United States*, 176 JAMA Pediatrics, 493, 494 (2022) (finding the "total annual cost of SOGICE among 4,554,300 LGBTQ youths in the US is estimated at $650.16 million, with associated harms, such as substance abuse and suicide attempts, totaling an estimated total economic burden of $9.23 billion").

efficacy showing the safety of SOGICE and in the presence of retrospective reports of harm, the potential for SOGICE to harm minors is of great concern to licensed mental health professionals ("LMHPs"), *amici*, and the public.

Generally, youth may be "particularly vulnerable" to the potential harms of SOGICE because they have been exposed to negative messages about sexual minorities, but have not yet developed the resources to reject those messages. *See, e.g.*, SOCE Resolution at 5. Given "[t]here is no research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation," 2009 Report at 85, the Report recommended LMHPs "provide multiculturally competent and client-centered therapies" to children and adolescents, "rather than SOCE," *id.* at 80. Ultimately, the 2009 Task Force concluded that it had "concerns that [SOGICE-type] interventions may increase self-stigma and minority stress and ultimately increase the distress of children and adolescents." *Id.* at 4.

More recent studies affirm that SOGICE may present unique threats to youth. Specifically, studies show minors who have been subjected to SOGICE report more suicide attempts than those who have not.[24] One recent study underscored that

---

[24] *See, e.g.*, Green et al., *supra* note 21, at 1221 (youth who "under[went] SOGICE were more than twice as likely to report having attempted suicide and having multiple suicide attempts" than youth who did not); *see also* Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents:*

minors are especially vulnerable to the negative effects of SOGICE when exposure to SOGICE happens at a young age. This 2022 study found that "conversion therapy increases the risk of attempting suicide … and running away" by a significant percentage, and that these "effects are largest when exposure to [SOGICE] occurs at a young age (11-14)."[25]

### C.  Licensed Mental Health Providers Have a Duty to Avoid Harm to Members of the Public Whom They Are Licensed to Serve.

"Do no harm" has long been foundational to the practice of healthcare professionals. This means certain aspirational principles (like the patient's self-determination) must be balanced against other principles, including beneficence and non-malfeasance. *See* Am. Psych. Ass'n, *Ethical Principles of Psychologists and Code of Conduct*, at General Principles A, E (Jan. 1, 2017), https://www.apa.org/ethics/code. For this reason, an ethical psychologist must resist patient requests that would harm the patient's health, or for which no evidentiary basis exists; for example, a psychologist would decline a request for a weight loss

---

*Implications for Young Adult Mental Health and Adjustment*, 67 J. on Homosexuality 159, 167-68 (2018); GICE Resolution at 2-3; SOCE Resolution at 5-6.

[25] Travis Campbell & Yana van der Meulen Rodgers, *Conversion Therapy, Suicidality, and Running Away: An Analysis of Transgender Youth in the U.S.*, 89 J. Health Econ. 102750, at 2 (2022); *see also* Turban, *supra* note 10, at 73 ("[E]xposure to GICE before age 10 years was significantly associated with several measures of suicidality, including lifetime suicide attempts.").

program from a patient with anorexia nervosa. Self-determination, while important, is not the only ethical principle—or even the most important ethical principle—in clinical decision-making.[26]

Accordingly, the GICE Resolution notes, "[P]rofessional consensus recommends affirming therapeutic interventions for transgender and gender nonbinary adults who request that a therapist engage in GICE, and for trans youth whose parents/guardians or other custodians (*e.g.*, state, foster care) request that a therapist engage in GICE." GICE Resolution at 3. Similarly, "the APA urges psychologists to assist patients seeking SOCE to understand the dangers of SOCE, the lack of research showing efficacy, the societal contexts of heterosexism and monosexism, and the internalized stigma that results from these contexts, and to use acceptance, support, comprehensive assessment, active coping, social support, and identity exploration and development." SOCE Resolution at 8.

## III.    There Is No Evidence to Support Exposing Individuals to SOGICE.

The APA's systematic review of the literature on the efficacy of SOCE in the 2009 Report concluded there is no scientific evidence that SOCE reduce same-sex attractions. A systematic review of the small number of rigorous peer-reviewed

---

[26] *See* Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, *in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy* 291 (Kurt A. DeBord et al. eds., 2017).

empirical studies found little evidence SOCE decreased same-sex attraction or increased other-sex attraction or behaviors. Moreover, the studies showed little evidence of any enduring changes or changes generalized from the treatment context into the real world.[27] Some studies that claimed to find sexual orientation change were not rigorous enough to permit the 2009 Task Force to draw any conclusions from those studies about the effects of SOCE.

Studies post-dating the 2009 Report do not alter its original conclusions. The APA has identified only one post-Report paper purporting to show SOCE can alter sexual orientation, but this paper suffers from serious methodological flaws.[28]

---

[27] The 2009 Report noted that "enduring change to an individual's sexual orientation is uncommon and that a very small minority of people in the [early SOCE] studies showed any credible evidence of reduced same-sex sexual attraction, though some show[ed] lessened physiological arousal to all sexual stimuli.… Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life." 2009 Report at 43.

