No. 25-1105

# In the United States Court of Appeals for the Sixth Circuit

———————————

CATHOLIC CHARITIES OF JACKSON, LENAWEE AND HILLSDALE COUNTIES;
EMILY MCJONES,

*Plaintiffs-Appellants,*

*v.*

GRETCHEN WHITMER, ET AL.,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court for the
Western District of Michigan Southern Division, No. 1:24-cv-718

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

LUKE W. GOODRICH
ADÈLE A. KEIM
DANIEL L. CHEN
BENJAMIN A. FLESHMAN
THE BECKET FUND
  FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketfund.org*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES........................................................................iii

INTRODUCTION............................................................................... 1

ARGUMENT ...................................................................................... 4

    I.    Plaintiffs have standing. ............................................................ 4

    II.   HB 4616 restricts speech directly, not incidentally.................. 12

    III.  HB 4616 cannot survive strict or intermediate scrutiny.......... 16

         A. HB 4616 does not further a compelling interest. ................ 17

         B. HB 4616 is not the least-restrictive alternative................... 23

         C. HB 4616 fails intermediate scrutiny. ................................... 26

    IV.  HB 4616 violates the Due Process Clause ............................... 27

    V.   HB 4616 violates the Free Exercise Clause............................. 28

    VI.  The remaining injunction factors favor relief. .......................... 29

CONCLUSION ................................................................................... 29

CERTIFICATE OF COMPLIANCE...................................................... 31

CERTIFICATE OF SERVICE................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Washington*,
  16 F.4th 170 (6th Cir. 2021) ............................................................. 26

*ACLU v. Livingston County*,
  796 F.3d 636 (6th Cir. 2015).............................................................. 29

*Block v. Canepa*,
  74 F.4th 400 (6th Cir. 2023) .............................................................. 12

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011).............................................................. 16, 21, 23

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014).............................................................. 17

*Chiles v. Salazar*,
  2022 WL 17770837
  (D. Colo. Dec. 19, 2022).......................................................... 8

*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ...................................... 8, 9, 19-20, 21

*Cohen v. California*,
  403 U.S. 15 (1971)........................................................................ 13

*Doyle v. Hogan*,
  2019 WL 3500924
  (D. Md. Aug. 1, 2019) ........................................................... 8

*Doyle v. Hogan*,
  1 F.4th 249 (4th Cir. 2021) .................................................... 8

*Espinoza v. Mont. Dep't of Revenue*,
  591 U.S. 464 (2020)....................................................................... 12

*Fischer v. Thomas*,
52 F.4th 303 (6th Cir. 2022) ............................................................ 8

*Free Speech Coal. v. Paxton*,
2025 WL 1773625
(U.S. June 27, 2025).......................................................................... 16

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)............................................................................ 17

*Green Party of Tenn. v. Hargett*,
791 F.3d 684 (6th Cir. 2015)............................................................ 11

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010)............................................................ 12-13, 15, 27

*Holt v. Hobbs*,
574 U.S. 352 (2015)............................................................................ 26

*Kareem v. Cuyahoga Cnty. Bd. of Elections*,
95 F.4th 1019 (6th Cir. 2024) ...................................................... 4, 11

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .......................................................... 4, 5

*King v. Christie*,
981 F. Supp. 2d 296 (D.N.J. 2013)..................................................... 8

*King v. Governor of N.J.*,
767 F.3d 216 (3d Cir. 2014) .......................................................... 8, 13

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ............................................................ 25

*McCullen v. Coakley*,
573 U.S. 464 (2014)...................................................................... 26-27

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016)...................................................... 10, 11

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)............................................................................... 16

*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ..................................................... 13, 14, 15-16, 27

*NRA v. Magaw,*
    132 F.3d 272 (6th Cir. 1997) ................................................. 9

*Otto v. City of Boca Raton,*
    353 F. Supp. 3d 1237 (S.D. Fla. 2019) .................................. 8

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ..................................... *passim*

*Pickup v. Brown,*
    42 F. Supp. 3d 1347 (E.D. Cal. 2012) .................................. 8

*Pickup v. Brown,*
    728 F.3d 1042 (9th Cir. 2013) ............................................ 8

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925) ......................................................... 12

*Planet Aid v. City of St. Johns,*
    782 F.3d 318 (6th Cir. 2015) ............................................ 26

*Platt v. Bd. of Comm'rs,*
    769 F.3d 447 (6th Cir. 2014) ............................................ 11

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ......................................................... 24

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) ......................................................... 16

*Snatchko v. Westfield LLC,*
    187 Cal. App. 4th 469 (Cal. Ct. App. 2010) ........................ 15

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ............................................. 9

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (6th Cir. 2019) ............................................ 10

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................ 11

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ............................................................. 29

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (6th Cir. 1999) ............................................. 16

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) ........................................................... 27

*Tingley v. Ferguson*,
  557 F. Supp. 3d 1131 (W.D. Wash. 2021) ............................ 7

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ................................ 8, 10, 11

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................... 23

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ....................................................... 18

*Vazzo v. City of Tampa*,
  2019 WL 1048294
  (M.D. Fla. Jan. 30, 2019) ..................................................... 8

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ............................................................. 9

*Welch v. Brown*,
  907 F. Supp. 2d 1102 (E.D. Cal. 2012) ................................ 8

*Welch v. Brown*,
  834 F.3d 1041 (9th Cir. 2016) ............................................. 8

**Statutes**

MCL 330.1100a ............................................................... *passim*

Wash. Rev. Code §18.225.030 ............................................ 25

**Other Authorities**

*Advocacy & Government Affairs*, The Trevor Project.............................21

