RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0347p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CATHOLIC CHARITIES OF JACKSON, LENAWEE, AND
HILLSDALE COUNTIES; EMILY MCJONES,

*Plaintiffs-Appellants*,

*v.*

No. 25-1105

GRETCHEN WHITMER, Governor of Michigan; in her
official capacity, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:24-cv-00718—Jane M. Beckering, District Judge.

Argued: October 23, 2025

Decided and Filed: December 17, 2025

Before: KETHLEDGE, LARSEN, and BLOOMEKATZ, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Luke W. Goodrich, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellants. Christopher W. Braverman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Luke W. Goodrich, Adèle A. Keim, Daniel L. Chen, Benjamin A. Fleshman, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellants. Christopher W. Braverman, Daniel J. Ping, Gallant Fish, Christopher M. Allen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. Amy V. Doukoure, CAIR-MI LEGAL FUND, Canton, Michigan, Joseph D. Spate, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, Paul Sherman, Benjamin Field, INSTITUTE FOR JUSTICE, Arlington, Virginia, Eric N. Kniffin, ETHICS & PUBLIC POLICY CENTER, Washington, D.C., B. Tyler Brooks, THOMAS MORE SOCIETY, Chicago, Illinois, Shireen A. Barday, PALLAS PARTNERS (US) LLP, New York, New York, Cristina Sepe, OFFICE OF

THE ATTORNEY GENERAL OF THE STATE OF WASHINGTON, Olympia, Washington, Shannon P. Minter, Christopher F. Stoll, NATIONAL CENTER FOR LESBIAN RIGHTS, Sacramento, California, Jessica Ring Amunson, JENNER & BLOCK LLP, Washington, D.C., for Amici Curiae.

KETHLEDGE, J., delivered the opinion of the court in which LARSEN, J., concurred. BLOOMEKATZ, J. (pp. 14–42), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  Under a law recently enacted in Michigan, therapists are free to offer their minor clients "counseling that provides assistance to an individual undergoing a gender transition."  M.C.L. § 330.1100a(20).  But if a minor client (with his parents' consent) seeks counseling to "change" his "behavior or gender expression" to align with his biological sex, his therapist can lose her license if she provides it.  *Id.*  The plaintiffs here offer counseling in the form of "talk therapy":  literally, spoken words and nothing more.  They argue that this regime restricts their speech based on its content and viewpoint, in violation of the First Amendment.  The district court denied their motion for a preliminary injunction, holding that the plaintiffs' therapy amounts to conduct—specifically "treatment"—rather than speech. We disagree and reverse.

I.

A.

As alleged in the complaint, the plaintiffs in this case offer counseling services grounded in their Catholic faith.  Plaintiff Catholic Charities employs 16 such counselors; plaintiff Emily McJones has her own counseling practice.  All these counselors have professional degrees specific to their field.  The plaintiffs' services consist solely of spoken words—what they call "talk therapy" (also known as psychotherapy).  They do not prescribe drugs or other procedures; nor do they use "aversion therapy," which seeks to suppress undesired behavior by associating it with pain or discomfort.

The plaintiffs' clients include both adults and children, to whom the plaintiffs "provide counseling on a vast array of issues that arise in personal, marriage, and family life." Compl. ¶¶30, 51. The clients, not the plaintiffs, "determine the goals for counseling." *Id.* ¶55. The plaintiffs provide their services only with the patients' informed consent, which in the case of minors includes the consent of the child and parents alike.

Some clients have sought the plaintiffs' counseling specifically "on issues related to gender identity or sexual orientation." *Id.* ¶64. The plaintiffs will refer clients to a different therapist if the client's goals are contrary to the plaintiffs' faith; but some clients seek out the plaintiffs' services precisely "because they desire a counselor who shares and so will understand and respect their religious beliefs." Compl. ¶¶36, 48. Some of those clients "seek to become more comfortable with their biological sex and thus decrease the dissonance between their gender identity and biological sex." *Id.* ¶65. Others "seek to reduce sexual activity with members of the same sex or align their sexual orientation identity with their religious beliefs." *Id.* The plaintiffs believe that, when a client seeks their assistance along these lines, "their ethical and religious duty" is "to help that client live the life she desires to live." *Id.* ¶69.

B.

In 2023, Michigan enacted two laws—together referred to as HB 4616—that prohibit licensed therapists from "engag[ing] in conversion therapy with a minor." M.C.L. § 330.1901a. For purposes of that ban, the law defines conversion therapy as follows:

> "Conversion therapy" means any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behavior or gender expression or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender. Conversion therapy does not include counseling that provides assistance to an individual undergoing a gender transition, counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development, including sexual orientation-neutral intervention to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change an individual's sexual orientation or gender identity.

M.C.L. § 330.1100a(20).

Thus, as relevant here, the Michigan law permits "counseling that provides assistance to an individual undergoing a gender transition"; but the law bans counseling "that seeks to change an individual's sexual orientation or gender identity," even when counseling to that end is what the client himself seeks. *Id.* Any therapist who violates this law is subject to the loss of her license and to fines of up to $250,000. M.C.L. § 333.16226(1)-(3). Michigan's Department of Licensing and Regulatory Affairs administers this law, and maintains a website that allows anyone, including third parties, to complain about potential violations.

This law took effect in February 2024. Five months later, in July 2024, the plaintiffs filed a lengthy complaint in federal court, naming some 34 defendants, all in their official capacities, and asserting six claims, all of them constitutional. A week later, the plaintiffs moved for a preliminary injunction, seeking to enjoin the defendants from enforcing HB 4616 during the case's pendency. Briefing on that motion was complete by August 30. Some five months later (on January 28, 2025)—without holding oral argument—the district court entered an opinion and order denying the motion. The court held, in relevant part, that the plaintiffs had standing to bring their claims, but that the counseling they sought to offer—talk therapy—was conduct or "treatment" rather than speech for purposes of the First Amendment. The plaintiffs then brought this interlocutory appeal. *See* 28 U.S.C. § 1292(a)(1).

II.

A.

1.

The defendants argue that the plaintiffs lack standing to challenge HB 4616. We review de novo the district court's determination that they do. *Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019).

The plaintiffs challenge HB 4616 in advance of any enforcement action against them. Thus, to establish standing, they must show the following: "(1) they intend to engage in expression" that is "arguably protect[ed]" by the First Amendment; "(2) their expression is arguably proscribed by" HB 4616; and "(3) they face a credible threat of enforcement"

thereunder.  *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

Here, the plaintiffs allege they "have had clients as young as 10 to 12 years old who said they were questioning their gender identity and said they felt like they were someone of the opposite sex or were attracted to people of the same sex."  Compl. ¶67.  The plaintiffs allege further they "have helped clients change their behavior and gender expression in ways that better align with the clients' own unique goals for their lives—including by accepting and embracing their biological sex."  *Id.* ¶6.

The speech in which the plaintiffs seek to engage—talk therapy to further a minor client's goal of "chang[ing] her gender identity or gender expression to align with her biological sex" or "chang[ing] her behavior to refrain from acting on same-sex attraction," *id.* ¶69—is at least arguably protected by the First Amendment.  The defendants do not argue otherwise.  And that kind of speech is arguably (if not plainly) proscribed by HB 4616, which bans speech "that seeks to change an individual's sexual orientation or gender identity" to align with her biological sex.  True, one might debate whether some other kinds of speech in which the plaintiffs might engage—say, more nuanced conversations about dressing or acting more consistently with one's sex—are proscribed by HB 4616.  As alleged in the complaint, however, some clients set goals that are not so nuanced:  they seek to reduce same-sex sexual activity, "align their sexual orientation identity with their religious beliefs," or change their existing gender identity or behavior to align with their biological sex.  Compl. ¶65.  The plaintiffs say they have a religious duty to help clients who wish to reach these goals.  *Id.* ¶69.  And HB 4616 expressly bars the plaintiffs from helping those clients do that.  (The defendants' arguments to the contrary, meanwhile, simply disregard what the complaint actually says.)

That leaves the question whether the plaintiffs face a credible threat of enforcement, under HB 4616, if, for example, they help a client "change her gender identity or gender expression to align with her biological sex."  *Id.*  This part of the inquiry concerns whether "the threatened injury is certainly impending," or, alternatively, whether "there is a substantial risk that the harm will occur."  *Driehaus*, 573 U.S. at 158 (cleaned up).  In a First Amendment pre-

enforcement case, this test is met when "the threat of future enforcement" under the statute "is substantial." *Id.* at 164. Here, as recited above, HB 4616 expressly bans speech in which the plaintiffs seek to engage. And HB 4616 threatens them with the loss of their licenses, and with fines up to $250,000, if they engage in that speech nonetheless. As a result, the plaintiffs' discussions with their minor clients about gender identity and sexual orientation are now "more guarded and cautious," rather than "open" and "candid." Compl. ¶123. Those facts are enough to show that the law "chills" the plaintiffs' speech—which is "the first and most important factor" in determining whether they are subject to "a credible threat of enforcement[.]" *Fischer*, 52 F.4th at 307. That chill is proof by omission—the plaintiffs want to speak on a topic, but do not—that they face a credible threat of enforcement.

Meanwhile, the State has not "disavow[ed] enforcement of" HB 4616, *id.*, if the plaintiffs provide counseling "to change [a minor] individual's sexual orientation or gender identity," M.C.L. § 330.1100a(20), "to align with her biological sex." Compl. ¶69. Quite the contrary: the defendants imply they will enforce the law if they "find[] a reasonable basis for concluding that a violation has occurred." Br. at 32. And anyone can file a complaint alleging that a therapist has violated HB 4616, thereby initiating a possible investigation. *See Driehaus*, 573 U.S. at 164. The plaintiffs have standing to proceed with their claims.

2.

The defendants also argue that we should forbear from deciding this appeal and instead simply await the Supreme Court's decision in a pending case that presents the same issue as the one here. But the Supreme Court has repeatedly affirmed that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (cleaned up). Title 28 U.S.C. § 1292(a)(1), in turn, provides that "the courts of appeals shall have jurisdiction of appeals from" orders denying preliminary injunctions—which is the kind of order the plaintiffs have appealed here. And orders granting or denying a preliminary injunction are by definition time-sensitive. Their effect is immediate, because they set the status quo during the case's pendency—only to be superseded months or years later by the court's final judgment. Meanwhile, the Supreme Court's

decision could come as late as the end of June 2026; and the plaintiffs make a strong claim that the status quo here—they wish to speak in a certain way, but cannot—violates the federal Constitution.  Nor would our decision intrude in the slightest upon the Supreme Court's work; to the contrary, the Court prefers to have more circuit-court opinions before deciding an issue, rather than fewer.  We see no reason to sit on our jurisdiction in this appeal—so we proceed to exercise it.