[28] The study in question resulted in a high attrition rate; lacked a baseline measure representing a state of being untreated; had inconsistent assessment intervals; had significant variations among participants in terms of the length of exposure to treatment, the nature of treatment, and the amount of time between a person's initial and subsequent assessments; and failed to explain significant gaps in data regarding participants. *See* Stanton L. Jones & Mark A. Yarhouse, *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011).

Another paper released after the 2009 Report was published purports to show SOCE led to shifts in sexual orientation with no harmful side effects. *See* Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018, at 1. But that study was retracted by the publishing journal due to statistical flaws. *See Retraction Notice*, 87 Linacre Q. 108 (2020),

Indeed, since the 2009 Report, social scientists have deemed many of the existing studies on SOCE to be methodologically and statistically flawed.[29] A 2021 paper by reviewers at Case Western University found that dozens of research studies deeming SOCE effective suffered from "biased recruitment, retrospective study designs, lack of generalizability, reliance on samples of bisexual individuals rather than those who are predominantly homosexual, and the use of sexual or social behavior (*e.g.*, engaging in sex with or marrying an individual of a different gender) as the outcome instead of sexual orientation."[30] The APA and social scientists have similarly found no scientifically valid empirical evidence that GICE are effective or safe practices for changing gender identity. *See* GICE Resolution at 2-3.

## IV.    Plaintiffs Misstate and Misrepresent the Science on SOGICE.

Both here and below, Plaintiffs have mischaracterized key aspects of the APA's 2009 Report and Resolutions and the scientific research on SOGICE, downplayed the possibility of harm from SOGICE, and ignored more recent evidence underscoring these harms.

---

https://pmc.ncbi.nlm.nih.gov/articles/PMC7016425/pdf/10.1177_00243639198548 42.pdf.

[29] *See e.g.*, Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) (reviewing the methodological and ethical problems of SOCE).

[30] *See* Przeworski, *supra* note 20, at 83, 92-93.

*First*, Plaintiffs wrongly claim there is no scientific consensus on the harms of SOGICE, in part because the 2009 Report acknowledged methodological problems with the published research on SOCE. Plaintiffs' Br. 42. Plaintiffs ignore the reasons behind the methodological issues: numerous researchers and LMHPs have concluded that SOGICE should neither be studied nor provided precisely *because SOGICE may cause harm to patients*. *See, e.g.*, 2009 Report at 91.[31]

Moreover, Plaintiffs ignore the font of more recent research confirming that SOGICE expose recipients to considerable risk of psychological harm. Though the 2009 Report acknowledged that scientifically valid efficacy research on SOCE was limited, *see id.* at 2, a body of research exists that is not efficacy studies but does find some participants in SOCE retrospectively report harms. Thus, the relative lack of empirical studies is not evidence of lack of harm from SOGICE, as Plaintiffs appear to suggest. Newer research on SOGICE harm only confirms this point. *See supra* § II.

Moreover, even if there were a wholesale lack of evidence on this topic, that would not counsel in favor of permitting the use of an unvetted therapeutic technique. The APA supports rigorous evaluation of therapeutic modalities. Its

---

[31] *See, e.g.*, Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Consideration*s, 32 Archives Sexual Behav. 438 (2003); Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976).

standards for the creation of practice guidelines, for instance, state that such guidelines must "take into account the best available sources on current theory, research, ethical and legal codes of conduct, and/or practice within existing standards of care so as to provide a defensible basis for recommended conduct." Am. Psychological Ass'n, *Criteria for Practice Guideline Development and Evaluation*, at 1049 (Dec. 2002), https://www.apa.org/practice/guidelines/criteria.pdf. Treatments must be borne out by data and experience to warrant a place in accepted therapeutic practice.

*Second*, Plaintiffs incorrectly assert that gender-affirming care causes harm and lacks an evidentiary basis for its efficacy. Plaintiffs' Br. 16-19, 42-44. This assertion is false. A myriad of studies demonstrate that gender-affirming care leads to positive outcomes for its participants.[32]

---

[32] *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open e220978 (2022) (finding that gender-affirming care lowered the risk of moderate to severe depression by 60% and suicidality by 73% for trans and nonbinary youth); Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics e20191725 (2020) (examining 20,000+ person sample and finding a "significant inverse association between treatment with pubertal suppression during adolescence and lifetime suicidal ideation among transgender adults who ever wanted this treatment"); Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2022) (surveying 11,000+ transgender adolescents and finding that use of gender-affirming hormone therapy was associated with lower risk of depression and suicide).