Amy E. Green et al., *Self-Reported Conversion Efforts and
    Suicidality Among US LGBTQ Youths and Young Adults,
    2018*, 110 Am. J. Pub. Health 1221 (Aug. 2020) ................................21

*The Cass Review*, Independent Review of Gender Identity
    Services for Children and Young People (Apr. 2024)..................17, 19

*Treatment of Pediatric Gender Dysphoria: Review of
    Evidence and Best Practices*, U.S. Dep't of Health
    & Hum. Servs. (May 1, 2025) ......................................18, 19, 21, 22-23

# INTRODUCTION

Michigan doesn't dispute that twenty-five states and five European countries have restricted "gender-affirming" treatment for minors due to mounting evidence of its harms. Instead, it calls this "fixation on the harms from 'medical transitions'" a "red herring." Opp.68 n.13. But this "red herring" is the *raison d'être* of this lawsuit: HB 4616 harms children by silencing compassionate counselors like Plaintiffs and pushing children toward harmful, irreversible medical transitions.

Unwilling to address these harms, Michigan instead disputes standing—claiming that HB 4616 doesn't ban counseling that facilitates a client's "goals." But the district court correctly rejected this argument as contrary to HB 4616's text. The text bans "any practice" that seeks to change "behavior or gender expression," with no exception for a client's goals—a point Michigan eventually concedes. In fact, fifteen federal courts have now considered pre-enforcement challenges to conversion-therapy bans like Michigan's, including bans with identical language challenged by counselors who likewise facilitated their client's goals. All fifteen courts expressly found standing or assumed it as obvious. Michigan ignores all these cases.

On the merits, Michigan doesn't dispute that HB 4616 regulates the words Plaintiffs speak based on their content and viewpoint. Instead, it tries to redefine Plaintiffs' "words" as unprotected "conduct." But this argument is foreclosed by the Supreme Court's decisions in *Cohen*, *Holder*,

and *NIFLA*, which make clear that a law regulates speech where, as here, "the conduct triggering coverage under the statute consists of communicating a message." And the Third and Eleventh Circuits have applied these decisions to conversion-therapy bans like Michigan's, rejecting the same arguments Michigan proffers here as a "counter-intuitive" "labeling game" that turns the First Amendment "truly upside down."

Because HB 4616 regulates speech based on its content and viewpoint, it is subject to strict scrutiny, which it fails. Michigan says HB 4616 furthers a compelling interest in protecting minors from physical and psychological harm. But Michigan's supposed evidence of harm has already been rejected by other courts as inadequate to satisfy strict scrutiny—and by a recent, comprehensive evidence review by HHS, which found "no evidence of adverse effects of [cautious counseling] in this context." Worse, HB 4616 actually *undermines* Michigan's interest by depriving children of cautious counseling and leaving them no alternative but the so-called "gender-affirming approach"—which pushes children toward puberty blockers, hormones, and surgeries that cause irreversible harms.

Even if HB 4616 furthered an interest in protecting minors, it is not the least restrictive means of doing so. Rather than banning all cautious therapy, Michigan could ban aversive practices that go beyond mere words; ban therapy that overrides a client's goals; impose malpractice liability for bad acts that cause harm; require counselors to obtain informed consent; or enact a religious exemption. Other states successfully

use such methods, and Michigan hasn't explained why it is different. That means HB 4616 cannot survive even intermediate scrutiny.

Nor is HB 4616 consistent with other constitutional requirements. By imposing liability based on subjective, vague, and undefined terms, HB 4616 invites arbitrary enforcement contrary to the Due Process Clause. And by favoring secular gender-affirming counseling over religiously motivated cautious counseling—even when gender-affirming counseling imposes greater harms—HB 4616 fails the requirements of the Free Exercise Clause.

*     *     *

None of this means Michigan's hands are tied. Under any reading of the First Amendment, Michigan remains free to regulate the practice of counseling, impose content-neutral licensing restrictions, require informed consent, and punish malpractice that causes harm. What it can't do is impose broad, prophylactic rules regulating the content and viewpoint of counselors' words. Nor should it want to, when those words can spare children a lifetime of unnecessary drugs, hormones, surgeries, and harm. The district court should be reversed.

# ARGUMENT

## I. Plaintiffs have standing.

Michigan starts by disputing standing. But the district court correctly held that Plaintiffs established all three elements of an "injury in fact" for a pre-enforcement challenge: "(1) an intent to engage in 'expression that the [Constitution] arguably protects,' (2) that this expression is arguably prohibited by [Michigan's] laws, and (3) that there exists a 'credible threat of enforcement' for engaging in that expression." Order, R.39, PageID#1305 (quoting *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024)). Michigan's counterarguments are meritless.

*Arguably protected expression.* Michigan doesn't dispute the first element. Nor can it: Plaintiffs' counseling, which consists entirely of spoken words, is "expression" arguably protected by the Constitution. *Kareem*, 95 F.4th at 1022.

*Arguably prohibited.* Plaintiffs' counseling is also "arguably prohibited" by HB 4616. *Id.* To meet this standard, "Plaintiffs need not prove their speech is actually prohibited; rather, it is enough if their speech is '*arguably* proscribed' by 'at least a *plausible* interpretation of the statute.'" Order, R.39, PageID#1306 (quoting *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022)).

The district court correctly held that Plaintiffs satisfy this standard. HB 4616 prohibits any practice "that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, *efforts to change behavior or gender expression*." MCL 330.1100a(20) (emphasis added). Plaintiffs "often" provide and "plan to keep providing" counseling that helps clients "*change their behavior and gender expression*" to "better align with the clients' own religious beliefs." Compl., R.1, PageID#14-15 (emphasis added). In fact, Plaintiffs believe it is their "ethical and religious duty" to help a client who "seeks to *change her gender identity or gender expression* to match her biological sex, or wants to *change her behavior* to reduce same-sex attraction or refrain from acting on same-sex attraction." McJones Decl., R.15-3, PageID#244 ¶48 (emphasis added); Lewis Decl., R.15-1, PageID#166 ¶¶23-24; Compl., R.1, PageID#13-14 ¶¶65, 69-70. The district court thus properly concluded that "Plaintiffs have described treatment that would arguably violate the law." Order, R.39, PageID#1308.

In response, Michigan first distorts the governing standard, claiming that Plaintiffs must "demonstrate that *they will violate* HB 4616." Opp.23 (emphasis added). The district court rightly rejected this argument. Under this Court's precedent, it is enough if Plaintiffs' speech is "*arguably* proscribed" by "at least a *plausible* interpretation of the statute." *Yellen*, 54 F.4th at 337.

Alternatively, Michigan tries to impose a narrowing construction on HB 4616 and then claim that Plaintiffs' counseling doesn't "run afoul of HB 4616." Opp.26-27. But in doing so, Michigan distorts the text in three ways.

First, Michigan repeatedly truncates the statute's definition of conversion therapy. It quotes only part of the definition ("seeks to change an individuals' sexual orientation or gender identity"), while omitting the key clause that dramatically expands the statute's reach: "including, but not limited to, efforts to change behavior or gender expression." Opp.24 (omitting clause). Plaintiffs clearly allege that their counseling includes efforts to "change … behavior and gender expression." Compl., R.1, PageID#5, 14-15 ¶¶6, 68-71; McJones Decl., R.15-3, PageID#244 ¶¶48-49; Lewis Decl., R.15-1, PageID#166 ¶23; Veenstra Decl., R.15-2, PageID#232-33 ¶¶35-36. Michigan simply ignores these allegations and the statutory text.

Second, Michigan adds new language to the text—claiming that seeking to change behavior or gender expression is prohibited only if the counselor harbors "a fixed therapeutic goal" that contradicts the client's "goals." Opp.25. But the statute doesn't mention the client's goals; it prohibits "any practice" that "seeks to change" gender identity, period. MCL 330.1100a(20). Indeed, later in Michigan's brief, it admits that "[t]he focus of the statutory definition is on the *treatment* itself, not on *who* (the

counselor or client) may be seeking it, or with whose goals it aligns." Opp.58.

Third, Michigan claims that Plaintiffs fall within a supposed carve-out for counseling that "*facilitates … an individual's …* identity exploration and development"—which, according to Michigan, applies if Plaintiffs "honor[] the client's right of 'self-determination.'" Opp.25-27. But the carve-out for "identity exploration and development" applies *only* "as long as the counseling does not seek to change an individual's sexual orientation or gender identity," MCL 330.1100a(20)—a limiting clause Michigan ignores.

In short, Michigan cannot escape HB 4616's plain language, and the district court correctly rejected all three of these arguments below. Order, R.39, PageID#1307-08.

Nor is this conclusion novel. Order, R.39, PageID#1308 n.5 (collecting cases). *Fifteen courts* have addressed pre-enforcement challenges to conversion-therapy bans like Michigan's—including with identical exemptions for "identity exploration and development," and in cases where counselors alleged that they merely facilitated the clients' goals. All fifteen courts expressly found standing or assumed it as obvious.[1] Both the

---

[1]   Seven courts expressly found pre-enforcement standing:

1. *Tingley v. Ferguson*, 557 F. Supp. 3d 1131, 1137-38 (W.D. Wash. 2021).

district court and Plaintiffs extensively discussed these rulings. *Id.*; Reply, R.31, PageID#1051-52. Yet Michigan doesn't even acknowledge their existence, much less distinguish them—because it can't.

**Credible threat.** The district court also correctly held that Plaintiffs face a credible threat of enforcement. "To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

---

2. *Tingley v. Ferguson*, 47 F.4th 1055, 1066-69 (9th Cir. 2022).

3. *Doyle v. Hogan*, 2019 WL 3500924, at *8-9 (D. Md. Aug. 1, 2019).

4. *Chiles v. Salazar*, 2022 WL 17770837, at *2-5 (D. Colo. Dec. 19, 2022).

5. *Chiles v. Salazar*, 116 F.4th 1178, 1194-99 (10th Cir. 2024).

6. *Otto v. City of Boca Raton*, 353 F. Supp. 3d 1237, 1245-46 (S.D. Fla. 2019).

7. *Vazzo v. City of Tampa*, 2019 WL 1048294, at *4-5 (M.D. Fla. Jan. 30, 2019), *report & recommendation adopted*, 2019 WL 1040855 (M.D. Fla. Mar. 5, 2019).

Eight courts assumed standing as obvious or uncontested:

8. *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020).

9. *King v. Christie*, 981 F. Supp. 2d 296 (D.N.J. 2013).

10. *King v. Governor of N.J.*, 767 F.3d 216 (3d Cir. 2014).

11. *Pickup v. Brown*, 42 F. Supp. 3d 1347 (E.D. Cal. 2012).

12. *Pickup v. Brown*, 728 F.3d 1042 (9th Cir. 2013).

13. *Welch v. Brown*, 907 F. Supp. 2d 1102 (E.D. Cal. 2012).

14. *Welch v. Brown*, 834 F.3d 1041 (9th Cir. 2016).

15. *Doyle v. Hogan*, 1 F.4th 249 (4th Cir. 2021).

8

The district court held that it was "not surprising" that HB 4616 chilled Plaintiffs' speech, because "the potential penalties for engaging in prohibited conduct are 'massive' and include fines up to $250,000 and the potential loss of their licenses and livelihoods." Order, R.39, PageID#1309. This is more than enough to establish a "financial threat" (Opp.31) that chills speech. *Chiles*, 116 F.4th at 1192, 1195 ("chilling effect" from fines "up to $5,000").

Indeed, chilling speech is exactly how HB 4616 is intended to work. As Michigan admits, it can already punish any harm from conversion therapy using "existing remedies, such as malpractice"; but those remedies are not "acceptable," Michigan says, because they "apply *after* a client is harmed." Opp.56. In other words, the point of HB 4616 is to chill speech *before* it occurs.

Even absent chilled speech, courts presume a credible threat of enforcement when a "newly enacted law" arguably proscribes plaintiffs' speech. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases). That's because it is "inconceivable that the government would enact a widely publicized law … and then sit idly by" when it is violated. *NRA v. Magaw*, 132 F.3d 272, 289 (6th Cir. 1997). Here, too, it is inconceivable that Michigan would tout the novel HB 4616 as "narrowly tailored" to address "devastating" harms, Opp.55, yet not enforce it.

Furthermore, three additional factors confirm the credible threat here: (1) "a history of past enforcement"; (2) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing" members of the public to "file a complaint"; and (3) the government's "refusal to disavow enforcement." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016).

First, as the district court found, Michigan has a history of "vigorously" enforcing its licensing laws, issuing "thousands of disciplinary orders each year," including against mental health professionals like Plaintiffs. Order, R.39, PageID#1310. Michigan claims this factor favors the state because it has not yet enforced HB 4616. Opp.29-30. But in *Speech First, Inc. v. Schlissel*, this Court held that students faced a credible threat of enforcement when a school enforced its "bullying" policy sixteen times in two years, even though there was "no evidence" of enforcement against "speech resembling what these students allegedly want[ed] to say." 939 F.3d 756, 766 (6th Cir. 2019); *see id.* at 774-76 (White, J., dissenting). Additionally, as the district court explained, this factor carries "less weight where, as here, the challenged law is relatively new," and where, as here, the law's "substantial sanctions" "could just as well indicate that speech has already been chilled." Order, R.39, PageID#1310 (cleaned up) (collecting cases); *Tingley*, 47 F.4th at 1069 ("history of enforcement[] carries 'little weight' when [conversion-therapy ban] is 'relatively new'").

10

Second, the "credibility of enforcement" is "bolster[ed]" by the fact that under HB 4616 "any person—not just a prosecutor or state agency—may initiate enforcement." *Platt v. Bd. of Comm'rs*, 769 F.3d 447, 452 (6th Cir. 2014) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)). Michigan claims this fact is "irrelevant" because an "agency" reviews complaints before prosecuting them. Opp.30, 32. But as the district court noted, this Court has held this factor is satisfied even when a disciplinary board must "independently review" third-party complaints. Order, R.39, PageID#1310 (citing *Kareem*, 95 F.4th at 1024 n.2). Once again, Michigan simply ignores the district court's holding and this Court's precedent.

Third, Michigan admits it "cannot disavow enforcement" against Plaintiffs. Opp.33. It claims this has "no relevance," *id.*, but the refusal to disavow enforcement against particular plaintiffs "add[s] credibility" to the threat, *Platt*, 769 F.3d at 452; *McKay*, 823 F.3d at 869, and is "strong evidence" of a threat of enforcement, *Tingley*, 47 F.4th at 1068.

Indeed, this Court has repeatedly found a credible threat of enforcement based on far less than what Plaintiffs have shown here. *See, e.g.*, *Platt*, 769 F.3d at 452 (credible threat based on refusal to disavow and individual-grievance mechanism); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695-96 (6th Cir. 2015) (credible threat without threatened or past enforcement because state hadn't disavowed future enforcement);

11

*Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (credible threat because state generally enforced the challenged statute). Likewise, fifteen federal courts have found or assumed a credible threat of enforcement in conversion-therapy-ban challenges like this one. *Supra* n.1. No court has held to the contrary, and Michigan offers no reason why this Court should be the first.[2]

## II. HB 4616 restricts speech directly, not incidentally.

Turning to the merits, Michigan doesn't dispute that Plaintiffs' counseling consists entirely of speaking words. Instead, it argues that Plaintiffs' words are actually "conduct," not speech. Opp.49. But this argument contravenes Supreme Court precedent and has been rightly rejected by the Third and Eleventh Circuits.

As Plaintiffs explained (Br.27-31), the Supreme Court in *Cohen*, *Holder*, and *NIFLA* drew a clear line between laws that regulate "speech" and laws that regulate "conduct." If "the conduct triggering coverage under the statute consists of communicating a message," the law regulates

---

[2]  Michigan separately claims Plaintiffs lack standing to assert "parents' First Amendment right to direct the religious upbringing of their children." Opp.33-35. But the Supreme Court has repeatedly recognized third-party standing in this context. *See Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (schools could assert burdens on "not only religious schools but also the families whose children attend" them); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (school "corporations" could assert "the liberty of parents" to "direct the upbringing and education of children"). Michigan doesn't distinguish these cases.

speech. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). This is true even if the speech is uttered by "professionals" practicing "medicine," *NIFLA v. Becerra*, 585 U.S. 755, 771 (2018), and even if the law itself "may be described as directed at conduct," *Holder*, 561 U.S. at 28. By contrast, to regulate "conduct," a law must apply to "separately identifiable conduct" that "does not necessarily convey any message." *Cohen v. California*, 403 U.S. 15, 18 (1971).

Here, it is undisputed that what triggers coverage under HB 4616 is Plaintiffs' communication of ideas and advice to their clients—not a physical procedure or any other "separately identifiable," non-expressive conduct. *Cohen*, 403 U.S. at 18. Under *Cohen*, *Holder*, and *NIFLA*, then, HB 4616 regulates speech. Indeed, that is precisely what the Third and Eleventh Circuits held regarding counseling laws indistinguishable from Michigan's. *See King*, 767 F.3d at 224-25, *abrogated on other grounds by*, *NIFLA*, 585 U.S. 755; *Otto*, 981 F.3d at 865-67.

Remarkably, Michigan's brief doesn't even mention *Cohen*. And its efforts to evade *Holder* and *NIFLA* are equally unavailing.

First, Michigan tries to distinguish *Holder* on the ground that the law there was triggered by "professionals" (lawyers) providing "specialized advice," whereas the law here is triggered by "professionals" (counselors) providing "a harmful course of medical care." Opp.51-52. But what Michigan calls harmful medical care "consists—entirely—of words." *Otto*, 981

F.3d at 865. Thus, this is no distinction at all. Both cases involve laws triggered by communicating a message and thus regulating speech.

Second, Michigan tries to spin *NIFLA* in its favor, claiming *NIFLA* "firmly suggested" that "laws like HB 4616 implicate conduct for which reduced scrutiny is warranted." Opp.42. But *NIFLA* did the opposite: It criticized and abrogated the only two circuit decisions then upholding laws like HB 4616. *See* 585 U.S. at 767 (abrogating *Pickup* and *King*). Thus, *NIFLA* strongly suggests such laws are *not* subject to reduced scrutiny. *See Otto*, 981 F.3d at 867 (*NIFLA* "directly criticized other circuit decisions approving of [conversion-therapy] bans").

Third, Michigan offers the sweeping pronouncement that "State regulation of health care is subject to reduced scrutiny." Opp.39. But that's flatly inconsistent with *NIFLA*, which emphasized "the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" 585 U.S. at 771. Indeed, *NIFLA* specifically held that speech uttered by medical professionals receives the same protections as any other speech. *Id.* at 773. Otherwise, states would have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *Id.*

Fourth, Michigan says HB 4616 is constitutional because it doesn't prohibit speaking "about" conversion therapy "generally." Opp.44. But the same could be said in *Cohen* and *Holder*; the laws there didn't prohibit speaking "about" the draft or aid to terrorists "generally." But that

is irrelevant. "The First Amendment does not protect the right to speak about banned speech; it protects speech itself." *Otto*, 981 F.3d at 863.

Finally, Michigan claims that because "talk therapy is not a medium for a mental health professional to express personal viewpoints," it is "[n]on-expressive speech," and therefore "conduct." Opp.49-50. But Michigan cites no authority for this theory of "non-expressive speech." That's because there is "no case identifying the existence of such a thing as non-expressive speech"; it is "an oxymoron." *Snatchko v. Westfield LLC*, 187 Cal. App. 4th 469, 493 (Cal. Ct. App. 2010).

Indeed, if Michigan is right, *Holder* is wrong. The speech there—legal advice on "how to petition for humanitarian relief before the United Nations," 561 U.S. at 22—was not "a medium for a [lawyer] to express personal viewpoints." Opp.49. It was "expert advice" based on "specialized knowledge," *Holder*, 561 U.S. at 22—as is Plaintiffs' counseling here. Yet Michigan cannot explain why legal counsel is inherently communicative, but psychological counsel is not. Both consist of speaking words. Both communicate messages. Both receive First Amendment protection. Indeed, as *NIFLA* makes clear, there is no basis for reducing First Amend-

ment protection just because the speakers—be they counselors or law-
yers—are "professionals." *See NIFLA*, 585 U.S. at 771; *Otto*, 981 F.3d at
867-68. HB 4616 thus regulates speech.[3]

### III. HB 4616 cannot survive strict or intermediate scrutiny.

Michigan doesn't dispute that if HB 4616 regulates speech, it does so
based on content and viewpoint. Br.38-40. As a viewpoint-based re-
striction on speech, HB 4616 is *per se* invalid, without requiring further
analysis. Br.39-40 (collecting cases). Michigan ignores this point.

Even if HB 4616 were only content-based, it would still be subject to
strict scrutiny—meaning Michigan must demonstrate that HB 4616 "pro-
mote[s] a compelling interest" and uses "the least restrictive means" of
doing so. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).
It is "rare that a regulation restricting speech because of its content will
ever" satisfy this standard. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786,
799 (2011). Indeed, "[i]n the First Amendment context," the Supreme
Court has "held only once that a law triggered but satisfied strict scru-
tiny"; that's because strict scrutiny "is fatal in fact absent truly extraor-
dinary circumstances." *Free Speech Coal. v. Paxton*, 2025 WL 1773625,
at *11-12 (U.S. June 27, 2025). HB 4616 is no exception.

---

[3]  Michigan also fails to address Plaintiffs' argument (Br.51-52) that HB
4616 is independently unconstitutional under *Minnesota Voters Alliance
v. Mansky*, 585 U.S. 1 (2018). Thus, Michigan has waived the issue. *Thad-
deus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

### A. HB 4616 does not further a compelling interest.

Michigan offers two allegedly compelling interests on appeal. First, it asserts an interest in "regulating the practice of professions." Opp.53. But this is circular. Michigan cannot justify a regulation by claiming it furthers an interest in "regulating." It must identify another interest. Nor can that interest be "couched in very broad terms, such as promoting 'public health.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014); *cf.* Opp.52 ("protect public health"). "[T]he First Amendment demands a more precise analysis." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

Second, Michigan claims an interest in "safeguarding the physical and psychological well-being of a minor." Opp.53. But HB 4616 doesn't *further* that interest; it *undermines* it. Br.42-44. By banning Plaintiffs' cautious counseling, HB 4616 leaves children with no alternative but the so-called "gender-affirming approach"—which affirms children in their stated gender identity and routinely culminates in medical interventions like puberty blockers, cross-sex hormones, and surgeries. Br.14-19.

But there is "no good evidence" that the gender-affirming approach helps to "manage gender-related distress" in the "long-term." *The Cass Review* at 13, 195, Independent Review of Gender Identity Services for Children and Young People (Apr. 2024), https://perma.cc/J5GN-ELUY ("Cass Review"). In fact, the federal government's most recent and comprehensive review of the evidence—which Michigan fails to mention—

warned that "the 'gender affirming' model of care" increases the "risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, psychiatric disorders, surgical complications, and regret." *Treatment of Pediatric Gender Dysphoria: Review of Evidence and Best Practices* at 10, U.S. Dep't of Health & Hum. Servs. (May 1, 2025), https://perma.cc/25AA-G4W8 ("HHS Report"). That is why, "[i]n the last three years, more than 20 States have enacted laws banning the provision of sex transition treatments to minors," and "a number of European countries have" placed "severe restrictions" on their use, citing "significant concerns regarding the potential harms." *United States v. Skrmetti*, 145 S.Ct. 1816, 1825-26 (2025).

Michigan doesn't dispute these harms. Instead, it claims they are a "red herring," because HB 4616 doesn't address "physically changing one's body." Opp.68 n.13. But that is incorrect. HB 4616 specifically *protects* "counseling that provides assistance to an individual undergoing a gender transition," MCL 330.1100a(20)—including the use of drugs and surgeries to change one's body. And it specifically *prohibits* counseling that seeks to address gender dysphoria by changing one's "behavior or gender expression" instead of one's body. *Id.*

Nor is it any surprise that HB 4616 deprives children of cautious counseling and pushes them toward gender transitions; that is the widely rec-

18

ognized effect of laws like HB 4616. As the Cass Review noted, "legislation on conversion practices" has left counselors "fearful of accepting referrals" of gender-questioning youth because doing so risks "potential accusations of conversion practice" for simply "following an approach that would be considered normal clinical practice when working with other groups of children." Cass Review at 202. Similarly, HHS's Report found "that the specter of being labeled a 'conversion therapist' ... has created a climate of anxiety among mental health professionals," who worry they will "jeopardize their careers and reputations" for "failing to affirm or recommend medical interventions for youth." HHS Report at 253-54.

Unable to dispute this effect of HB 4616, Michigan tries to change the subject—claiming it has "numerous studies" documenting "the harms of conversion therapy." Opp.54. But every appellate judge who has examined this evidence under strict scrutiny has found it lacking. Br.41-42.

The most recent was Judge Hartz in *Chiles*, who evaluated the evidence offered by the same expert Michigan relies on here (Glassgold). As Judge Hartz explained in 2024: "None of the cited papers specifically studied the results of conversion therapy (1) by licensed mental-health professionals (2) limited to talk therapies (as opposed to aversive therapies) (3) provided to minors." *Chiles*, 116 F.4th at 1244 (dissenting). Instead, the "great bulk" of studies "do not describe the therapy provided, so there is no way to know whether any of the therapy was limited to speech" as opposed to aversive techniques. *Id.* "[M]ore than half" of the

studies lumped together "both licensed and unlicensed practitioners," while most of the rest simply "did not indicate who gave the therapy." *Id.* And "only one provided results specifically for those receiving conversion therapy as minors." *Id.* Thus, as Judge Hartz noted: there is *no* "study (good or bad) that focuses on the type of therapy at issue in this case: talk therapy for a minor provided by a licensed mental-health professional." *Id.* at 1243; *see also Otto*, 981 F.3d at 868 ("[Studies] offer assertions rather than evidence, at least regarding the effects of purely speech-based SOCE.").

Michigan doesn't contest this analysis. Indeed, Michigan now *concedes* that "the APA's 2009 report"—which Michigan trumpeted in the district court as "demonstrat[ing] why conversion therapy has been so thoroughly rejected" (PI Opp., R.27, PageID#533)—actually confirms "a lack of rigorous research around conversion therapy, particularly in its nonaversive forms." Opp.54.

Instead, Michigan claims a 2023 "SAMHSA Report" identifies "additional research" supporting its cause. Opp.54-55 (citing R.27-1, PageID#869). But none of SAMHSA's research is new; every study it cites was published in 2022 or earlier, predating *Chiles*. Nor does SAMHSA or the research it cites address the problems identified in *Otto* and *Chiles*; rather, it still fails to distinguish between aversive and nonaversive forms of therapy, between licensed and unlicensed counselors, and between minors and adults. *See, e.g.*, SAMHSA Report, R.27-1, PageID#870

(no mention of the term "aversive"; noting the "majority" of recent studies were "conducted with adults"; ignoring the problem of conflating licensed and unlicensed counselors). Thus, SAMHSA falls far short of demonstrating "a direct causal link between [cautious counseling] and harm to minors." *Brown*, 564 U.S. at 799. And in any event, SAMHSA's 2023 Report has been superseded by HHS's more comprehensive 2025 Report—which "found no evidence of adverse effects of psychotherapy in this context." HHS Report at 16.

The only "recent" study Michigan identifies by name illustrates just how flimsy its supposed evidence is. *See* Opp.7 n.2 (citing Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults, 2018*, 110 Am. J. Pub. Health 1221, 1222-24 (Aug. 2020), https://perma.cc/8LNM5HQT). That study was based on anonymous online surveys conducted by researchers from The Trevor Project, an advocacy organization that boasts "the largest campaign in the country" dedicated to "Ending Conversion Therapy." *Advocacy & Government Affairs*, The Trevor Project, https://perma.cc/G7P9-6X3M. In addition to being an advocacy piece, the study also fails to distinguish between aversive versus non-aversive practices or between counseling provided by licensed professionals versus unlicensed individuals with no formal training. Green, *supra*, 110 Am. J. Pub. Health at 1225. Nor is this study new; it was already part of the record in *Chiles*. 116 F.4th at 1217.

21

The study also suffers from severe methodological flaws. *See* Amicus Br. of Do No Harm at 21-23, *Chiles v. Salazar*, No. 24-539 (U.S. filed June 13, 2025), https://perma.cc/TQ42-CMP9. Among other things, it is a retrospective study, which is limited by inaccuracies in participants' "recollection of past events," and "cannot determine" causation. SAMHSA Report, R.27-1, PageID#873. It is plagued by sampling bias, because participants were recruited by Facebook and Instagram ads that disproportionately excluded those who potentially benefitted from counseling. Amicus Br. of Do No Harm at 22, *Chiles v. Salazar*, No. 24-539. And it fails to account for various confounding variables that also bear on suicidality, such as the high rate of "psychological comorbidities present in those with gender dysphoria." *Id.* at 23-24. Thus, it falls far short of carrying Michigan's burden on strict scrutiny.

Michigan also fails to address the emerging evidence that cautious counseling *benefits* minors with gender dysphoria. As HHS's 2025 Report explains, minors with gender dysphoria experience a disproportionately high rate of co-occurring mental health issues, including "depression, anxiety, suicidality, self-harm, and eating disorders," and "neurodevelopmental conditions like autism spectrum disorder." HHS Report at 65-66, 248-51. Counseling is an effective, evidence-based treatment for these co-occurring issues. *Id.* at 248-51. And "[t]he effectiveness of psychotherapy for a wide range of mental health problems … that often present with

22

[gender dysphoria] suggests it may also be beneficial for [gender dysphoria] specifically." *Id.* at 254. At minimum, HHS concluded that "there is no reliable evidence to suggest that psychotherapy for [gender dysphoria] is harmful." *Id.* at 252. And "several studies suggest that psychotherapy for [gender dysphoria] may effectively resolve the condition noninvasively." *Id.* at 251. Indeed, in Sweden, Finland, and England, "[p]sychotherapy is now the recommended first-line treatment" for gender dysphoria. *Id.* at 246.

In short, Michigan has failed to demonstrate that HB 4616 furthers a compelling interest. At minimum, the evidence is uncertain—and Michigan "bears the risk of uncertainty" on strict scrutiny. *Brown*, 564 U.S. at 799-800. Worse, HB 4616 *undermines* Michigan's interest in protecting the well-being of minors by depriving them of cautious counseling and pushing them toward medical interventions that cause irreversible harm.

## B. HB 4616 is not the least-restrictive alternative.

Even if HB 4616 advanced Michigan's interests, Michigan still has the burden to "prove" that each "plausible, less restrictive alternative" is "ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Plaintiffs have offered six alternatives; Michigan hasn't carried its burden on any of them.

First, Michigan could ban aversive methods rather than pure talk therapy. Br.46. Michigan vaguely says this would run "contrary to the statute's goal," Opp.57, but it offers no evidence that pure talk therapy

(as opposed to aversive methods) is harmful, or that a narrower ban would be ineffective.

Second, Michigan could ban counseling that contradicts a client's self-determined goals. Br.46-47. This would respect clients' autonomy to pursue "change" in their "behavior" or "gender expression" if that was their own goal, while still preventing counselors from imposing their values on clients. Michigan previously said this is how HB 4616 should in fact be construed, conceding that it is an acceptable alternative. PI Opp., R.27, PageID#540-42. Michigan now tries to take that back on appeal, saying it doesn't matter "with whose goals [the counseling] aligns"; it is still forbidden. Opp.58. Again, however, Michigan offers no evidence that respecting clients' autonomy in this way is harmful, or that a narrower ban would be ineffective.

Third, Michigan could use existing "torts for professional malpractice" to penalize "bad acts that produce actual harm." Br.47 (quoting *Otto*, 981 F.3d at 870). Michigan says this "is not an acceptable alternative when suicide is among the harms to be avoided." Opp.56-57. But as just discussed, Michigan has no evidence that cautious counseling increases suicidality, much less that it has ever caused harm in Michigan. Instead, HB 4616 prophylactically prevents cautious counseling from occurring, even when it causes no harm. Such "[b]road prophylactic rules in the area of free expression" are, by definition, not the least restrictive alternative. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

Fourth, Michigan could require informed consent for cautious counseling. Br.47. Michigan says minors "cannot meaningfully consent to a harmful and ineffective treatment." Opp.57. But Michigan allows minors and their parents to consent to "irreversible" puberty blockers, cross-sex hormones, and genital surgery. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023). And Michigan doesn't even attempt to explain how a young girl and her parents can meaningfully consent to testosterone, a double mastectomy, hysterectomy, and genital surgery—permanently stripping her of the ability to ever bear or nurse children—yet somehow cannot meaningfully consent to merely talking with a counselor who helps her accept her body as a healthy gift from God.

Fifth, Michigan could provide a religious exemption, as Washington did in *Tingley*. *See* Wash. Rev. Code §18.225.030(4) (protecting "mental health counseling ... under the auspices of a religious ... organization."). Indeed, in *Skrmetti*, Michigan cited this religious exemption as an example of appropriate narrow tailoring. Amicus Br. of Michigan et al. at 9 n.10, *Skrmetti*, 145 S.Ct. 1816 (No. 23-477), https://perma.cc/AU99-6XBF. Yet Michigan never explains why it cannot tailor HB 4616 in the same way.

Sixth, Michigan could follow the lead of roughly half of the states that have not banned cautious counseling at all. Br.48. While Michigan claims most states "*have* banned the practice," Opp.57, the question on strict scrutiny is not one of majority rule; rather, when other states permit a

practice, Michigan "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Ackerman v. Washington*, 16 F.4th 170, 191 (6th Cir. 2021) (quoting *Holt v. Hobbs*, 574 U.S. 352, 369 (2015)). Michigan has not done so here.

Unable to refute these alternatives, Michigan pivots, claiming that HB 4616 is "narrowly drawn" because it could have been broader—for example, by imposing "a general prohibition on speech" about "sexual orientation and gender diversity" by all speakers, including "family members" and "religious leaders." Opp.55-56. But this inverts the strict-scrutiny inquiry. The question is not whether a speech restriction could have been broader. Any speech restriction could be broader. The question is whether the state has chosen the narrowest possible measure to accomplish its goals. Michigan has not come close to meeting that standard here. *See Planet Aid v. City of St. Johns,* 782 F.3d 318, 331 (6th Cir. 2015) ("'[I]t is of no moment' whether the ordinance is labeled [a] 'complete'" ban or only a partial "burden[]"; both "must satisfy the same rigorous scrutiny").

## C. HB 4616 fails intermediate scrutiny.

For similar reasons, HB 4616 also fails intermediate scrutiny. Br.49-51. Michigan concedes that even if HB 4616 only incidentally affects speech, it still must satisfy intermediate scrutiny. Opp.52. Under intermediate scrutiny, Michigan must demonstrate that HB 4616 is "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Here, HB 4616 undermines, rather than

serves, Michigan's interests in protecting youth by pushing them toward harmful medical procedures. Nor has Michigan shown that it "seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* at 494. Far from it. Michigan's "tepid response" to Plaintiffs' proposed alternatives—which "identifie[s] no evidence" that narrower alternatives would be inadequate—fails even intermediate scrutiny. *NIFLA*, 585 U.S. at 775; *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("no hint that the government even considered these or any other alternatives.").

## IV. HB 4616 violates the Due Process Clause.

HB 4616 is also void for vagueness under the Due Process Clause. To begin, Defendants ignore the Supreme Court's admonition to apply "a more stringent vagueness test" where a law "interferes with the right of free speech or of association." *Holder*, 561 U.S. at 19.

Instead, Michigan argues that HB 4616 isn't vague because it defines what conversion therapy "*is not.*" Opp.59. But that definition simply exacerbates the problem. It says conversion therapy "does not include" counseling that "facilitates" an individual's "identity exploration and development," but only "as long as" the counseling does not "seek to change" an individual's "gender identity," "behavior," or "gender expression." MCL 330.1100a(20). That merely restates the problem—giving counselors no guidance on what crosses the line from permissibly facilitating development to impermissibly seeking change.

27

Michigan says the "dividing line" is whether "change" is the "predetermined outcome." Opp.61. But that line appears nowhere in the statute; nor does it resolve the problem. *See* Br.53-54. What if the client predetermines that the "outcome" she "seeks" is to "change" her gender identity, behavior, or expression? When disputing standing, Michigan asserts such counseling is permitted, since it "honor[s] the client's right of 'self-determination'" and respects the client's "goals." Opp.25-27. But when arguing strict scrutiny, Michigan backtracks, asserting that counseling is prohibited *whenever* it "seeks to change" gender identity, behavior, or expression—regardless of "*who* (the counselor or client) may be seeking [change], or with whose goals it aligns." Opp.58. That Michigan itself offers conflicting interpretations of HB 4616 only underscores the statute's vagueness and susceptibility to arbitrary enforcement.

## V. HB 4616 violates the Free Exercise Clause.

HB 4616 also violates the Free Exercise Clause because it burdens Plaintiffs' religious exercise and is not generally applicable. As Plaintiffs explained, HB 4616 burdens their religious exercise by subjecting them to ruinous penalties for engaging in counseling that is an expression of their religious faith. Br.56. And HB 4616 is not generally applicable because it bans Plaintiffs' religious counseling even when it furthers children's well-being and permits gender-affirming counseling even when it produces devastating harms. Br.57.

Michigan responds that HB 4616 is generally applicable because it bans "conversion therapy" "for both secular *and* religious reasons." Opp.67-68. But "[i]t is no answer that a State treats some comparable secular" counseling "as poorly as or even less favorably than the religious exercise at issue"; laws trigger strict scrutiny under the Free Exercise Clause "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Here, the "comparable secular activity" that Michigan favors is gender-affirming talk therapy—which Michigan permits even when it imposes devastating harms. Thus, HB 4616 is subject to strict scrutiny, which it has not satisfied.

## VI. The remaining injunction factors favor relief.

Michigan doesn't dispute that once likelihood of success is established, "there is no issue as to the existence of the remaining preliminary injunction factors." *ACLU v. Livingston County*, 796 F.3d 636, 649 (6th Cir. 2015) (cleaned up). Instead, it largely repeats its standing and merits arguments, which fail for the reasons already stated.

## CONCLUSION

This Court should affirm the district court on standing, reverse on the merits, and remand with instructions to enter a preliminary injunction.

Respectfully submitted,

Dated: July 1, 2025

/s/ *Luke W. Goodrich*
Luke W. Goodrich
Adèle A. Keim
Daniel L. Chen
Benjamin A. Fleshman
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketfund.org*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit in Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: July 1, 2025                    /s/ *Luke W. Goodrich*
                                       Luke W. Goodrich

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on July 1, 2025.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CM/ECF system or by other electronic means.

Dated: July 1, 2025                    /s/ *Luke W. Goodrich*
                                       Luke W. Goodrich