B.

We review the district court's decision to deny injunctive relief for an abuse of discretion. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).  "Courts consider four factors in deciding whether to grant a preliminary injunction: whether the movant is likely to succeed on the merits of its claim; whether the movant is likely to suffer irreparable harm absent an injunction; the balance of equities; and the public interest." *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 447 (6th Cir. 2023).

So we turn to the merits here.  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573 (2002) (cleaned up).  A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Some content-based laws regulate speech by subject matter—say, a law that allows picketing on one issue, but bans it on others. *See Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Other content-based laws regulate "speech by its function or purpose." *Reed*, 576 U.S. at 163.  The law at issue here does that:  it bans counseling "that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behavior or gender expression[,]" among other things.  M.C.L. § 330.1100a(20).

Worse, the Michigan law discriminates based on viewpoint—meaning the law permits speech on a particular topic only if the speech expresses a viewpoint that the government itself approves. *See Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995).  Specifically, the Michigan law forbids counseling that "seeks to change" a child's

"sexual orientation or gender identity" to align with the child's religious beliefs or biological sex (here, at the child's own request).   M.C.L. § 330.1100a(20).   But the law expressly permits "counseling that provides assistance to an individual undergoing a gender transition"—meaning, to any contemporary reader, a transition *away* from one's biological sex.   *Id.*   The law omits a similar carveout for sexual orientation.   Thus, like a materially identical law in Florida, the Michigan law codifies "a particular viewpoint—sexual orientation is immutable, but gender is not—and prohibit[s] the therapists from advancing any other perspective."   *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020).

Under the First Amendment (applied here through the Fourteenth), content-based restrictions on speech are "presumptively invalid, and the Government"—here, the defendants— "bears the burden to rebut that presumption."   *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up).   Moreover, viewpoint discrimination is itself "an egregious form of content discrimination."   *Rosenberger*, 515 U.S. at 829.   For when the government targets "particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."   *Id.*

So HB 4616 finds itself in a constitutional no-man's land, absent some exception that liberates it from First Amendment scrutiny altogether.   The district court thought that exception came by way of "the broad power of States to regulate the practice of licensed professionals[.]" Op. at 22.   And the defendants, on the same ground, argue throughout their brief that HB 4616 "is subject to only rational basis review."   Br. at 35.

But it takes more than a general tradition of regulation, in some domain of human activity, to validate content- and viewpoint-based restrictions on speech.   Disturbing the peace, for example, has been a subject of government regulation since the 14th century (and indeed much longer ago than that).   *See* Justices of the Peace Act 1361, 34 Edw. 3, c. 1 (Eng.).   And that is what Paul Cohen was doing in 1968, when he wore a "Fuck the Draft" jacket in a courthouse in Los Angeles.   Despite that centuries-old tradition of regulation, however, the Supreme Court invalidated Cohen's conviction for disturbing the peace.   *Cohen v. California*, 403 U.S. 15, 17 (1971).   There, as here, the government had relabeled the speech at issue as conduct.   The Court

saw through that: "The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech.'" *Id.* at 18. The Court also found that Cohen's speech did not fall within one of the "established exceptions . . . to the usual rule that governmental bodies may not prescribe the form or content of individual expression." *Id.* at 24. So, absent such an exception, in *Cohen*, the state's traditional power to regulate disturbances of the peace yielded to the First Amendment's protections.

The Court's decision in *Stevens* more specifically illustrates the analysis we must conduct here. There, Congress had passed a statute, 18 U.S.C. § 48, that made criminal the sale of videos depicting "animal cruelty." *Stevens*, 559 U.S. at 464. Stevens was convicted of violating § 48 (he had sold videos of pit bull "dogfights"), but argued that the statute violated the First Amendment. *Id.* at 466-67. The Court found that § 48 regulated expression based on content, because it proscribed "visual and auditory depictions . . . depending on whether they depict conduct in which a living animal is intentionally harmed." *Id.* at 468 (cleaned up). Hence the law was "presumptively invalid." *Id.*

To rebut that presumption, the government made the same argument that the defendants (and the district court) make here: that the depictions (here, the spoken words) at issue "are outside the reach of [the First] Amendment altogether—that they fall into a First Amendment Free Zone." *Id.* at 469 (cleaned up). In support, the government showed that "the prohibition of animal cruelty itself has a long history in American law," dating back to 1641. *Id.* But, the Court wrote, "we are unaware of any similar tradition excluding *depictions* of animal cruelty from 'the freedom of speech' codified in the First Amendment, and the Government points us to none." *Id.* (emphasis in original). The Court also rejected, emphatically, the government's argument "that categories of speech may be exempted from the First Amendment's protection without any long-settled tradition of subjecting *that speech* to regulation." *Id.* (emphasis added). The Court then proceeded to strike down the law under the First Amendment. *Id.* at 482.

The Court's decision in *Stevens* makes clear, therefore, the kind of "long-settled tradition" that the government must identify to exempt a content- or viewpoint-discriminatory law from scrutiny under the First Amendment. By way of background, "[t]he First

Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Id.* at 470. Thus, the courts cannot engage in that balancing to decide whether a category of speech—in *Stevens*, depictions of animal cruelty; here, entirely consensual discussions between therapists and clients—is protected by the First Amendment. The Court indeed dismissed that idea as "startling and dangerous." *Id.*

The default, of course, is that the First Amendment protects all speech; that is why the government bears the burden of showing that a category of speech falls outside the First Amendment's protection. *Id.* at 468. To carry that burden, a more general tradition of regulation—of "animal cruelty," as in *Stevens*, or of "licensed professionals" or of "treatment," as in this case—is not good enough. A general tradition of regulation reflects a judgment, over time, that certain restrictions on human action are beneficial; but it does not reflect any judgment about the utility (or more to the point, the lack of utility) of any particular category of speech.

To put a category of speech outside the protection of the First Amendment, rather, the government must identify a "long-settled tradition of subjecting *that speech* to regulation." *Id.* at 469 (emphasis added). Only that more specific kind of tradition—of "the power of government to deal more comprehensively" with a certain type of speech itself, *Cohen*, 403 U.S. at 20—can reflect a judgment, over time, as to the uselessness or indeed harm of that kind of speech. These traditions usually concern the regulation of speech *qua* speech: for example, speech amounting to fraud, incitement, or conspiracy has long been subject to punishment. *Stevens*, 559 U.S. at 468; *United States v. Williams*, 553 U.S. 285, 298 (2008). Much less frequently, a more general tradition of regulation might specifically include punishment of certain speech. An example is treason, which requires giving "aid and comfort" to the enemy. 18 U.S.C. § 2381. Such aid often takes tangible form. *See Haupt v. United States*, 330 U.S. 631, 634 (1947). But treason can just as easily take the form of spoken words—divulging secrets to the enemy, for example—and when it does, the First Amendment provides no defense. *See, e.g.*, *Chandler v. United States*, 171 F.2d 921, 938-40 (1st Cir. 1948) (wartime broadcasting of Nazi propaganda was treason).

Here, the defendants do not even attempt to identify any long-settled tradition of regulating speech in the same way that HB 4616 regulates it. Nor could they: before the enactment of laws like this one, liability for the kind of speech at issue here was unheard of. Rather, the defendants just characterize the plaintiffs' speech as "treatment," and point to the states' power to regulate that. But again, under *Stevens*, that more general tradition is not remotely good enough. If it were, states could just as easily ban counseling to assist a gender transition.

More to the point, that the states can regulate, say, gallbladder surgery or hospital sanitation—or even require a certain educational background for therapists—says nothing about whether the "categor[y] of speech" at issue here is "outside the protection of the First Amendment." *Stevens*, 559 U.S. at 471. Regulation of non-expressive activity tells us nothing about the value of expressive; and the discussions that HB 4616 forbids involve the expression of ideas in ways that surgery or flu shots do not. Meanwhile, there exists not even a colorable argument that these discussions fall within the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Id.* at 468-69 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). Indeed, at oral argument, the defendants' counsel—to his credit—candidly admitted that the defendants lack a single example of any regulation of treatment (other than HB 4616 and nearly identical statutes in other states) whose application was triggered by the content of a provider's speech. Oral Arg. at 53:30-47. That concession all but means that the defendants have not carried their burden here.

Relatedly, the defendants argue that HB 4616 regulates "conduct" rather than speech. Br. at 43. That argument faces strong headwinds as applied to counseling that consists solely of spoken words—spoken words, moreover, that for these plaintiffs reflect the moral beliefs of therapist and client alike. Indeed, that the plaintiffs' speech is guided by those beliefs is shown by the plaintiffs' referral, to other therapists, of clients whose goals conflict with those beliefs. And on this issue the law is clear: when the putative conduct "triggering coverage under the statute consists of communicating a message[,]" the restriction is treated as one on speech. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). The Court's decision in *Cohen*

illustrates the same point.  *See* 403 U.S. at 18 ("The only 'conduct' which the State sought to punish is the fact of the communication.").  That is because the communication of a message is *exactly what speech is.*  And here, to reiterate, HB 4616 proscribes counseling (or not) based solely on the therapist's message:  if the counseling "seeks to change an individual's sexual orientation or gender identity," the therapist can lose her license; but if the counseling supports "a gender transition," the counseling is lawful.  As applied to these plaintiffs, therefore, the Michigan law restricts speech, not conduct.

Finally, that HB 4616's application depends upon the content of a therapist's message distinguishes this case from ones where physicians were required to make certain disclosures before performing a surgical procedure (namely abortions).  *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 881 (1992) (plurality opinion); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 432 (6th Cir. 2019).  In those cases, the abortion was the trigger for the disclosure obligations; the required disclosures were a condition precedent to performing it; and so those requirements amounted to regulation of the abortion itself.  *See Casey*, 505 U.S. at 881-82; *EMW*, 920 F.3d at 429-30.  Those disclosures were thus akin to warning labels that a state might require for the sale of a dangerous product—which, when mandating the disclosure of "purely factual and uncontroversial information," amount to regulation of the product's sale, not of speech.  *See Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985).  Here, the content (indeed the viewpoint) of the plaintiffs' speech is what triggers application of HB 4616; and thus HB 4616 regulates speech.  *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766-73 (2018).

We hold, therefore, that HB 4616 is subject to the strictest of scrutiny, under the First Amendment, as a content- and viewpoint-discriminatory restriction upon speech.  Indeed, as a viewpoint-based restriction on speech, under the Supreme Court's precedents, HB 4616 might be unconstitutional per se.  *See Otto*, 981 F.3d at 864 (collecting cases).  But we can make short work of the strict-scrutiny analysis here.

For HB 4616 to survive strict scrutiny, the defendants must show that its restrictions on speech are the least restrictive means of achieving a compelling government interest.  *Bernal v.*

*Fainter*, 467 U.S. 216, 219 (1984).  The defendants have not come close to making that showing; indeed they have hardly tried.  The defendants define their compelling interests at a high level of generality—"regulating professional conduct to protect public health and safety," and "safeguarding the physical and psychological well-being" of minors, Br. at 52-53 (citations omitted)—which impedes the "precise analysis" that the Supreme Court demands.  *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).  And the defendants make only a perfunctory attempt to show a "direct causal link," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011), between harm to those interests, on the one hand, and the speech proscribed by HB 4616, on the other.  In short, the defendants cite a handful of studies—some of which concern aversive therapies, which the plaintiffs do not employ, and some of which concern practices undertaken by laypersons.  And the plaintiffs, for their part, counter with studies and evidence that suggest their therapy can prevent serious harms to clients who seek it.  The defendants thus have not established the "direct causal link" that the Court's precedents require.  *Id*.  We think it likely, therefore, that HB 4616 will not be one of the first-ever content-based restrictions on speech to survive strict scrutiny—and indeed the first-ever viewpoint-discriminatory restriction to do so.  The plaintiffs are likely to succeed on their First Amendment claim.

In First Amendment cases, the plaintiffs' likelihood of success is usually determinative of their entitlement to injunctive relief.  *Am. C.L. Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).  And here the remaining factors for entry of preliminary injunctions give us no reason to allow this near-certain violation of the plaintiffs' First Amendment rights to continue throughout the pendency of this case.  Again the defendants hardly argue otherwise.

*         *         *

We reverse the district court's denial of the plaintiffs' motion for a preliminary injunction, and remand for prompt entry of a preliminary injunction consistent with this opinion.

_____

**DISSENT**

_____

BLOOMEKATZ, Circuit Judge, dissenting in part, and dissenting in the judgment.  After reviewing the medical evidence, the Michigan legislature passed a law prohibiting licensed mental health professionals from administering conversion therapy to minor patients.  Conversion therapy is a medical practice that developed when homosexuality and gender nonconformity were considered mental disorders, and it aims to change an individual's sexual orientation or gender identity.  Scientific evidence now demonstrates that conversion therapy is ineffective and harmful.  So, like 26 other states, Michigan restricted the practice.

The majority opinion overrides Michigan's judgment about the efficacy and harms of conversion therapy by declaring that regulations of medical treatments are subject to "the strictest of scrutiny" whenever the regulated treatment is delivered via words.  Maj. Op. at 12.  The majority opinion reaches that result by saying that psychotherapy consists of "spoken words and nothing more," and then affords it the same protection as speech in the public square or a conversation between friends.  *Id.* at 2.  I disagree.

Not all words receive the same First Amendment protection, as is evident from the law's long tradition of subjecting speech that administers a medical treatment to lesser First Amendment scrutiny.  Far from being "words and nothing more," psychotherapy is an evidence-based medical intervention provided by trained licensed professionals, and it falls within the state's historic power to regulate medicine.  By affording the words therapists say while providing psychotherapy the highest constitutional protection possible, the majority opinion ties states' hands as to medically-repudiated practices like conversion therapy, and its reasoning threatens to subject wide swaths of medical regulations to strict scrutiny.

What's more, the majority opinion reaches this result even though all agree that the Supreme Court is poised to resolve the same issue in *Chiles v. Salazar*.  Neither the plaintiffs nor the majority opinion provides a single example of our court pushing forward to decide an appeal

when, as here, the Supreme Court held oral argument in the controlling case *before* we did. I would not make this case the first.

But given that we are pressing to the merits, I would hold that Michigan's prohibition on conversion therapy is likely constitutional and affirm the district court's denial of a preliminary injunction. Accordingly, I respectfully dissent.

## BACKGROUND

I begin with a discussion of the history and context of conversion therapy before detailing the law at issue. Conversion therapy evokes deeply-held beliefs about sexual orientation and transgender identity and the best way to discuss them with children. The First Amendment protects that diversity of opinion and guards against state-sanctioned orthodoxy on sensitive topics. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). But there is a jurisprudential difference between an expression of personal opinion and the provision of a medical treatment. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992). The Constitution grants states the prerogative to establish minimum standards of medical care—even if the most appropriate professional interventions are debated. *United States v. Skrmetti*, 605 U.S. 495, 524 (2025). I review the background of conversion therapy because it situates Michigan's law as one regulating medical practice.

*Conversion Therapy.* The term "conversion therapy" refers to a practice that consists of administering aversive or verbal interventions in an attempt to change an individual's sexual orientation or gender identity. It developed in the period when homosexuality and gender nonconformity were considered mental illnesses; conversion therapy was designed as a "cure." *Tingley v. Ferguson*, 47 F.4th 1055, 1064 (9th Cir. 2022). As the medical consensus on sexual orientation and gender identity evolved, so too did the medical consensus on the appropriateness of conversion therapy as a medical intervention.

Start with sexual orientation. For much of the 20th century, the American medical community deemed homosexuality a mental disorder. The first and second editions of the Diagnostic and Statistical Manual of Mental Disorders (DSM), for example, considered homosexuality a sexual deviation. During this period, doctors and psychiatrists attempted an

array of conversion therapy techniques to turn gay people straight. Some used aversive techniques like administering electric shocks or inducing nausea; others used non-contact interventions like psychotherapy and masturbation reconditioning. Am. Psych. Ass'n, Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation at 22 (2009) [hereinafter 2009 APA Report]. The psychotherapy at issue in this case has been a common form of conversion therapy since the origin of the practice. Cognitive therapists practicing conversion therapy attempted to alter "sexual arousal, behavior, and orientation" by "reframing desires, redirecting thoughts, or using hypnosis." *Id.*

Eventually the medical consensus on homosexuality changed. In the mid-1970s, the American Psychiatric Association declassified homosexuality as a mental illness. The medical community increasingly adopted the perspective that homosexuality is a "normal and healthy variation[] of human sexuality" rather than "pathological." Substance Abuse & Mental Health Servs. Admin., Moving Beyond Change Efforts at 11 (2023) [hereinafter SAMHSA Report]. Accordingly, mental health professionals became concerned that conversion therapy was "inappropriate, unethical, and inhumane." 2009 APA Report at 24.

The history of the medical consensus on gender identity has sketched a similar trajectory. Although the DSM once considered "transsexualism" and "gender identity disorder" mental conditions, the modern edition of the DSM explains that gender nonconformity is not in itself a mental disorder. Rather, potential mental health conditions arising from being transgender often result from gender dysphoria—a condition that may occur when an individual's body and mind do not align. Am. Psychiatry Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 451 (5th ed. 2013). The medical community has come to recognize, therefore, that gender transition can be an appropriate treatment for some individuals experiencing gender dysphoria.

Today, all major medical organizations condemn conversion therapy as an illegitimate medical treatment. *Tingley*, 47 F.4th at 1064. Medical studies have overwhelmingly found that conversion therapy is not effective at altering sexual orientation or gender identity, and that the practice often inflicts lasting psychological harms on those subjected to it. In 2023, for instance, a comprehensive report by the Substance Abuse and Mental Health Services Administration

concluded that "large, methodologically rigorous studies consistently find that" conversion therapy "places individuals at increased risk of suicidality and suicide attempts." SAMHSA Report at 26. Studies indicate that conversion therapy may harm recipients regardless of whether the intervention is carried out via aversive techniques or talk therapy. Glassgold Decl., R. 27-1, PageID 596–98. In short, "[n]o formal science-based training in psychotherapy, psychology[,] or psychiatry teaches or advocates conversion therapy." Hilary Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report at 151 (2024) [hereinafter Cass Review].

Although the medical consensus no longer considers conversion therapy a legitimate medical intervention, some forms of the practice have persisted. There are still licensed mental health professionals (LMHPs) who attempt to change their patients' sexual orientation or gender identity through psychotherapy. Minors who receive conversion therapy often do so based on their parents' request. *See* Glassgold Decl., R. 27-1, PageID 591 n.24; 2009 APA Report at 74–75; Amicus Brief of Conversion Therapy Survivor Network at 5–8, *Chiles v. Salazar*, No. 24-539 (U.S. cert. granted Mar. 10, 2025).

*The Michigan Law.* In 2023, the Michigan state legislature reviewed the medical evidence on conversion therapy at length. The legislature considered the documented harms stemming from conversion therapy, including the greatly increased risk of suicide, depression, and anxiety. It heard live testimony from a dozen experts, some supporting and some opposing a prohibition on conversion therapy, and considered written statements and evidence from many more.

Ultimately, the legislature determined that conversion therapy is harmful and falls below an LMHP's standard of care. It therefore drafted legislation to ensure that Michigan's LMHPs—practitioners stamped with the approval of the state—were not providing a dangerous treatment. Exercising its police power to regulate the practice of medicine, the legislature enacted two laws to prevent LMHPs from performing conversion therapy on minors. For consistency with the majority opinion, I refer to these laws collectively as HB 4616. The Michigan governor signed

HB 4616 into law in July 2023, joining 26 other states, as well as the District of Columbia and Puerto Rico, in restricting conversion therapy.  The law took effect in February 2024.

HB 4616 prohibits "mental health professional[s]" from "engag[ing] in conversion therapy with a minor."  Mich. Comp. Laws § 330.1901a.  It defines "conversion therapy" as a "practice or treatment" that "seeks to change an individual's sexual orientation or gender identity."  *Id.* § 330.1100a(20).  Michigan law defines "mental health professionals" as physicians, psychologists, nurses, licensed master's social workers, licensed professional counselors, and licensed family therapists.  *Id.* § 330.1100b(19).  Violating HB 4616 can lead to disciplinary action, including delicensure and monetary penalties.  *Id.* §§ 330.1901a; 333.16221(a); 333.16226(1).

A mental health professional's intent is the touchstone of the law, as HB 4616 permits counseling that "facilitates an individual's . . . identity exploration and development" so long as "the counseling does not seek to change [the] individual's sexual orientation or gender identity." *Id.* § 330.1100a(20).  Accordingly, HB 4616 allows "cautious counseling," where an LMHP is "open minded as to the outcome of the treatment" and helps the patient explore their identity. Clark Decl., R. 15-4, PageID 254.  The law does not prohibit "counseling that provides assistance to an individual undergoing a gender transition" because Michigan considers that treatment, which aims to reduce gender dysphoria, a legitimate medical intervention.  *See* Mich. Comp. Laws § 330.1100a(20).

Even as HB 4616 regulates the treatment that LMHPs may provide to their minor patients, it does not prevent LMHPs from speaking freely about their opinions on conversion therapy.  LMHPs may advocate for a resurgence of conversion therapy and proclaim the benefits of the practice to their patients.  Additionally, they remain free to expound the view that being gay or transgender is immoral, shameful, or unnatural—expressions of opinion that the law does not proscribe.  HB 4616 only prohibits LMHPs from administering conversion therapy to a minor patient.

*The Plaintiffs.*  Catholic Charities, one of the parties bringing this First Amendment challenge to HB 4616, is an organization that employs LMHPs with master's degrees in social

work, psychology, or professional counseling.  The organization aims to "treat mental health disorders, behavior disorders, relational difficulties, grief and loss, and other clinically significant issues."  Program Pol'ys and Procs., R. 15-1, PageID 171.  Its therapists "provide comprehensive mental health services" consisting of "evidence[] based interventions" that are "individualized to meet client needs and goals of treatment."  *Id.* at PageID 169.  Catholic Charities's therapists treat patients via talk therapy, not aversive physical techniques.

The intake paperwork that Catholic Charities requires patients to complete before starting treatment provides insight on the nature of the care that the organization provides.  In their words, Catholic Charities provides "psychotherapeutic treatment." Informed Consent Form, R. 15-1, PageID 177.  The parents of a minor patient must sign a form entitled "Informed Consent for Treatment" that gives Catholic Charities permission to provide that "treatment."  *Id.* The form tells patients and their parents that the patient may "discontinue treatment at any time," but that "a two week notice to the therapist is required" in order to "plan effectively for continued care."  *Id.*  In addition to the informed consent form, Catholic Charities provides patients with a notice of privacy practices.  That document informs patients and their parents that the organization creates records of patients' treatment information to provide "quality care and to comply with certain legal requirements," and that it may "use and disclose" information concerning "health and recovery" to evaluate the effectiveness of the organization's medical interventions.  Notice of Priv. Pracs., R. 15-1, PageID 181–82.  The notice also informs patients that their "treatment" may be billed to an insurance company.  *Id.* at PageID 181.

Emily McJones also challenged HB 4616.  She is a state-licensed clinical psychologist who holds a master's degree in counseling psychology.  She runs her own private practice where she counsels minor patients.  Before beginning treatment, she obtains informed consent and the patient's "electronic health record."  McJones Decl., R. 15-3, PageID 241.  Like the therapists at Catholic Charities, McJones uses talk therapy to treat clients.

Catholic Charities and McJones assert that they have provided and want to continue providing treatment that aims to change their minor patients' sexual orientation or gender identity.  For example, with regards to sexual orientation, the plaintiffs provide psychotherapy

that encourages patients "to refrain from acting on same-sex attraction."  Appellant Br. at 12.
With regards to gender identity, the plaintiffs believe that helping a gender nonconforming
patient feel comfortable in their identity pushes the patient into physical interventions like
"experimental drugs, hormones, [and] surgeries."  Appellant Br. at 7.  So, to forestall patients
from seeking those physical interventions, they aim to change the patient's gender identity
through psychotherapy.  Catholic Charities refuses to treat any LGBT person who seeks to live
comfortably in their expressed sexual orientation or gender identity.[1]

*Procedural History.*  Catholic Charities and McJones sought a preliminary injunction
against Michigan's prohibition on conversion therapy.  They argue that because they use
psychotherapy—words alone—instead of aversive physical interventions, they have a First
Amendment right to attempt to change their minor patients' sexual orientation or gender identity.

The district court denied the plaintiffs' request for a preliminary injunction.  After
holding that the plaintiffs had standing to challenge HB 4616, the district court reasoned that the
central component of talk therapy is the treatment of mental and emotional disorders.  The
district court therefore determined that the law regulates LMHPs' professional conduct while
only incidentally burdening their expressive activity.  The district court then applied rational
basis review and concluded that the plaintiffs could not show a likelihood of success on the
merits of their First Amendment challenge.  Catholic Charities and McJones brought this timely
interlocutory appeal.

I.    **Abeyance Motion**

Before addressing the merits, I question whether we should do so at all.  Michigan asked
us to hold this case in abeyance to await the Supreme Court's decision in *Chiles v. Salazar*
(No. 24-539), a case that was already argued before the Court and will control the outcome here.
*Chiles* concerns a state conversion therapy prohibition that, all agree, is materially
indistinguishable from Michigan's law.  And the plaintiffs' challenge in *Chiles* is, all agree, the
same as the plaintiffs' here.  The Supreme Court heard argument in *Chiles* on the second day of

---

[1]I agree with the majority opinion's conclusion that, given these facts, the plaintiffs have standing to
challenge HB 4616.

its 2025–2026 term—a few weeks before the hearing date for this appeal.  Waiting for the Supreme Court's decision in *Chiles* would have promoted judicial efficiency, uniformity, and legitimacy.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936).  I am aware of no case where we have raced to decide an appeal when the Supreme Court has argued essentially the same case before we have.  I would not make this the first.

    In forging ahead despite *Chiles*, the majority opinion appears to break new ground.  Our general practice is to wait for the Supreme Court's guidance when it is slated to decide a case that will govern our analysis, especially when the Supreme Court's review is further along than ours.[2]  Our sister circuits do the same.[3]  The majority opinion does not cite to a single example where we pushed forward and resolved an appeal in circumstances like these.

    The plaintiffs provide two citations where we declined to hold an appeal in abeyance: *Royal Truck & Trailer Sales & Service, Inc. v. Kraft*, 974 F.3d 756 (6th Cir. 2020), and *United States v. Buford*, 632 F.3d 264 (6th Cir. 2011).  But those citations are inapposite because our review of the legal questions in both *Kraft* and *Buford* was much further along than the Supreme Court's review.  Indeed, we heard oral argument in each case before the Supreme Court had even granted certiorari in the controlling case.  *See Van Buren v. United States*, 140 S. Ct. 2667 (2020)

---

[2]For just a few examples, see *United States v. Bradley*, No. 23-5440, 2025 WL 2658388, at *1 (6th Cir. Apr. 17, 2025) (holding for *Erlinger v. United States*); *Maryville Baptist Church v. Beshear*, No. 24-5737 (6th Cir. Dec. 20, 2024) (order) (holding for *Lackey v. Stinnie*); *Ocampo v. Hemingway*, No. 22-1994 (6th Cir. Feb. 23, 2023) (order) (holding for *Jones v. Hendrix*); *Redmon v. Yorozu Auto. Tenn., Inc.*, 834 F. App'x 234, 235 n.1 (6th Cir. 2021) (holding for *Bostock v. Clayton County*); *United States v. Lara*, 679 F. App'x 392, 396 (6th Cir. 2017) (holding for *Honeycutt v. United States*); *In re Embry*, 831 F.3d 377, 382 (6th Cir. 2016) (holding for *Beckles v. United States*); *Hill v. Snyder*, 821 F.3d 763, 769 (6th Cir. 2016) (holding for *Montgomery v. Louisiana*).

[3]*PFLAG, Inc. v. Trump*, No. 25-1279 (4th Cir. May 12, 2025) (order) (holding for *United States v. Skrmetti*); *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (holding for *303 Creative LLC v. Elenis*); *Billard v. Charlotte Catholic High Sch.*, No. 22-1440 (4th Cir. Apr. 21, 2023) (order) (same); *Updegrove v. Miyares*, No. 21-1506 (4th Cir. Apr. 1, 2022) (order) (same); *Lawson v. Missouri*, No. 14-3779 (8th Cir. Apr. 29, 2015) (order) (holding for *Obergefell v. Hodges*); *Gerber v. Moore*, No. 14-2230 (4th Cir. Feb. 10, 2015) (order) (same); *Golinski v. U.S. Off. of Pers. Mgmt.*, 724 F.3d 1048, 1050 (9th Cir. 2013) (holding for *United States v. Windsor*); *see also Fla. Comm'r of Agric. v. Att'y Gen. of U.S.*, 148 F.4th 1307, 1311 (11th Cir. 2025) (holding for *United States v. Rahimi*); *Meta Platforms, Inc. v. FTC*, No. 24-5054 (D.C. Cir. Apr. 30, 2024) (order) (holding for *SEC v. Jarkesy*); *Kennedy v. Biden*, No. 24-30252 (5th Cir. Apr. 24, 2024) (order) (holding for *Murthy v. Missouri*); *Zhu v. Garland*, 850 F. App'x 447, 448 (7th Cir. 2021) (holding for *Niz-Chavez v. Barr*); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 324 (3d Cir. 2019) (holding for *Frank v. Gaos*); *Bekele v. Lyft, Inc.*, 918 F.3d 181, 186 (1st Cir. 2019) (holding for *Epic Sys. Corp. v. Lewis*); *United States v. Kirklin*, 727 F.3d 711, 717 (7th Cir. 2013) (holding for *Alleyne v. United States*).

(mem.) (granting certiorari four months after our oral argument in *Kraft*); *Davis v. United States*, 562 U.S. 1002 (2010) (mem.) (granting certiorari a few weeks after our oral argument in *Buford*). That meant any efficiency or legitimacy benefit from waiting for the Supreme Court would have been minimal, as we had already invested significant resources into the appeals. Not so here, where our oral argument echoed the Supreme Court's oral argument in *Chiles* from several weeks before.[4]

Lacking any examples, the majority opinion suggests that waiting for the Supreme Court's guidance in *Chiles* would abandon our "unflagging" obligation to "hear and decide cases within [our] jurisdiction." Maj. Op. at 6 (quoting *LexMark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 126 (2014)). Is the majority opinion saying that each time we held a case pending a Supreme Court decision we abandoned our "unflagging" duty? That is quite an indictment of our well-settled practice, our sister circuits' practice, and our broad power to order abeyance. *Landis*, 299 U.S. at 254–55. And it seems quite a sudden change of pace. *See Ohio ex rel. Yost v. Ascent Health Servs., LLC*, No. 24-3033 (6th Cir. Oct. 29, 2024) (order) (granting motion to reconsider and holding appeal in abeyance because "the questions presented in [the pending Supreme Court case] could affect the law that governs" the appeal).

Next, the majority opinion proposes that we should proceed with resolving this appeal because "orders granting or denying a preliminary injunction are by definition time-sensitive." Maj. Op. at 6. That may be true, but, in my view, is an unconvincing reason to decide this appeal today. We routinely hold appeals in abeyance for forthcoming Supreme Court decisions even when the plaintiffs seek a preliminary injunction or allege ongoing harm. Earlier this year, for example, we granted Tennessee's request to hold an appeal for a pending Supreme Court case even though the plaintiffs sought a preliminary injunction against a law that was allegedly

---

[4]At oral argument, I remarked that I "had a hard time finding a case where the Supreme Court had already argued something and we didn't hold it [in abeyance]," and I asked the plaintiffs' counsel if they had "one of those [they could] share with me." Oral Arg. at 4:55–5:20. The plaintiffs' counsel responded with two cases: *Kentucky v. EPA*, 123 F.4th 447 (6th Cir. 2024), and *Memphis Center for Reproductive Health v. Slatery*, 14 F.4th 409 (6th Cir. 2021). Oral Arg. at 5:20–6:30. That response was erroneous at best. As in *Buford* and *Kraft*, we heard argument in each case before the Supreme Court had even granted certiorari in the controlling case, much less argued it. *See EPA v. Calumet Shreveport Refin., L.L.C.*, 145 S. Ct. 410 (2024) (mem.) (granting certiorari five months after our oral argument in *Kentucky v. EPA*); *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2021) (mem.) (granting certiorari three weeks after our oral argument in *Slatery*).

violating their First Amendment rights in the interim. *Free Speech Coal. v. Skrmetti*, No. 24-6158 (6th Cir. Feb. 6, 2025) (order). So too, we regularly hold appeals from prisoners claiming that their sentence is unlawful, even when the appropriate remedy for the prisoner's claim could be immediate release. *See, e.g.*, *Joseph v. Dunbar*, No. 21-1191 (6th Cir. Feb. 6, 2023) (order).

I do not think the plaintiffs have provided us a compelling reason to afford this request for a preliminary injunction unique treatment. To the contrary, the plaintiffs' litigation posture throughout this appeal belies haste. The plaintiffs waited a year after HB 4616 was signed, and five months after the law went into effect, before filing suit. They never asked us, nor the district court, to consider their request for a preliminary injunction in an expedited posture. Instead, the plaintiffs obtained three separate briefing extensions.

The majority opinion finally suggests that our writings today will be helpful to the Supreme Court. Maj. Op. at 7. In my view, however, there is no significant percolation benefit from rushing to resolve this case. The Supreme Court has on-hand the reasoning of four of our sister circuits addressing the First Amendment question at issue, not to mention the scores of briefs. *See Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024); *Tingley*, 47 F.4th 1055; *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), *reh'g en banc denied*, 41 F.4th 1271 (11th Cir. 2022); *King v. Governor of the State of N.J.*, 767 F.3d 216 (3d Cir. 2014). Nor am I sure that the Supreme Court would want us to race them to judgment, given that we "are duty-bound to respect 'the hierarchy of the federal court system.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __ (2025) (slip. op., at 4) (Gorsuch, J., concurring in part and dissenting in part) (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam)). The Supreme Court has told us it will decide this issue, so I would have waited for *Chiles*.

## II.    Level of Scrutiny

The majority opinion addresses the merits, thus I do so as well. On the merits, we must address how HB 4616 intersects with both the state's historic power to regulate medicine and the plaintiffs' First Amendment rights. The first step is determining the appropriate level of scrutiny to apply.

### A.    HB 4616 Is Not Subject to Strict Scrutiny

The plaintiffs here do not use prescriptions, scalpels, or X-rays.  They practice conversion therapy through psychotherapy, using only words.  Accordingly, the plaintiffs argue that strict scrutiny applies.  But not all words trigger the same First Amendment scrutiny, and in this case, the plaintiffs' speech is inseparable from the very delivery of the medical treatment that Michigan has the power to regulate.  Therefore, I would not afford HB 4616 the strictest of scrutiny.  Instead, I would employ intermediate scrutiny to ensure that the law "further[s]" the state's "significant interest" in regulating medical care and is not substantially more burdensome than necessary.  *See McCullen v. Coakley*, 573 U.S. 464, 486, 497 (2014).

To explain my view, I proceed in three parts.  *First*, I examine Michigan's power to regulate medicine, including psychotherapy.  *Second*, I analyze how the Supreme Court has instructed us to review regulations of medical treatment that burden speech.  *Third*, I ask whether HB 4616 is a regulation targeted at the practice of medicine, and thus should not be subject to strict scrutiny.

### 1.    Michigan has the power to regulate the practice of medicine, including psychotherapy.

Michigan undoubtedly has the power to regulate the practice of medicine within its borders.  Since "time immemorial," states have regulated the provision of medical care, *Dent v. West Virginia*, 129 U.S. 114, 122 (1889), as part of their broad prerogative to promote "health and welfare."  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023); *see also Schall v. Martin*, 467 U.S. 253, 265 (1984).  That power holds strong even in areas of "medical and scientific uncertainty."  *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Lambert v. Yellowley*, 272 U.S. 581, 590 (1926).  Beyond regulating medicine itself, Michigan "bears a special responsibility for maintaining standards among members of the licensed professions," including medical professionals.  *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978).

Medical professionals regularly administer treatment through speech, a fact exemplified by the growing prevalence of telemedicine.  For instance, medical professionals often effectuate care by providing information, such as how to care for a wound, how to prevent illness,

what foods to eat or avoid, how much to exercise, or what over-the-counter supplements to take. Even when there is no physical intervention, states regulate the information medical providers give, the instructions they mandate patients follow, and the diagnoses they reach. *See, e.g.*, *Allen v. Harrison*, 374 P.3d 812, 817 (Okla. 2016) (duty to give proper advice); *Hofmann v. Blackmon*, 241 So. 2d 752, 753 (Fla. Dist. Ct. App. 1970) (duty to convey accurate information); *Harris v. Gallaher*, 375 A.2d 456, 458 (Del. 1977) (duty to properly diagnose); *Davis v. Mercy Med. Ctr.*, 994 N.W.2d 380, 387 (N.D. 2023) (duty to properly refer).

Likewise, the states' power over medical care includes the power to regulate psychotherapy, even though psychotherapy operates through speech. "It cannot be questioned that psychological well-being is a facet of health." *Casey*, 505 U.S. at 882. Thus, the Supreme Court has long recognized that psychotherapy is a part of the practice of medicine. *See Crane v. Johnson*, 242 U.S. 339, 340, 343–44 (1917). The key component of psychotherapy is "the treatment of emotional suffering and depression." *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000) (citation omitted). The plaintiffs do not dispute that, in providing talk therapy, they are engaged in medical care. Catholic Charities Internal Paperwork, R. 15-1, PageID 169, 170, 171, 173, 174, 175, 176, 177, 186 (repeatedly explaining that the organization provides "treatment"); *Id.* at PageID 177 (obtaining informed consent for "psychotherapeutic treatment"); *Id.* at PageID 181 (explaining that the organization may bill health insurance for the treatment provided).

Exercising their authority over medicine, many states, including Michigan, extensively regulate psychotherapy. LMHPs must satisfy rigorous licensing and educational requirements before they may treat patients. *E.g.*, Mich. Comp. Laws § 333.18107; *In re Aaren Snyder, L.M.F.T.*, No. 41-24-004485, at *1 (Mich. Dep't of Licensing & Regul. Affs. Sept. 24, 2025). Even after licensure, LMHPs may only administer treatments that they have been trained to provide and are subject to discipline if they practice a therapeutic modality outside of their expertise. Mich. Comp. Laws § 330.1901; *cf. In re Heath Howard Achatz, L.M.S.W.*, No. 68-23-004180, at *3, *6 (Mich. Dep't of Licensing & Regul. Affs. Nov. 13, 2024).

There are also myriad rules about the substance of what therapists can say, including protections for patient confidentiality, restrictions on certain conversation topics, and various disclosure requirements.  Mich. Comp. Laws §§ 333.16221; 333.18117; *see also In re Gayle Marie Beach, L.P.C.*, No. 64-23-003326, at *7–8 (Mich. Dep't of Licensing & Regul. Affs. May 19, 2025) (disciplining LMHP for asking patient for dating advice). For example, LMHPs may not comment on the sexual attractiveness of their patients or treat someone when they have a conflict of interest.  *In re Peter D. Fashho, L.P.C.*, No. 64-24-002289, at *11 (Mich. Dep't of Licensing & Regul. Affs. Apr. 11, 2025) (sexual attractiveness); Ariz. Rev. Stat. § 32-3251(16)(aa) (same); Minn. Stat. Ann. § 147.091(t) (same); *In re Kay Vonne Cason, Ph.D*., No. 63-22-000586, at *8–9 (Mich. Dep't of Licensing & Regul. Affs. Mar. 27, 2025) (conflict of interest).  And state tort law creates liability for deficient psychotherapy, such as treatment that triggers false memories of sexual trauma. *Roberts v. Salmi*, 866 N.W.2d 460, 474 (Mich. Ct. App. 2014); *Tuman v. Genesis Assocs.*, 894 F. Supp. 183, 189 (E.D. Pa. 1995); *Hungerford v. Jones*, 722 A.2d 478, 481 (N.H. 1998); *Sawyer v. Midelfort*, 595 N.W.2d 423, 434 (Wis. 1999); *Smith v. Robinson*, 422 P.3d 863, 865 (Utah 2018).

### 2.      The Supreme Court has not applied strict scrutiny to laws that regulate speech only as part of the practice of medicine.

We do not have a Supreme Court case that squarely addresses how we should evaluate regulations of psychotherapy for First Amendment purposes, given that this form of medical treatment is provided solely through words.  But precedent from both the Supreme Court and our circuit dictates that states may regulate speech that is part of the practice of medicine without triggering strict scrutiny.

I begin with *NIFLA*, the most recent Supreme Court case addressing licensed professionals' First Amendment rights and the relevance of the medical context.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018).  *NIFLA* held that there is not a broad category of "professional speech" that is per se subject to diminished First Amendment protection.  *Id.* at 767–68.  It explained that "[s]peech is not unprotected merely because it is uttered by 'professionals.'"  *Id.*  At the same time, however, *NIFLA* affirmed that states may

regulate "speech" that occurs "as part of the *practice* of medicine" without triggering strict scrutiny. *Id.* at 770 (citation omitted).

As an example of this type of permissible speech regulation, *NIFLA* affirmed *Casey*'s First Amendment holding. *Casey* involved an informed consent law that required physicians to tell patients various pieces of information before performing an abortion and supply a "list of agencies which provide adoption and other services as alternatives to abortion." *Casey*, 505 U.S. at 881. The joint opinion in *Casey* quickly disposed of a First Amendment challenge to the compelled speech requirement, holding that the law regulated speech "only as part of the practice of medicine, subject to reasonable licensing and regulation by the state." *Id.* at 884. The fact that the law "express[ed] a preference for childbirth over abortion," and compelled physicians' speech in a manner reflecting that preference, made no difference. *Id.* at 883.

Following *NIFLA*, this circuit reaffirmed *Casey*'s conclusion that states may regulate speech as part of the practice of medicine without triggering strict scrutiny. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019). In *EMW*, we examined a Kentucky law that compelled physicians' speech before they could perform an abortion, requiring them to describe the fetus in ways that furthered Kentucky's "political goal to protect unborn life" and attempted to convince women considering an abortion to change their minds. *Id.* at 435 n.13. We upheld the law, reasoning that strict scrutiny does not apply to "incidental regulation of professional speech that is part of the practice of medicine." *Id.* at 429. We further explained that when the state regulates speech as part of the practice of medicine, it does not matter whether the compelled speech "fall[s] on one side of [a] debate." *Id.* at 436.

*NIFLA* also affirmed the application of lesser First Amendment protections to speech that constitutes a professional activity, even outside of the medical context. In *Ohralik*, the state bar disciplined a lawyer for soliciting a client in person. 436 U.S. at 451–53. The lawyer contended that the bar's disciplinary action violated the First Amendment because his activity consisted of only words, and no conduct. *Id.* at 453. But the Supreme Court rejected his argument, emphasizing that unlike traditionally protected speech such as "political expression," the lawyer's speech was subject to Ohio's regulatory authority. *Id.* at 459–60. The Supreme Court

noted that there was a "common-sense distinction" between the lawyer's speech, which occurred in "an area traditionally subject to government regulation," and "other varieties of speech." *Id.* at 455–56.   Accordingly, the Supreme Court upheld the disciplinary rule under intermediate scrutiny, holding that although the lawyer's speech was "entitled to some constitutional protection," it was "subject to regulation in furtherance of important state interests." *Id.* at 459.

These precedents show why the state may regulate the speech LMHPs use to administer psychotherapy without triggering full First Amendment protection.   There is a "common-sense distinction" between psychotherapy and "other varieties of speech"—psychotherapy is itself a medical treatment.   *Ohralik*, 436 U.S. at 455–56.   And a "law regulating speech only as part of the practice of medicine" does not trigger strict scrutiny.   *NIFLA*, 585 U.S. at 883; *see also EMW*, 920 F.3d at 429.

### 3.     HB 4616 targets the practice of medicine, so it does not trigger the highest scrutiny.

Given this framework, I next ask whether HB 4616 targets the practice of medicine.   In my view, it does.   Like other laws with permissible regulatory aims that incidentally burden personal expression, it should be subject to only intermediate scrutiny.   *See Ohralik*, 436 U.S. at 463–68; *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968).

HB 4616's limited scope demonstrates that the law targets the practice of medicine. Michigan's conversion therapy prohibition applies only to the actual medical interventions given by an LMHP to a patient.   And it misunderstands the nature of psychotherapy to suggest that, when providing mental health treatment, therapists are engaging in the "advocacy of ideas" that the First Amendment defends.   *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 588 (1980) (Rehnquist, J., dissenting).   Psychotherapy is an evidence-based medical treatment, not a forum for the therapist to express their personal opinions.   HB 4616 allows LMHPs to fully participate in the "marketplace of ideas" on sexual orientation and gender identity and express their opinions on conversion therapy, so long as they do not attempt to change a minor patient's sexual orientation or gender identity through their "psychotherapeutic treatment."   *See McCullen*, 573 U.S. at 476 (quoting *FCC v. League of Women Voters of Cal.*,

468 U.S. 364, 377 (1984)).  HB 4616's targeted applicability to medical treatment, rather than to LMHPs' personal expression outside of that treatment, situates the law as one regulating the practice of medicine.

Comparing HB 4616 with the law invalidated in *NIFLA* further supports that conclusion. In *NIFLA*, the Supreme Court held that the state's notice requirement for clinics did not regulate speech as part of the practice of medicine because the law required notice for "all interactions between a covered facility and its clients," regardless of whether any treatment was "ever sought, offered, or performed."  585 U.S. at 770.  In contrast to that blanket notice requirement unmoored from any medical treatment, HB 4616 regulates the actual medical care that LMHPs provide patients.

Even though HB 4616 targets medical care, I acknowledge that therapists may have a personal expressive interest in the medical treatment they provide via speech.  But that is not unique to psychotherapy.  Expression is embedded in the practice of medicine for many professionals, whether their treatment is composed of speech or not.  A fertility specialist, for example, might express their beliefs about the value of family and procreation through their clinical work.  A doctor might perform abortions to express their belief in women's equality.  A plastic surgeon might view their work as artistic expression.  The treatment and expression may be inseparable, but still, strict scrutiny does not apply when the state regulates medical practice.

Instead, in my view, intermediate scrutiny is the appropriate standard for regulations of medical treatments that are inseparable from expression.  Although the caselaw is somewhat inconsistent, the Supreme Court has often applied that standard to assess the constitutionality of regulations that impose upon both protected and unprotected activity.  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984); *O'Brien*, 391 U.S. at 376.  When a law targets the non-protected element, intermediate scrutiny applies.  *See Barnes*, 501 U.S. at 567–68.  For example, the lawyer's speech in *Ohralik* received intermediate protection, given that the state's regulation of the lawyer's speech was inextricable from the state's recognized authority to regulate the legal profession.  436 U.S. at 463–68.

As in these cases, LMHPs' medical interventions and expression are inextricably intertwined. HB 4616 targets the practice of medicine, and it is impossible for a state to regulate "psychotherapeutic treatment" without also burdening speech. In this context, that speech is "entitled to some constitutional protection," *id.* at 459, so I would examine HB 4616 under intermediate scrutiny.

### B.     The Majority Opinion

The majority opinion's contrary analysis makes several missteps, all emanating from its characterization of conversion therapy as speech like any other personal expression, rather than as the practice of medicine. *First*, the majority opinion applies a traditional content and viewpoint discrimination framework, which is incongruent with evaluating medical interventions. *Second*, it contends that several Supreme Court cases are controlling, even though the precedents do not address medical treatment. *Third*, for the state to regulate medical treatment, the majority opinion wrongly assumes that the intervention must be "physical," and not carried out by words alone. And, *fourth*, the majority opinion, as far as I can discern, lacks a limiting principle. I describe each of my concerns in turn.

*Content and Viewpoint Discrimination.* The majority opinion reasons that the Michigan law is subject to the "strictest of scrutiny" because it discriminates based on content and viewpoint, as it allows counseling that supports a gender transition but prohibits conversion therapy. Maj. Op. at 12. If Michigan were regulating speech outside of a medical intervention, I would agree. But our task, as I see it, is to evaluate Michigan's science-based prohibition on a type of medical intervention; a restriction on what the plaintiffs call "psychotherapeutic treatment." The Michigan legislature found that some forms of therapy are effective treatments for remedying medical conditions, but conversion therapy is not. And, in regulating medicine, states may distinguish between treatments based on their efficacy and risk of harm. *See* Robert Post, NIFLA *and the Construction of Compelled Speech Doctrine*, 97 Ind. L.J. 1071, 1083 (2022) (explaining that a medical professional is not "entitled to force patients to wager their salvation on the experiment of [the] professional's wayward opinion").

The doctrine of content and viewpoint neutrality does not map onto regulations of medical treatment, so, unlike the majority opinion, I would not apply it here. Take an obvious example; without having to pass strict scrutiny, the state can prohibit pediatricians from encouraging parents to feed their newborns honey but allow pediatricians to encourage parents not to feed their newborns honey. That is because one intervention can lead to infant botulism, and the other does not. *Botulism Prevention*, CDC, https://perma.cc/ZT4J-DUY3. But I do not need to hypothesize. *Casey* and *EMW* demonstrate that content and viewpoint discrimination is not fatal in the context of medical procedures. Both cases involved laws requiring physicians to provide women seeking an abortion with specific information that "conveyed" a clear one-sided "viewpoint." *EMW*, 920 F.3d at 436 (citation omitted); *see also Casey*, 505 U.S. at 883–84. That state-mandated viewpoint would be precisely the sort of law that is usually First Amendment anathema. Yet content and viewpoint discrimination posed no obstacle to either law and did not factor into either case's First Amendment analysis because the laws regulated medical treatment. *EMW*, 920 F.3d at 435–36 & n.13; *see also Casey*, 505 U.S. at 883–84. The same is true here.[5]

*Supreme Court Precedents.* By my reading, the Supreme Court cases the majority opinion relies upon do not require us to apply strict scrutiny to laws governing verbal medical treatments. Begin with *Cohen* and *Holder*. To be sure, these cases show that a law may be subject to strict scrutiny when its application is triggered by "communicating a message." Maj. Op. at 11 (quoting *Holder v. Humanitarian L. Project*, 561 U.S 1, 28 (2010)). Because "communication of a message is *exactly what speech is*," the majority opinion reasons that all regulations that limit speech based on its substance (absent a few historically exempted categories) must get strict scrutiny. *Id.*

By contrast, I do not read *Cohen* and *Holder* to support such a sweeping proposition. In *Cohen*, the Supreme Court applied strict scrutiny to California's attempt to prosecute the

---

[5]In analyzing viewpoint discrimination, the majority opinion relies on the fact that Michigan's counsel at oral argument did not provide "a single example of any regulation of treatment," other than HB 4616, "whose application was triggered by the content of a provider's speech." Maj. Op. at 11. Michigan's extensive regulatory scheme for therapists, which prohibits some therapeutic speech and routinely sanctions more, provides many such examples. *See supra* at 25–26.

message "Fuck the Draft" under the state's breach of the peace statute.  *Cohen v. California*, 403 U.S. 15, 16, 26 (1971).  The Supreme Court examined Cohen's conviction and determined that the rationale for his prosecution was the "asserted offensiveness of the words Cohen used to convey his message to the public."  *Id.* at 18; *see also Holder*, 561 U.S. at 28 (explaining that Cohen was prosecuted "because of the offensive content" of his message).  Rather than prosecuting Cohen based on his "intent to incite disobedience to or disruption of the draft," California had attempted to "excise" the phrase "Fuck the Draft" "from the public discourse."  *Cohen*, 403 U.S. at 18, 22.  The distinction with HB 4616 is apparent.  In prohibiting LMHPs from performing conversion therapy, Michigan did not attempt to accommodate a heckler's veto, eliminate advocacy of conversion therapy "from the public discourse," or act as a "guardian[] of public morality."  *Id.* at 22.  Instead, Michigan exercised its power to ensure minimum standards of medical care based on its determination about conversion therapy's ineffectiveness and harmfulness.

The majority's reliance on *Holder* fares no better.  For one thing, that case *upheld* a prohibition on speech assisting terrorist organizations without ever asking whether the restriction was narrowly tailored to a compelling state interest, so it is not clear why *Holder* would mandate applying strict scrutiny to HB 4616.  *See* 561 U.S. at 37 (upholding the law's application to particular speech because "Congress logically concluded" that the speech "could" promote terrorism).  Furthermore, nothing in *Holder* contradicts the longstanding precedent that states may regulate speech as part of the practice of medicine without having to satisfy strict scrutiny, even though that speech communicates a message.  Nor does the majority opinion's expansive reading of *Holder* comport with *Ohralik*, where the Supreme Court did not apply strict scrutiny to the lawyer's speech, irrespective of the fact that the speech "communicated a message."  Accordingly, I do not read *Cohen* and *Holder* as requiring us to apply strict scrutiny to regulations of medical treatment when words are the source of the treatment.

Even when addressing *Casey* directly, the majority opinion dismisses the import of the medical context.  In describing *Casey*'s First Amendment holding, the majority opinion likens abortion to the sale of a product.  Citing *Zauderer*, the majority opinion reasons that *Casey* upheld the law compelling physicians' speech on abortion because it amounted to a "warning

label[] that a state might require for the sale of a dangerous product," such that the law regulated "the product's sale," not "speech."  Maj. Op. at 12 (citing *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)).  *NIFLA*, however, forecloses that reading of *Casey*.  *NIFLA* identified two separate strands of doctrine that trigger lesser First Amendment protection: (1) mandated factual, commercial disclosures, as in *Zauderer*; and (2) laws limiting professional activity that incidentally burden speech, including regulations of speech "as part of the practice of medicine."  *NIFLA*, 585 U.S. at 768–70.  *NIFLA* situated *Casey* in the *second* doctrinal strand, not the first.  *Id.* at 768–70; *see also EMW*, 920 F.3d at 428.

Finally, the majority opinion focuses on *United States v. Stevens*, 559 U.S. 460 (2010), which provides the governing analysis to determine whether a type of speech categorically falls outside of the First Amendment's protections.  Maj. Op. at 9–11; *Stevens*, 559 U.S. at 469.  Michigan did not argue, however, that HB 4616 regulates speech which is outside of the First Amendment's protection altogether.  There may be a plausible argument that, based on history and tradition, speech that constitutes medical practice is not subject to First Amendment scrutiny.  *See Tingley*, 47 F.4th at 1079–80; *Otto*, 41 F.4th at 1290 & n.7 (Rosenbaum, J., dissenting from denial of rehearing en banc).  But Michigan does not make that argument, so I do not address it.

*Physical Conduct.*  As for the precedents allowing states to restrict speech in the context of medical practice, the majority opinion says they do not apply here because the plaintiffs challenge HB 4616 as applied to talk therapy, not physical medical interventions like "surgery or flu shots."  Maj. Op. at 11.  But, as I read *NIFLA* and *Casey*, they contain no such "physical" requirement.  They ask whether the state burdened speech as part of its regulation of the practice of medicine.  *NIFLA*, 585 U.S. at 770; *Casey*, 505 U.S. at 884.  And they do not make any distinction about the "nature of the medical treatment" and whether it involved a verbal or physical intervention.  *Chiles*, 116 F.4th at 1210.  I would not carve "psychotherapeutic treatment" out of the existing jurisprudence regarding health care regulation.  That would suggest that "mental health care is not really health care and that talk therapy is not really medical treatment."  *Id.* at 1210–11.  As our sister circuits have observed, "[t]alk therapy is no less a medical treatment than the procedures described in *Casey* simply because it is 'implemented through speech rather than through scalpel.'"  *Id.* at 1211 (quoting *Tingley*, 47 F.4th at 1064).

Indeed, there was not any physical conduct regulated in *Ohralik*—it was just the lawyer's speech—yet the Supreme Court applied lesser scrutiny than the majority opinion does here to a medical intervention.

I also do not think it possible to disentangle verbal and physical medical treatment as the majority opinion does. The majority opinion's analysis appears to deem medical treatment that involves direct physical intervention (e.g., surgery) "non-expressive activity" subject to state regulation and to paint talk therapy as "the expression of ideas" protected by strict scrutiny. Maj. Op. at 11. But I am not sure even the best surgeon can separate the two so neatly. As mentioned, I question whether all physical medical interventions are non-expressive; even regulating surgery, or what a doctor can prescribe, can have an impact on the expression of personal views. *See supra* at 29.

Nor is psychotherapy devoid of a physical connection. Just like medical professionals outside psychotherapy may recommend behaviors to engage in (or refrain from) to improve a patient's health, so too for a therapist seeking to change a patient's sexual orientation or gender identity. They might tell their patients to wear (or not wear) clothes based on social norms for the patient's biological sex, avoid particular locations like gay bars, try being romantic with members of the opposite sex, or refrain from masturbating to homoerotic imagery. *See* 2009 APA Report at 22. Both types of medical professionals use speech to direct a patient's physical actions.

Conversion therapy also seeks to influence physical outcomes. A core tenet of conversion therapy focuses on suppressing sexual arousal—a physiological reaction. Glassgold Decl., R. 27-1, PageID 590, 607. The plaintiffs also focus on the need for their therapy to address anxiety, depression, and other disorders that have physical manifestations. *E.g.*, Veenstra Decl., R. 15-2, PageID 230–31, ¶ 27; McJones Decl., R. 15-3, PageID 239, ¶ 22. And, critically, the plaintiffs emphasize that the psychotherapy at issue in the Michigan law is directly related to whether minors pursue gender-related surgery or puberty blockers. They say the law prevents them from counseling a "cautious" approach to such physical interventions.

Advising for or against these interventions based on medical training sounds in the type of advice a surgeon might give.

Accordingly, I find the majority opinion's attempt to separate physical and nonphysical medical interventions unpersuasive, and do not agree that we should align First Amendment scrutiny with such artificial categories. Instead, the relevant First Amendment inquiry here is whether the medical professional's speech administers treatment, not how related the medical professional's speech is to some physical intervention.

*Limiting Principle.* Last, I worry that the majority opinion's reasoning lacks a limiting principle. Declaring that speech delivering medical treatment receives full First Amendment protection would subject many regulations of psychotherapy and the broader practice of medicine to strict scrutiny.

Consider first the general regulatory scheme surrounding psychotherapy. Even when just using words for treatment, LMHPs are subject to a host of requirements—none of which we have ever subjected to strict scrutiny. As mentioned above, licensed therapists must take certain courses and meet other educational requirements; they must keep confidences (except when they are legally compelled to break them); they must avoid conflicts of interest; and they must provide psychotherapy that meets the standard of care and face discipline or malpractice suits if they do not. If I were to adopt the majority opinion's logic and treat psychotherapy as any other speech expressing a viewpoint, I do not see how all of these basic requirements could survive a First Amendment challenge. The First Amendment protects the right to express views on the controversial topics of the day without needing a degree or a license. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (noting the "heavy presumption" against the validity of a prior restraint). So too, the First Amendment shields individuals from liability based on expressing their personal opinion on a matter of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 450, 458 (2011). The majority opinion's characterization of psychotherapy as "spoken words and nothing more" therefore places a cloud over long-established regulatory schemes for medical professionals.

Next consider limits on the substance of psychotherapeutic treatment.  Under the majority opinion's approach, states may not prohibit psychotherapists from administering harmful interventions unless the scientific evidence is so utterly conclusive that the regulation would pass strict scrutiny.  That flips our constitutional structure on its head.  It is well settled that states have the police power to regulate even hotly-debated medical interventions in the face of some uncertainty.  *Skrmetti*, 605 U.S. at 524.  Yet now the majority opinion forces state regulations of medicine to satisfy the most stringent constitutional test, the same one that we apply to laws expressing naked hostility to religion or enforcing invidious racial discrimination.  *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Loving v. Virginia*, 388 U.S. 1, 11 (1967).

A few examples illustrate the point.  Assume that a state determined that body-shaming teens with anorexia for being too skinny was ineffective, harmful, and created a substantial risk of suicide, so it prohibited LMHPs from doing so.  Or imagine a state that prevents LMHPs working at a foster care home from providing psychotherapy aimed to have the children accept the worthlessness of their lives.  Or consider a state that wants to prevent LMHPs from attempting to convert patients to their religion or telling patients that they will burn in hell.  Under the majority opinion's interpretation of the First Amendment, regulation of any of these scenarios would discriminate based on content and viewpoint and thus be subject to strict scrutiny.

I could continue this parade of potential horribles that the majority opinion's reasoning opens the door to, but I need not look further than the stories of the countless minors who were subjected to conversion therapy and developed suicidal ideation and acute mental illnesses.  *See* Amicus Brief of Conversion Therapy Survivor Network at 15–18, *Chiles*, No. 24-539.  Like the story of the child who received conversion therapy, carved the word "DEFILED" into her arm with a knife, and then committed suicide.  *See* Amicus Brief of Parents of Conversion-Therapy Participants at 14, *Chiles*, No. 24-539.  The majority opinion forces Michigan to allow state-licensed mental health professionals to administer treatment that, in Michigan's determination, causes those harms.

The plaintiffs' response to some of the most egregious hypotheticals is that the state's regulation would pass strict scrutiny, even if there were no scientific studies supporting the state's specific prohibition. *E.g.*, Oral Arg. at 1:06:10–1:08:10. But, as the majority opinion correctly observes, few "content-based restrictions on speech" have ever withstood strict scrutiny. Maj. Op. at 13. By requiring "a parity of constitutional protection" between purely expressive speech and speech that delivers a medical treatment, the majority opinion's approach will either threaten to invalidate many regulations of medical care, or else it will "invite dilution" of strict scrutiny itself and, thereby, weaken the First Amendment's protections across the board. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989)).

## III.    Application

Applying intermediate scrutiny, I would ask whether HB 4616 furthers a "significant" government interest and does not "burden substantially more speech than is necessary" to advance that interest. *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017) (quoting *McCullen*, 573 U.S. at 486). Given the evidence in the record, the Michigan law passes this test.[6]

### A.    State Interest

The state's interest here is undoubtedly significant. Michigan enacted HB 4616 to "protect minors from the devastating and documented effects caused by an ineffective and harmful form of therapy." Appellee Br. at 55. As I described above, the Supreme Court has long recognized that states have a strong interest in "safeguarding the physical and psychological well-being" of its residents, and specifically, minors. *New York v. Ferber*, 458 U.S. 747, 757 (1982) (citation omitted). As part of that interest, the Court has consistently affirmed states'

---

[6]The majority opinion suggests that, if my view of the governing First Amendment law is correct, then a regulation banning psychotherapy that supports a gender transition or helps a minor feel comfortable with their sexual orientation would also be subject to intermediate scrutiny. Maj. Op. at 11. I agree. I would evaluate any such regulation under the same intermediate scrutiny that I apply here. I would look at the record, including the medical evidence, and I would be mindful that evidence of animus might invoke additional constitutional considerations. *See Romer v. Evans*, 517 U.S. 620, 631–32 (1996); *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 634–36 (2018).

authority to regulate the provision of medical care and recognized that states "have an abiding interest 'in protecting the integrity and ethics of the medical profession.'" *L.W. ex rel. Williams*, 83 F.4th at 473 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)); *see also Dent*, 129 U.S. at 122; *Collins v. Texas*, 223 U.S. 288, 297–98 (1912); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975).

Michigan has a "well founded" belief that HB 4616 will further that significant interest. *Ohralik*, 436 U.S. at 464. Its belief comports with the position of every major medical organization. *See Tingley*, 47 F.4th at 1064. It is also supported by the medical research in the record, which provides sufficient evidence that conversion therapy—even when administered through speech—is ineffective at changing an individual's sexual orientation or gender identity and increases the risk of depression, anxiety, and suicide. Glassgold Decl., R. 27-1, PageID 596–97. For example, one study focused on transgender adults who had discussed their gender identity with a professional. Those who had received conversion therapy were over twice as likely to have attempted suicide. Those who had received conversion therapy before the age of ten were more than four times as likely to have attempted suicide. *Id.* at PageID 596 n.36.

The plaintiffs contend that the medical evidence does not sufficiently demonstrate that conversion therapy is ineffective or harmful. But none of their arguments persuade me to dismiss the consensus of the medical community.

*First*, the plaintiffs argue that there is medical uncertainty on the benefits and risks of puberty blockers, hormone treatment, and surgical transitions, so the state does not have an interest in prohibiting conversion therapy but allowing psychotherapy that affirms a patient's gender identity or sexual orientation. That argument misses the point; HB 4616 does not apply to hormones or surgery, nor does it prevent LMHPs from discussing any such uncertainty with their clients. To the extent the plaintiffs argue that conversion therapy is inextricably intertwined with those physical interventions, *see* Appellant Br. at 44, it only reinforces the state's power to regulate. *See supra* at 33–35. And that is not the only way that the plaintiffs' argument backfires. The primary citations the plaintiffs rely upon to argue about the uncertain efficacy of hormone blockers and surgery reinforce Michigan's decision to ban conversion therapy.

The Cass Review clarifies that "[n]o formal science-based training . . . teaches or advocates conversion therapy" and recommends that "no LGBTQ+ group should be subjected to conversion practice." Cass Review at 150–51. The plaintiffs' expert likewise declared: "Since [the last half of the 20th century], conversion therapy has been broadly repudiated, even by its former practitioners, such that there is at present a near-universal consensus amongst mental health practitioners that such methods are both futile and often psychologically harmful." Clark Decl., R. 15-4, PageID 280. So, even crediting the plaintiffs' sources, the medical consensus is that conversion therapy is ineffective and harmful.

*Second*, the plaintiffs argue that HB 4616 does not further the state's interest in protecting children's health because the studies demonstrate only that *aversive* conversion therapy, rather than the psychotherapy at issue here, is problematic. But Michigan has pointed to evidence demonstrating that conversion therapy delivered through "psychology treatment using words" is ineffective and harmful. Glassgold Decl., R. 27-1, PageID 597.

I acknowledge that there may only be a "handful of studies" that focus on nonaversive conversion therapy alone, Maj. Op. at 13, but demanding more research with additional granularity misunderstands the history of the practice. Since the 1980s, the medical community largely stopped running experimental studies on conversion therapy precisely because the practice had been debunked as ineffective and harmful. The DSM now acknowledges that homosexuality and gender nonconformity are not diseases or disorders. And there is no reason for researchers to study a "cure" if there is no disease. Indeed, performing the kind of studies the plaintiffs demand could pose serious ethical problems, particularly for minors who cannot legally consent. The existing scientific evidence is sufficient for doctors and other expert medical professionals to have developed a widespread consensus on the harms of even nonaversive conversion therapy. It should be enough for Michigan to rest on too.

Additionally, I would not prevent Michigan from relying on the broad consensus of medical and psychological organizations simply because they were, by their own admission, wrong on this issue in the past. *See* SAMHSA Report at 15. In protecting its youngest citizens, Michigan must be able to rely on the prevailing scientific evidence, lest it be left without any

ability to safeguard against harmful medical practices. The DSM's prior flaws do not mean the modern medical consensus is illegitimate or lacks weight. Indeed, I would not discount the current medical consensus rejecting thalidomide or lobotomies just because those were once considered helpful medical interventions. The LMHPs in this case, along with scientists and others, remain free to question the medical consensus, just as it was questioned before. But I would not let the fundamental truth that science and medicine evolve deprive Michigan of the authority to regulate medical interventions that the contemporaneous medical community broadly deems ineffective and harmful.

### B.    Tailoring

Turning to tailoring, the law is quite limited in scope and thus does "not burden substantially more speech than is necessary" to further Michigan's interest in protecting children from the harmful effects of conversion therapy. *Packingham*, 582 U.S. at 106 (quotation omitted).

Consider first what the law limits in the clinical setting. To violate HB 4616, an LMHP must administer psychological treatment to a child with the intent to change the patient's sexual orientation or gender identity. As I read the law, it does not prevent therapists from counseling delay and careful consideration before a patient decides to undergo hormone therapy or surgery. The law specifically exempts identity exploration that does not have a predetermined goal, and an LMHP remains free to broach issues that may be clinically relevant to identity exploration, such as prior trauma or underlying mental illnesses. Mich. Comp. Laws § 330.1100a(20). An LMHP does not violate HB 4616 when a minor patient wonders whether they are gay or transgender, explores that subject in psychotherapy, and ultimately concludes that they are heterosexual or cisgender.

Furthermore, as mentioned, HB 4616 does not limit LMHPs' expression outside of the treatment itself. And, because religious advisors and non-licensed counselors do not engage in the practice of medicine, HB 4616 does not apply to them.

Nonetheless, the plaintiffs contend that HB 4616 is insufficiently tailored because Michigan could rely on informed consent requirements or post hoc malpractice actions rather

than prohibit conversion therapy outright. But these two proffered alternatives raise both practical and legal concerns, so they would "fail to achieve the government's interests" in preventing the harms HB 4616 targets. *McCullen*, 573 U.S. at 495.

As a practical matter, I do not see how either informed consent or malpractice actions could meaningfully prevent the harms of conversion therapy that Michigan seeks to address. An informed consent requirement makes little sense when the patients are too young to legally consent, and may also be too immature to understand the nature of the therapy or the warning. It is also well-documented that minors who "voluntarily" receive conversion therapy often do so in circumstances inconsistent with genuine consent, like being forced to choose between seeing a conversion therapist or being thrown out on the street. *See, e.g.*, Amicus Brief of Conversion Therapy Survivor Network at 5–8, *Chiles*, No. 24-539; Amicus Brief of Ryan Kendall at 5–6, 12, 13, 22–23, *Chiles*, No. 24-539.

Setting aside these problems with the adequacy of consent, it is beside the point whether conversion therapy is "entirely consensual." Maj. Op. at 10. Consent does not create a right to receive a medical treatment that the state has determined is ineffective and harmful. *Skrmetti*, 605 U.S. at 523–24. Indeed, suicide is one of the key harms that HB 4616 targets; Michigan wants to prevent that risk regardless of consent. For a similar reason, malpractice actions are insufficient to achieve HB 4616's purpose because Michigan wants to prevent suicides before they happen. A state may design its laws to prevent harm "before it occurs" rather than waiting for "actual injury" after the fact. *See Ohralik*, 436 U.S. at 464, 466. If that is true for regulating lesser harms like the dangers of in-person legal solicitation, it should also be true for protecting against minors committing suicide.

Even if these alternatives would help protect minors from the harms that HB 4616 aims to prevent, I doubt whether, under the majority opinion's analysis, they would survive First Amendment scrutiny. Imagine if Michigan required detailed informed consent for conversion therapy that outlined the risks motivating HB 4616. Disagreeing that conversion therapy is harmful, I have no doubt that conversion therapy practitioners would challenge the hypothetical consent law. If psychotherapy is viewed as just words and "nothing more," instead of speech as

part of the practice of medicine, any informed consent requirement for verbal conversion therapy would trigger the strictest scrutiny. *Cf. Casey*, 505 U.S. at 884. Likewise, the plaintiffs' repeated insistence that Michigan could rely on malpractice suits is inconsistent with their position (and the majority opinion's holding) that regulations of medical treatments delivered through words receive full First Amendment protection, given that the First Amendment provides a defense against state tort actions. *See Snyder*, 562 U.S. at 458; *Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018); *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 734, 739 (6th Cir. 2020).

Given the flaws with these alternatives, I would hold that Michigan has likely carried its burden under intermediate scrutiny. Accordingly, I would have affirmed the district court's denial of a preliminary injunction.[7]

## CONCLUSION

As the parties agree, the Supreme Court's reasoning in *Chiles* will prevail over the opinion our court reaches today and bind us moving forward. I would have waited without wading in. But under existing law, for the reasons discussed, I respectfully dissent.

---

[7]In accordance with the reasoning of our sister circuits, I would also affirm the district court's rejection of the plaintiffs' cursory vagueness and free exercise claims. *See Tingley*, 47 F.4th at 1089 (vagueness); *Chiles*, 116 F.4th at 1221 (free exercise).