Gender affirming care does not always result in medical interventions, such as hormone therapy. But even the study Plaintiffs rely upon on that topic found that hormone therapy is associated with increased quality of life, decreased depression, and decreased anxiety. *See* Plaintiffs' Br. 16 (citing Clark Decl. ¶ 92 n.36, R.15-4, citing in turn Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y, at 1 (Apr. 2021), https://perma.cc/YHU2-GW72). *Amici* recognize that some debate continues among clinicians and researchers regarding the timing and specific protocols of medical interventions in gender-affirming care for youth. However, these debates occur within a framework that overwhelmingly rejects SOGICE as ineffective and harmful, and support the broader principle that gender-affirming care is based on individual needs and patient-centered approaches.

*Third*, Plaintiffs wrongly claim that, because of the ostensible harms associated with gender-affirming care and because gender identity may not remain fixed over one's lifetime, consensual SOGICE are a preferable and less invasive alternative. Plaintiffs' Br. 16, 43-44. That approach ignores the harms associated with SOGICE. For example, Plaintiffs cite to the Cass Review—a study commissioned by the National Health Services ("NHS") in England on gender identity services for young people—to argue that SOGICE should be implemented to meet the needs of people seeking to change their gender identity. *See id.* Yet the

actions of the NHS arising out of the Cass Review's (heavily critiqued) findings are not to promote SOGICE;[33] they are to *expand and strengthen* gender-affirming care for youth.[34]   Indeed, nothing in the Cass Review or the subsequent NHS plan undermines the practice of gender-affirming care, nor does it suggest psychotherapists should not affirm gender diversity.[35]

---

[33] D.M. Grijseels, *Biological and Psychosocial Evidence in the Cass Review: A Critical Commentary*, 25 Int'l J. Transgender Health 1, 6-8 (2024) (describing the Cass Review's double standard for evaluating evidence showing risks associated with puberty blockers and hormone therapy versus their benefits, as well as the Review's internally inconsistent statements on that topic, including as to the effect of puberty blockers on adult height).

[34] *See* NHS England, *Implementing Advice from the Cass Review*, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/implementing-advice-from-the-cass-review/ (last visited June 3, 2025) ("NHS England is committed to improving and expanding gender services for children and young people[.]").

[35] The Department of Health and Human Services recently released a report that relies heavily on the Cass Review's findings.  *See* Dep't Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*: *Review of Evidence and Best Practices* (May 1, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf ("HHS Report").  The HHS Report is no more supportive of SOGICE than the Cass Review on which it relies; the research it deems valid on this issue either does not address SOGICE or documents that it is harmful.  One of the two systematic reviews it cites, *see id.* at 88 n.36, 252 & n.78, examines no SOGICE studies, but rather reviews *other* therapeutic interventions, including ones with a stated aim of "prepar[ing] [patients] for gender transitions."  Claire Heathcote et al., *Psychosocial Support Interventions for Children and Adolescents Experiencing Gender Dysphoria or Incongruence: A Systematic Review*, 109 Archive Disease in Childhood S19, S25-27 (2024).  The other, meanwhile, found that SOGICE was associated with higher suicidality and produced no benefits.  *See* Alex R. Dopp et al., *Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and*

In addition, SOGICE cannot be justified by invoking client autonomy or self-determination.  *See supra* § II.C.  As the 2009 Report recognized, "simply providing SOCE to clients who request it does not necessarily increase self-determination but rather abdicates the responsibility of LMHP[s] to provide competent assessment and interventions that have the potential for benefit with a limited risk of harm."  2009 Report at 69.  Moreover, the concept of self-autonomy with respect to minors who "opt into" SOGICE is simply wrong, because minors are typically "emotionally and financially dependent on adults."  *See id.* at 77.

## CONCLUSION

For the foregoing reasons, the district court's Order should be affirmed.

June 3, 2025                                         Respectfully submitted,

                                                    */s/ Jessica Ring Amunson*

Deanne M. Ottaviano                                 Jessica Ring Amunson
AMERICAN PSYCHOLOGICAL                                 *Counsel of Record*
  ASSOCIATION                                       Illyana A. Green
750 First Street NE                                 Ruby C. Giaquinto
Washington, DC 20002                                JENNER & BLOCK LLP
(202) 336-6100                                      1099 New York Avenue NW
                                                    Suite 900
*Counsel for American*                              Washington, DC 20001
*Psychological Association*                          (202) 639-6000
                                                    jamunson@jenner.com

                                                    *Counsel for Amici Curiae*

---

*Risks to Inform Practice, Policy, and Research*, RAND, at 30 (2024),
https://www.rand.org/pubs/research_reports/RRA3223-1.html.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14 point Times New Roman font for the main text and footnotes.

Dated:  June 3, 2025

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson

**CERTIFICATE OF SERVICE**

I, Jessica Ring Amunson, an attorney, hereby certify that on June 3, 2025, I caused the foregoing **Brief of American Psychological Association, Michigan Psychological Association, National Association of Social Workers, and American Association for Marriage and Family Therapy as *Amici Curiae* in Support of Defendants-Appellees and Affirmance** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson